IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————— x
                                              :
MOHAMMED AHMED TAHER,                         :
                                              :
                 Petitioner,                  :
                                              :
        v.                                    :    Civil Action No. 06-CV-1684 (GK)
                                              :
GEORGE W. BUSH, *et al.*,                     :
                                              :
                 Respondents.                 :
                                              :
————————————————— x

### PETITIONER'S OPPOSITION TO MOTION TO DISMISS OR TRANSFER FOR LACK OF JURISDICTION AND CROSS-MOTION FOR HABEAS HEARING AND RELATED RELIEF

Petitioner Mohammed Ahmed Taher ("Petitioner"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to Respondents' motion to dismiss this case for lack of jurisdiction or, in the alternative, to transfer it to the Court of Appeals. Petitioner also cross-moves for a habeas hearing and additional related relief, including expedited entry of the protective order, access to his counsel, and production of a factual return to his habeas petition. Respondents' motion to dismiss should be denied, and Petitioner's cross-motion should be granted, for the following reasons.

### Introduction

Petitioner is a citizen of Yemen, who is currently detained virtually *incommunicado* in military custody at the U.S. Naval Station at Guantánamo Bay, Cuba ("Guantánamo"). Petitioner is being held without lawful basis, without charge, and without access to counsel or any meaningful opportunity to challenge his detention.

**ORAL ARGUMENT REQUESTED**

On September 29, 2006, Petitioner filed a habeas corpus petition challenging the legality of his detention ("Petition").[1]  Petitioner alleges that he has been wrongfully classified as an "enemy combatant"; that he was not a member or associate of the Taliban or Al Qaeda; that he did not commit any hostile acts against the United States or its coalition allies; and that he had no involvement in the attacks on September 11th, the ensuing armed conflict, or any other acts of international terrorism.  *See* Petition ¶¶20, 22.  Petitioner also contends that Respondents have seized and continue to detain him without affording him any fundamental due process.  *See* Petition ¶56.  In these respects, his arrest and continued detention violate the Suspension Clause of the U.S. Constitution, *see* U.S. Const., art. I, § 9, cl. 2, which guarantees him the right to be charged criminally or released.  *See* Petition ¶¶54-57.  Moreover, Petitioner argues that the Detainee Treatment Act of 2005 ("DTA") is unconstitutional on its face and as applied to him because it purports to remove this Court's jurisdiction over the Petition in violation of the Suspension Clause.  Accordingly, he argues, the DTA does not deprive this Court of jurisdiction to hear or consider the Petition and grant the relief that he seeks therein.  *See* Petition ¶¶11, 57.[2]

On October 16, 2006, the Court ordered Respondents to show cause by November 6, 2006 why the Petition should not be granted.  Respondents filed a response to that order, and moved to dismiss this case for lack of jurisdiction under the DTA and the Military Commission Act of 2006 ("MCA") or, in the alternative, to transfer the case to the Court of Appeals (*see* dkt. nos. 4 & 5) ("Gvt. Br.").  In support of their motion, Respondents argue that the DTA and MCA withdrew jurisdiction of the district courts to consider habeas petitions filed by non-citizens like Petitioner, who are held as "enemy combatants."  *See* Gvt. Br. at 4-7.  They also contend that the

---

[1] The Petition was authorized in writing by Petitioner's father, who acts as his next friend.

[2] Petitioner also alleges other violations of U.S. and international law.

DTA and MCA do not effect a suspension of habeas corpus inconsistent with the Constitution because (1) Petitioner has no constitutional rights, including under the Suspension Clause, *see id.* at 7-11, and (2) the DTA and MCA provide a constitutionally adequate substitute for habeas, *i.e.*, record review of Petitioner's Combatant Status Review Tribunal ("CSRT") determination in the Court of Appeals, *see id.* at 11-15.  Respondents are wrong on all accounts.[3]

Respondents attempt to create an artificial distinction between the right to habeas corpus and the protections afforded against unilateral suspension of that right by the political branches of government.  But the Supreme Court has held that detainees are entitled to the protections of the writ as it existed at common law, at the time the Constitution was adopted, and that the common law right of habeas is protected by the Suspension Clause.  Thus, regardless of whether detainees have constitutional rights, they have the right to habeas and may seek to protect that right by asserting a challenge to the DTA and MCA under the Suspension Clause. This Court also plainly has the power under Article III of the Constitution to invalidate the DTA and MCA on the ground that those statutes violate the Suspension Clause.

The DTA and MCA are also constitutionally deficient because they fail to provide an adequate substitute for habeas in several respects.  First, they provide no review at all for certain detainees.  Second, they provide no opportunity for the Court of Appeals to engage in a factual inquiry into the bases for detainees' detentions or to engage in any fact-finding at all. Third, the laws prevent detainees from introducing, and the Court of Appeals from considering, extrinsic evidence to controvert Respondents' evidence, including evidence of "actual innocence" or evidence that statements used against them were obtained through torture.  Fourth, neither detainees nor their counsel are entitled under the DTA and MCA to all relevant classified

---

[3] Petitioner was granted an extension of time until December 11, 2006 to file this response to the motion to dismiss.

information that may provide the factual bases for detainees' detentions.  Fifth, while the DTA and MCA authorize the Court of Appeals to consider whether the CSRT standards and procedures are "consistent with the Constitution and laws of the United States," Respondents argue that there is not a single constitutional protection, including fundamental due process, which detainees may invoke.  Sixth, Respondents have made clear their view that the DTA and MCA give the Court of Appeals no authority to order detainees' releases even if it determines that their CSRTs were unfair or unlawful.  The only remedy, according to Respondents, is for the Court of Appeals to order new CSRTs.[4]

The MCA is also unconstitutional in several other respects.  First, it violates core separation of powers principles by prescribing rules of decision that necessarily resolve all cases and controversies in Respondents' favor.  Second, to the extent the MCA may be interpreted to bar habeas review of otherwise valid non-constitutional claims, including Geneva Conventions-based claims that would otherwise support habeas relief, it violates the Suspension Clause.  Third, the MCA constitutes an unlawful Bill of Attainder by imposing legislative punishment (limiting access to courts) on a specifically designated group (Guantánamo detainees and other non-citizens designated by Respondents as "unlawful enemy combatants").  Finally, the MCA violates equal protection by denying a class of individuals the fundamental right of equal access to the courts on the basis of an inherently suspect distinction (alienage).

---

[4] Respondents correctly point out that the Court of Appeals is considering similar issues in certain of the pending Guantánamo detainee appeals, *Boumediene v. Bush*, Nos. 05-5062 & 05-5063 (D.C. Cir.), and *Al Odah v. United States*, Nos. 05-5064, *et al.* (D.C. Cir.).  *See* Gvt. Br. at 4 n.4.  Those issues are also currently being briefed in *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), which is pending before Judge Robertson.  However, unlike those cases which raise statutory construction arguments against the retroactive application of the DTA and MCA, the serious constitutional flaws addressed here cannot be avoided because this case was filed after enactment of the DTA and thus falls squarely within its purported withdrawal of jurisdiction. *See* DTA §§ 1005(e)(1), (h)(1); *see also infra* Part VI.C.

The Court should therefore deny Respondents' motion to dismiss.  The Court should also enter the protective order, order counsel access to Petitioner and production of a factual return, and schedule a hearing on the merits of the Petition.

## Background

On December 30, 2005, President Bush signed the DTA into law.  *See* Pub. L. No. 109-148, 119 Stat. 2680 (2005).  Section 1005(e)(1) of the DTA amended the federal habeas statute, 28 U.S.C. § 2241, to eliminate the jurisdiction of the federal courts to hear or consider habeas petitions and other actions brought by or on behalf of detainees held by the Defense Department at Guantánamo.  That provision took effect on the date of enactment.  *See* DTA § 1005(h)(1).[5]  Section 1005(e)(2)(A) of the DTA also granted the U.S. Court of Appeals for the District of Columbia Circuit "exclusive jurisdiction" to determine the validity of any final decision of a CSRT that an alien is properly detained as an "enemy combatant."[6]  In addition, § 1005(e)(2)(C) provided that the applicable "scope of review" by the Court of Appeals is limited to determining whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States."[7]

---

[5] Again, because this case was filed after enactment of the DTA, it falls squarely within this purported withdrawal of jurisdiction.  *See infra* Part IV.C.

[6] Respondents' argument that this provision for the exclusive review of CSRT decisions in the Court of Appeals operates independently to deprive this Court of jurisdiction over the Petition, *see* Gvt. Br. at 6, has already been squarely rejected by the Supreme Court and need not be considered further.  *See INS v. St. Cyr*, 533 U.S. 289, 297-98, 308-11 (2001).

[7] Section 1005(e)(3)(A) of the DTA also granted the Court of Appeals "exclusive jurisdiction" to determine the validity of any final decision rendered by a military commission.  Section 1005(e)(3)(D) specified a "scope of review" analogous to that provided for final CSRT determinations.  However, like most detainees Petitioner has not been charged and likely never will be charged by military commission.  *See* Craig Whitlock, *U.S. Faces Obstacles to Freeing*

On June 29, 2006, the Supreme Court issued its decision in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006), reaffirming its holding in *Rasul v. Bush*, 542 U.S. 466 (2004), that Guantánamo detainees are entitled to challenge their detention through habeas.  The Court also struck down the military commission procedures established to try detainees for violations of the laws of war, concluding that those procedures violated the Uniform Code of Military Justice and the Geneva Conventions.  In addition, the Court determined that Common Article 3 of the Geneva Conventions applied in the conflict in Afghanistan and, among other things, entitled Guantánamo detainees to trial by "a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  *Id.* at 2796 (internal quotation marks omitted).

The MCA was enacted on October 17, 2006, ostensibly in response to *Hamdan*. *See* Pub. L. No. 109-366, 120 Stat. 2600 (2006).  Among other things, the MCA established new military commission procedures and also amended 28 U.S.C. § 2241 to expand the withdrawal of habeas jurisdiction under the DTA.  Thus, Section 7(a) of the MCA specifically provides, in relevant part, that:

> No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

Section 7(b) also provides that this amendment:

> [S]hall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

---

*Detainees from Guantanamo*, Wash. Post, Oct. 17, 2006, at A1 (reporting only 60 to 80 detainees are expected to be tried by military commission).

Section 7 of the MCA thus not only attempts to withdraw habeas jurisdiction in pending cases, but also expands the territorial reach of that withdrawal to non-citizen detainees held anywhere in the world instead of simply to detainees at Guantánamo.  It also expands the withdrawal of jurisdiction to detainees held by the "United States" – which presumably includes detainees imprisoned by the Central Intelligence Agency in secret ghost prisons overseas – not just detainees in the custody of the Defense Department.  And it extends the withdrawal of jurisdiction to include not only detainees designed as "enemy combatants" by CSRTs, but also those who are "awaiting such determination" by a CSRT or some other undisclosed "competent tribunal established under the authority of the President or the Secretary of Defense," MCA § 948a (defining "unlawful enemy combatant"), at some indeterminate point in the future.

Accordingly, for the reasons set forth below, because Congress has not invoked its stated powers under the Suspension Clause, and because it has otherwise breached the limitations on its constitutional powers by attempting to eliminate habeas entirely for a single class of individuals, the withdrawal of habeas jurisdiction under the DTA and MCA is invalid and this Court retains jurisdiction to consider the Petition.

## Argument

"At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest."  *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).  Petitioner's central argument – that he was seized and continues to be detained as an enemy combatant without "notice of the factual basis for his classification [or] a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker," *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) – falls squarely within this historical core of habeas review.  Indeed, the Supreme Court has held that alleged

enemy combatants detained at Guantánamo have the right to challenge their detention through habeas corpus: "Consistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention, in wartime as well as in times of peace."  *Rasul v. Bush*, 542 U.S. 466, 474 (2004).

The Court's jurisdiction to issue the writ in a case like this is a function not only of the federal habeas statute, but also of the common law, *see id.* at 481-82, as recognized and protected by the Suspension Clause of the Constitution.  *See St. Cyr*, 533 U.S. at 304 n.24 (Suspension Clause "was intended to preclude any possibility that 'the privilege itself would be lost' by either the inaction or the action of Congress").  The constitutional right to habeas relief therefore exists even in the absence of statutory authorization, and may be suspended only by explicit congressional action under strictly limited circumstances.  *See Johnson v. Eisentrager*, 339 U.S. 763, 767-68 (1950) (assuming that, in absence of a statutory right of habeas, petitioners could seek the writ directly under the Constitution to the extent their claims fell within the scope of habeas protected by the Suspension Clause).[8]  The Suspension Clause thus protects the essential role of the courts in the preservation of liberty, and imposes clear limits on the powers of Congress to interfere with that role.  *See Hamdi*, 542 U.S. at 536 ("[U]nless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining [the] delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions.").

---

[8]  The Supreme Court has further signaled that detainees in Guantánamo are entitled to fundamental rights protected by the federal courts.  *See Rasul*, 542 U.S. at 484 n.15 ("Petitioners' allegations . . . unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.'") (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 277-78 (1990) (Kennedy, J., concurring)); *see also In re Guantanamo Detainee Cases*, 355 F. Supp. 2d

In the Guantánamo detainee cases, Congress has plainly exceeded its constitutional power and improperly infringed on the Article III powers of the Judiciary. Far from invoking its constitutional powers to suspend habeas, Congress instead has attempted for the first time in our history to eliminate habeas altogether for a single class of individuals – non-citizens detained by the United States – by passage of the DTA and MCA. Indeed, Congress has attempted to do so indefinitely on a countrywide (and worldwide) basis. Congress has violated the Constitution, and these laws should therefore be struck down by the Court.

## I.    THE DTA AND MCA VIOLATE THE SUSPENSION CLAUSE

In their motion to dismiss, Respondents argue that the DTA (and now the MCA) do not effect an unconstitutional suspension of the writ of habeas corpus because Petitioner has no constitutional rights under the Suspension Clause. In particular, they argue that "aliens" detained outside the sovereign territory of the United States have no constitutional rights, including under the Suspension Clause. *See* Gvt. Br. at 7-11. Respondents also contend that the DTA and MCA provide a constitutionally adequate substitute for habeas. These claims are meritless and should be rejected.

### A.    Petitioner's Right to Habeas Is Protected by the Suspension Clause

As indicated above, the Supreme Court held in *Rasul* that the Guantánamo detainees have the right to habeas corpus. *See* 542 U.S. at 484. In addition to finding that they have that right under the federal habeas statute, *Rasul* confirmed that they are entitled to the writ under the common law and would have been entitled to the writ as it existed in 1789 when the

---

443, 464 (D.D.C. 2005) (Green, J.), *appeal pending. But see Khalid v. Bush*, 355 F. Supp. 2d 311, 320-21 (D.D.C. 2005) (Leon, J.), *appeal pending.*

Constitution was adopted. *See id.* at 479-82.[9]  Because "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789,'" *St. Cyr*, 533 U.S. at 301, Petitioner's right to the writ as it existed in 1789 includes the protection of the Suspension Clause. Accordingly, regardless of whether detainees have constitutional rights, they have the right to habeas and may seek to protect that right by asserting a challenge to the DTA and MCA under the Suspension Clause.

This Court also clearly has the power under Article III of the Constitution to invalidate a statute that violates the Suspension Clause.  *Rasul* held that habeas corpus "does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody."  542 U.S. at 478 (internal quotation marks omitted).  The Suspension Clause is likewise a plain, direct, and explicit limitation imposed on the power of Congress by Article I of the Constitution.  Unlike the Due Process Clause of the Fifth Amendment, it does not confer individual rights.[10]  Rather, it acts as a restraint on the power of Congress.  It provides that Congress may not suspend habeas corpus except in certain limited circumstances of "invasion" or "rebellion" as the public safety may require, which plainly do not exist here.[11]  Thus, because those circumstances do not exist, Congress cannot suspend habeas corpus and this Court cannot

---

[9] Respondents' contention that the holding in *Rasul* is limited to the reach of the federal habeas statute is simply wrong. *See* Gvt. Br. at 10 n.6.

[10] Nonetheless, we believe that Judge Green correctly held that the Guantánamo detainees have stated valid Fifth Amendment claims.  *See* 355 F. Supp. 2d at 464.

[11] The Suspension Clause provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2.  Respondents do not argue that Congress has authorized a suspension of the writ, as it has done only four times in American history, *see* William F. Duker, A Constitutional History of Habeas Corpus 149, 178 n.190 (1980), or that a state of rebellion or invasion endangering the public safety otherwise exists to justify suspension of the writ.  *See also* Letter from Hon. Kenneth W. Starr to Hon. Arlen Specter (Sept. 24, 2006) [hereinafter "Starr Letter"] ("The United States is neither in a state of rebellion nor invasion.  Consequently, it would [be] problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events.") (attached hereto as Ex. A).

allow such a suspension to stand. *See United States v. Klein*, 80 U.S. 128, 147 (1872) (invalidating a statute that unconstitutionally stripped the Supreme Court of jurisdiction in violation of the separation of powers); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) ("[A]n act of the legislature, repugnant to the constitution, is void.").

Respondents also mistakenly rely on *Johnson v. Eisentrager*, 399 U.S. 763 (1950), a case involving admitted "enemy aliens" tried by an American military commission in China in the immediate aftermath of Japan's surrender in World War II. *See id.* at 765-66, 784. There, the Court held that the petitioners were not entitled to habeas corpus because they "at no relevant time and in no stage of [their] captivity, ha[d] been within [U.S.] territorial jurisdiction." *Id.* at 768, 781. Notably, however, the Court considered their application for a writ of habeas corpus on the merits but concluded that there was no basis for issuing the writ. *See id.* at 780-81 ("the doors of our courts have not been summarily closed upon these prisoners"). Indeed, the *Eisentrager* petitioners were afforded "the same preliminary hearing as to sufficiency of [their habeas] application that was extended in *Quirin* [and] *Yamashita*. . . ." *Id.* at 781; *see infra* Part I.B.4 (discussing *Quirin* and *Yamashita*).

Moreover, to the extent that the Court's decision was based on a lack of jurisdiction, that conclusion arose from factors not present in this case, as established in *Rasul* when it distinguished *Eisentrager*:

> Petitioners in these cases differ from the *Eisentrager* detainees in important respects: They are not nationals of countries at war with the United States, and they deny that they have engaged in or plotted acts of aggression against the United States; they have never been afforded access to any tribunal, much less charged with and convicted of wrongdoing; and for more than two years they have been imprisoned in territory over which the United States exercises exclusive jurisdiction and control.

*Rasul*, 542 U.S. at 476; *see also id.* at 487-88 (Kennedy, J., concurring).    Accordingly, *Eisentrager* does not stand for the proposition that alleged enemy combatants held outside the United States have no habeas rights.[12]    *See also* Starr Letter ("[T]he <u>Eisentrager</u> case may no longer be relied upon with confidence to rule out constitutional *habeas* protections for Guantanamo detainees.") (attached hereto as Ex. A).

**B.    The DTA and MCA Do Not Provide a
       <u>Constitutionally Adequate Substitute for Habeas</u>**

Respondents contend that even if Petitioner could properly invoke the Suspension Clause, the review of his "enemy combatant" determination available in the Court of Appeals is "more than constitutionally sufficient" to withstand a suspension challenge to the validity of the DTA and MCA.    In support of this argument, they note that the DTA permits the Court of Appeals to consider (1) whether the CSRT determination that Petitioner is properly held as an "enemy combatant" was consistent with the "standards and procedures" governing the CSRT process, including whether that determination was supported by a "preponderance of the evidence," and (2) whether the CSRT standards and procedures were "consistent with the Constitution and laws of the United States."    Gvt. Br. at 13 (quoting DTA § 1005(e)(2)(C)).    But such limited review is hardly adequate or effective to test the legality of Petitioner's detention as

_____

[12] The other cases cited by Respondents also do not support their position.  *See* Gvt. Br. at 8-9. For example, *32 County Sovereignty Comm. v. Dep't of State*, 292 F.3d 797 (D.C. Cir. 2002), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), did not involve habeas or the Suspension Clause.  However, in each case the court considered the merits of the petition. Notably, in *32 County Sovereignty* that review included examination of classified information concerning an alleged terrorist organization.  *See* 292 F.3d at 799.  In addition, although it rejected the extraterritorial application of U.S. law, *Verdugo-Urquidez* involved only non-fundamental rights (suppression of evidence obtained in violation of the Fourth Amendment). To the extent the Court addressed fundamental rights under the Fifth Amendment, it merely cited *Eisentrager, see* 494 U.S. at 269, which, as discussed above, is readily distinguishable from this case.  *Verdugo-Urquidez* also largely relied on the "impractical and anomalous" application of the Fourth Amendment's warrant requirement in Mexico, *see id.* at 278 (Kennedy, J., concurring); but Respondents make no claim that the application of Fifth Amendment rights to Guantánamo – thousands of miles from any battlefield – would be similarly burdensome.

would be required in a habeas hearing.  *See Swain v. Pressley*, 430 U.S. 372, 381 (1977) (any statutory substitute for habeas must provide an "adequate and effective" means to test the legality of the detention, in a process "commensurate" with habeas, to avoid a violation of the Suspension Clause).[13]

### 1.    The DTA and MCA Provide No Review for Certain Detainees

As an initial matter, to illustrate just how far Congress has gone in its unlawful attempt to eliminate judicial review for Guantánamo detainees, it must be noted that the DTA and MCA provide *no review at all* for certain detainees.  The limited review available under the DTA and MCA only extends to the "final decision" of a CSRT that a detainee is "properly detained as an enemy combatant."  DTA § 1005(e)(2)(A).  Thus, a detainee's challenge to his detention as an "enemy combatant" is necessarily limited to a challenge to the adequacy of the CSRT.  But, as indicated above, Section 7 of the MCA purports to withdraw habeas jurisdiction for detainees held as "enemy combatants" *and* those "awaiting such determination."  The DTA and MCA also impose no limits whatsoever on the time within which Respondents must make such determinations.  Nor do those statutes even require that future determinations be made by a CSRT, as opposed to some other undisclosed tribunal established by the President or the Secretary of Defense.  *See* MCA § 948a.  Accordingly, the DTA and MCA do not provide for any judicial inquiry or relief for those detainees awaiting an enemy combatant determination.  For this reason alone, the DTA and MCA violate the Suspension Clause.

---

[13] The *Swain* Court upheld a statute providing a collateral remedy for prisoners in custody in the Superior Court of the District of Columbia against a Suspension Clause challenge for reasons that are not applicable here.  In particular, the Court cited the statute's "savings clause" allowing a federal district court to hear an application for habeas if the statute's remedy was "inadequate or ineffective" to test the legality of the prisoner's detention.  The DTA and MCA have no such "savings clause" allowing resort to habeas if limited review of the CSRTs under the DTA is determined to be inadequate or ineffective to test the legality of a detainee's detention.

## 2.    The DTA and MCA Are Also Constitutionally Deficient for the Reasons Set Forth in Respondents' Filings in the *Bismullah* Case

In a recent filing in *Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir.) – in which a Guantánamo detainee seeks review in the Court of Appeals under the DTA – Respondents have set forth their views concerning the scope of review available under the DTA (and now the MCA), making it clear that such review is not commensurate with the searching inquiry required by common law habeas.   *See* Response in Opp'n to Motion to Compel (Aug. 21, 2006) ("*Bismullah* Opp'n") (attached hereto as Ex. B).

First, according to Respondents' position in *Bismullah*, the DTA provides no opportunity for the Court of Appeals to engage in a factual inquiry into the bases for detainees' detentions or to engage in any fact-finding at all. *Id.* at 15. Rather, they argue, the Court of Appeals is limited to reviewing the CSRT "record," *id.* at 14, which as a practical matter consists only of the evidence that Respondents themselves chose to put before the CSRT panel.   In Respondents' view, the Court of Appeals also may only examine the CSRT record to determine "whether the CSRT followed appropriate procedure." *Id.* at 12-13.   And although the DTA instructs the Court of Appeals to determine whether a detainee's enemy combatant designation is consistent with "the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence," Respondents claim that this provision "limits review to the question of whether the CSRT followed appropriate procedure and rendered a decision supported by sufficient evidence." *Id.* at 12.   Moreover, by "sufficient evidence" Respondents mean "simply such relevant evidence as a reasonable person might accept as proof of a conclusion." *Id.* at 13 (citation omitted).

Second, Respondents contend that the DTA prevents detainees like Petitioner from introducing, and the Court of Appeals from considering, extrinsic evidence to controvert

Respondents' evidence, including evidence of "actual innocence" or evidence that statements used against detainees were obtained through torture. *Id.* at 16-17.[14] According to Respondents, the DTA simply "does not authorize the submission of new evidence." *Id.* at 16.

Third, Respondents contend that, although the factual bases for a detainee's detention may be classified, neither the detainees nor their counsel are entitled under the DTA to have access to all such relevant but classified information. Indeed, Respondents argue that detainees and their counsel are not entitled to any evidence relevant to the detainees' detentions that is outside the "record" compiled by them for the CSRTs. *Id.* at 10-12, 17-20. Moreover, in this case Respondents have refused to provide even the record evidence concerning Petitioner's CSRT proceedings, thus requiring counsel to file a motion for production of a factual return. *See infra* Part VI.B.

Fourth, while the DTA authorizes the Court of Appeals to consider whether the CSRT standards and procedures are "consistent with the Constitution and laws of the United States" – and Respondents point to that provision in their instant motion as a basis for why the DTA is not unconstitutional, *see* Gvt. Br. at 13 – Respondents argue in *Bismullah* that there is not a single constitutional protection, including fundamental due process, which detainees may invoke. *See Bismullah* Opp'n at 6 n.5 & 7. Thus, under Respondents' interpretation, DTA § 1005(e)(2)(C)(ii) is utterly meaningless.

Fifth, during oral argument in the *Al Odah/Boumediene* consolidated appeals, Respondents have made clear their view that the DTA gives the Court of Appeals no authority to

---

[14] The CSRTs' acceptance of evidence obtained by torture – and the presumption that such evidence is genuine and accurate – constitutes a particularly troubling departure from habeas corpus, for all of the reasons set forth in the *amicus* brief filed by seven former federal judges in the *Al Odah/Boumediene* consolidated appeals (attached hereto as Ex. C), which we incorporate herein by reference.

order a detainee's release even if it determines that his CSRT was unfair or unlawful. The only remedy, according to Respondents, is for the Court of Appeals to order a new CSRT.

According to a recent analysis of unclassified CSRT proceedings, there have already been at least three cases where detainees who were found by CSRTs not to be "enemy combatants" were sent back for new hearings rather than being released. Respondents simply sent went back for a second or third "bite at the apple," ordering new CSRTs for each of those detainees until they eventually obtained "enemy combatant" determinations. *See* Mark Denbeaux & Joshua Denbeaux, *No-Hearing Hearings: An Analysis of the Proceedings of the Government's Combatant Status Review Tribunals at Guantánamo* at 3, 37-39 (Nov. 17, 2006) ("Denbeaux Report") (attached hereto as Ex. D).[15] Nor is there any indication that the detainees in those cases were ever informed of the initial favorable decisions, or informed of or allowed to participate in the later CSRT proceedings. *See id.* Perhaps nothing could offend fundamental due process more starkly than sending an innocent man back for additional pro forma hearings until Respondents are able to obtain a preferred outcome that results in potentially life-long detention without charge for the detainee.

In any event, the Court of Appeals' purported inability to order detainees released certainly belies any claim that CSRT review under the DTA is an adequate substitute for habeas corpus. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas

---

[15] It also appears from recently obtained unclassified factual returns in the case *Thabid v. Bush*, No. 05-CV-2398 (ESH), that all twenty-two of the Uighur detainees from China who have ever been detained at Guantánamo may at one time have been determined not to be "enemy combatants," and that all but five of those men (who have since been released to Albania) were sent back for subsequent CSRTs until it was determined that they were "enemy combatants." *See also, e.g., Lawyers Argue for Chinese at Guantanamo*, Assoc. Press (Dec. 5, 2006) (Navy spokesman confirming Uighurs had "multiple" enemy combatant reviews). Respondents have repeatedly refused to provide additional information concerning the status of the Uighurs. Nonetheless, if we are correct this would mean that many more detainees were sent back for additional CSRTs instead of being released than are reflected in the Denbeaux Report.

corpus is an attack by a person in custody upon the legality of that custody, and [ ] the traditional function of the writ is to secure release from illegal custody."); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 576 (2004) (Scalia, J., dissenting) ("The role of habeas corpus is to determine the legality of the executive detention, not to supply the omitted process necessary to make it legal. . . . It is not the habeas court's function to make illegal detention legal by supplying a process that the Government could have provided, but chose not to.").

Nor are these constitutional deficiencies merely theoretical or academic in this particular case, as the limited information available concerning Petitioner's CSRT and Administrative Review Board ("ARB") proceedings illustrates so clearly. *See infra* Part I.B.5.

**3.  In Cases of Executive Detention, Common Law Habeas Demands a Far More Searching and Extensive Review than the Limited DTA Review Espoused by Respondents**

Petitioner has been imprisoned in Guantánamo for several years without charge or trial. He is detained not under sentence of any court or tribunal, but by the sheer might of the Executive. In these circumstances of "pure executive detention," common law habeas would require a searching judicial inquiry into the factual and legal basis for the detention, including the opportunity to traverse Respondents' factual return – which, again, has not even been provided to Petitioner in this case – to present exculpatory evidence and to obtain a judicial determination of any disputed factual issues.

The common law distinguished between habeas petitions challenging a prior conviction pursuant to judicial process and those challenging pure executive detentions. While courts prohibited petitioners from introducing extrinsic evidence and limited their review of the underlying facts in cases where the petitioners were challenging a criminal conviction by a duly

constituted court of "competent jurisdiction,"[16] that was never the case with respect to executive detentions. As indicated above, the Supreme Court has emphasized: "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *St. Cyr*, 533 U.S. at 301.

In cases of non-judicial detention, the common law required a searching judicial examination into the bases for detention. This examination included not only an examination of the Executive's return, but also allowed a petitioner to dispute the return and present evidence. And the court would review all of the evidence and order the petitioner's release if it concluded that the evidence as a whole was insufficient to justify the detention. *See, e.g.*, *Goldswain's Case*, 96 Eng. Rep. 711, 712 (C.P. 1778) (petitioner "may plead to [court] any special matter necessary to regain his liberty" and court "could not willfully shut [its] eyes against such facts as appeared on the affidavits, but which were not noticed on the return"). Early American courts also required the same searching judicial examination into the bases for detention. *See, e.g.*, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) (court examined "facts stated in Milligan's petition, and the exhibits [he] filed" to decide ultimate questions of lawful authority); *State v. Joseph Clark*, 2 Del. Cas. 578 (Del. Chancery 1920) (releasing habeas petitioner after reviewing his affidavit traversing the return and hearing testimony from his father). Likewise, non-citizens detained by the Executive in wartime were able to submit evidence in habeas proceedings to challenge whether they were properly detained by the Executive as "enemy aliens." *See, e.g.*, *Lockington's Case,* Bright (N.P.) 269, 298-99 (Pa. 1813); *Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779); *Rex v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759).[17]

---

[16] *See generally* R.J. Sharpe, The Law of Habeas Corpus 51 (1989).

[17] Respondents misconstrue *INS v. St. Cyr*, 533 U.S. 289, 306 (2001), in support of the proposition that "[t]raditional habeas review in alien-specific contexts involved, in general,

Nor does habeas otherwise entail a limited, highly deferential review that Respondents have suggested is the extent of judicial inquiry available under the DTA. Even if the Executive has undertaken some prior process of its own to justify the detention, a habeas court would not be bound by that process or restricted simply to reviewing whether the Executive had abided by its own rules in conducting that process. *See, e.g., Bushell's Case*, 124 Eng. Rep. 1006, 1007 (C.P. 1670) ("[O]ur judgment ought to be grounded upon our own inferences and understandings, and not upon [those of an inferior tribunal]."); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 125 (1807) (Supreme Court examined written depositions to determine if there was sufficient evidence of petitioner levying war against United States to justify detention for treason); *see also Moore v. Dempsey*, 261 U.S. 86, 92 (1923) (habeas corpus does not "allow a Judge of the United States to escape the duty of examining the facts for himself").

### 4. Petitioner Has Not Been Afforded More "Procedural Process and Protections" Than Military Commission Defendants

Respondents also suggest that the DTA and MCA do not violate the Suspension Clause because the CSRT process is modeled on Army Regulation § 190-8 (1997), which implements the Geneva Conventions' requirement for determining whether detainees are entitled to prisoner-of-war status. Indeed, Respondents contend that the CSRTs provide detainees like Petitioner with "significant additional procedural process and protections" beyond what is required by Army Regulation § 190-8. Gvt. Br. at 14 & n.9. Respondents also argue that these

---

review of questions of law, but 'other than the question of whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive.'" Gvt. Br. at 13. To the contrary, in the cases cited in *St. Cyr* on which Respondents apparently rely the factual review of habeas was limited because the petitioners had already had the opportunity to participate in full immigration removal proceedings and appeals to the Board of Immigration Appeals. Indeed, the Court emphasized that at common law "an attack on an executive order could raise *all issues* relating to the legality of the detention." *Id.* at 301 n.14 (emphasis added; citation omitted).

minimal procedures comport with the due process requirements of *Hamdi*. *See id.* Again, Respondents are wrong on all accounts.

As an initial matter, the CSRT process falls well short of the requirements of Army Regulation § 190-8. As Judge Green explained, Article 5 of the Third Geneva Convention entitles all individuals to be treated as prisoners of war "until such time as their status has been determined by a competent tribunal," even if there is doubt as to whether they are entitled to that status under Article 4 of the Convention. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 479-80 (D.D.C. 2005), *appeal pending*. "Army Regulation 190-8 created the rules for the 'competent tribunal' referenced in Article 5 of the Third Geneva Convention." *Id.*

"Article 5 hearings, like the CSRT, involve a panel of three officers who hear information from the military and the prisoner. These hearings, the [*Hamdi*] Court said, had proven successful in resolving doubts about the status of prisoners captured during conflicts governed by the Geneva Conventions." Joseph Margulies, Guantánamo and the Abuse of Presidential Power 160 (2006). "The streamlined proceedings of an Article 5 hearing were developed in response to the unique circumstances presented in the field. . . . Admittedly, these hearings are extremely summary, which creates a significant risk of error. But the consequences of a mistake are mitigated by the fact that prisoners will be confined under conditions that comply with the Geneva Conventions." *Id.* That is far from true with the CSRTs, which are unrestrained by the applications of the Geneva Conventions. *See id.* at 170.

Indeed, while a CSRT "bears a glancing resemblance to an Article 5 hearing, [it] actually provides fewer procedural protections." *Id.* at 161. For example, in the Guantánamo detainee cases the "inflexible and expansive definition of enemy combatant made it inevitable the CSRT would rule against a number of prisoners who should have been released. Yet this

problem was exacerbated by the procedural rules governing the CSRTs. To begin with, the tribunals based their decision on secret evidence kept from the prisoner. This sometimes produced absurd spectacles, fit for Lewis Carroll . . ." *Id.* at 163.

> At the same time, the [CSRT] tribunal must presume that the evidence presented by the military, including secret evidence, is genuine and accurate. This distinguishes the CSRT from an Article 5 hearing, where the prisoner is presumed to be a POW until proven otherwise, and there is no presumption in favor of the military's evidence. In addition, the CSRT panel may rely on "any information it deems relevant and helpful," including any degree of hearsay. . . . and for the first time in U.S. military history, the tribunal may rely on evidence secured by torture, coercive interrogations, or cruel and degrading treatment. . . . Article 5 hearings, by contrast, rely on evidence secured in compliance with the Geneva Conventions, which prohibit torture and unlawful coercion and thereby minimize the risk of error caused by unreliable confessions.

*Id.* at 164.

The CSRTs are also decidedly not administered by impartial decisionmakers. *See id.* at 166. "Like an Article 5 hearing, each [CSRT] tribunal consists of three commissioned officers. But in an Article 5 hearing, the prisoner is presumed a POW. In these tribunals, by contrast, [Respondents] have all repeatedly announced that each detainee is an enemy combatant" without determining on an individualized basis whether a particular detainee complied with the laws of war or otherwise falls within an exception denying him POW status. *Id.*; *see also* 355 F. Supp. 2d at 480; *infra* note 24. In this respect, a CSRT is exactly the opposite of an Article 5 hearing.

Accordingly, while there are other examples of how CSRTs fall short of the standards for Article 5 hearings, "the conclusion is simply inescapable that these tribunals were created for no other purpose than to validate a predetermined result." Margulies at 169. The CSRTs bear "superficial similarity to Article 5 hearings" but only serve to "create[ ] the impression that the Administration has fixed the problem identified in *Rasul*." *Id.*

Respondents are also incorrect that under *Hamdi* "proceedings by which the military determined enemy combatant status legitimately could be severely limited in scope, in ways that are not characteristic of traditional judicial proceedings." Gvt. Br. at 14. To the contrary, *Hamdi* held that an individual detained by Respondents as an "enemy combatant" must receive notice of the factual basis for that determination and a fair opportunity to rebut Respondents' factual assertions before a neutral decisionmaker. *See* 542 U.S. at 533. In reaching that conclusion, the Court "necessarily reject[ed]" Respondents' suggestions that "separation of powers principles mandate a heavily circumscribed role of the courts in such circumstances." *Id.* at 535. The Court cautioned that "a state of war is not a blank check for the President." *Id.* at 536.

The *Hamdi* plurality also suggested *in dicta* that "exigencies of the circumstances may demand that, aside from these core elements [of due process], enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." 542 U.S. at 533. "Hearsay, for example, may need to be accepted as the most reliable evidence available from the Government," and there may be a "presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Id.* at 533-34. The Court further explained that "once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside that criteria." *Id.* at 534. But in the absence of a tribunal following constitutionally mandated procedures, the district courts must provide those procedural rights to the detainee through habeas. *See id.* at 605.

Here, Respondents have not shown – and cannot show – that exigent circumstances require anything less than full habeas review.[18]  And they have not demonstrated that admission of hearsay evidence is necessary, or that such evidence would be reliable.  They have not put forth any evidence – let alone "credible" evidence – to show that Petitioner is properly held as an enemy combatant.  Nor has Petitioner had a fair opportunity to contest that designation before a neutral decisionmaker.  *See infra* Part I.B.5.  Thus, under *Hamdi*, this Court must afford him full habeas review.

Respondents also overlook prior precedent establishing that detainees subject to military commissions have traditionally been afforded all of the rights that Petitioner has been denied here.  For instance, unlike Petitioner, military commission defendants typically have the right to examine and rebut the factual evidence against them, to confront their accusers, to call witnesses and present evidence, and to be represented by counsel.  *See Ex parte Quirin*, 317 U.S. 1 (1942); *In re Yamashita*, 327 U.S. 1 (1946); *Johnson v. Eisentrager*, 339 U.S. 763 (1950).  The limited habeas review afforded in these cases is also consistent with the limited habeas review that common law courts afforded petitioners who challenged convictions resulting from prior

---

[18] While Respondents have often raised the specter of interference with military operations, the Supreme Court has rejected their argument that such circumstances justify the denial of due process in the detainee cases.  The Court has done so in the context of tribunals to determine who is properly detained, and with respect to military commissions to try and punish violations of the laws of war.  *See Hamdi*, 542 U.S. at 532, 534-35 ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad. . . . We think that it is unlikely that this basic [due] process will have the dire impact on the central functions of warmaking that the Government forecasts. . . . [I]t does not infringe on the core role of the military for the courts to exercise their own time-honored and constitutionally mandated roles of reviewing and resolving claims like those presented here."); *Hamdan*, 126 S. Ct. at 2773 ("Exigency alone, of course, will not justify the establishment and use of penal tribunals not contemplated by . . . the Constitution unless some other part of that document authorizes a response to the felt need.").  Here, too, any rote claims of exigency could not operate to deprive Petitioner of full habeas review because the Petition was not filed in a "zone of active military operations" and Petitioner is detained on an island thousands of miles away from any battlefield.  *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 780 (1950).

trial-like procedures deemed fair and adequate. Moreover, in each of these cases the Supreme Court engaged in a searching and detailed analysis of whether the military commissions complied with the laws of war, including the Geneva Conventions. *See* 317 U.S. at 24; 327 U.S. at 5-6, 9; 339 U.S. at 780-81, 785-91. Here, by contrast, Respondents contend that the Court of Appeals has no such power to inquire into such matters or independently assess the fairness and adequacy of the CSRT process.

Finally, it is important to remember that Petitioner has not been convicted of war crimes by military commission. He has not even been charged with any offense. Nor can the post-hoc CSRT process to which he was unilaterally subjected by the military after *Rasul* in order to confirm his "enemy combatant" status be compared to duly authorized military commissions established to try war crimes.

### 5. The Limited Information Available Concerning Petitioner's CSRT and ARB Proceedings Illustrates the Urgent Need for Habeas Review

Although Respondents have refused to provide a factual return – or any other information concerning Petitioner's continuing detention – they did release unclassified summaries of his CSRT and ARB proceedings to the public as the result of a Freedom of Information Act lawsuit instituted by the Associated Press.[19] Those summaries illustrate beyond any doubt the grave inadequacies of the CSRT process and the urgent need for habeas review.

According to the summary of Petitioner's CSRT proceeding, there appear to be two central allegations against Petitioner: (1) that he was sent a personal greeting from the Taliban Deputy Minister of Intelligence; and (2) that a senior Al Qaeda lieutenant recognized a

---

[19] Those summaries are attached here to as Exhibits E (CSRT) and F (ARB).

photograph of him.[20]    Petitioner repeatedly denied both allegations, arguing that they were

probably just cases of mistaken identity.

He asked repeatedly for the opportunity to confront both the Taliban official and

the alleged Al Qaeda lieutenant about these claims:

- "I'd like to meet this [alleged Al Qaeda] person and see if he can, and show
  him that it's not me.  That's all." (Ex. E at 7); and

- "How did this happen?  Can you bring [the alleged Al Qaeda lieutenant and
  the Taliban official] in front of this tribunal?  Or in front of this . . . your law
  says that you can.  You didn't bring them, and I even asked you, but you
  didn't.  We are following the rules and laws.  How come these laws do not
  apply?" (*Id.* at 11).

Petitioner also requested two witnesses in his defense – a Pakistani intelligence

agent and a Yemeni government official – to prove his actual innocence of any wrongdoing.  *Id.*

at 1.  Petitioner explained the critical need for these witnesses to the CSRT panel:

> [T]he interrogator from the Pakistani intelligence said yes, all of what [Petitioner]
> said is correct and all he said about his story in Pakistan is correct and therefore
> that is why we are going to give him back his passport that we took. . . . I was
> really surprised that the American intelligence refused all of those proofs and they
> said no.  We still need him, they said, and then they took me [to Guantánamo].
> That's why for these reasons I chose the Pakistani government as a witness
> because they have all this information and they know everything.  I also chose the
> Yemeni government because I'm sure my government will confirm what the
> Pakistanis are saying.  That's why I am very confident that will be the case.  I
> have great confidence that you will find out too, that what I'm really saying is true
> and that I really don't have anything to do with all these things that are being said
> about me.

*Id.* at 4.

---

[20]  Another allegation against Petitioner was his purported admission that he was a "terrorist,"
which the military officers on the CSRT and ARB panels apparently realized was a mistake
resulting from a translating error.

In addition, Petitioner requested the opportunity to examine documentary evidence against him and to submit his own evidence, including documents from his family concerning his educational background:

- "I wanted to ask my family to gather information and to help me prove that I finished high school, and that I was fine, to prove that all this is not funded [sic], not based on any reasonable proof. That's what I was trying to get my family to give me." (*Id.* at 3); and

- "I'm talking about the videos [i.e., the letter and photograph]. I heard in the beginning that you said, you said you could not bring these people, the people that saw me . . . and said such things about me." (*Id.* at 11).

In the end, the CSRT panel denied each and every one of Petitioner's repeated requests to call or confront witnesses, to see the evidence against him, and to obtain and present his own evidence.[21] The importance of the deprivation of Petitioner's right to confront the evidence against him – and, in particular, his right to cross-examine witnesses against him – cannot be understated. *See Crawford v. Washington*, 541 U.S. 36, 49 (2004) ("It is a rule of the common law, founded on natural justice, that no man shall be prejudiced by evidence which he had not the liberty to cross examine.") (quoting *State v. Webb*, 2 N.C. 103, 104 (1749)); *see also Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2798 n.67 (2006).

After being detained without charge or trial for three years at the time of his CSRT, *see id.* at 10, Petitioner summed up his frustration with the process as follows:

I have no means, or no ways of defending myself; I have no lawyer. I don't have any way to get witnesses to prove that I am really innocent of all this. I was hoping that all the time that I have been here, that they would look, look at my file, and search the information for them to prove, and to read and get to a reasonable conclusion to clear me from all this. . . .

---

[21] Petitioner's requests to examine the purported letter from the Taliban official and the photograph concerning the alleged Al Qaeda lieutenant – perhaps the most critical evidence against him – were denied because the information had "national security implications for the United States and cannot be released." *Id.* at 11.

I wasn't given the chance to prepare my defense, or help myself, gather witnesses or to see if this is not correct or not true. If you check the Pakistani government and the Yemeni government, they know everything about me. All I wanted was just for you to look deeply into my case and to take into consideration all these things. I would like America not to be unjust or judge me at all, really, because that will reflect badly on the Americans. They preach justice and they don't want to be unjust against anybody or to do wrong to anybody and that's what they swore to do. You and I hope that you will be just.

*Id.* at 3.

Petitioner fared no better in his ARB proceeding. Again, he made repeated requests to call or confront witnesses, to see the evidence against him, and to obtain and present his own evidence:

- "Detainee said if [an alleged Al Qaeda lieutenant] saw him in a photo, bring that person so he can meet him. The Detainee said it is possible that the person who saw his photo may have made a mistake." (Ex. F at 4);

- "In response to the allegation that the Detainee was sent a personal greeting from the Taliban Deputy Minister of Intelligence, the Detainee laughed and asked, 'where is the letter, and what is the address it was sent [to]?' The Detainee said he has never received the letter. The Detainee said he never knew or heard of the Taliban until the Tribunal." (*Id.*);

- "I would like for you to consider, that I could not give you [I did not give you] enough information is because I did not have any documentation. [Because] they did not allow me to send or receive any letters. Three years I have not been able to contact my family, my attorney or even exercise my rights. And I wish that you consider that in your decision." (*Id.* at 5-6) (alterations in original);

- "There was no proof to show that I am an individual that is trying to attack somebody. . . . And maybe they meant to capture somebody else, but they captured me instead. I hope that they don't make a mistake." (*Id.* at 6);

- "Did you find this letter [from the Taliban official]?" (*Id.* at 8)[22];

- "Whoever told you [that I got a letter from the Taliban official]; ask him to give you the letter. . . . I don't know who would say something like that. This

---

[22] The ARB panel's only response was "[w]e can discuss that in the closed session." *Id.*

question should not be directed to me.  You should look for that yourself. . . .
Where's the source of this lie?" (*Id.* at 9); and

- *"[Petitioner's personal representative at the CSRT] indicated they could not find any proof, that I am a member or I belong to either the Taliban or al-Qaeda but he said 'we are looking for something, regardless what it is to connect me to them.'  I told them, is this what you consider justice?  The guy said 'no.'"* (*Id.* at 8) (emphasis added).

As with the CSRT, all of these requests were denied by the ARB panel.

Petitioner further explained that he had discussed the ARB process with other

detainees, who considered it a sham:

They told me about it.  They say this is nothing more than a theatrical thing.  It's formality.  They're just going through this thing and everybody is laughing at the whole process.  But I made up my mind that I wanted to attend the ARB despite what they said.  That's why I attended the Tribunal and I'm here now. . . .

Everybody is saying that these ARBs are nothing but a formality.  These are not interrogators and even you don't know that this is just formality.  *They, the soldiers and interrogators, said it was a matter of paperwork and paper pushers and the American politics is just playing its role and that's true.  You can check with your countrymen, you'll find out that's true.*  A lot of people, they end up leaving the camp here without having to attend the ARB or the Tribunal.  They were accused of larger crimes than myself.  You people know that as well.

*Id.* at 10 (emphasis added).  Sadly, Petitioner was entirely correct.[23]

In sum, these CSRT and ARB summaries bear out the allegations included in the

Petition: (1) that a CSRT is a non-adversary hearing conducted pursuant to rules and procedures

that are unfair in design and biased in practice; (2) that these rules and procedures in practice and

effect virtually compel the CSRT conclusion that the detainee is an "enemy combatant"; and (3)

---

[23] Wholly apart from Petitioner's inability to present evidence during the ARB process, that process does not provide an adequate substitute for habeas because it has nothing to do with a detainee's designation as an "enemy combatant."  The purpose of the ARBs, according to Respondents, is to determine whether "enemy combatants" may be released despite that designation.  ARB determinations are also not reviewable by the courts.  *See* ARB Memo and Procedures § 1.c (July 14, 2006).  There is no reconsideration of the underlying CSRT determination.

that they are incapable of determining who is or is not properly detained by Respondents as an "enemy combatant." Petition ¶¶7-8. The limited review of the CSRTs that is available under the DTA and MCA simply does not come close to providing the full measure of process, rights and remedies required by habeas. The withdrawal of habeas jurisdiction therefore violates the Suspension Clause and is void.

## II.  THE MCA IS UNCONSTITUTIONAL BECAUSE IT INVADES THE CORE FUNCTION OF THE JUDICIARY IN VIOLATION OF THE SEPARATION OF POWERS

The jurisdictional provisions of the MCA are also unconstitutional because they offend the separation of powers principles articulated in *United States v. Klein*, 80 U.S. 128 (1872), by unconstitutionally interfering with the core judicial functions of Article III courts.

In *Klein*, Congress passed a law providing that "no pardon [or amnesty granted by the President] shall be admissible in evidence in support of any claim against the United States in the Court of Claims," and "when judgment has been already rendered [in the Court of Claims in favor of a claimant based on a Presidential pardon], the Supreme Court, on appeal, shall have no further jurisdiction of the cause, and shall dismiss the same for want of jurisdiction." *Id.* at 143. The Court acknowledged that "[u]ndoubtedly the legislature has complete control over the organization and existence of that court and may confer or withhold the right of appeal from its decision." *Id.* at 145. But, the Court said, the language of the statute "shows plainly that it does not intend to withhold appellate jurisdiction except as a means to an end. . . . The proviso declares that pardons shall not be considered by this court on appeal. We had already decided that it was our duty to consider them and give them effect, in cases like the present, as equivalent to proof of loyalty." *Id.*

The Court concluded that this manipulation of its jurisdiction was not a proper exercise of legislative authority because it invaded the judicial function. The Court asked:

> What is this but to prescribe a rule for the decision of a cause in a particular way? . . . . We are directed to dismiss the appeal, if we find that the judgment must be affirmed, because of a pardon granted . . . to claimants. Can we do so without allowing one party to a controversy to decide it in its own favor? Can we do so without allowing that the legislature may prescribe rules of decision to the Judicial Department of the government in cases pending before it? We think not.

*Id.* at 146.

Here, the MCA operates in a similar fashion. It prescribes "rules of decision to the Judicial Department" within the meaning of *Klein* by providing that "[n]o alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights." MCA § 948b(g). This is directly analogous to the statute in *Klein*, which attempted to prevent courts from giving effect to a presidential pardon. As in *Klein*, the MCA's prohibition on giving effect to Geneva Convention rights is tantamount to "allowing one party to a controversy to decide it in its own favor." And the MCA does so here with respect to the decision of the Supreme Court in *Hamdan*, which finally resolved the question of whether Common Article 3 of the Geneva Conventions applies in these cases.

In addition, by stripping the courts of jurisdiction over habeas claims filed by alleged members of the "Taliban, al Qaeda or associated forces" held at Guantánamo, MCA § 948a(1)(A)(i), the MCA "prescribe[s] a rule for the decision of a cause in a particular way" in precisely the same manner as the jurisdictional strip in *Klein*. It is an unconstitutional "means to an end" because the Taliban, Al Qaeda and associated forces are defined by the statute to be unlawful combatants, and the courts are directed that that determination is "dispositive." MCA §§ 948a(1)(A), 948d(c). Indeed, even if there were to be a subsequent judicial review of this determination under Section 7 of the MCA (and, again, there is no assurance of one given that

Section 7 purports to strip habeas jurisdiction for anyone "awaiting" an enemy combatant status determination), Section 5 of the MCA would block any effort to seek redress because it provides that Geneva Convention rights – even those concerning combatant immunity as a prisoner of war ("POW"), for example – cannot be invoked. This is directly analogous to the situation in *Klein*, where "the court [was] forbidden to give the effect to evidence which, in its own judgment, such evidence should have." 80 U.S. at 147.

There are a number of other ways in which the MCA attempts to dictate a judicial decision. The MCA's definition of "unlawful enemy combatant," for example, is a jurisdictional prerequisite for a military commission and, concomitantly, a prejudgment of guilt for any detainee hauled before a commission (since unlawful combatants are not "privileged" to engage in combat and by doing so become criminals). Giving effect to this definition implicates the court in violating the Third Geneva Convention ("GCIII"). Under the MCA, an "unlawful enemy combatant" is defined as one who (1) "is not a lawful enemy combatant," or (2) "has been determined to be an unlawful enemy combatant by a [CSRT]." MCA § 948a(1)(A). But the MCA's definition of "lawful enemy combatant" includes only three of six categories of persons identified under Article 4 of GCIII as persons entitled to POW status. *Compare* MCA § 948a(2), *with* GCIII, Art. 4.[24] And POWs are lawful combatants. Thus, by refusing to recognize as

---

[24] As Judge Green explained:

> Article 4 of the Third Geneva Convention defines who is considered a "prisoner of war" under the treaty. Paragraph (1) provides that the term "prisoners of war" includes "members of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces." As provided in Paragraph (2), the definition of "prisoners of war" also includes "members of other militias and members of other volunteer corps, including those of organized resistance movements," but only if they fulfill the following conditions: "(a) that of being commanded by a person responsible for his subordinates; (b) that of having a fixed distinctive sign recognizable at a distance;

lawful combatants all persons entitled to POW status under the GCIII, the MCA not only violates the GCIII (by failing to afford POWs the protections of the Convention, including the right to be tried by the "same courts, according to the same procedures" as would be used to try members of the Detaining Power's armed forces, *see* GCIII, Art. 102), it also completely decides the controversy in favor of the prosecution in any military commission trial because the only defendants before the commissions are those who have already been determined to be "unlawful combatants." Without "combatant immunity" detainees are guilty by definition (just as in *Klein* people who had accepted a Presidential pardon were statutorily defined as guilty of disloyalty and were penalized rather than allowed the immunity conferred by the pardon).

The alternative definition of "unlawful enemy combatant" in the MCA is a person who "has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal." MCA § 948a(1)(A)(ii). This definition is completely circular. It is devoid of any standards or criteria by which a reviewing court could determine that the detainee is not an unlawful enemy combatant. While the DTA may allow for judicial review of whether the standards used by the CSRT to make the status determination are "consistent with the Constitution and laws of the United States," this formulation pointedly excludes "treaties." When combined with Section 5 of MCA (prohibiting any person from invoking the Geneva Conventions as a source of law in any American court), the effect of the habeas strip in Section 7 of the MCA and the inadequate substitute provided by the statute is to "decide the controversy"

---

(c) that of carrying arms openly; (d) that of conducting their operations in accordance with the laws and customs of war."

*In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 479-80 (D.D.C. 2005), *appeal pending*. "Nothing in the Convention itself or in Army Regulation 190-8 authorizes the President of the United States to rule by fiat that an entire group of fighters covered by the Third Geneva Convention falls outside of the Article 4 definitions of 'prisoners of war.'" *Id.*

against any detainee who might have a defense based on Geneva Convention rights.  This is a particularly egregious invasion of the judicial function.  *See Hamdan*, 126 S. Ct. at 2796; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995) ("Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.").

In sum, both the substantive and jurisdictional provisions of the MCA operate as a "means to an end" in the manner of the unconstitutional statute at issue in *Klein*.  Because this "passe[s] the limit which separates the legislative from the judicial power," the MCA's jurisdictional strip should be deemed constitutionally invalid.  *Klein*, 80 U.S. at 147.

### III.  THE MCA DOES NOT PRECLUDE HABEAS RELIEF FOR CLAIMS UNDER THE GENEVA CONVENTIONS OR FOR VIOLATIONS OF CUSTOMARY INTERNATIONAL LAW

Because Section 5 of the MCA attempts to block detainees' efforts to invoke their Geneva Convention rights in any federal or state court, it risks placing this country in default of its obligations under these treaties and customary international law, and makes the judicial inquiry authorized by the MCA an inferior process to that which has historically been available through habeas.  For this reason, the MCA must be read not to preclude habeas relief for claims under the Geneva Conventions or for violations of customary international humanitarian law.

Section 5(a) of the MCA provides, in relevant part, that "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States . . . is a party as a source of rights in any court of the United States or its States or territories.  *See also* MCA § 948b(g) ("No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights.").  This section prohibiting invocation of the Geneva

Conventions contains no indicia of retroactivity and thus plainly does not apply to pending actions, including this case.

In addition, the qualifying phrase "as a source of rights" would appear to have meaning only if construed to refer to rights afforded exclusively by the Geneva Conventions, and not to rights afforded by other sources of law, regardless of whether the rights are also afforded by the Geneva Conventions. Section 5(a) of the MCA thus should be read not to bar enforcement of rights afforded by the laws of war or customary international law, even though such law may incorporate rights afforded by the Geneva Conventions, and even though the Geneva Conventions may incorporate rights afforded by such law. *See Hamdan*, 126 S. Ct. at 2793-98.[25]

Thus construed, Section 5(a) of the MCA would not violate the Suspension Clause to the extent that other law also affords the rights at issue. Such a construction comports with "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," *INS v. St. Cyr*, 533 U.S. 289, 298 (2001), and also with the canon that statutes "ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804); *see also Weinberger v. Rossi*, 456 U.S. 25, 32 (1982).

---

[25] *See Ali v. Rumsfeld*, No. 06-CV-145 (TFH) (D.D.C. Nov. 28, 2006) (dkt. no. 33); *see also* Theodor Meron, *The Geneva Conventions as Customary International Law*, 81 Am. J. Int'l L. 348 (1987). The minimal rules governing all armed conflicts are set forth in Common Article 3 of the four Geneva Conventions, which bars violence to life and person, including murder, mutilation, cruel treatment, torture and "outrages on personal dignity." *See, e.g.*, Michael J. Matheson, *Session One: The U.S. Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions* 2 Am. U. J. Int'l L. & Pol'y 419, 430-31 (1987) (Common Article 3 is a part of generally accepted customary international law); International Committee of the Red Cross, Customary International Humanitarian Law (2005) (Rules) (discussing sources of customary international law in addition to the Geneva Conventions). In addition, U.S. courts have held that violations of Common Article 3 are violations of the law of nations and justiciable under the Alien Tort Statute. *See, e.g.*, *Kadic v. Karadzic*, 70 F.3d 232, 242-43 (2d Cir. 1995).

However, to the extent that Section 5(a) of the MCA may be interpreted to bar habeas review of otherwise valid non-constitutional claims in pending cases like the instant case, including habeas review of Geneva Conventions-based claims, it would violate the Suspension Clause because those treaties have the status of supreme federal law within the meaning of Article VI of the Constitution and 28 U.S.C. § 2241(c)(3), and thus provide a substantive source of rights that may be vindicated through habeas.  *See Breard v. Greene*, 523 U.S. 371, 376 (1998); *United States v. Alvarado-Torres*, 45 F. Supp. 2d 986, 988 n.3 (S.D. Cal. 1999) ("as law of the land, courts must give a treaty the same consideration as a federal statute"), *aff'd*, 230 F.3d 1368 (9th Cir. 2000).

## IV.    THE MCA IS AN UNLAWFUL BILL OF ATTAINDER

Laws violate the Attainder Clause, U.S. Const. art. I, § 2, cl. 3, when they inflict "legislative punishment, of any form or severity, on specifically designated persons or groups." *United States v. Brown*, 381 U.S. 437, 447 (1965); *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) ("[A] law is prohibited under the bill of attainder clause 'if it (1) applies with specificity, and (2) imposes punishment.'").  The jurisdiction-stripping provision of Section 7 of the MCA targets only "aliens" who by virtue of Respondents' own designation are deemed "unlawful enemy combatants."  *See also* MCA § 948a(1).  There can be no real question that this language in the MCA, like the DTA before it, is specifically targeted at Guantánamo detainees, though it may be applied to non-citizens elsewhere as well.  *See Foretich*, 351 F.3d at 1217 (specificity element satisfied by describing affected persons without naming them).

Furthermore, the definition of "unlawful enemy combatant" includes "a person who is part of the Taliban, al Qaeda, or associated forces."  MCA § 948a(1)(A)(i).  But any Taliban fighters detained at Guantánamo were part of the armed forces of a sovereign state when

American military personnel invaded Afghanistan in the fall of 2001. The MCA is therefore a legislative decree that strips members of that military force of the protections and immunities that must be afforded to them under the laws of war. As such, it is an unlawful Bill of Attainder. *See Pierce v. Carskadon*, 83 U.S. 234, 239 (1872) (declaring lack of access to the courts an unlawful attainder); *see also United States v. Lovett*, 328 U.S. 303, 317-18 (1946) (noted that the Attainder Clause, at its core, is intended to prevent trial by unlawful means and citing a case involving trial by military commission).

## V.    THE MCA'S WITHDRAWAL OF HABEAS JURISDICTION VIOLATES EQUAL PROTECTION

The right of equal access to the courts is a fundamental right under equal protection, and that right is taken away by the MCA. *See Griffin v. Illinois*, 351 U.S. 12, 17 (1956); *Douglas v. California*, 372 U.S. 353, 358 (1963); *see also Tennessee v. Lane*, 541 U.S. 509, 522-23 (2004) ("the right of access to the courts" is subject to "more searching judicial review" under equal protection). Moreover, the line that divides who does and does not receive habeas review under Section 7 of the MCA is based on a patently unconstitutional distinction – alienage. *See Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("classifications based on alienage . . . inherently suspect and subject to close judicial scrutiny"). As the text of the MCA makes clear, it is not only those detainees like Petitioner, whom Respondents have imprisoned without charge for several years, who have their habeas rights removed. The MCA deprives those rights to all non-citizens – even lawful permanent residents of the United States – and thus violates equal protection. The MCA's withdrawal of habeas jurisdiction is therefore unconstitutional on this basis as well and must be stricken.

*       *       *

For all of these reasons, Respondents' motion to dismiss for lack of jurisdiction should be denied. Respondents' alternate request to transfer this case to the Court of Appeals, pursuant to 28 U.S.C. § 1631, based on its exclusive jurisdiction under the DTA, *see* Gvt. Br. at 15-17, should likewise be denied.

## VI.    THE COURT SHOULD SCHEDULE A HABEAS HEARING AND GRANT ADDITIONAL RELATED RELIEF

Because the withdrawal of habeas jurisdiction under the DTA and MCA is unconstitutional, there is no reason to delay consideration of the merits of the Petition. Petitioner thus moves for an order scheduling a habeas hearing. He also requests additional related relief, including expedited entry of the protective order, access to his counsel, and production of a factual return to his habeas petition.[26]

### A.    Expedited Entry of the Protective Order and Access to Counsel

As indicated above, it is clear from the unclassified summaries of Petitioner's CSRT and ARB proceedings that he wants – and desperately needs – access to his counsel in order to challenge the legality of his continuing, indefinite detention. Indeed, based on the unclassified summaries it appears that Petitioner may currently be detained as an enemy combatant solely as a result of mistaken identity. He may very well be "actually innocent" of any offense, as he maintained throughout the CSRT and ARB proceedings. *See supra* Part I.B.5. As this Court is also aware, Petitioner may not meet or otherwise communicate with his counsel until the protective order first entered by Judge Green in the *In re Guantanamo Detainee Cases*, 344 F. Supp. 174 (D.D.C.), is also entered in this case.[27] Petitioner therefore respectfully

---

[26] Respondents object to these requests. *See* Gvt. Br. at 16 n.11.

[27] *See* Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba (Nov. 8, 2004); Order Addressing Designation

requests that the Court order expedited entry of the protective order and direct Respondents to provide him access to his counsel as soon as possible.[28]

The Court plainly has the power to order entry of the protective order and grant counsel access to Petitioner because the withdrawal of habeas jurisdiction under the DTA and MCA is unconstitutional. Even if the Court were to conclude otherwise, that would not prevent the Court from granting this limited form of relief. Courts have entered the protective order more than forty times since enactment of the DTA. *See* Ex. G (attached hereto). In addition, Courts have entered the protective order several times since enactment of the MCA, including in cases like this that were filed between enactment of the DTA and MCA. *See, e.g.*, *Al-Zarnouqi v. Bush*, No. 06-CV-1767 (D.D.C. Dec. 4, 2006) (Urbina, J.) (order attached hereto as Ex. H); *Hentif v. Bush*, No. 06-CV-1766 (D.D.C. Nov. 21, 2006) (Kennedy, J.); *Saleh v. Bush*, No. 06-CV-1765 (D.D.C. Nov. 17, 2006) (Kennedy, J.); *Lal v. Bush*, No. 06-CV-1763 (D.D.C. Oct. 29, 2006 (Kollar-Kotelly, J.); *see also Feghoul v. Bush*, No. 06-CV-618 (D.D.C. Oct. 31, 2006) (Roberts, J.) (petition filed before, but docketed after, enactment of the DTA) (order attached hereto as Ex. I).

As Judge Urbina recently explained in *Al-Zarnouqi*, "[d]espite the lack of finality regarding the issues on appeal [ ] it is hardly sensible to withhold or frustrate something that no one doubts is petitioner's right – a meaningful communication with counsel regarding the factual basis of petitioner's detention. Allowing petitioners to meet with their lawyers is not the type of interim relief that even remotely risks infringing on the Court of Appeals' possible jurisdiction."

---

Procedures for "Protected Information" (Nov, 10, 2004); Order Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended Protective Order (Dec. 13, 2004).

[28] Counsel have obtained the necessary security clearances to meet with Petitioner under the terms of the protective order; and they intend to meet with him as soon as possible.

Ex. H, at 2 (quoting *Feghoul*; citations and internal quotation marks omitted).  Moreover, even if this case ultimately must be litigated in the Court of Appeals under the DTA and MCA, Petitioner will certainly require and – as Respondents have conceded – be granted access to counsel.  Accordingly, there is no reason to delay entry of the protective order or counsel access.

       **B.**       **<u>Production of a Factual Return to the Petition</u>**

Petitioner likewise seeks production of a factual return to the Petition, which at least two Courts have ordered since enactment of the MCA.  *See Feghoul*, No. 06-CV-618 (D.D.C. Oct. 31, 2006) (Ex. I); *Lal v. Bush*, No. 06-CV-1763 (D.D.C. Oct. 29, 2006) (Kollar-Kotelly, J.) (requiring production within thirty days of ruling by Court of Appeals).  He specifically requests copies of all classified and unclassified records from his CSRT and ARB proceedings, including without limitation any audio recordings or verbatim transcripts of those proceedings and any interim or final decisions of those proceedings.  Like entry of the protective order and counsel access, there can be no dispute that Petitioner is entitled to receive such information in order to fully and adequately challenge the factual and legal basis for his enemy combatant designation before a neutral decisionmaker.  *See Hamdi*, 542 U.S. at 533.  As it stands now, Petitioner has not even received the most basic notice concerning the basis for his continuing, indefinite detention except for the limited information contained in the two unclassified summaries of his CSRT and ARB proceedings, which is plainly insufficient to satisfy the due process requirements of *Hamdi*.

Moreover, we note that Respondents have already provided the type of information that Petitioner seeks here to members of the media – *some of whom previously attended CSRT and/or ARB proceedings* – who recently broadcast audio excerpts of such hearings on National Public Radio.  *See* Jackie Northam, *Tapes Provide First Glimpse of Secret*

*Gitmo Panels*, NPR Morning Ed. (Nov. 21, 2006), *available at* http://www.npr.org/templates/story/story.php?storyId=6514923.  Accordingly, there can be no good reason why this information should not also be provided to counsel for Petitioner.  Respondents' refusal to provide Petitioner with even the most limited information about the basis for his detention can only be seen as part of a campaign to frustrate and delay judicial scrutiny.

### C.    The Court Should Schedule a Habeas Hearing

Finally, the Court should schedule a hearing on the merits of the Petition.  As Your Honor noted in a recent decision:

> [T]he Court has felt compelled, for purposes of judicial economy and efficiency, to grant Respondents' Motions to stay proceedings of the Guantanamo Bay cases until completion of related appeals.  The longer appellate proceedings drag on, the more problematic it becomes as to whether a stay serves the interest of justice.  It is often said that 'justice delayed is justice denied.'  Nothing could be closer to the truth with reference to the Guantanamo Bay cases."

Mem. Order at 3, *Razak v. Bush*, No. 05-CV-1601 (D.D.C. Dec. 1, 2006) (dkt. no. 41).  While the Court nonetheless stayed that case pending resolution of the *Al Odah/Boumediene* appeals, this case is distinct and should not be stayed for two reasons.[29]

First, the consolidated appeals will not necessarily resolve the serious constitutional issues raised here.  The cases now on appeal were all filed long before enactment of the DTA, and thus fall squarely outside its prospective withdrawal of habeas jurisdiction.  *See* DTA §§ 1005(e)(1), (h)(1).  As to the MCA, the petitioners on appeal have argued that under ordinary canons of statutory construction the MCA's withdrawal of habeas jurisdiction is not retroactive and thus not applicable to them.  *See also Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (dkt. no. 78, at 10-15) (including statutory non-retroactivity argument).  If they are correct, this argument may avoid the need for the Court of Appeals to address some (or all) of the

---

[29] To the extent this case may have already been stayed, Petitioner moves to lift that stay.

constitutional arguments raised here.  But those constitutional arguments may not be avoided in this case because it was filed after enactment of the DTA and thus falls squarely within its purported withdrawal of jurisdiction, regardless of the retroactive application of the MCA.  *See* DTA §§ 1005(e)(1), (h)(1).

Second, there is otherwise no basis for this Court to stay consideration of the merits of the Petition pending appeals in other habeas cases.  Indeed, the Habeas Corpus Act itself requires that "[w]hen the writ or order is returned a day shall be set for hearing, not more than five days after the return unless for good cause additional time is allowed," and directs that the Court "shall summarily hear and determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.  No good cause exists to stay this case.

In deciding whether to grant a stay pending resolution of an appeal in another case, a court "must weigh competing interests and maintain an even balance."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254-255 (1936).  "[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else.  Only in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both."  *Id.* at 255; *see Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971) ("Any protracted halting or limitation of plaintiffs' right to maintain their case would require not only a showing of 'need' in terms of protecting the other litigation involved but would also require a balanced finding that such need overrides the injury to the parties being stayed.  This consideration is of particular importance where the claim being stayed involves a not insubstantial claim of present and continuing infringement of constitutional rights.  No such consideration or balancing was provided by the District Court.").

Because this is a habeas case, it is no answer for Respondents to cite to the usual stay jurisprudence, which applies abuse-of-discretion review to the unremarkable proposition that a trial court has broad flexibility to manage its general civil docket. *See Yong v. INS*, 208 F.3d 1116, 1119 (9th Cir. 2000) (explaining that the standard of review in a habeas proceeding "is somewhat less deferential than the flexible abuse of discretion standard applicable in other contexts"). Habeas is fundamentally different. The statutory provisions for prompt returns, immediate hearings, and summary disposition of habeas cases expressly require that petitions must be heard and decided promptly. 28 U.S.C. §§ 2241, 2243; *see Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 490 (1973) (noting the interest of the prisoner and of society in "preserv[ing] the writ of habeas corpus as a swift and imperative remedy in all cases of illegal restraint or confinement") (internal quotations and citation omitted); *Yong*, 208 F.3d at 1120 ("[H]abeas proceedings implicate special considerations that place unique limits on a district court's authority to stay a case in the interests of judicial economy."); *Ruby v. United States*, 341 F.2d 585, 587 (9th Cir. 1965) ("The application for the writ usurps the attention and displaces the calendar of the judge or justice who entertains it and receives prompt action from him within the four corners of the application. . . . One who seeks to invoke the extraordinary, summary and emergency remedy of habeas corpus must be content to have his petition or application treated as just that and not something else."); *Van Buskirk v. Wilkinson*, 216 F.2d 735, 737-38 (9th Cir. 1954) ("[The Writ] is a speedy remedy, entitled by statute to special, preferential consideration to insure expeditious hearing and determination.").

In habeas proceedings, stays are substantive, not procedural. Delay means more indefinite imprisonment, and that is the harm *itself*. So grievous is that harm, and so fundamental the right to be protected from it, that Congress limited the right to impair habeas

corpus in the Suspension Clause of the Constitution. Even an adjudicated criminal alien who has never made an entry into the United States, and has no right in law to be here, must be released into the United States when faced with the prospect of indefinite detention. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005).

*Yong* is directly on point with this case. It held that the entry of a lengthy and indefinite stay in a habeas case pending an appeal in a similar case is unlawful. *See* 208 F.3d at 1120-21 ("The stay . . . placed a significant burden on Yong by delaying, potentially for years, any progress on his petition. Consequently, although considerations of judicial economy are appropriate, they cannot justify the indefinite, and potentially lengthy, stay imposed here."). In *Yong*, a former Cambodian citizen filed a habeas petition challenging his indefinite detention after the United States was unable to promptly negotiate an agreement for his repatriation to Cambodia. *Id.* at 1118. Instead of ruling on the merits of his petition, the district court entered a stay pending resolution of similar issues on appeal of a different case. *Id.* Recognizing that the writ is intended to be a "swift and imperative remedy in all cases of illegal restraint of confinement," *id.* at 1120 (internal quotations and citations omitted), the Ninth Circuit vacated the five-month old stay order and remanded the case for further proceedings, *id.* at 1121. Here, as in *Yong*, a prolonged stay would impermissibly restrict the writ and should not be imposed.

The need for a prompt hearing is never greater than where, as here, a petitioner has been afforded no judicial review. *See Rasul*, 542 U.S. at 473-75; *St. Cyr,* 533 U.S. at 301; *Johnson v. Rogers*, 917 F.2d 1283, 1284 (10th Cir. 1990) (recognizing that if delay in deciding a habeas petition, absent good reason, were routinely permissible, "the function of the Great Writ would be eviscerated"); *Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir. 1978) ("The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if the trial courts do not act

within a reasonable time."); *Cross v. Harris*, 418 F.2d 1095, 1105 n.64 (D.C. Cir. 1969) ("This is a habeas corpus proceeding, and thus particularly inappropriate for any delay.").

*    *    *

The Center for Constitutional Rights filed the first habeas petition on behalf of Guantánamo detainees in February 2002. That case proceeded to the Supreme Court, which held in *Rasul* (and again in *Hamdan*) that the detainees have the right to challenge their detention through habeas. The Court also instructed the district courts to consider the "merits" of those petitions in the first instance. That has not happened.

Nearly five years after the first habeas case was filed, and after two Supreme Court decisions in favor of the detainees, Respondents continue to imprison more than 400 men virtually *incommunicado*, without charge, and without any meaningful opportunity to challenge the legality of their continuing detention. The results have been predictable: three detainees have died; more than eighty detainees suffer from serious mental illnesses precipitated or exacerbated by their indefinite detention; and many others have suffered and continue to suffer untold physical and psychological harm as a result of their hopeless circumstances.[30] This is not justice. For justice finally to be done at Guantánamo, this Court must consider the merits of the Petition.

---

[30] In some cases the harm may be so great as to impair a detainee's ability ever to proceed with a hearing on the merits of his petition. *See, e.g.*, Emergency Motion to Supplement Record on Appeal, *Kiyemba v. Bush*, Nos. 05-5487, *et al.* (D.C. Cir. Sept. 1, 2006) (with redacted supporting affidavit) (attached hereto as Ex. J).

## Conclusion

Petitioner respectfully requests that the Court deny Respondents' motion to dismiss and grant his cross-motion in its entirety.

Dated:     New York, New York
           December 11, 2006

                                   Respectfully submitted,

                                   Counsel for Petitioner:

                                   /s/ J. Wells Dixon
                                   William Goodman (Pursuant to LCvR 83.2(g))
                                   Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
                                   J. Wells Dixon (Pursuant to LCvR 83.2(g))
                                   CENTER FOR CONSTITUTIONAL RIGHTS
                                   666 Broadway, 7th Floor
                                   New York, New York 10012
                                   Tel:  (212) 614-6464
                                   Fax:  (212) 614-6499

# EXHIBIT A

*Kenneth W. Starr*
*24569 Via de Casa*
*Malibu, CA 90263*

September 24, 2006

The Honorable Arlen Specter
Chairman, Senate Committee on the Judiciary
Dirksen Senate Office Building, Room 224
Washington, D.C. 20510

Dear Chairman Specter:

I write to express my concerns about the limitations on the writ of *habeas corpus* contained in the compromise military commissions bill, The Military Commissions Act of 2006 (S. 3930). Although S. 3930 contains many laudable improvements to military commission procedure, section 6 of the bill effectively bars detainees at the U.S. Naval Base at Guantanamo Bay, Cuba from applying for *habeas corpus* review of their executive detention. I am concerned that limitation may go too far in limiting *habeas corpus* relief, especially in light of the apparent conflict between the holdings of Rasul v. Bush, 124 S.Ct. 2684 (2004), and Johnson v. Eisentrager, 339 U.S. 763 (1950).

Although the Rasul Court limited its holding to statutory *habeas* rights, which may be limited by the Congress, the Supreme Court nevertheless viewed Guantanamo Bay, Cuba as a territory within the control and jurisdiction of the United States. Accordingly, the Eisentrager case may no longer be relied upon with confidence to rule out constitutional *habeas* protections for Guantanamo detainees. One of the Eisentrager factors that limited constitutional *habeas* rights for aliens in military custody was whether the detainee was held outside of the United States. Based on the finding of the Rasul case that Guantanamo Bay falls within U.S. territorial jurisdiction, Guantanamo detainees likely have a different constitutional status than the alien detainees in Eisentrager, who were held in Landsberg, Germany.

Article 1, section 9, clause 2 of the United States Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." The United States is neither in a state of rebellion nor invasion. Consequently, it would problematic for Congress to modify the constitutionally protected writ of *habeas corpus* under current events.

I encourage the Senate Judiciary Committee to study the constitutional implications of S. 3930 on the *habeas corpus* rights of detainees in United States territory. Although no one wants the War on Terror to be litigated in the courts, Congress should act cautiously to strike a balance between the need to detain enemy combatants during the present conflict and the need to honor the historic privilege of the writ of *habeas corpus*. I thank you for holding a hearing on this topic and hope that it helps to strike that balance.

Sincerely,

Kenneth W. Starr

# EXHIBIT B

[NO ORAL ARGUMENT SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |  |
|---|---|---|
| HAJI BISMULLAH, et al., | ) | |
| Petitioners, | ) | |
| v. | ) | No. 06-1197 |
| | ) | |
| DONALD H. RUMSFELD, | ) | |
| Secretary of Defense, | ) | |
| Respondent. | ) | |

## RESPONSE IN OPPOSITION TO MOTION TO COMPEL

The Government opposes petitioners' motion to compel. Bismullah has been determined to be an enemy combatant in connection with the ongoing hostilities in Afghanistan against the Taliban and Al Qaeda and communications with him carry with them an inherent risk to the nation's wartime security. Accordingly, counsel access to Bismullah should be controlled by the entry of a protective order by this Court, in the form proposed by the government, and counsel's execution of a memorandum of understanding acknowledging the requirements of that order and agreeing to comply with it. The United States will move for entry of an appropriate protective order on or before August 25, 2006. Until the entry of that order, counsel can submit the petition or any other materials to Bismullah through normal mail channels, where the material would be subject to routine security screening. [1] Any specialized "legal mail" system in these circumstances, however, is appropriately controlled by a protective order, which is not yet in effect for Guantanamo Bay detention

---

[1] Contrary to petitioners' assertions, the Government has not refused to provide the petition or other legal material to Bismullah. Rather, it has refused to provide them absent the clearance of the filings through the Defense Department screening process for material within those filings that would raise security concerns.

cases in this Court pursuant to the Detainee Treatment Act. Bismullah's counsel also has no right to access classified information in the record of the Combatant Status Review Tribunal (CSRT), and access to such information must also await entry of a protective order.[2]

The development of a protective order for entry by this Court is not a simple task, contrary to what Bismullah suggests. Mot. at 9-10. It is a complex document consisting of numerous provisions designed to balance carefully the interest of allowing counsel to participate in this proceeding with the compelling national security interests that are at stake in detaining enemy combatants during ongoing hostilities. Further, the district court protective order is not an adequate substitute. Rather, that order has led to intractable disputes over vague or ambiguous provisions, unanticipated consequences that threaten safety and security at Guantanamo, and gaps that have allowed unwarranted potential security risks and inappropriate impositions upon the military during a time of war.[3]

Bismullah's overheated rhetoric (p. 2) that these issues "must be resolved immediately" lacks merit. Bismullah has been detained as an enemy combatant since February 2003. He was expressly notified in 2004 of his right to submit a petition for habeas

---

[2] The unclassified CSRT material has now been provided to counsel. In future cases, the provision of such material will also be governed by the proposed protective order.

[3] These problems will be explained in detail in the government's motion for a protective order to be filed later this week. In brief, those problems have stemmed from counsel and detainees utilizing the legal mail system to transmit materials that are not related to the litigation challenging the detentions or in a manner that creates a security risk; the pursuit of litigation on behalf of detainees by alleged "next friends" in circumstances where the detainee refuses to participate in the suit; and communications from counsel that have encouraged risky behavior by detainees.

corpus. *See Adem v. Bush*, 425 F.Supp.2d 7, 11-13 (D.D.C. 2006). In spite of this notice, Bismullah never sought habeas corpus relief, nor has he himself sought relief under the Detainee Treatment Act. Likewise, the petitioner here, who claims to be Bismullah's "next friend," has been aware of Bismullah's detention at Guantanamo since March 2003 (Pet. 13), yet did not file any action in until over three years had passed. The government is working diligently to prepare a proposed protective order to govern these proceedings and will move for entry of one by August 25; in these circumstances, no immediate court-ordered access as sought by Bismullah is necessary in advance of the entry of such an order. Indeed, the government has permitted two visits by counsel with Bismullah in the past two months pursuant to a restrictive regime agreed to by counsel.

The government genuinely seeks to allow counsel to participate meaningfully in this litigation, and its proposed protective order will provide counsel with much of what they are seeking. First, it will allow counsel to communicate with the detainee through a special legal mail system designed to preserve attorney-client privilege while still ensuring that national security is protected in these unique circumstances. Second, if the detainee elects to participate in this action, counsel will be given the opportunity to visit the detainee in person. Third, counsel with the necessary clearances will be given access to the full CSRT record to the extent counsel has a need to know this information. This record formed the basis of the CSRT determination and has been certified in this Court as the "complete record upon which the final decision of the [CSRT] was entered in this case." Certified Index to Record at 1.

Counsel seeks, in addition to the record before the CSRT, to be given immediate

access to "all relevant and reasonably available information in the government's possession concerning Bismullah." Mot. at 14. Essentially, counsel seeks to engage in wide ranging discovery in search of any information that ought to have been considered by the CSRT. Such a request wholly incompatible with the scheme of limited judicial review provided by the Detainee Treatment Act. It is also inconsistent with the scope of review familiar in administrative review cases, where a strong presumption of regularity is accorded to the record, and, finally, it is unprecedented with respect to wartime detention of enemy combatants. For all these reasons, to the extent counsel seeks information other than that contained in the certified CSRT record, that request should be denied.

## STATEMENT

**A.** CSRT procedures were established by written orders of the Deputy Secretary of Defense and the Secretary of the Navy "to determine, in a fact-based proceeding, whether the individuals detained * * * [at] Guantanamo * * * are properly classified as enemy combatants and to permit each detainee the opportunity to contest such designation." Deputy Sec. England Memo. at 1 (Pet. Exh. 3). A CSRT is composed of "three neutral commissioned officers" who were not involved in the apprehension or interrogation of the detainee, CSRT Process, Encl. 1, §C(1) (Pet. Exh. 3). A recorder is charged with "obtain[ing] and present[ing] all relevant evidence to the [CSRT] and to cause a record to be made of the proceedings." *Id.* § C(2). During the CSRT hearing, the recorder "shall present to the Tribunal such evidence in the Government Information as may be sufficient to support the detainee's classification as an enemy combatant, including the circumstances of how the

detainee was taken into the custody of U.S. or allied forces." *Id.* § H(4).[4] The recorder provides to the CSRT any evidence which might "suggest that the detainee should not be designated as an enemy combatant." *Ibid.* The recorder also presents an "unclassified report summarizing the Government Evidence and any evidence to suggest that the detainee should not be designated as an enemy combatant." *Id.* § H(5). This report is provided to the detainee and his personal representative in advance of the CSRT proceeding. *Ibid;* Enc. 3, § D. The recorder also "shall call witnesses, if any." Enc. 1, § H(6). The detainee's personal representative also reviews the government information presented, and may independently present evidence "to the CSRT on the detainee's behalf." *Id.*, Enc. 3, § C(2) & (3).

During the CSRT proceeding, the detainee may "present evidence" and testimony. *Id.* Enc. 1, § H(7). In addition to his own testimony, the detainee may present the relevant "testimony of witnesses who are reasonably available," as well as relevant documents and written statements. *Id.* § F(6), H(7). A personal representative shall "assist the detainee in reviewing all relevant unclassified information, in preparing and presenting information, and in questioning witnesses." *Id.* § C(3).

**B.** The Detainee Treatment Act ("DTA"), enacted in December 2005, establishes a

---

[4] Information presented to the CSRT that supports the detainee's classification as an enemy combatant is delineated as the "Government Evidence." *Ibid.* "Government information" is defined as that information which is "reasonably available information in the possession of the U.S. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings." *Id.* § E(3).

judicial review mechanism for determinations made by a CSRT. Pub. L. No. 109-148, tit. X, § 1105(e)(2), 119 Stat. 2741-42. The statute confers on this Court "exclusive jurisdiction to determine the validity of any final decision of a [CSRT] that an alien is properly detained as an enemy combatant." *Id.* § 1105(e)(2)(A). This Court's review "shall be limited to the consideration of * * * whether the status determination of the [CSRT] with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for [CSRTs] (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). This Court may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).[5]

C. Bismullah, was captured in Afghanistan in February 2003 and has been detained as an enemy combatant since that time. In a hearing held on November 30, 2004, a CSRT reviewed his status and determined that he is an enemy combatant. In June 2006, Haji Mohammad Wali filed a petition for review in this Court under the DTA. Wali states that he is Bismullah's brother, and is acting as his "next friend." Pet. at 6-7. Counsel has been allowed to visit Bismullah in person twice at Guantanamo (in June and August 2006) but has

---

[5] This petition was filed after the enactment of the DTA. Accordingly, this case will remain in this Court regardless of the decision in *Al Odah v. United States*, Nos. 05-5064, 05-5095 through 05-5116, and *Boumediene v. Bush*, 05-5062 & 05-5063, relating to the applicability of the Act to pending cases and other issues that will impact this case, such as whether Guantanamo detainees have rights under the Constitution.

not submitted anything to this Court signed by Bismullah to suggest that Bismullah supports

this lawsuit or would like counsel to represent him.

## ARGUMENT

On or before August 25, 2006, the government will seek the entry of a protective order

that will allow counsel access to much of what he seeks. Until such an order is entered,

however, he is not entitled to the information requested in his motion. Further, even after the

entry of a protective order, Bismullah is not entitled to the sort of wide-ranging discovery of

any "relevant" information contained in government files. Instead, review under the DTA

is on the record of the CSRT, and no additional material need be provided in order for this

Court to carry out that review.

A.   **Entry of a Protective Order on Terms Appropriately
     Protective of the Government's Interests is Required to
     Govern Counsel Access to Classified Material and to
     Represented Detainees.**

Contrary to Bismullah's claim, counsel has no right stemming from the Constitution

or the DTA to access the detainee or classified information in the record. Rather, that access

requires protective measures appropriate to the circumstances of these detentions, and which

will be set forth soon in a proposed protective order. As an initial matter, Bismullah, as an

enemy combatant detained overseas during an ongoing armed conflict, has no right to

counsel; nor does his counsel have any right to access classified information. These points

were fully addressed in *Al-Odah* and *Boumediene*, and a decision on the process appropriate

in this case is closely bound up in this Court's resolution of those appeals.

1. Historically, a captured enemy combatant was entitled to *no* process to challenge

-7-

his status. More recently, the process granted to aliens captured on a foreign battlefield was no more than the procedures reflected in Article 5 of the Geneva Convention and Army Regulation 190-8, where there is *no* provision of counsel and detainees are given *no* access to classified information. *See* Army Reg. 190-8, § 1-6.e(3) & (5).[6] The same could occur in this review proceeding.

Further, this Court can carry out its review without a requirement for counsel access to classified information. When this Court performs its familiar role of reviewing the decision of an administrative body, it has the "inherent authority to review classified material *ex parte, in camera* as part of its judicial review function." *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004). Because this Court can perform that function *ex parte*, there is no reason to allow counsel access to the classified material that is in the CSRT record. Instead, this Court has explained in regard to classified information: "[w]e anticipate that in camera review of affidavits, followed if necessary by further judicial inquiry, *will be the norm.*" *Stillman v. C.I.A.*, 319 F.3d 546, 548 (D.C. Cir. 2003) (emphasis added).

**2.** The Due Process Clause does not require that counsel be provided materials that are classified. The rulings of the Supreme Court and this Court have recognized the government's compelling interest in protecting its national security and in the classified information that is vital to the nation's security. *See Haig v. Agee*, 453 U.S. 280, 307

---

[6] Common Article 3 of the Convention does not address the procedures for determining an individual's status as an enemy combatant during the relevant hostilities. Instead, it only limits the "passing of sentences and the carrying out of executions," neither of which are involved here. 6 U.S.T. 3316, 3318 (1956).

(1981). Because of this compelling interest, this Court has upheld agency action and rejected due process claims even when private parties and their counsel have been denied all access to classified information in the record. *See Jifry*, 370 F.3d at 1184; *People's Mojahedin Org. v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003) (citing *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 207-09 (D.C. Cir. 2001)); *Holy Land Foundation v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003).

Moreover, this Court should work towards a solution that will allow resolution of this matter while avoiding the difficult constitutional and separation-of-powers questions that would arise if a court attempted to *compel* disclosure of national security information or *require* access to a detained enemy combatant. *See Stillman*, 319 F.3d at 548. Indeed, ordering the release of information or unqualified access to enemy combatants would violate core separation-of-powers principles. *See Hamdi* v. *Rumsfeld*, 542 U.S. 507, 531 (2004) (recognizing detention of enemy combatant as "core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them") (plurality op.); *Egan*, 484 U.S. at 527 ("authority to classify and *control access to information* bearing on national security * * * flows primarily from [Article II's] constitutional investment of power in the President and exists quite apart from any explicit congressional grant") (emphasis added); *Holy Land*, 333 F.3d at 164 (recognizing "the primacy of the Executive in controlling and exercising responsibility over access to classified information"). These considerations strongly militate in favor of awaiting the government's proposed protective order, to be filed later this week, prior to ordering access to the detainee

or to the classified materials in the CSRT record.

**B.    Counsel Is Not Entitled To The Production Of Materials Outside of the CSRT Record.**

**1.** Bismullah next argues (p. 18) that the "plain language" of the DTA authorizes him to "rely on evidence that was not part of the prior CSRT evidentiary record." This contention is without merit because the DTA's plain language clearly sets forth a familiar scheme whereby this Court reviews the decision of the CSRT based on the record before it. The Act specifies that "review" is of "the validity of any final decision of a Combatant Status Review Tribunal." *Id.* § 1105(e)(2)(A). That "review" also "shall be limited to the consideration of * * * whether the status determination * * * was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)." *Id.* § 1105(e)(2)(C). The review may also consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* § 1105(e)(2)(C).

Such review is limited by the statute's terms and established precedent to the administrative record before the tribunal. Even outside the wartime context, it is established that statutes providing for review of final agency decisions authorize a "reviewing function [that] is * * * ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based." *United States v. Carlo Bianchi & Co.*, 373 U.S.

-10-

709, 714-15 (1963); *see Florida Power & Light Co. v. Lorion* 470 U.S. 729, 743 (1985)

(recognizing the "fundamental principle[] of judicial review of agency action" that "'[t]he

focal point for judicial review should be the administrative record already in existence, not

some new record made initially in the reviewing court.'") (quoting *Camp v. Pitts*, 411 U.S.

138, 142 (1973)); *Jifry*, 370 F.3d at 1181.

Even in cases where "Congress has simply provided for review, without setting forth

the standards to be used or the procedures to be followed, [the Supreme] Court has held that

consideration is to be confined to the administrative record and that no de novo proceeding

may be held." *Carlo Bianchi*, 373 U.S. at 715. Here, Congress specified narrow review of

the administrative decision – to determine if the decision was "consistent with" CSRT

procedures; whether the decision was "supported by a preponderance of the evidence"; and

whether the "use of such standards and procedures * * * is consistent with the Constitution

and laws of the United States," to the extent applicable. *Id.* § 1105(e)(2). Each of these

limitations calls for a review of the record before the agency upon which it based its decision.

Accordingly, this type of record review is limited to assessing the validity of the decision of

the CSRT based upon the record before it and applying the appropriate standard of review.

*See Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d

678, 685 (D.C. Cir. 1982) ("applicability of de novo review to administrative actions is

limited and is generally not presumed in the absence of statutory language or legislative

intent to the contrary"). [7]

Bismullah urges that review need not be on the record of the proceeding because the detainee may challenge the CSRT determination "on the ground that the determination is not supported by 'a preponderance of the evidence'" and the statute does "not limit" this review to "a preponderance of the evidence 'in the record.'" Mot. at 18. This argument simply fails to accord meaning to the language of the statute. The Act specifies that this Court may assess whether the "requirement *that the conclusion of the Tribunal* be supported by a preponderance of the evidence" has been met, DTA, § 1105(e)(2)(C) (emphasis added), as part of an inquiry into whether a CSRT decision is "consistent with the standards and procedures specified by the Secretary of Defense." *Ibid.* By its terms, this provision limits review to the question of whether the CSRT followed appropriate procedure and rendered a decision supported by sufficient evidence. In determining on review whether the "the tribunal (*i.e.* the CSRT) rendered a decision "consistent with" DOD CSRT procedures requiring support of a CSRT decision by a "preponderance of the evidence," it makes no sense to consider evidence not before the CSRT.

Rather, this type of review provision is consistent with this Court reviewing the CSRT

---

[7] Review on the record is, of course, particularly appropriate where Congress has lodged review of an agency determination in the court or appeals, which is not suited for factfinding. *See Bianchi*, 373 U.S. at 715; *Midwest Independent Transmission System Operator, Inc. v. FERC*, 388 F.3d 903, 910 (D.C. Cir. 2004) (court of appeals review appropriate when "'[t]he factfinding capacity of the district court is . . . unnecessary to judicial review of agency decisionmaking,' because the administrative proceedings have already generated the record necessary for appellate review"); *General Elec. Uranium Management Corp. v. U.S. Dept. of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985).

factual determination to ensure, at most, that it is supported by substantial evidence.  *See*

*Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) ("Substantial evidence * * * *

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion"); *Jifry*, 370 F.3d at 1181 ("'[s]ubstantial evidence' is simply such relevant

evidence as a reasonable person might accept as proof of a conclusion"); *Charlton v. FTC*,

543 F.2d 903, 907 (D.C. Cir. 1976) (explaining that in circumstance where "agency itself is

to initially ascertain the facts" under a "preponderance of the evidence" standard, "on judicial

review of agency action, [those] administrative findings of fact must be sustained when

supported by substantial evidence on the record considered as a whole" as the standard to be

utilized by the "reviewing court").

Indeed, every administrative review proceeding must necessarily develop a standard

of review for administrative resolution of factual issues, and nothing about defining that

standard of review suggests that this Court should conduct its review by going outside of the

record. *See Carlo Bianchi*, 373 U.S. at 715 ("the standards of review adopted * * * 'not

supported by substantial evidence'-have frequently been used by Congress and have

consistently been associated with a review limited to the administrative record * * * * [t]his

standard goes to the reasonableness of what the agency did on the basis of the evidence

before it, for a decision may be supported by substantial evidence even though it could be

refuted by other evidence that was not presented to the decision-making body").  Rather,

when Congress intends to allow factfinding when a court is conducting review of an agency

decision, it provides expressly for such factfinding.  *Cabinet Mountains*, 685 F.2d at 685;

*see, e.g.*, 28 U.S.C. § 2347(c) (Hobbs Act provision addressing "leave to adduce additional evidence"); 5 U.S.C. § 706(2)(F); *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (IDEA expressly authorizes district court to "'hear additional evidence at the request of a party'" and "'bas[e] its decision on the preponderance of the evidence'") (quoting 20 U.S.C. § 1415(i)(2)(B)). In sum, the DTA does not provide for evaluating evidence outside of the record reviewing a CSRT's factual conclusion of evidentiary sufficiency.

In accord with ordinary administrative review principles, the DTA is thus properly read as limiting this Court's review to the record before the CSRT. It is important to remember, however, that this is not a garden-variety administrative law case. Rather, it is the extraordinary grant of review of an enemy combatant determination during an ongoing armed conflict. To read the DTA to afford wide ranging discovery and *de novo* fact review, as petitioner suggests, is not only contrary to established administrative review principles, it is also to argue that the DTA grants greater judicial review than that has historically been granted to even a person convicted by a military commission. *See Yamashita v. Styer*, 327 U.S. 1, 8, 23 (1946). Such review is not remotely contemplated by Article 5 of the Geneva Convention or Army Regulation 190-8, and it is not even contemplated in *Hamdi* even for citizens held in this country as enemy combatants. At bottom, the DTA, which provides record review of final CSRT decisions, cannot fairly be construed as providing discovery and *de novo* review, especially where doing so both has no historical precedent and would impose of the Executive an unprecedented wartime burden.

-14-

**2.** Bismullah next argues (p. 8) that factfinding is allowed because the DTA "confers original – not appellate – jurisdiction on this Court." The fact that the DTA provides direct review of a CSRT determination in this Court lends no support to Bismullah's argument that review should extend beyond the record in this case. Rather, as we have shown, record review is the norm when original jurisdiction is conferred upon this Court. Similarly, whether or not this case involves "administrative decisions entitled to deference" (p. 19 n.11) or "claims" rather than "appeals" (*ibid.*) says nothing about whether this case involves review based on the record before the CSRT. Instead, as we have explained, the statute itself calls for record review by conferring on this Court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review." DTA § 1005(e)(2)(A).

Bismullah urges (p. 19 n.11) that he has "made a strong showing of inadequate fact-finding procedures" such that this Court needs to consider extra-record evidence. In a similar vein, Bismullah's counsel urges that "significant exculpatory information has been provided" to various United States officials, thereby justifying a discovery-like process to determine if the government is in possession of this evidence. But the DTA does not authorize fact-finding by this Court in these or any other circumstances. *Cf. Camp*, 411 U.S. at 142 ( *de novo* hearing allowed in APA claims in limited circumstances because 5 U.S.C. § 706(2)(F) expressly so provides). Instead, Congress directed the Department to ensure that its already existing administrative review board process for periodic review of detainee status that takes into consideration any relevant new information. *See* DTA § 1005(a)(1) & (3) (directing Secretary to promulgate "procedures of the * * * Administrative Review Boards" that, among

-15-

other things, "provide an annual review to determine the need to continue to detain an alien who is a detainee" and "provide for periodic review of any new evidence that may become available relating to the enemy combatant status of a detainee"). The Department has updated its preexisting regulation to include those procedures.    *See* ARB Memo. and Procedures, Enc. 13 (July 14, 2006).[8] The ARB procedures, in existence since 2004, provide for annual "consideration of all relevant and reasonably available information to determine whether the enemy combatant represents a continuing threat." ARB Mem., § 1.c. In those proceedings, the detainee is allowed to "present information relevant to his continued detention, transfer, or release." *Ibid.*; *Id.* encl. 3, § 3.a (detainee "shall be provided a meaningful opportunity to be heard and to present information to the ARB"). Under the present regulations, any new information relating to the enemy combatant status of a detainee that is presented to an ARB shall be brought to the attention of the Deputy Secretary of Defense as soon as practicable. The Deputy Secretary of Defense shall review the new evidence and decide whether to convene a new CSRT to reconsider the basis of the detainee's enemy combatant status. *See* ARB Memo. and Procedures, Enc. 13.

In sum, the DTA does not authorize the submission of new evidence to this Court relating to the detainee's status as an enemy combatant; such evidence must instead be submitted to DoD, consistent with the congressionally-authorized procedures for consideration of such evidence.

Finally, Bismullah argues that he must be able to submit evidence to this Court "akin

---

[8] Http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf.

to an 'actual innocence' claim in *habeas corpus* proceedings;" if not, Bismullah argues (p. 19-20), the DTA would constitute a suspension of the writ of habeas corpus. This claim is meritless, for reasons that have been addressed in detail in the *Al Odah* briefing. First, alien combatants held overseas have no constitutional rights under the Suspension Clause. *See Johnson v. Eisentrager*, 339 U.S. 763, 777-79 (1950). Second, even if Suspension Clause rights existed, they do not require or necessitate any factual review of the CSRT determination. *See INS* v. *St. Cyr*, 533 U.S. 289, 305-06 (2001) (under traditional habeas review, "other than the question whether there was some evidence to support the order, the courts generally did not review the factual determinations made by the Executive"); *Yamashita*, 327 U.S. at 8 (military tribunals are "not subject to judicial review merely because they have made a wrong decision on disputed facts."). And third, what Bismullah calls an "actual innocence" claim is in fact a claim that Bismullah is not properly designated as an enemy combatant. A challenge to the evidentiary sufficiency of the CSRT decision, designating him as an enemy combatant,  is properly rendered on the CSRT record. *Superintendent, Mass. Correctional Institution v. Hill*, 472 U.S. 445, 455-457 (1985) (the some evidence standard "does not require" a "weighing of the evidence," but rather calls for assessing "whether there is any evidence in the record that could support the conclusion")).

**3.**  Bismullah also argues that he is entitled to obtain  "all information in the possession of the government that is relevant" (Mot. at 15) in order to "show that the Recorder failed to discharge his obligations consistent with the CSRT Procedures" to provide relevant information to the CSRT. Mot. at 16. Bismullah argues that such review is entailed

in determining whether the "CSRT Procedures" were followed. Mot at 16. Such a request

is essentially an effort to disguise free-ranging discovery of any relevant material possessed

by the government in the guise of a procedural challenge. But Bismullah misperceives the

scope of this Court's review as well as the nature of the recorder's task, which is routine and

entitled to a presumption of regularity.

First, Bismullah misperceives the scope of this Court's review, which is of the

"validity of any final decision of a CSRT." DTA, § 1005(e)(2)(A). That review, as we have

explained, is on the record and does not call for opening up to review the recorder's process

of identifying and gathering relevant evidence. *See Citizens to Preserve Overton Park, Inc.

v. Volpe*, 401 U.S. 402, 417, 420 (1971) (in evaluating "whether the Secretary's action

followed the necessary procedural requirements" under the APA, explaining that "where

there are administrative findings that were made at the same time as the decision * * * there

must be a strong showing of bad faith or improper behavior before [an] inquiry may be

made" into the "mental processes of administrative decisionmakers"); *Community for

Creative Non-Violence v. Lujan*, 908 F.2d 992, 998 (D.C. Cir. 1990) (no review of "agency

decisionmaking process" when there is an "adequate record in this case for effective judicial

review"). Instead, this Court's review of the process is based on the record before the

administrative decisiomaker, *i.e.*, the CSRT. *See James Madison Ltd. v. Ludwig*, 82 F.3d

1085, 1095 (D.C. Cir.1996).

Thus, this Court has rejected the notion that in conducting review of an agency

decision, it should look behind the actions of officials who are not the ultimate

decisionmaker. In *James Madison*, this Court rejected the assertion that because "the examiners were the 'real decision-makers,' * * * the district court should have reviewed whatever materials the examiners may have seen during their on-site investigation." *See James Madison*, 82 F.3d at 1095. Instead, there was no reason to look behind the actions of the examiners, just as here there is no reason to look beyond the evidence compiled by the recorder; rather, review is of the information submitted by the examiner or the recorder for use in making the ultimate administrative decision. *Id.* at 1095-96. Ultimately, a contrary view would turn the Court into the first line factfinder searching for "all information in the possession of the government that is relevant" (Mot. at 15), but in administrative review courts "do not duplicate agency fact-finding efforts." *James Madison*, 82 F.3d at 1096.

Indeed, the recorder's task is routine and subject to a strong presumption of regularity. The recorder's job, essentially, is to compile material that is both relevant and reasonably available and to present that material to the CSRT. CSRT Procedures, Enc. 1, § C(2).[9] Such a routine task is entitled to the strongest sort of presumption of regularity in reviewing the

---

[9] Bismullah vastly overstates the recorder's role. With one small exception, the recorder simply compiles relevant material that is reasonably available in government files (*see* CSRT Procedures, Enc. 1, § E(3) (defining "Government Information")), and places that information into the CSRT record. *Id.* § H(4). The only government information that would not enter the CSRT record is material that goes *beyond* what would be sufficient to conclude that the detainee is an enemy combatant, *e.g.*, duplicative material supporting the fact that a detainee is an enemy combatant. As an additional check, the Personal Representative also reviews all of the government information, and may independently present evidence "to the CSRT on the detainee's behalf." *Id.*, Enc. 3, § C(2) & (3). And, of course, Bismullah himself could testify and submit evidence that is reasonably available. *Id.*, Enc. 1, § F(6). Thus, Bismullah's claim (p. 15) that the "Recorder *alone* is responsible for reviewing all information * * * that is relevant" is not true.

decision of the CSRT. *See Martino v. U.S. Dept. of Agriculture*, 801 F.2d 1410, 1413 (D.C.

Cir. 1986. Indeed, the original purpose of the presumption of regularity is to allow reliance

upon the record upon which a decision is based. *See Dorsey v. Gill*, 148 F.2d 857, 874 (D.C.

Cir. 1945).

In sum, the functions of the recorder cannot be utilized as an avenue for freewheeling

discovery into "all information in the possession of the government that is relevant." Mot.

at 15. Instead, the review in this Court is to be based upon the record before the CSRT, and

that record will be provided to this Court and, upon entry of a protective order, to counsel.

## CONCLUSION

For the foregoing reasons, this Court should deny Bismullah's motion to compel.

Respectfully submitted,

PETER D. KEISLER
*Assistant Attorney General*

GREGORY G. KATSAS
*Deputy Associate Attorney General*

DOUGLAS N. LETTER
*Terrorism Litigation Counsel*

ROBERT M. LOEB
(202) 514-4332
AUGUST E. FLENTJE
(202) 514-1278
Attorneys, Appellate Staff
Civil Division, Room 7268
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

AUGUST 2006

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2006, I caused copies of the foregoing "RESPONSE IN OPPOSITION TO MOTION TO COMPEL" to be served upon counsel of record by causing copies to be sent by Fed Ex overnight delivery and by e-mail transmission to:

> Jeffery I. Lang
> Jennifer R. Cowan
> Debevoise & Plimpton
> 919 Third Avenue
> New York, New York 10022

Robert M. Loeb

# EXHIBIT C

ORAL ARGUMENT HELD SEPTEMBER 8, 2005 AND MARCH 22, 2006

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 05-5064, 05-5095 through 05-5116
KHALED A.F. AL ODAH, *et al.*,
*Petitioners-Appellees/Cross-Appellants,*

v.

UNITED STATES OF AMERICA, *et al.*,
*Respondents-Appellants/Cross-Appellees.*

Nos. 05-5062 and consolidated case 05-5116
LAKHDAR BOUMEDIENE, *et al.*,
*Petitioners-Appellants,*

v.

GEORGE W. BUSH, *et al.*,
*Respondents-Appellees.*

ON CONSOLIDATED APPEALS FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

## BRIEF OF *AMICI CURIAE* RETIRED FEDERAL JURISTS
## IN SUPPORT OF PETITIONERS' SUPPLEMENTAL BRIEF
## REGARDING THE MILITARY COMMISSIONS ACT OF 2006

Patricia A. Bronte
Douglas A. Sondgeroth
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
312 222-9350

Dated: November 1, 2006

Agnieszka M. Fryszman
COHEN, MILSTEIN, HAUSFELD
 & TOLL, PLLC
1100 New York Avenue, N.W.
Washington, DC 20005
202 408-4600

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A.    Parties and *Amici***

Except for the following, all parties, intervenors, and *amici* appearing before the District Court and/or in this Court on these appeals are listed in the Opening Brief of the Government in *Al-Odah v. United States*, Nos. 05-5064, 05-5095 through 05-5116, in the Opening Brief of the Petitioners in *Boumediene v. Bush*, Nos. 05-5062 and 05-5063, in the Brief of the Government in *Boumediene v. Bush* filed on May 25, 2005, in the Guantanamo Detainees' Corrected Second Supplemental Brief Addressing the Effect of the Detainee Treatment Act of 2005 in *Al Odah v. United States* filed on March 10, 2006, and in the briefs filed on November 1, 2006 by the Petitioners in *Al-Odah v. United States* and *Boumediene v. Bush*.

*Amici curiae,* former federal judges, are:

- The Honorable Shirley M. Hufstedler, who served as a judge on the United States Court of Appeals for the Ninth Circuit from 1968 to 1979.

- The Honorable Nathaniel R. Jones, who served as a judge on the United States Court of Appeals for the Sixth Circuit from 1979 to 2002.

- The Honorable George N. Leighton, who served as a judge on the United States District Court for the Northern District of Illinois from 1976 to 1987.

i

- The Honorable Timothy K. Lewis, who served as a judge on the United States District Court for the Western District of Pennsylvania from 1991 to 1992, and as a judge on the United States Court of Appeals for the Third Circuit from 1992 to 1999.

- The Honorable Frank J. McGarr, who served as a judge on the United States District Court for the Northern District of Illinois from 1970 to 1988, and as chief judge of the court from 1981 to 1986.

- The Honorable Abner J. Mikva, who served as a judge on the United States Court of Appeals for the District of Columbia Circuit from 1979 to 1994, and as chief judge of this Court from 1991 to 1994.

- The Honorable Patricia M. Wald, who served as a judge on the United States Court of Appeals for the District of Columbia Circuit from 1979 to 1999, and as chief judge of this Court from 1986 to 1991.

The law firms of Jenner & Block LLP and Cohen, Millstein, Hausfeld & Toll, PLLC have appeared for *amici*. Jenner & Block LLP currently represents fourteen Guantánamo detainees, only one of whom is a petitioner in these consolidated appeals. The firm previously submitted an *amicus* brief to this Court on behalf of petitioners in *Qassim, et al. v. Bush*, No. 05-5477. In addition, Jenner & Block LLP represented *amici* before the Supreme Court in *Hamdi v. Rumsfeld*, No. 03-6696, and *Rasul, et al. v. Bush*, No. 03-334. Cohen, Milstein, Hausfeld & Toll PLLC currently represents four Guantánamo detainees, but none of the detainees is a petitioner in these consolidated appeals.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Opening Briefs of the Government in *Al-Odah v. United States* and of the Petitioners in *Boumediene v. Bush*.

**C.    Related Cases**

The Opening Briefs of the Government in *Al-Odah v. United States* and of the Petitioners in *Boumediene v. Bush* indicate which of the cases on review were previously before this Court and identify the names and numbers of related cases pending in this Court or in the District Court.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ...................................................i

A.    Parties and *Amici* .................................................................................i

B.    Rulings Under Review...........................................................................iii

C.    Related Cases.....................................................................................iii

Table of Authorities .................................................................................vi

Glossary..................................................................................................viii

Interest of *Amici Curiae* .............................................................................1

Summary of Argument................................................................................1

Argument..................................................................................................4

Adopting The Government's Interpretation Of The MCA/DTA Would
Unconstitutionally Force This Court To Condone The Use Of
Evidence Secured By Torture. .....................................................................4

A.    The CSRTs Failed to Consider Whether Evidence Relied
      Upon Was Obtained By Torture.........................................................4

      1.    CSRTs referred torture allegations for investigation
            but did not wait for the investigation results. ........................6

      2.    Many CSRTs did not address evidence of torture. .................9

      3.    A few CSRTs cross-examined detainees to distance
            U.S. forces from the alleged torture. ....................................11

B.    The Fifth Amendment and the Common Law Prohibit
      Detention Based on Evidence Procured by Torture. .........................15

      1.    The Due Process Clause....................................................15

      2.    The Common Law..............................................................16

C.    The Government's Reading of the MCA/DTA Would Allow
Indefinite Imprisonment Based On Evidence Secured By Torture,
in Violation of the Constitution and the Common Law. ...............................18

Conclusion ...............................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*A(FC) v. Secretary of State for the Home Department,*
   [2005] UKHL 71 (H.K. Dec. 8, 2005) ............................................................17

\**Brown v. Mississippi,* 297 U.S. 278 (1936) ............................................................16

*Chambers v. Florida,* 309 U.S. 227 (1940) ............................................................18

*Chavez v. Martinez,* 538 U.S. 760 (2003) ............................................................15

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) ............................................15

*Felker v. Turpin,* 518 U.S. 651 (1996) ............................................................16

*Hamdan v. Rumsfeld,* 126 S. Ct. 2749 (U.S. 2006) ............................................2

*In re Guantánamo Detainee Cases,* 355 F. Supp. 2d 443 (D.D.C. 2005) ................6

\**INS v. St. Cyr,* 533 U.S. 289 (2001) ............................................................16

\**Jackson v. Denno,* 378 U.S. 368 (1964) ............................................................15

\**Miller v. Fenton,* 474 U.S. 104 (1985) ............................................................15, 16

*Palko v. Connecticut,* 302 U.S. 319 (1937), *overruled on other grounds*
   *by Benton v. Maryland,* 395 U.S. 784 (1979) ............................................15

*Rasul v. Bush,* 542 U.S. 466 (2004) ............................................................1

*Rochin v. California,* 342 U.S. 165 (1951) ............................................................15, 16

\**Swain v. Pressley,* 430 U.S. 372 (1977) ............................................................18

\* Authorities upon which we chiefly rely are marked with asterisks

**Statutes**

Pub. L. No. 109-148, 119 Stat. 2739 (2005)................................................................2

Pub. L. No. 109-366, 120 Stat. 2600 (2006)...............................................................2

U.S. Const. Art. I, § 9, cl. 2.........................................................................................18

**Other Authorities**

4 William Blackstone, *Commentaries on the Laws of England*
(1st ed. 1803) ......................................................................................................17

Edward Coke, *The Third Part of the Institutes of the Laws of England*
(W. Clarke & Sons 1817) ....................................................................................17

3 Jonathan Elliot, The Debates in the Several State Conventions on the
Adoption of the Federal Constitution (1836) ...........................................15, 18

Lawrence Herman, *The Unexpected Relationship Between the Privilege
Against Compulsory Self-Incrimination and the Involuntary
Confession Rule (Part I)*, 53 Ohio St. L.J. 101 (1992)..................................18

David Hope, *Torture*, 53 Int'l & Comp. L. Q. 807 (2004)................................17, 18

Seth F. Kreimer, *Too Close to the Rack and the Screw: Constitutional
Constraints on Torture in the War on Terror*, 6 U. Pa. J. Const.
L. 278 (2003) ......................................................................................................18

John H. Langbein, *Torture and the Law of Proof: Europe and England
in the Ancient Regime* (1977) ...........................................................................17

Joseph Margulies, *Guantánamo and the Abuse of Presidential Power* 182 (New
York 2006) ...........................................................................................................7

Leonard A. Parry, *The History of Torture in England* 1 (1933) ...........................16

Proceedings Against John Felton, 3 Howell's St. Tr. 367 (1628).....................17, 18

# **GLOSSARY**

| **Term** | **Definition** |
|---|---|
| CSRT | Combatant Status Review Tribunal |
| DTA | Detainee Treatment Act, Pub. L. No. 109-148, 119 Stat. 2739 (2005) |
| MCA | Military Commissions Act, Pub. L. No. 109-366, 120 Stat. 2600 (2006) |

## INTEREST OF *AMICI CURIAE*

The issue presented by these consolidated cases challenges the integrity of our judicial system:  may this Court sanction life-long detention in the face of credible allegations that the evidence upon which the detention is based was secured by torture?  As former federal judges, we believe that compelling this Court to sanction Executive detentions based on evidence that has been condemned in the American legal system since our Nation's founding erodes the vital role of the judiciary in safeguarding the Rule of Law.  Therefore, pursuant to Federal Rule of Appellate Procedure 29 and this Circuit's Rule 29, *amici* respectfully submit this brief in support of Petitioners Al Odah, *et al.* and Boumediene, *et al.*

*Amici curiae* include the following former federal judges, as further identified in the Parties and *Amici* section of this brief:  The Honorable Shirley M. Hufstedler, the Honorable Nathaniel R. Jones, the Honorable George N. Leighton, the Honorable Timothy K. Lewis, the Honorable Frank J. McGarr, the Honorable Abner J. Mikva, and the Honorable Patricia M. Wald.

## SUMMARY OF ARGUMENT

After the Supreme Court found in *Rasul v. Bush*, 542 U.S. 466 (2004), that detainees at the Guantánamo Bay Naval Base in Cuba were entitled to challenge their detentions in federal court, the United States Defense Department announced

that each prisoner would appear before a "Combatant Status Review Tribunal." At the same time, the Defense Department also stated that every prisoner at the base had been determined "through multiple levels of review" to be an "enemy combatant."[1]    The stated purpose of the CSRT was to decide whether this determination would be upheld.[2]    Between August 2004 and January 2005, the military conducted 558 CSRT hearings, finding all but 38 prisoners to be enemy combatants.[3]

On December 30, 2005, the President signed the Detainee Treatment Act. Pub. L. No. 109-148, 119 Stat. 2739 (2005).    The DTA purported to replace plenary district court review over the prisoners' habeas petitions with the CSRT and limited review in this Court.    On June 29, 2006, the Supreme Court held that the DTA did not apply to pending habeas cases which, like these consolidated cases, "challeng[ed] the very legitimacy" of the CSRTs. *Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2769 (2006).    On October 17, 2006, the President signed the Military Commissions Act. Pub. L. No. 109-366, 120 Stat. 2600 (2006).

---

[1]  Memo. of Deputy Sec'y of Def. to Sec. of Navy, *Order Establishing Combatant Status Review Tribunal* 1 (July 7, 2004) (A442). *Amici* respectfully submit with this brief an Addendum of cited materials marked A1 to A445.

[2]  *Id.*; Memo. of Deputy Sec'y of Def., *Implementation of Combatant Status Review Tribunal Procedures* (July 29, 2004) (A382) (hereinafter "CSRT Procedures").

[3]  Dep't of Def., *Combatant Status Review Tribunal Summary*, *available at* http://www.defenselink.mil/news/Mar2005/d20050329csrt.pdf.

2

In their briefs, the Petitioners discuss the various statutory and constitutional infirmities of the MCA. *Amici* direct this brief at one specific and fundamental flaw.[4]  With the CSRT, the Government created a tribunal that was permitted to accept evidence secured by torture and presume that evidence was genuine and accurate.   Furthermore, the limited review in this Court provided by the MCA/DTA cannot remove the stain of torture because the Court – at least according to the Government – cannot alter or expand the record created by the military.

One of the most hallowed judicial roles in our constitutional democracy is to ensure that no person is imprisoned unlawfully.  The statutory scheme created by the MCA/DTA inhibits the Judiciary's ability to ensure that Executive detentions are not grounded on torture or cruel, inhuman, or degrading treatment.  Because no habeas court would permit detentions based on evidence obtained in this manner, the MCA/DTA scheme is not an adequate substitute for habeas review and is therefore unconstitutional.

---

[4] *Amici* take no position on other constitutional deficiencies in the MCA.

3

## ARGUMENT

## ADOPTING THE GOVERNMENT'S INTERPRETATION OF THE MCA/DTA WOULD UNCONSTITUTIONALLY FORCE THIS COURT TO CONDONE THE USE OF EVIDENCE SECURED BY TORTURE.

**A.    The CSRTs Failed to Consider Whether Evidence Relied Upon Was Obtained By Torture.**

Two of the rules governing the CSRT procedures are particularly relevant to our purpose:  First, the CSRT could rely on any information it deemed "relevant and helpful to a resolution of the issues before it," and second, the CSRT was obligated to accept the Government's evidence against the prisoner as presumptively "genuine and accurate."[5]  Applying these rules, the CSRTs were allowed to and apparently did conclude that prisoners' incriminating statements were both "relevant and helpful" to the decision, and presumptively correct.

Yet, case after case for which transcripts of the CSRT hearings are publicly available,[6] prisoners told the CSRT panels that their so-called confessions were false and had been wrung from them through torture.[7]  Often they assured the

---

[5]  CSRT Procedures, Encl. 1 ¶¶ G(7) and G(11) (A390) ("There is a rebuttable presumption that the Government Evidence . . . to support a determination that the detainee is an enemy combatant, is genuine and accurate.").

[6]  *See* Dep't of Def., *Combatant Status Review Tribunal (CSRT) and Administrative Review Board (ARB) Documents, available at* http://www.dod.mil /pubs/foi/detainees/csrt/index.html (last visited Oct. 29, 2006).

[7]  Because the prisoners did not have access to counsel and many did not attend their CSRT hearing, the CSRT record likely underreports the extent to which evidence obtained by torture formed the basis of enemy combatant determinations.

CSRT their account could be confirmed by review of medical records or other reports. But the Executive has maintained that investigating allegations of torture was not "the CSRT's role," and that it was permissible for the Tribunal to rely on evidence "obtained through a non-traditional means, even torture" to determine that a prisoner was an enemy combatant.[8] *Amici* take no position on the veracity of the prisoners' accounts,[9] nor do we attempt here to distinguish between torture and other illegal forms of coercion. But we do firmly contend that Article III courts have a duty to inquire whether, in fact, evidence has been gained by torture or

---

[8] Transcript of Oral Argument at 83-87, *Boumediene v. Bush, et al.*, Civ. No. 04-1166 (RJL) (D.D.C. Dec. 2, 2004) (A377-81). The DTA required the Department of Defense to revise its procedures so that future CSRTs would, "to the extent practicable, assess whether any statement derived from or relating to such detainee was obtained as a result of coercion; and the probative value (if any) of any such statement." DTA § 1005(b). The prisoners with cases currently pending in federal court, however, were found to be "enemy combatants" under the prior rules. Moreover, the MCA/DTA does not require the prior CSRT determinations to meet the new standard, and the MCA explicitly states that the determination of enemy combatant status under the prior rules is final, at least for the purpose of eligibility for trial by a Military Commission. MCA § 948a(1).

[9] We note, however, that investigations by the military, international bodies, and human rights organizations revealed that abusive interrogations did occur. *See, e.g.,* Dep't of Def., *Army Regulation 15-6: Investigation of the Abu Ghraib Detention Facility and 205th Military Intelligence Brigade* 63 (Aug. 2004) ("Abu Ghraib Report"), *available at* http://www.defenselink.mil/news/ Aug2004/ d20040825fay.pdf; United Nations, *Conclusions and Recommendations of the Committee against Torture: United States of America* ¶¶ 24, 26, 30 (July 25, 2006); Human Rights First, *Command's Responsibility: Detainee Deaths in U.S. Custody in Iraq and Afghanistan* (Feb. 2006).

other cruel, inhuman, or degrading treatment, and to reject that evidence if so obtained. In the CSRT process, however, that inquiry did not take place.

\* \* \* \*

The publicly available record indicates the CSRT panels did little to evaluate the probity of allegedly coerced evidence, even when evidence such as medical records was readily available. Some CSRTs found the torture allegations credible enough to warrant investigation by other military authorities, but the panels nevertheless found the detainees to be enemy combatants without awaiting the outcome of the investigation. Although the Government might have adduced other, non-coerced evidence in individual cases, the CSRT neither examined allegations of torture *before* the individual was adjudicated an enemy combatant nor did it exclude such evidence from its consideration.

1.   **CSRTs referred torture allegations for investigation but did not wait for the investigation results.**

Many cases involved reports of false confessions coerced by interrogators in countries where the State Department has long condemned the use of torture by state security agents.[10]   For instance, the District Court recounted the torture endured by Mamdouh Habib, who was rendered by the United States to Egypt,

---

[10] *See, e.g.*, Dep't of State, *Country Reports on Human Rights Practices – 2005 – Egypt* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/ 61687.htm.

where he alleges he was subjected to horrific abuse. *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 473 (D.D.C. 2005). The United States has never denied the truth of Habib's allegations. All the Government's claims against Habib were based on "confessions" he gave to interrogators in Egypt.[11] (*See* September 9, 2004 Memo at 1-2, A20-21.) Habib's Personal Representative reported to the CSRT that his "confessions" were made "under duress" in an attempt to "tell interrogators what they wanted to hear because he was in fear." (Unclassified Summary at 1, 3, A12, A14.) Yet, the CSRT simultaneously (a) determined that the torture allegations were credible enough to warrant an investigation, and (b) found Habib to be an enemy combatant. (*Id.* at 3, A14.)

Habib's case is not unusual. Several prisoners told the CSRT they had been tortured by Pakistani security forces.[12] For example, Abd Al Nasir Khantumani and his son, Muhammad Khantumani, were arrested in Pakistan. The Pakistanis

---

[11] Joseph Margulies, *Guantánamo and the Abuse of Presidential Power* 182 (New York 2006).

[12] These allegations are consistent with the State Department's findings that Pakistan tortures prisoners. *See* Dep't of State, *Country Reports on Human Rights Practices - 2005 – Pakistan* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61710.htm. Ironically, the 2005 report also criticizes an anti-terrorism law under which "coerced confessions are admissible in special courts." *Id.* The State Department made similar allegations in its 2004, 2003, 2002, and 2001 reports. *See, e.g.,* Dep't of State, *Country Reports on Human Rights Practices - 2004 – Pakistan* (Feb. 28, 2005), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41743.htm.

wanted them to admit they had been on a particular bus: "the Pakistanis tortured us to a point that we admitted we were on the bus." (Transcript at 4, A85.) "We tried to say no, no, no," his son, Muhammad, testified at his father's Tribunal, "but they just keep torturing us. Then they broke my nose and I said I was on the bus." (*Id.* at 7, A88.) "If you look at my nose," he said, "you can see it is broken." (*Id.*) The CSRTs passed the Khantumanis' allegations of torture up the chain of command, but found them both to be enemy combatants before any investigation was conducted. (Unclassified Summary at 3, A81, 118; Report at 1, A78, 115.)

The CSRT took the same action in the case of Abdul Aziz Al Khaldi, who told the CSRT he had been captured by the Afghani police. "They were threatening me and torturing me," he said. (Transcript at 9, A161.) "If I didn't say that I was from al Qaeda or Taliban I was tortured." (*Id.*) The Afghanis transferred him to Kandahar, where the beatings continued. (*Id.*) "The guy was speaking English saying, al Qaeda? Taliban? . . . Evidence of the torture is that they broke my tooth, which was fixed here [in Cuba]." (*Id.*) Al Khaldi's allegations of torture were referred for investigation (Unclassified Summary at 2, A168), but the CSRT found Al Khaldi to be an enemy combatant on the day of his CSRT hearing (Report at 1, A167).

2.    **Many CSRTs did not address evidence of torture.**

A number of CSRTs simply ignored testimony that the detainee's prior statements to interrogators were the result of torture. Bisher al Rawi, for example, reported to the CSRT that he confessed "only after I was subjected to sleep deprivation and various threats were made against me" at Bagram, Afghanistan.[13] (Transcript at 24, A216.) Al Rawi, a British resident, was arrested during a business trip to Gambia and taken to Afghanistan. (*Id.*) The CSRT discussed other aspects of al Rawi's testimony, but did not address al Rawi's testimony that his confession to interrogators had been coerced. (Unclassified Summary at 3-4, A190-91.)

Similarly, Fahd Al Sharif was arrested while visiting Pakistani villages with a group of missionaries. (Transcript at 5, A314.) He told the CSRT that he confessed to interrogators at Kandahar because they beat him so severely that his wrist was broken and his eardrum punctured. (*Id.* at 2, A311.) According to the publicly available record, the CSRT did not retrieve Sharif's medical records.

---

[13] Prisoners held in Afghanistan reported being subjected to prolonged isolation, sleep deprivation, environmental manipulation, hooding, and so-called "stress and duress positions" – all techniques the U.S. has admitted using. *See, e.g.,* Don Van Natta, Jr. and Ray Bonner, *Questioning Terror Suspects in a Dark and Surreal World,* N.Y. Times at A1 (Mar. 9, 2003); Tim Golden, *In U.S. Report, Brutal Details of 2 Afghan Inmates' Deaths,* N.Y. Times at A1 (May 20, 2005); Abu Ghraib Report 63; Human Rights Watch, *Enduring Freedom: Abuses by U.S. Forces in Afghanistan* at 37-40 (Mar. 2004), *available at* http://hrw.org/reports/2004/afghanistan0304.

Similarly, the public record indicates no investigation of Mohammed Souleimani Laalami's testimony that he confessed to training at the al-Farouq training camp only to end the beatings by his captors. "I did say these things," he told the panel, "but I said them when I was captured and being beaten and threatened with death. . . . I told the Red Cross in Kandahar, I and others were being beaten and admitted to things that were not true. . . . I was beaten until I said they were true." (Transcript at 1, A322.)

These accounts are not unique. When the CSRT accused Mohammed Haidel of receiving artillery training in Afghanistan, for instance, Haidel explained that an interrogator in Kandahar "hit my arm and told me I received training in mortars." (Transcript at 1, A325.) When Haidel denied the allegation, the beating intensified. "As he was hitting me, I kept telling him, no I didn't receive training." (*Id.*) Throughout this interrogation, Haidel was kneeling on the ground with his hands lashed behind his back. (*Id.*) He began to bleed from his head. "I was crying and finally I told him I did receive the training. . . . I was in a lot of pain, so I said I had the training." (*Id.*) "At that point," Haidel said, "if he had asked me if I was Usama Bin Ladin, I would have said yes." (*Id.*)

Samuer Abdenour explained to the CSRT that in Kandahar he had admitted to advance knowledge of the 9/11 attacks because interrogators refused to tend his wounded leg: "They just wanted anything. Any information. I just told them

10

anything; whatever they wanted to hear because I wanted them to treat my leg. I saw other people whose legs had to be cut off [as a result of injuries]. I did not want my leg to be cut off." (Transcript at 4, A331.) The CSRT found Abdenour to be an enemy combatant.[14] The publicly available record does not indicate that the CSRT sought to review any potentially relevant medical or other records.

### 3. A few CSRTs cross-examined detainees to distance U.S. forces from the alleged torture.

On occasion, CSRTs probed the torture allegations, but to demonstrate that U.S. forces did not participate in the torture, not to determine whether the "confession" was reliable or the product of coercion. For example, Abdul Rahim Ginco told the CSRT that he had been tortured by both the Taliban and forces allied with Americans. (Transcript at 11, 13, A352, A354.) The Taliban had accused Ginco of being an American spy, and imprisoned him from May 2000 until January 2002. (*Id.* at 3, 6-7, A344, A347-48.) Upon release from the Taliban prison, Ginco and a friend told an Australian reporter that they "wanted to be witnesses against al Qaida and Taliban . . . to the Americans." (*Id.* at 6, 8, A347, A349.) Two days later, U.S. forces arrested Ginco and held him in Kandahar. (*Id.*) Ginco told the CSRT the interrogators at Kandahar "kept pushing me, they

---

[14] *See* Annual Review Board Transcript for Detainee ISN #659 at 1, *available at* http://www.dod.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_8_20751-21016. pdf. (indicating enemy combatant status).

beat and tortured me. . . . Military intelligence, they told me to say I'm al Qaida, so, I told them, ok, I'm al Qaida." (*Id.* at 13, A354.)  In finding Ginco to be an enemy combatant, the CSRT apparently relied not only on Ginco's coerced confessions to U.S. interrogators, but also a false videotaped confession that Ginco made after weeks of torture by the Taliban and high-level Al Qaeda members.  (*Id.* at 3, 10-11, A344, A351-52.)  The CSRT had asked Ginco only about torture by the Taliban:  "So it was the Taliban prison people who forced you to do this [videotape]?" (*Id.* at 11, A352.) [15]

\* \* \* \*

In each of these cases, the prisoner reported to the CSRT that he had "confessed" only to stop the torture.  But because the CSRTs relied on secret evidence, it is impossible to know how many times a CSRT found a prisoner to be an enemy combatant based on a false accusation by one prisoner who was tortured to incriminate another.  For instance, the Department of Defense has reported that interrogation of Guantánamo detainee Mohammed al Qahtani produced "detailed information about 30 of Osama Bin Laden's bodyguards who are also held at

---

[15] *See also* Transcript of Obaidullah at 5, A360 (CSRT asked detainee whether he had "told a consistent story since" arriving in Cuba, but did not inquire into alleged torture in Afghanistan leading to false confession).

Guantanamo."[16]  According to the publicly released portion of his Department of Defense interrogation log,[17] al Qahtani was interrogated at Guantánamo for about 20 hours per day for seven weeks, during which period he was kept in isolation, intimidated with military dogs, sexually humiliated, and subjected to sleep and sensory deprivation.[18]

Under standard CSRT procedures, the 30 men whom al Qahtani implicated would never be told who had accused them of being Osama Bin Laden's bodyguards or under what circumstances, and al Qahtani's coerced accusations would be presumed accurate.  This Court cannot know how many other prisoners remain at Guantánamo based on accusations produced by similar interrogation techniques.[19]

---

[16]  Dep't of Def., News Release (June 12, 2005), *available at* http://www. defenselink.mil/releases/2005/nr20050612-3661.html.

[17] Dep't of Def., *Interrogation Log, Detainee 063* (Nov. 23, 2002 to Jan. 11, 2003), *available at* www.time.com/time/2006/log/log.pdf.

[18] *Id.* at 27 (At one point al Qahtani's heart rate slowed to 35 beats per minute).

[19] *See, e.g.*, FBI email from (name redacted) to (name redacted) (Aug. 2, 2004), *available at* http://www.aclu.org/torturefoia/released/FBI.121504.5053.pdf (describing detainees chained to floor for 18-24 hours, subjected to extreme temperatures, sleep deprivation, and threatened with dogs); FBI email from (name redacted) to Gary Bald, Frankie Battle, and Arthur Cummings (Dec. 5, 2003), *available at* http://www.aclu.org/torturefoia/released/FBI. 121504.3977.pdf; Dep't of Def., *Army Regulation 15-6: Investigation Into FBI Allegations of Detainee Abuse at Guantánamo Bay, Cuba, Detention Facility, Executive Summary* (June 9 2005), *available at* http://www.defenselink.mil/news/Jul2005/d20050714 report.pdf; Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y.

Furthermore, even when prisoners suspected that the allegations against them came from another detainee's torture, it was impossible for them to prove it. For example, Ibrahim Zeidan told his CSRT that he believed another person – Anwar Abu Faris – had made false statements about Zeidan receiving training in Afghanistan because Faris had been rendered to Jordan and tortured.[20] (Transcript at 3, 6, A369, A372.)

*Amici* are not aware of a single CSRT that permitted the prisoner to develop an evidentiary record regarding statements allegedly obtained by torture. Yet, according to the Government, the MCA/DTA does not allow this Court to consider facts outside the CSRT record bearing on the grounds for detention, even if those facts would show that the prisoner is detained based on a false confession obtained through torture. *Amici* cannot know if the torture allegations are true, but the reviewing court will likewise not be able to make that determination.

---

TIMES (Nov. 30, 2004), *available at* http://www.nytimes.com/ 2004/11/30/politics/ 30gitmo.html?ex=1259470800&en=825f1aa04c65241f&ei =5088&partner=rssnyt.

[20] The State Department has reported on confessions obtained by torture in Jordanian prisons. Dep't of State, *Country Reports on Human Rights Practices – 2005 – Jordan* (Mar. 8, 2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/ 2005/61691.htm.

**B.    The Fifth Amendment and the Common Law Prohibit Detention Based on Evidence Procured by Torture.**

      1.    **The Due Process Clause**

"What has distinguished our ancestors? – That they would not admit of tortures, or cruel and barbarous punishment."[21]    Patrick Henry's words expressed the Founding Fathers' deep abhorrence of torture, which they viewed as a tool of royal despotism.  This abhorrence is embedded in our Constitution.  The Supreme Court has consistently held that the Due Process Clause of the Fifth Amendment prohibits the government from depriving a person of his liberty based on statements obtained by torture.  *See, e.g., Miller v. Fenton*, 474 U.S. 104, 109 (1985); *Rochin v. California*, 342 U.S. 165, 173-74 (1951).  Indeed, the most fundamental purpose of the Due Process Clause is to "give protection against torture, physical or mental" to all persons subject to government power.  *Palko v. Connecticut*, 302 U.S. 319, 326 (1937), *overruled on other grounds by, Benton v. Maryland*, 395 U.S. 784 (1979); *see also Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (plurality); *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).

Not only is evidence derived from torture inherently unreliable,[22] but allowing detentions based on such evidence corrupts the judicial process.  An

---

[21] 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447 (1836).

[22] *See, e.g., Jackson v. Denno*, 378 U.S. 368, 385-86 (1964).

unwavering stand against the use of this evidence is therefore essential. For that reason, federal courts have long held that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned . . . ." *Miller*, 474 U.S. at 109. Beatings and other forms of physical and psychological torture are interrogation methods that are "revolting to the sense of justice." *Brown v. Mississippi*, 297 U.S. 278, 286 (1936). Coerced confessions "offend the community's sense of fair play and decency. . . . [T]o sanction [such] brutal conduct . . . would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." *Rochin*, 342 U.S. at 173-74.

## 2. The Common Law

The common law similarly condemns torture and the use of its fruits. At a minimum, the Suspension Clause protects habeas as it existed at common law. *See, e.g., INS v. St. Cyr*, 533 U.S. 289, 301 (2001) (citing *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996) and stating "at the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789'"). "It has always been the boast of Englishmen that torture was forbidden by the Common Law of the land."[23]

---

[23] Leonard A. Parry, *The History of Torture in England* 1 (1933).

16

Blackstone, for instance, derided the rack as "an engine of state, not of law."[24]

Coke was likewise unequivocal in condemning torture, declaring without

reservation that "there is no law to warrant tortures" in England.[25]

By the time the common law was developed in the colonies, and long before

the Constitution was adopted, torture was a discarded relic of a repudiated past.

*See A(FC) v. Secretary of State for the Home Department*, [2005] UKHL 71 (H.K.

Dec. 8, 2005) ¶¶10-17 (holding common law forbids reliance on evidence gained

via torture even where detaining power didn't conduct the torture). In 1628, King

Charles asked the common law judges whether John Felton, assassin of the Duke

of Buckingham, "might not be racked" to make him identify his accomplices and

"whether there were any law against it."[26] The judges answered unanimously that

the common law would not tolerate a prisoner's detention or prosecution based on

---

[24] 4 William Blackstone, *Commentaries on the Laws of England* at 320-21 (1st ed. 1803).

[25] Edward Coke, *The Third Part of the Institutes of the Laws of England* 35 (W. Clarke & Sons 1817) (1644); *see also* David Hope, *Torture*, 53 Int'l & Comp. L.Q. 807, 811 (2004) ("the use of torture was not permitted in any of the common law courts in England as part of the ordinary course of the administration of justice.").

[26] Proceedings Against John Felton, 3 Howell's St. Tr. 367, 371 (1628); John H. Langbein, *Torture and the Law of Proof: Europe and England in the Ancient Regime* 134 (1977).

evidence secured by torture.[27]    As noted above, the framers of the Constitution

shared the English common law's abhorrence for evidence obtained by torture.[28]

**C.    The Government's Reading of the MCA/DTA Would Allow Indefinite Imprisonment Based On Evidence Secured By Torture, in Violation of the Constitution and the Common Law.**

No habeas court would ever rely on evidence obtained by torture, whether its

review were grounded in the common law or the Fifth Amendment.   Instead, when

presented with allegations that evidence had been so obtained, a habeas court

would ensure a searching inquiry.   We do not understand Congress to have

suspended the writ.   *See* U.S. Const. art. I, § 9, cl. 2 (limiting Congress's power to

suspend the writ to cases of invasion or rebellion).   Absent a suspension, therefore,

the constitutional question is simply whether allegations of torture under the MCA

and DTA are handled in a fashion equivalent to that under the common law or the

Constitution.   *See, e.g., Swain v. Pressley,* 430 U.S. 372, 384 (1977) (absent

suspension, Congress cannot divest federal courts of habeas jurisdiction without

providing an adequate and effective substitute "commensurate" with the scope of

---

[27] Lawrence Herman, *The Unexpected Relationship between the Privilege Against Compulsory Self-Incrimination and the Involuntary Confession Rule (Part I),* 53 Ohio St. L.J. 101, 134 (1992) (citing Proceedings Against John Felton, 3 Howell's St. Tr. 367, 371 (1628)); *see also* Hope, *supra,* at 812; Seth F. Kreimer, *Too Close to the Rack and the Screw:   Constitutional Constraints on Torture in the War on Terror,* 6 U. Pa. J. Const. L. 278, 311 n.17 (2003).

[28] *See, e.g., Chambers v. Florida,* 309 U.S. 227, 236-37 (1940); 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 447 (1836).

habeas).  Regrettably, the CSRTs did not subject allegations of torture and other abuse to the same searching inquiry as would a habeas court.  The MCA, therefore, is unconstitutional, at least in its treatment of such allegations.

Section 7 of the MCA purports to strip the federal courts of jurisdiction to hear habeas corpus claims by aliens whom the Executive has designated enemy combatants and to relegate such persons to the limited judicial review the DTA specifies.  Under the DTA, the Court is limited to considering whether the CSRT followed its own "standards and procedures" in determining enemy combatant status and, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures . . . is consistent with the Constitution and the laws of the United States."  DTA § 1005(e)(2)(C).

The Executive Branch interprets the first clause to prevent this Court from considering any evidence not presented to and considered by the CSRT. According to the Government, "the DTA does not authorize the submission of new evidence to this Court relating to the detainee's status as an enemy combatant."[29] Moreover, the Government claims the Tribunal's evidentiary record "is entitled to

---

[29] Resp'ts' Resp. in Opp'n to Mot. to Compel at 19, *Bismullah v. Rumsfeld*, No. 06-1197 (D.C. Cir., Aug. 21, 2006).

the strongest sort of presumption of regularity."[30]    The Government would apparently relegate this Court to undertaking the most cursory review into whether the CSRT followed its own rules, beginning with a presumption that it did. If the Court adopted this interpretation, it – like the CSRT – would be forced to accept evidence obtained under torture, a result abhorrent to this Nation's judicial and legal principles.

The Government maintains that the second clause has no effect because the Constitution and laws of the United States do not apply to this Court's review of CSRT determinations. If this were correct, then MCA/DTA effectively would bar this Court from examining whether evidence presented to the CSRT had been obtained by torture or other illegal coercion, and if so, whether there remained a sufficient basis in law or fact to justify detention. Accordingly, the Government's interpretation would mean that the MCA/DTA fails to provide an adequate or effective substitute for habeas in violation of the Suspension Clause.

## CONCLUSION

The Executive's interpretation of the MCA/DTA threatens to force the federal judiciary to sanction indefinite detention based on evidence secured by torture. This prospect raises grave constitutional concerns and jeopardizes the

---

[30] *Id.*; *see also id.* at 14 ("In sum, the DTA does not provide for evaluating evidence outside of the record reviewing [sic] a CSRT's factual conclusion of evidentiary sufficiency.").

integrity of the Judiciary. This Court should not be made to accept evidence wrung from the prisoner by the simple expedient of brute force.

Dated: November 1, 2006                    Respectfully submitted,

                                           By: _____
                                               Agnieszka M. Fryszman

Patricia A. Bronte                         COHEN, MILSTEIN, HAUSFELD
Douglas A. Sondgeroth                        & TOLL, PLLC
JENNER & BLOCK LLP                         1100 New York Avenue, N.W.
330 N. Wabash Avenue                       Washington, DC  20005
Chicago, IL 60611                          202 408-4600
312 222-9350

                    *Counsel for Amici Curiae*

21

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to Federal Rules of Appellate Procedure 29(c)(5) and 32(a)(7)(C), and Circuit Rule 32(a)(7)C), that the foregoing Brief of *Amici Curiae* Retired Federal Jurists complies with the type-volume limitations set forth in Circuit Rule 32(a)(7)(B) and the Court's Order of October, 18, 2006.

This brief is in 14-point, proportionally spaced Times-New Roman Type, and the number of words in this brief, according to the word-processing system utilized in preparing it, is 4,881.

Dated: November 1, 2006                      Certified by:

Agnieszka M. Fryszman

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2006, two copies of the foregoing Brief

of *Amici Curiae* Retired Federal Jurists were hand-delivered and were also sent by

e-mail transmission, to the following counsel:

Robert M. Loeb
Douglas N. Letter
S. Department of Justice
Civil Division, Appellate
950 Pennsylvania Ave., N.W.
Washington, DC  20530-0001
Robert.Loeb@usdoj.gov

Thomas B. Wilner
Neil H. Koslowe
Shearman & Sterling
801 Pennsylvania Avenue, NW
Suite 900
Washington, DC  20004-2634
twilner@shearman.com
neil.koslowe@shearman.com

In addition, two copies of the foregoing were sent by overnight mail and e-mail
transmission to the counsel listed below:

Stephen H. Oleskey
Robert C. Kirsch
Melissa A. Hoffer
Mark Fleming
Wilmer Cutler Pickering Hale & Dorr
60 State Street
Boston, MA  02109
Melissa.Hoffer@wilmerhale.com
Mark.Fleming@wilmerhale.com

Douglas F. Curtis
Wilmer Cutler Pickering Hale & Dorr LLP
339 Park Avenue
New York, NY  10022
Douglas.Curtis@wilmerhale.com

_____
Linda Aono

# EXHIBIT D

# NO-HEARING HEARINGS

## CSRT: THE MODERN HABEAS CORPUS?

**AN ANALYSIS OF THE PROCEEDINGS OF THE GOVERNMENT'S COMBATANT STATUS REVIEW TRIBUNALS AT GUANTÁNAMO**

By
Mark  Denbeaux
Professor, Seton Hall University School of Law and
Counsel to two Guantanamo detainees
Joshua Denbeaux, Esq.
Denbeaux & Denbeaux

David Gratz, John Gregorek, Matthew Darby, Shana Edwards,
Shane Hartman, Daniel Mann, Megan Sassaman and Helen Skinner
Students, Seton Hall University School of Law

1

# NO-HEARING HEARINGS

## AN ANALYSIS OF THE PROCEEDINGS OF THE GOVERNMENT'S COMBATANT STATUS REVIEW TRIBUNALS AT GUANTÁNAMO

# EXECUTIVE SUMMARY

In the wake of the Supreme Court's decision that the United States Government must provide adequate procedures to assess the appropriateness of continued detention of individuals held by the Government at Guantánamo Bay, Cuba, the Department of Defense established the Combatant Status Review Tribunals ("CSRT") to perform this mission. This Report is the first comprehensive analysis of the CRST proceedings. Like prior reports, it is based exclusively upon Defense Department documents. Most of these documents were released as a result of legal compulsion, either because of an Associated Press Freedom of Information request or in compliance with orders issued by the United States District Court in habeas corpus proceedings brought on behalf of detainees. Like prior reports, "No Hearing Hearings" is limited by the information available.

The Report documents the following:

1. The Government did not produce any witnesses in any hearing and did not present any documentary evidence to the detainee prior to the hearing in 96% of the cases.
2. The only document that the detainee is always presented with is the summary of classified evidence, but the Tribunal characterized this summary before it as "conclusory" and not persuasive.
3. The detainee's only knowledge of the reasons the Government considered him to be an enemy combatant was the summary of the evidence.
4. The Government's classified evidence was always presumed to be reliable and valid.
5. In 48% of the cases, the Government also relied on unclassified evidence, but, like the classified evidence, this unclassified evidence was almost always withheld from the detainee.
6. At least 55% of the detainees sought either to inspect the classified evidence or to present exculpatory evidence in the form of witnesses and/or documents.
   a. All requests by detainees to inspect the classified evidence were denied.
   b. All requests by detainees for witnesses not already detained in Guantánamo were denied.

    c. Requests by detainees for witnesses detained in Guantánamo were denied in 74% of the cases. In the remaining 26% of the cases, 22% of the detainees were permitted to call some detainee-witnesses and 4% were permitted to call all of the detainee-witnesses that they requested.

    d. Among detainees that participated, requests by detainees to produce documentary evidence were denied in 60% of the cases. In 25% of the hearings, the detainees were permitted to produce all of their requested documentary evidence; and in 15% of the hearings, the detainees were permitted to produce some of their documentary evidence.

7. The only documentary evidence that the detainees were allowed to produce was from family and friends.

8. Detainees did not always participate in their hearings. When considering all the hearings, 89% of the time no evidence was presented on behalf of the detainee.

9. The Tribunal's decision was made on the same day as the hearing in 81% of the cases.

10. The CSRT procedures recommended that the Government have an attorney present at the hearing; the same procedures deny the detainees any right to a lawyer.

11. Instead of a lawyer, the detainee was assigned a "personal representative," whose role, both in theory and practice, was minimal.

12. With respect to preparation for the hearing, in most cases, the personal representative met with the detainee only once (78%) for no more than 90 minutes (80%) only a week before the hearing (79%).

13. At the end of the hearing, the personal representative failed to exercise his right to comment on the decision in 98% of the cases,

    a. During the hearing; the personal representative said nothing 12% of the time.

    b. During the hearing; the personal representative did not make any substantive statements in 36% of the cases; and

    c. In the 52% of the cases where the personal representative did make substantive comments, those comments sometimes advocated for the Government.

14. In three of the 102 CSRT returns reviewed, the Tribunal found the detainee to be not/no-longer an enemy combatant. In each case, the Defense Department ordered a new Tribunal convened, and the detainee was then found to be an enemy combatant. In one instance, a detainee was found to no longer be an enemy combatant by two Tribunals, before a third Tribunal was convened which then found the detainee to be an enemy combatant.

15. When a detainee was initially found not/no-longer to be an enemy combatant:

    a. The detainee was not told of his favorable decision;

    b. There is no indication that the detainee was informed of or participated in the second (or third) hearings;

    c. The record of the decision finding the detainee not/no-longer to be an enemy combatant is incomplete.

**INTRODUCTION:**

After the Supreme Court ruled on June 28, 2004 in *Rasul v. Bush*, 542 U.S. 466 (2004), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), that the Guantánamo detainees were entitled to access to federal court through the writ of habeas corpus, the Defense Department established processes to review the status of all detainees, many of whom had been held without any proceeding for two and a half years. Within one month of *Rasul,* the Defense Department created the "Combat Status Review Tribunal" ("CSRT") and established a process for hearings before the CSRT. Each CSRT was composed of three unidentified members of the military who presided over the hearings.

As soon as most of the CSRT hearings were completed, the Government informed the District Court in which the habeas proceedings were pending that, despite the Supreme Court's ruling, no further judicial action was necessary because the detainees had been given CSRT review.

This Report analyzes the CSRT proceedings, comparing the hearing process that the detainees were promised with the process actually provided. The Report is based on the records that the United States Government has produced for 393 of the 558 detainees who had CSRT hearings.

The most important documents in this record were produced by the Government in response to orders by United States District Judges that the Department of Defense provide the entire record of the Combat Status Review Tribunal for review by counsel for at least 102 detainees. These are described as habeas-compelled "full CSRT returns." Without these documents, it would only be possible to review the process promised. With the 102 "full CSRT returns," this Report can also compare the process promised with the process provided.

The results of this review are startling. The process that was promised was modest at best. The process that was actually provided was far less than the written procedures appear to require.

The detainees were denied any right to counsel. Instead, they were assigned a "personal representative" who advised each detainee that the personal representative was neither his lawyer nor his advocate, and that anything that the detainee said could be used against him. In contrast to the absence of any legal representative for the detainee, the Tribunal was required to have at least one lawyer and the Recorder (Prosecutor) was recommended to be a lawyer.

The assigned role of the personal representative was to assist the detainee to present his case. In practice, any assistance was extraordinarily limited. The records of meetings between detainees and their personal representatives indicate that in 78% of the cases, the personal representative met with the detainee only once. The meetings were as short as 10 minutes, and this includes time for translation. Some 13% of the meetings were 20 minutes or less, and more than half of the meetings lasted no more than an hour.

4

During this meeting, the detainee was told the following:

- The CSRT proceeding was his opportunity to contest the Government's finding that he was an enemy combatant;

- The Government had already found the detainee to be an enemy combatant at multiple levels of review;

- The Government's finding rested upon classified evidence that the detainee would not see; and

- The Tribunal must presume that the secret classified evidence was reliable and valid.

In the majority of the CSRT hearings, the Government rested on the presumption that the classified evidence was sufficient to establish that the detainee was an enemy combatant. The Government never called any witnesses and rarely adduced unclassified evidence. In the majority of cases, the Government provided the detainee with no evidence, declassified or classified, which established that the detainee was an enemy combatant. Instead, the Government provided the detainee merely with what purported to be a summary of the classified evidence. This summary was so conclusory that it precluded a meaningful response. The Government then relied on the presumption that the secret evidence was reliable and accurate.

In the minority of cases, the Government produced declassified evidence to the Tribunal. Such declassified evidence did not bear directly on the question at issue. It consisted of letters from the detainee's family and friends asking for his release, portions of habeas corpus petitions submitted by the detainee's own lawyers on his behalf in United States District Court, and publicly available records that did not mention the detainee by name. None of the declassified evidence introduced against any detainee contained any specific information about the Government's basis for the detainee's detention as an enemy combatant.

Detainees who participated in CSRT proceedings rarely were able to confront the Government evidence. The Government never called witnesses and did not typically produce any unclassified evidence. When such evidence was presented to the Tribunal, it was not shown to the detainee 93% of the time. As for the ability of the detainees to produce evidence, only 11% of the detainees were allowed to introduce any evidence. The promised CSRT process provided that detainees could call witnesses, but no witness from outside Guantánamo ever appeared. The only witnesses the Government allowed detainees to call were other detainees. Therefore, the only witnesses that were allowed under the CSRT process were presumed enemy combatants testifying in favor of other presumed enemy combatants.

The promised CSRT process stated that detainees would be allowed to produce documentary evidence. In operation, the only documentary evidence that detainees were actually allowed to introduce were letters from family and friends. This was true even when the documentary evidence sought to be introduced was available and, in fact, even when the documents were in the Government's possession -- such as passports, hospital records, and even judicial proceedings. In these cases, the detainee insisted that the documents would prove that the charges against him could not be true, but none of the documents was permitted to be introduced.

The detainee's personal representative was totally silent in 12% of the hearings, and in only 52% of the hearings did the personal representative make substantive comments. However, sometimes the substantive comments of the personal representative advocated for the Government and against the detainee. At the end of the hearing, the personal representative had a last opportunity to make comments, but 98% of the time the personal representative explicitly chose not to do so.

In sum, while the promised procedures stated that detainees were allowed to present evidence (witnesses and documents), the only evidence that the detainees were permitted to offer in the vast majority of the cases was their own testimony. As a result, the only option available to the detainee was to make a statement attempting to rebut what he could glean from the summary of classified evidence that he could not see. In 81% of the cases reviewed, the Tribunals made their decision the same day as the hearing. Among the 102 records reviewed for this report, the ultimate decision was always unanimous, and all detainees reviewed were ultimately found to be enemy combatants. It is true that Government statements indicate that 38 of 558 detainees were ultimately found not/no longer to be enemy combatants, but no such determinations are found in the full CSRT records reviewed.

While all detainees reviewed were ultimately found to be enemy combatants, not all Tribunals found the detainee to be an enemy combatant. On a few occasions, a Tribunal initially found that the detainee was not/no longer an enemy combatant. In such cases, the detainee was never told of this decision. Instead, the Tribunal's decision was reviewed at multiple levels in the Defense Department chain of command and eventually a new Tribunal was convened. However, some detainees were still found not/no longer to be enemy combatants. At least one detainee's record indicates that after a second Tribunal found him no longer an enemy combatant, the process was repeated and sent back for a third Tribunal which found him to be an enemy combatant.

## THE DATA

In response to *United States v. Rasul* and *Hamdi v. Rumsfeld,* on June 28, 2004 the Department of Defense created the Combatant Status Review Tribunal system and processed each detainee. This report analyzes the data released by the Department Defense about the CSRT proceedings in response to Freedom of Information Act requests and through discovery during *habeas* lawsuits. Substantive data regarding individual detainees has never been voluntarily released by the Department of Defense.

According to the available Department of Defense data, there have been 759 total detainees ever incarcerated at Guantanamo; 558 detainees at Guantánamo Bay have been reviewed by the CSRT process.[1] The Department presumably created a file for each of the 558 CSRT proceedings, which we will refer to as the full CSRT Record. Since the Government has not released these files, except under court orders entered in the various habeas proceedings, the 102 full CSRT returns are the only full CSRT records that can be analyzed in this Report.

Each detainee was provided the right to appear before the CSRT Tribunal. At least 361 detainees chose to participate, and a Summarized Detainee Statement was prepared from their testimony in each case. This report refers to these Summarized Detainee Statements as "transcripts," although they are not verbatim records. A transcript is provided for those Tribunals in which the detainee is physically present and for those Tribunals in which the detainee has the personal representative read a statement into the record. The Department of Defense initially refused to release any of these transcripts, but a Freedom of Information Act lawsuit brought by the Associated Press succeeded and the Department of Defense was ordered to release these documents.[2] This Report examines these 102 full CSRT returns and 356 transcripts, as those are the only documents that the Government has released.[3] See Diagram I.

---

[1] This report does not consider the recent "high value detainees" transferred to Guantanamo in September 2006. See "High Value Deatinees Moved to Gitmo; Bush Proposes Detainee Legislation," (Sept. 6, 2006), http://www.defenselink.mil/news/NewsArticle.aspx?ID=721.

[2] The Department of Defense released 356 transcripts through the FOIA request, but there are 4 additional detainee transcripts available among the 102 full CSRT returns reviewed in this report.

[3] 5 of the 102 CSRT returns include transcripts that were not produced in conjunction with the AP FOIA request. Therefore, a total of 361 transcripts exist.

**DIAGRAM I**



Since only 356 transcripts were released, 202 of the 558 detainees apparently did not participate in the CSRT process; however, because 5 of the 102 full CSRT returns contain transcripts that are not present in the FOIA released 356 transcripts, these 356 transcripts do not contain the records of all detainees who participated in the CSRT.

Although the 102 full CSRT returns contain 69 returns with transcripts, in 11 of these cases the transcripts only record conversations between the personal representative and the Tribunal. Therefore 102 Full CSRT records reviewed include records of 58 detainees who appeared in the CSRT proceeding and 43 detainees who did not physically appear. See **Diagram II.**

**DIAGRAM II**



This results in full CSRT returns (including transcripts) for 69 detainees. The 38 full CSRT returns of detainees who do not have transcripts released in the Associated Press FOIA are for detainees about whom no other information has been released by the Department of Defense. Eleven detainees who were not physically present at their hearing are among the 69 for whom a transcript is available. The 356 FOIA transcripts combined with the 38 full CSRT returns total 394 detainee records which make up our full sample set. These 394 records reveal that 324 detainees physically appear before the Tribunal.

The data collected on these 38 detainees without a FOIA released transcript constitutes the only information available about the 202 detainees whose transcripts were not produced by the FOAI request.

In short, of the entire 558 detainees at Guantánamo who have been provided the CSRT process, there is some documentation for 394 detainees: the 356 FOIA released transcripts (64 of which also have full CSRT returns) and the 38 full CSRT returns whose transcript was not released by the FOIA.[4]

---

[4] The two different data sets upon which this report is based have been compared with the profile of all of the detainees that was published February 8, 2006. Mark Denbeaux, *et. al.*, REPORT ON GUANTANAMO DETAINEES: A Profile of 517 Detainee through Analysis of Department of Defense Data (2006), available at *http://law.shu.edu/news/guantanamo_report_final_2_08_06.pdf* . The correlation between the data

## CREATION OF THE COMBATANT STATUS REVIEW TRIBUNALS

*United States v. Rasul* and *Hamdi v. Rumsfeld* were decided on June 28, 2004. The Department of Defense issued Establishing and Implementing Orders on July 7 and 29, 2004, respectively.[5] Guantanamo personnel hand-delivered a letter to every detainee, advising him both of the upcoming Combatant Status Review Tribunal and of his right, independent of the CSRT, to file a habeas corpus suit in United States District Court.[6] Therefore the entire CSRT procedures were promulgated in only 32 days.

As the CSRT's were being convened in Guantánamo, the Department of Defense was responding to habeas proceeding in Washington, D.C. The response, beginning in August 2004, justified the CSRT as providing the appropriate hearing detainees were entitled to under *Rasul*. On October 4, 2004 the Defense Department advised the Court that the CSRT's were being processed and described the process that each detainee was being provided. The goal was to demonstrate that, since a sufficient hearing had been held for each detainee, no habeas hearing by a federal court was required.

According to the CSRT procedures established in the July 29, 2001 memo, prior to the commencement of any CSRT proceeding, the classified evidence relevant to that detainee had to be reviewed, a "summary of evidence" prepared, a personal representative appointed for the detainee, the personal representative had to meet with the detainee, and a Tribunal impaneled. The first hearing, according to the records reviewed was of ISN #220[7] and held on August 2, 2004. For that first hearing, the personal representative met with the detainee on July 31, 2004, two days after the CSRT procedures were promulgated. This was the only meeting between this detainee and his personal representative and it lasted only 10 minutes, including translation time. On Monday, August 2, 2004, two days after the meeting between the personal representative and the detainee, the CSRT Tribunal was empanelled, the hearing held, the classified evidence evaluated and the decision issued. This detainee did not participate in his CSRT hearing.

The remainder of the habeas detainees whose CSRT returns were in the 102 considered in this report were processed rapidly: 49% of the hearings were held and

---

previously analyzed and the data considered in this report is very strong. That correlation is presented in Appendix 1.

[5] Paul Wolfowitz, *Order Establishing Combatant Status Review Tribunal* (Jul. 7, 2004), http://www.defenselink.mil/news/Jul2004/d20040707review.pdf; Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

[6] While the right, to proceed in federal court may have been extinguished by the Military Commissions Act of 2006, Pub. L No. 109-366, the meaning and constitutionality of that statute is not addressed by the present Report.

[7] Mr. Abdullah Saleh Ati Ai Ajmi, ISN #220, is represented by counsel in habeas litigation. He represents one of the 35 detainees who refused to participate in the CSRT process but whose Full CSRT Return was obtained by his attorney under court order in the *habeas* litigation.

decisions reached by September 30, 70% by October 31, and fully 96% were completed by the end of November 2004. This haste can be seen not only in the scheduling of the hearing but in the speed with which the Tribunals declared a verdict. Among the 102, in 81% of the cases, the decision was reached the same day as the hearing.

The progress of the CRST hearings is reflected in Chart I, "Timeline of CSRT for 102 full CSRT returns" which displays the history of the 102 full CSRT returns by tracking four separate events for each detainee. "R-1" (dark blue line) is the declassified "Summary of Evidence" for each detainee; "1st D-A" (pink line) is the document prepared by the personal representative either during or after the first meeting between he and the detainee. "Hearing" (yellow line) is the date the CRST convenes to consider evidence and hear from the detainee. "Decision" (light blue line) is the date of the CRST decision (in most cases closely tracking the hearing date). It is apparent that the proceedings were commenced and completed in a very short period. [8]

## CHART I



Chart I can be profitably compared with Chart II, the "Dates of Decision for the CSRT," which presents the pattern of decision making of the CSRT's for all of the detainees as published by the Department of Defense in March 29, 2005. Chart II chart

---

[8] The Defense Department reported in 2005 that, to the best of their knowledge, there were only 5 personal representatives participating in the CSRT process. Affidavit on file at Seton Hall University School of Law.

shows the timing of the decisions for all of the detainees' CSRT proceedings. According to Chart II, the detainees' final administrative decisions tended to cluster at the end of the time frame, long after the decisions of the Tribunals. Almost 40% of the final decisions were made after the last Tribunal decision. During this six weeks after the Tribunals ended and the bulk of the decisions were made, 35 of the 38 detainees who were found to no longer be enemy combatants were determined.

### CHART II



### THE DECISION TO PARTICIPATE

Each of the 558 detainees who received a CSRT proceeding was advised on at least three occasions that he would also have a right to a habeas corpus proceeding in United States District Court in Washington D.C.

The Department of Defense Order of July 7, 2004 directed that each detainee be told within 10 days that he would have a CSRT proceeding and that each detainee was also entitled, should he so choose, to proceed with habeas litigation in United States District Court challenging their detention at Guantánamo Bay. Pursuant to this Order, each detainee was hand-delivered a formal written notice so specifying.



The English version of this Notice, prepared for and delivered to every detainee in translation in accordance with the DOD July 7, 2004 Order provided as follows:

> The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers. This is not a criminal trial and the Tribunal will not punish you, but will determine whether you are properly held…
>
> As a matter separate from these Tribunals, *United States courts have jurisdiction to consider petitions brought by enemy combatants held at this facility that challenge the legality of their detention.* You will be notified in the near future what procedures are available should you seek to challenge your detention in the U.S. courts. Whether or not you decide to do so, the Combatant

---

[9] 07/13/2004 Guantánamo Bay, Cuba - The Combatant Status Review Tribunal Notice is read to a detainee. Photo by Airman Randall Damm, USN http://www.defenselink.mil/news/Jul2004/2004071604b.jpg. This picture was obtained from the Department of Defense and depicts the service of the formal written notice, duly translated, advising the detainee of the CSRT and his right to challenge his detention in United States District Court.

Status Review Tribunal will still review your status as an enemy combatant.[10]

This document, then, informs each detainee he will be accorded a CSRT, whether or not he chooses to participate. It also informs the detainee that the CSRT is only one of his legal rights, the other being petitions to "United States courts."

## THE PERSONAL REPRESENTATIVE

The CSRT procedures provide that there must be a "personal representative" for each detainee, and also require the personal representative to meet with the detainee before the CSRT hearing. The personal representative must advise the detainee of the CSRT process, and also advise the detainee, for a second time, that he has an independent right to habeas corpus.[11]

The records of meetings between detainees and their personal representatives indicate that in 78% of the 102 full CSRT returns, the detainee and the personal representative met only once. Such meetings were typically brief: 91% percent of these meetings were two hours or less, 51% were an hour or less, 6% were 30 minutes or less, 13% were 20 minutes or less, and 2% were ten minutes or less.

The time spent in the meetings includes the time spent translating and the time spent conveying specific information about the process, the personal representative's role, and the option of going to federal court. The length of these meetings did not leave much time for detailed communication, much less meaningful consultation between the personal representative and detainee.

---

[10] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf, (emphasis added).

[11] *Id.*

**DIAGRAM III**



At that initial meeting with each detainee, the personal representative had several tasks, including warning the detainee that the personal representative was not the detainee's lawyer and that nothing discussed would be held in confidence:

> I am neither a lawyer nor your advocate, but have been given the responsibility of assisting your preparation for the hearing. *None of the information you provide me shall be held in confidence and I may be obligated to divulge it at the hearing.* I am available to assist you in preparing an oral or written presentation to the Tribunal should you desire to do so.[12]

This statement makes clear both that the detainee has no advocate in the process and that the detainee has the right to not participate in his process. After receiving this information, 32% of the detainees opted not to participate in the CSRT proceeding.

The meetings with the personal representative occurred very shortly before the Tribunal hearing. The records of meetings between detainees and their personal representatives indicate that for 24% of the detainees, the meeting with the personal representative was held the day of or the day before the CSRT proceeding. For 55% of the detainees, the meeting was between two days and a week before the hearing. Only 7% of the detainees met with their personal representative more than two weeks prior to the CSRT proceeding. See Diagram IV.

---

[12] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf, (emphasis added).

15

**DIAGRAM IV**



In 52% of the cases, the personal representative made substantive statements to the Tribunals. However, many times they did not say a word (12 %) and other times they made only formal non-substantive comments (36%). Furthermore, in a number of cases, the personal representative advocated for the Government.

Detainees frequently expressed the view that the CSRT process was not an opportunity to "contest" their status as enemy combatants, but rather another form of interrogation. Seven percent of the detainees who *did* physically appear in their CSRT proceeding made voluntary statements on the record indicating that they understood this to be a continuation of their interrogation and not a true hearing.

The documents show that some detainees objected to the personal representative's role as an aid to the Tribunal rather than as an assistant to the detainee. In 8% all records reviewed, the detainees suggested, without being asked, that the personal representative or the Tribunal were a form of interrogation rather than a hearing. In every occasion when the detainee objected to his personal representative serving as the Government's agent against him, the detainee's objections were ignored.

Contained in the records for detainee ISN #1463 is the following exchange:

> Detainee: My personal representative is supposed to be with me. Not against me. Now he is talking like he is an interrogator. How can he be an attorney? I said all of these allegations were fabricated and I told you I had nothing to do with them. It's up to

16

> the Recorder or Reporter to respond or provide the proof. I'm afraid to say anything that you might use against me. As you know, there is no attorney here today and I don't know anything about the law. I don't know which of these statements are going to be used for me or against me. Whoever is representing the Government needs to provide evidence.
>
> I cannot say anything that can be used against me. I am even afraid to say what my name is
>
> Anything else I say, I am afraid is going to be used against me.
>
> I hope that you can forgive me.[13]

Although the CSRT procedure requires the personal representative to advise the detainee of the Tribunal process and the detainee's rights under the process, the personal representative on a number of occasions neglected to do this.

ISN #45, Ali Ahmed Mohammed Al Rezehi, did not appear at his CSRT hearing. His personal representative received the "Summary of Evidence" against Mr. Al Rezehi on September 23, 2004 and met with him for 20 minutes on September 28, 2004. According to the "Conclusions of the Tribunal" section the Summary of the Basis for Tribunal Decision, Mr. Al Rezehi declined to participate in his CSRT proceeding:

> The detainee understood the Tribunal Proceedings, but chose not to participate . . . The Tribunal questioned the personal representative closely on this matter and was satisfied that the personal representative had made every effort to ensure that the detainee had made an informed decision.

The Tribunal's close questioning of the personal representative is problematic because the form the personal representative presented to the Tribunal stated that the he had neither read nor left a written copy of the procedures with the detainee.

According to the CSRT record, the detainee's brother submitted a sworn affidavit on behalf of Mr. Al Rezehi. The Tribunal declined to consider the sworn affidavit, determined that the detainee had chosen not to participate in the CSRT, and found Mr. Al Rezehi to be an enemy combatant. The personal representative made no comment during the proceeding.

At least once, the personal representative did not advise the detainee of his right to appear before the Tribunal until after that hearing had already taken place and the Tribunal made its decision. The Detainee Election Form is the document that each personal representative was required to complete as soon as he finished his first meeting with each of his detainees. In the case of Musa Abed Al Wahab, ISN #58, the Combatant

---

[13] Quotes taken from detainee transcripts are available on file at Seton Hall University School of Law.

Status Review Tribunal Decision Report Cover Sheet concludes that the detainee was determined to be an enemy combatant by a Tribunal, following a hearing with which he chose not to participate in, on October 20, 2004. There is nothing remarkable about this, except for the fact that the Detainee Election Form (Exhibit D-a) is dated *October 25, 2004*. It is not clear how the personal representative could have advised the Tribunal that the detainee had affirmatively declined to participate when he had yet to meet with the detainee.

**BURDEN OF PROOF AND**
**PRESUMPTION OF VALIDITY OF GOVERNMENT EVIDENCE**

*A.      Burden of Proof*

The published rules for CSRT proceedings formally place the burden of proof that the detainee is an enemy combatant upon the Government, not the detainee:

> Tribunals shall determine whether the preponderance of the evidence supports the conclusion that each detainee meets the criteria to be designated as an enemy combatant.[14]

That language might seem inconsistent with the notice read to each detainee in notifying them of the CSRT procedures:

> The U.S. Government will give you an opportunity to contest your status as an enemy combatant. Your case will go before a Combatant Status Review Tribunal, composed of military officers. This is not a criminal trial and the Tribunal will not punish you, but will determine whether you are properly held....[15]

The language "...an opportunity to *contest* your status as an enemy combatant" (emphasis added) might suggest that it is the detainee, and not the Government, that bears the burden of proof to demonstrate that the detainee is *not* an enemy combatant. Indeed, the July 7th Order also referred to determinations of combatant status that the military had made before the CSRT process. "Each detainee subject to this Order has been determined to be an enemy combatant *through multiple levels of review* by officers of the Department of Defense." (emphasis added)

Further, the summary of evidence provided to each detainee at the start of the first meeting with the personal representative repeats this refrain. Each summary of evidence includes the following statement:

---

[14] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.
[15] *Id.*

> The United States Government has *previously determined*
> that the detainee is an enemy combatant. This determination
> is based on information possessed by the United States that
> indicates that the detainee is....
> (Emphasis added)

In sum, while the burden of proof was placed formally on the Government, the controlling documents clearly suggest the presumptive correctness of the detentions. A Tribunal would have to find that "multiple levels" of military review were all in error in order to find a detainee to not be an enemy combatant. In any event, the debate about who bore the burden of proof may not be worth pursuing in light of the presumption of the validity of the evidence that the procedures mandated, which is detailed below.

*B.     Presumption of Validity of Government Evidence*

While the CSRT procedures formally place the burden of persuasion on the Government, they simultaneously mandate that the Tribunal consider the classified evidence as presumptively valid:

> There is a rebuttable presumption that the Government Evidence,
> as defined in paragraph H (4) herein, submitted by the Recorder to
> support a determination that the detainee is an enemy combatant, is
> genuine and accurate[16]

The effect of this presumption of validity of classified evidence is to meet, if not lift, the Government's burden of proving by a preponderance of the evidence that the detainee was properly classified as an enemy combatant. The detainee is presumed to be an enemy combatant based upon the classified evidence. Although the detainee may in theory rebut the presumption, the requirement that he do so effectively shifts the burden of persuasion to him.

However objectionable it may be to place the burden of proof on the Government with one hand and simultaneously presume it satisfied with the other, the CSRT procedures are even more problematic in light of their concomitant command that the detainee be denied access to the evidence itself. The evidentiary presumption might in theory be rebuttable, but, since the evidence is classified and kept secret from the detainee, he is unable to challenge, explain, or simply rebut it. The rebuttable presumption of validity becomes, in practice, an irrebuttable one.

This explains why, although the burden of proof was supposedly on the Government, the Government never felt the need to present a single witness at any of the 393 CSRT hearings. Instead, it relied almost exclusively on the secret, and

---

[16] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

presumptively valid, classified evidence. In reality, the burden was on the detainee to prove that the classified evidence was wrong. And the detainee was denied access to the evidence that might have enabled him to do so.

## THE HEARING

Each CRST took place in a small room. Armed guards brought the detainee, shackled hand and foot, to the room, seated him in a chair against the wall and chained his shackled legs to the floor. The detainee faced the Recorder (prosecutor for this proceeding), the personal representative (seated beside the Recorder), a paralegal and the interpreter. The three (3) Tribunal members, all military officers, sat to the right of the detainee behind the covered table. The scene is captured in the photograph below.[17]



---

[17] 07/29/2004 Guantánamo Bay, Cuba - The facility where the Combatant Status Review Tribunals (CSRT) will take place for detained enemy combatants. U.S. Navy photo by Photographer's Mate 1st Class Christopher Mobley (RELEASED) http://www.defenselink.mil/news/d20040805pic4.jpg

## THE EVIDENCE

Typically the Government provided the detainee only the document known as the "Unclassified Summary of the Evidence" and marked R-1 by the Recorder.[19] The boilerplate Discussion of Unclassified Evidence in most record reads:

> Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, *it is not persuasive in that it provides conclusory statements without supporting unclassified evidence.*

(Emphasis added)

The Unclassified Summary of Evidence often made it impossible for detainees to address its thrust. For example, the transcript of the proceeding for detainee ISN# 1463 recounts:

> Detainee: That is not true. I did not help anybody and whoever is saying that I did, let them present their evidence. If I know that somebody presented any evidence, then somebody can tell me what that evidence is so that I can respond to it. If there is any evidence at all....

> Detainee: That's not true. Again, whoever has any evidence to prove, let them present it. If somebody submitted any evidence, I'd like to take a look at it to find out if that evidence is true....

> Detainee: It's not fair for me if you mask some of the secret information.... How can I defend myself?

The CSRT Procedures as promulgated by the July 29, 2004 memo accord a broad range of powers to the Tribunals for the production of evidence. The Tribunal has the power to order witnesses who are members of the United States military to appear, the power to request civilian witnesses to testify, and the power to order production of any document in the possession of the United States Government. For none of the 393 detainees for whom records have been released did the Government *ever* produce a single witness, military or civilian, during the unclassified portion of the record. The CSRT Procedures accord the detainee a right to question witnesses against him, but that right is academic because the Government never presented any witness.

*A.      Government Unclassified Documentary Evidence*

The CSRT Procedures anticipate that the Government will produce unclassified evidence at the hearing. The Procedures explicitly require that the personal representative advise the detainee of his right to see such unclassified evidence.[20] According to the 102 full CSRT returns the Government did not present any witnesses and rarely presented non-testimonial evidence to the detainee prior to the hearing.  A review of the 361 transcripts reveals that the Government may have shown the detainee some evidence before he began his statement in 4% of the cases.  When the hearing began, 89% of the detainees had no facts to rebut, whether from witnesses or from documentary evidence. The same documents also reveal that the Tribunal showed the detainee unclassified information in 7% of the hearings.  It is unclear why the Tribunal showed unclassified evidence in some cases but not in others.

As explained below, 49% of the 102 full CSRT returns contain some form of unclassified evidence presented by the Government.  This number is in stark contrast to the 4% of detainees who had access to unclassified information prior to their hearings, and to the 7% of detainees who were shown unclassified information during their hearings.

Each CSRT Return includes an Unclassified Summary of the Basis for Tribunal Decision, including the unclassified evidence against the detainee.  Twenty nine of the 102 full CSRT returns also contain a Recorder's Exhibit List, which cites every piece of classified and unclassified evidence that the Tribunal considers.  In addition, sometimes unclassified evidence is appended to the full CSRT returns.  These appended exhibits may or may not be listed in either the Recorder's Exhibit List or the Unclassified Summary of Basis.  Based on these three sources, unclassified evidence against detainees appears in 48% of the 102 full CSRT returns.

Thus, for 52% of the CSRT hearings, the Government had no unclassified evidence and relied solely upon the presumptively valid classified evidence to meet its burden of proof.

## 1. Types of Government Unclassified Evidence Presented to the Tribunal

The Government introduced five types of unclassified evidence in the CSRT hearing:

1.    Documents from friends and family
2.    Submissions from habeas corpus litigation
3.    Publicly available documents either released by the Government or published by the press that name the detainee at issue

---

[20] Enclosure (3) page 3, Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

4. Publicly available documents either released by the Government or published by the press that do not name the detainee
5. Non-publicly available documents that particularly concern the detainee.

These are reflected in Chart III

## CHART III



**Types of Unclassified Documents Present in the Full CSRT Returns**
**Percentage of 49 Returns with Unclassified Evidence**

    For 47% of the detainees whose Tribunal consider unclassified documents, this evidence consisted of documents and letters written by friends and family of the detainees. Correspondence written by family and friends generally lacks inculpatory value.

    Eighteen percent of the records contain habeas corpus pleadings. Motions taken from habeas corpus proceedings also lack inculpatory value.

    Of the full CSRT returns that consider unclassified documents, 29% contain public records that do not refer to the detainee. The inculpatory value of these documents is tenuous because the documents are used to establish that certain groups are terrorist organizations while not directly accusing the detainee of any wrongdoing.

Of the full CSRT returns that reflect unclassified documents, 10% contain public records that identify the detainee by name. The inculpatory value of these documents is more apparent.

An additional 14% contain non-publicly available documents directly pertinent to the detainee. Included in this group are documents that are labeled FOUO, as discussed below, as well as a Bosnian court investigation documents and a mental health record. The inculpatory value of these documents seems more apparent -- however, there is no indication the detainees ever saw these documents.

Most unclassified documents in a detainee's full CSRT return do not allow the detainee to effectively contest his status as an enemy combatant particularly when the detainee is usually not allowed to view this unclassified evidence.

## 2.    Unclassified FOUO Evidence Withheld from Detainee

Unclassified evidence includes, but is not limited to, documents labeled "For Official Use Only" ("FOUO"). However, the CSRT process consistently treated FOUO documents as if they are classified. For example, the record does not discuss these documents in the unclassified summary of the basis for decision. The FOUO documents primarily consist of interrogations of the detainee. Without access to these FOUO documents, the detainee is not able to clarify statements made or claim the statements were made as a result of torture.

The existence and reliance upon FOUO evidence is not revealed in any of the 356 FOIA-produced transcripts. Its existence was revealed, in most instances, in the Recorder's Exhibit List, which was produced only as part of the habeas compelled full CSRT returns. But for the habeas petitions, therefore, the Government's reliance on this variety of secret evidence would never have been revealed.

This Report was able to review the Recorder's Exhibit list for only 28% of the detainees' full CSRT returns. However, Exhibit Lists, when present, show that the Government relied upon unclassified FOUO evidence *for 83% of the detainees*. The record also shows that, when the Government relied upon unclassified FOUO evidence, it was always withheld from the detainee. See Chart IV.

24

## CHART IV



In essence detainees were not shown any evidence against them, classified or unclassified. Not only was the FOUO evidence withheld from the detainee in violation of the CSRT procedures, but other declassified evidence was also withheld.

B.    *The Detainee's Opportunity to Present His Evidence*

Records indicate that as many as 96% of the detainees began their presentation of their case without hearing or seeing any facts upon which the Government based its determination that the detainee was an enemy combatant other than the unclassified summary of evidence. The detainee began to present his case without knowing the facts he had to rebut. All data within this section is based upon the 102 full CSRT returns reviewed.

The CSRT procedures provided that each detainee would have the right to present his evidence to the Tribunal. The CSRT procedures provide that:

> (6) **The detainee may present evidence to the Tribunal,** including the testimony of witnesses who are reasonably available and whose testimony is considered by the Tribunal to be relevant. Evidence on the detainee's behalf (other than his own testimony, if

25

offered) may be presented in documentary form and through written statements, preferably sworn.[21]

Of the detainees who chose to participate in their Tribunal, more than half[22] (55%) attempted either to inspect the classified (or perhaps unclassified) evidence or to produce their own witnesses or documentary evidence. Most requests for the production of evidence at the Tribunal, however, were denied. Chart V reflects the requests made by type of evidence.

**CHART V**



1. **Witness Requests**

One third of detainees who participated requested that witnesses testify on their behalf. In some cases, requests were denied as being made too late to be considered, as during the hearing. Still other detainees refused to participate because their requests were denied.

---

[21] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.
[22] Some detainees sought more than one kind of evidence. Some detainees sought witnesses and/or non-testimonial evidence and/or the opportunity to review classified evidence. The analysis that follows reviews the evidence requested and permitted without associating it with the total requests of any particular detainee.

Chart VI below shows that, among those records, only 26% of the detainees that requested witnesses were able to get *any* of those witnesses produced by the Tribunal. Even detainees who requested the testimony of other detainees at Guantánamo were often denied the right to call such witnesses.

**CHART VI**



27

Chart VII further breaks down the data by showing that only 4% of these detainees were able to obtain *all* of their witnesses, and 22% of these detainees were able to have only *some* of their witnesses produced. Fully 74% of the detainees who requested witnesses were denied the production of all witnesses by the Tribunal. The Tribunal denied witness requests if it deemed the witnesses either "not reasonably available," "irrelevant," or at least one egregious example, because "the Tribunal would have been burdened with repetitive, cumulative testimony."[23]

**CHART VII**



Some detainees requested witnesses located outside Guantánamo and some requested witnesses from within the Base -- always another detainee. More than half of the detainees who requested witnesses, requested the testimony of witnesses who were not at Guantánamo. *All requests* for the testimony of detainees not detained at Guantánamo were denied.

The detainees who asked for witnesses from inside Guantánamo were successful in producing some witnesses only 50% of the time.

---

[23] For example, ISN 277 requested 17 witnesses, and the Tribunal President decided that he could only have two of them, because he determined that "all of the witnesses would probably testify similarly, if not identically." No basis is given for the belief that the witnesses would testify similarly or identically, and, as ISN 277's personal representative pointed out to the Tribunal, there is no basis in the CSRT procedures for denying a witness based on redundancy.

Nineteen percent of the participating detainees requested witnesses from outside Guantánamo. However, these requests were *never successful*. Thus, as the data shows, the only witnesses that any of the detainees were able to produce to testify on their behalf were other detainees.

The Unclassified Summary of the Basis for Decision lists the evidence that it considered and the evidence that the Tribunal did not consider. The data shows that only 26% of the detainees who requested witnesses had witnesses whose testimony was considered by the Tribunal. Broken down further, only 4% of the detainees who requested witnesses had all of their witnesses considered by the Tribunal. All of the witnesses considered were detainees testifying for each other.

In sum, the detainees were denied the right to produce any testimonial evidence other than the testimony of some of the fellow detainees.

2.    **Unclassified Evidence Requests**

Twenty-nine percent of the detainees requested unclassified documentary evidence prior to their hearings. Chart VIII analyzes participating detainees' unclassified evidence requests and the disposition of the requests. For the detainees who requested unclassified evidence, it was only produced 40% of the time. Twenty-five percent of the detainees who requested this evidence had all of their evidence produced, while 15% of these detainees had only some of the requested evidence produced. The documentary evidence that the Tribunal allowed the detainee to bring mostly letters from parents and friends that was accorded little weight by the Tribunal.

**CHART VIII**



% of Detainees That Requested
Unclassified Evidence and Had It Produced

D Had Some Produced 15%

D Had None Produced 60%

D Had All Produced 25%

3.    **Requests to See Classified Evidence**

During their hearing, more than 14% of the detainees requested the opportunity to view the classified evidence against them.[24]  These requests were always denied.

4.    **Evidence Detainees were Permitted to Present**

The Tribunals denied more evidence than they permitted, and denied almost all evidence that would be persuasive.  Detainees' requests for witnesses not detained in Guantanamo were always rejected.  Detainees requests to see any of the Government's classified evidence was always denied.  Detainees' requests for testimony from other detainees was usually denied.   The detainees, however, were allowed to present their documentary evidence, at least in part, 40% of the time.

**CHART IX**



---

[24] An examination of the 361 available transcripts reveals 18% made a request for classified evidence, but for purposes of this section analyizing all evidentiary requests, 14% corresponds to the 102 full CSRT returns.

The picture of what kind of evidence was permitted and rejected is bleak. However, when the number of detainees who have any evidence to present upon their behalf is considered, the picture is bleaker still. Based upon the 361 available transcripts, for as many as 89% of detainees, no evidence was presented on their behalf. The evidence the remaining 11% had was limited to testimony from other detainees and letters from friends and families. Taken as a whole, 96% of the detainees were shown no facts by the Government to support their detention as enemy combatants and 89% of the detainees had no evidence to present, and the 11% who did were allowed only unpersuasive evidence: family letters and other testimony from other detainees.

5.    **Reasons for Denying the Detainees' Evidence**

The Procedures empower the CSRT Tribunal to:

> Order U.S. military witnesses to appear and to request the appearance of civilian witnesses if, in the judgment of the Tribunal President those witnesses are *reasonably available*.[25]

The Procedures also permit the CSRT Tribunal to:

> [R]equest the production of such *reasonably available* information in the possession of the US. Government bearing on the issue of whether the detainee meets the criteria to be designated as an enemy combatant, including information generated in connection with the initial determination to hold the detainee as an enemy combatant and in any subsequent reviews of that determination, as well as any records, determinations, or reports generated in connection with such proceedings[26]

The CSRT procedures do not define "reasonably available" and the detainee has no right to appeal a determination that certain evidence is either unavailable or "irrelevant." The reasons the Tribunals gave for the refusal to allow detainees to present evidence vary. The three most common reasons were:

1.    The evidence/witness was not "reasonably available"
2.    The evidence/witness was not relevant, or
3.    The request for production of evidence/witness was not made to the personal representative during the D-A meeting and was thus too late.

---

[25] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.
[26] *Id.*

The Tribunals sometimes did not give any reason for denying evidence. The Tribunals sometimes also refused to permit the introduction even of documentary evidence in the possession of the United States Government.

Mohammad Atiq Al Harbi (ISN #333) appeared before a Tribunal and identified documents which he said would exonerate him and explain that he was not an enemy combatant:

> It is important you find the notes on my visa and passport because they show I was there for 8 days and could not have been expected to go to Afghanistan and engage in hostilities against anyone.

During the proceeding for detainee ISN #680, the following exchange took place:

> Questions to Recorder by Tribunal Members
> Q: Are you aware if the passport is in control of the U.S. Government here in Guantánamo?
> A: No, sir, I'm not aware.
> Questions to Detainee by Tribunal Members
> Q: If we were to see a copy of your passport, what are the dates it would say you are in Pakistan?
> A: The date of my entry to Pakistan, the dates I have on my visa, they all exist there. Even in Pakistan, we were received by American investigators. We were interrogated by American interrogators in Pakistan.
> Q: How long have you been here at the camp?
> A: I really don't know anymore, but most likely 2 to 2 1/2 years.

The passport was neither located nor produced and the detainee was promptly found to be an enemy combatant.

For Khi Ali Gul, ISN# 928, the Tribunal President said:

> [W]e will keep this matter open for a reasonable period of time; that is, if we receive back from Afghanistan this witness request, even if we close the proceedings today, with new evidence, we would be open to introducing or re-introducing any witness statements we might receive.

Khi Ali Gul's requested that his brother be produced as a witness and provided the Tribunal with his brother's telephone number and address. Instead of calling the phone number provided, which might have produced an immediate result, the Government instead sent a request to the Afghan embassy. The Afghan embassy did not respond within 30 days and the witness was not produced. The witness was then found not to be reasonably available by the Tribunal, the detainee determined to be an Enemy Combatant, and the hearing was never reopened.

In another case, an Algerian detainee requested court documents from his hearing in Bosnia at which the Bosnian courts had acquitted him of terrorist activities. The Tribunal concluded that these official Court documents were not "reasonably available" even though the Unclassified Summary of the Basis for Decision discussed another document from the same Bosnian legal proceedings. The aspects of the Bosnian proceedings which the Tribunal considered were not the records that the detainee requested. Apparently, according to the Government, some records from a formal Bosnian trial are "reasonably available" but others are not. There was no explanation in the record to explain why the Government did not obtain the requested records. This detainee, like the others, was determined to be an enemy combatant.

In the case of Allal Ab Aljallil Abd Al Rahman Abd, ISN #156, the detainee sought the production of medical records from a specified hospital.

> During the hearing, the detainee requested that the Tribunal President obtain medical records from a hospital in Jordan . . . The Tribunal president denied the request. He determined that, since the detainee failed to provide specific information about the documents when he previously met with his PR, the request was untimely and the evidence was not reasonably available.

CSRT Procedures provide for two reasons to deny requested evidence: that it is irrelevant and that it is "not reasonably available." That the detainee did not mention this request to his personal representative is not a reason to deny the evidence, at least according to the Procedures set forth in the July 29, 2004 memo.

## TRIBUNAL EVALUATION OF THE EVIDENCE

Once the detainee leaves the hearing chamber, the Tribunal is supposed to review and evaluate the classified evidence for the first time. What occurred after each detainee left the hearing is never recorded, or at least no record has been released. While we have no access to the classified evidence, much of the classified evidence is apparently hearsay. The CSRT procedures permit the use of hearsay, but require the Tribunal to first determine the reliability of the hearsay:

> The Tribunal is not bound by the rules of evidence such as would apply in a court of law. Instead, the Tribunal shall be free to consider any information it deems relevant and helpful to a resolution of the issue before it. *At the discretion of the Tribunal, for example, it may consider hearsay evidence,* taking into account the reliability of such evidence in the circumstances. (emphasis added) [27]

---

[27] This language can be found in both the Wolfowitz and England memos at Jul. 7 2004 § G(9) and Jul. 29 2004 § G(7)). Paul Wolfowitz, *Order Establishing Combatant Status Review Tribunal* (Jul. 7, 2004), http://www.defenselink.mil/news/Jul2004/d20040707review.pdf; Gordon England, *Implementation*

The Tribunal's Basis for its Decision describes the rationale for determining that a detainee is an enemy combatant. However, the 102 full CSRT returns reviewed, all obtained only through the habeas litigation, show that the Tribinal apparently never questioned the reliability of any hearsay.

This failure to analyze the reliability of the hearsay is all the more serious because three issues arise concerning the reliability of the hearsay. First, the source of the hearsay is usually or always anonymous; second, there is great confusion about the names of the detainees; and third, there is some evidence of the coercion of declarants.

A.    *Hearsay from Anonymous Sources*

Each Tribunal decision was reviewed by a Legal Advisor. It is not possible to definitively analyze the quality of the hearsay evidence since it is unavailable, but the statement of the Legal Adviser reviewing the Tribunal's decision for ISN #552 demonstrates the problem:

> Indeed, the evidence considered persuasive by the Tribunal is made up almost entirely of hearsay evidence recorded by unidentified individuals with no first hand knowledge of the events they describe.

Outside of the CSRT process, this type of evidence is more commonly referred to as "rumor."

In one instance, the personal representative made the following comments regarding the Record of Proceedings for ISN #32:

> I do not believe the Tribunal gave full weight to the exhibits regarding ISN [redacted]'s truthfulness regarding the time frames in which he saw various other ISNs in Afghanistan. It is unfortunate that the 302 in question was so heavily redacted that the Tribunal could not see that while ISN [redacted] may have been a couple months off in his recollection of ISN [redacted]'s appearance with an AK 47, that he was six months to a year off in his recollections of other Yemeni detainees he identified. I do feel with some certainty that ISN [redacted] has lied about other detainees to receive preferable treatment and to cause them problems while in custody. Had the Tribunal taken this evidence out as unreliable, then the position we have taken is that a teacher of the Koran (to the Taliban's children) is an enemy combatant (partially    because    he    slept    under    a    Taliban    roof).

---

*of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

*B.    Possible False Identities or Misnomers*

It is black letter evidence law in normal settings that, while hearsay may sometimes be admissible, the reliability of hearsay evidence always depends upon the reliability of the hearsay declarant. The problem of reliability in the case of the detainees is apparent because the Government's records of its detainees themselves misidentified the detainees more than 150 times.

On April 19, 2006 the Government published the names of the 558 detainees who have had CSRT proceedings at Guantanamo.[28]  On May 15, 2006 the Government also published a list of 759 names which represents all those ever detained at Guantánamo.[29] The Government has also released transcripts and other documents related to Administrative Review Board hearings that also contain detainee names.[30]

These three records contain more than 900 different versions of detainee names.. Adding other Government documents, such as the full CSRT returns and other legal documents, the number rises to more than 1000 different names.  Yet, according to the Government there only 759 detainees have passed through Guantánamo "between January 2002 and May 15, 2006."[31]  The more 1000 different names does not mean that there were more than 1000 detainees at Guantánamo; but it does establish the difficulty of identifying individuals in these circumstances.

If, after more than four years of interrogation, the Government does not know the names of its own detainees, confusion about the identity of detainees clouds any analysis of the evidence at the CSRT hearings.  In short, there should be considerable concern when a Tribunal relies upon hearsay declarants who may be talking about someone other than the detainee to whom the declaration is supposedly directed.  For example, one detainee responded to the claim that his name was found "on a document."  The detainee states:

> There are several tribes in Saudi Arabia and one of these tribes is Al Harbi.  This is part of my names and there are literally millions that share Al Harbi as part of their name.  Further, my first names Mohammad and Atiq are names that are favored in that region. Just knowing someone has the name Al Harbi tells you where they came from in Saudi Arabia.  Where I live, it is not uncommon to be in a group of 8-10 people and 1 or 2 of them will be named

---

[28] Available at: http://www.defenselink.mil/pubs/foi/detainees/detainee_list.pdf
[29] Available at: http://www.defenselink.mil/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf
[30] The Procedures provide that each prisoner found an Enemy Combatant must go through an Administration Review Board process (ARB) every year following the CSRT conclusion that the detainee is an Enemy Combatant.
[31] This is the language used to describe the list of 759 detainee produced by the Government on May 15, 2006.

Mohammed Al Harbi. If fact, I know of 2 Mohammed Al Harbis here in Guantánamo Bay and one of them is in Camp 4. The fact that this name is recovered on a document is literally meaningless.[32]

### 3.    *Possible Coercion*

No Tribunal apparently considered the extent to which any hearsay evidence was obtained through coercion. While the effects of torture, or coercion more generally, would obviously apply to inculpatory statements from the detainee himself, the possibility should also have been considered by a Tribunal weighing all statements and information relating to the detainee which may have been, in the words of the Detainee Treatment Act of 2005 "obtained as a result of coercion...."[33] This statute was not the enacted until December 2005, after the CSRT process was complete, but indications of torture or coercion by a detainee should have at least raised hearsay concerns, which the Tribunal is required to consider.[34] The record does not indicate such an inquiry by any Tribunal. Instead, the Tribunal usually makes note of allegations of torture, and refers them to the convening authority. This is less surprising than the fact that several Tribunals found a detainee to be an enemy combatant before receiving any results from such investigation. While there is no way to ascertain the extent, if any, that witness statements might have been affected by coercion, fully 18% of the detainees alleged torture; in each case, the detainee volunteered the information rather than being asked by the Tribunal or the personal representative. In each case, the panel proceeded to decide the case before any investigation was undertaken.

---

[32] Mohammad Atiq Al Harbi, ISN #333, goes on to state that there are documents available to the United States that will prove that his classification as an enemy combatant is wrong. He also objects to anonymous secret evidence "It is important you find the notes on my visa and passport because they show I was there for 8 days and could not have been expected to go to Afghanistan and engage in hostilities against anyone. . . . I understand you cannot tell me who said this, but I ask that you look at this individual very closely because his story is false. If you ask this person the right question, you will see that very quickly. I am trusting you to do this for me."

[33] The Detainee Treatment Act of 2005 provides in part:

b) CONSIDERATION OF STATEMENTS DERIVED WITH COERCION.--

(1) ASSESSMENT.--The procedures submitted to Congress pursuant to subsection (a)(1)(A) shall ensure that a Combatant Status Review Tribunal or Administrative Review Board, or any similar or successor administrative Tribunal or board, in making a determination of status or disposition of any detainee under such procedures, shall, to the extent practicable, assess--

(A) whether any statement derived from or relating to such detainee was obtained as a result of coercion; and

(B) the probative value (if any) of any such statement.

[34] Gordon England, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba* (Jul. 29, 2004), http://www.defenselink.mil/news/Jul2004/d20040730comb.pdf.

## DECISIONS OF TRIBUNAL WHEN A DETAINEE PREVAILS

Despite all this, the detainees sometimes won, at least initially The orders of July 29, 2004 state that:

> [t]he Director, CSRT, shall review the Tribunal's decision and may approve the decision and take appropriate action, or return the record to the Tribunal for further proceedings. In cases where the Tribunal decision is approved and the case is considered final, the Director, CSRT, shall so advise the DoD Office of Detainee Affairs, the Secretary of State, and any other relevant U.S. Government agencies.[35]

If the Director of the CSRT wishes, he may send any decision back to the CSRT for further proceedings, which means that the detainee can be subjected to multiple Tribunals until the Government is satisfied with the ruling. The additional hearings are always conduced without the detainee himself, who was never notified of his "victory" in the first proceeding.

At least three detainees were initially found not to be enemy combatants and then subjected to multiple re-hearings until they were found to be enemy combatants. This fact is not formally published in any records but was discovered through a careful review of documents produced under court order  in the *habeas* litigations.

Several detainees had second hearings and at least one detainee, after his first and second Tribunals unanimously determined him to not be an enemy combatant, had yet a third Tribunal — again *in abstentia* — which finally found him to be properly classified as an enemy combatant. The Government's record for one detainee whose proceeding was returned for a second hearing states:

> On 24 November 2004, a previous Tribunal [unanimously] determined, by a preponderance of the evidence, that Detainee #654 was not properly designated as an enemy combatant.

It continues,

> On 25 January 2005, this Tribunal, upon review of all the evidence, determined that detainee #654 was properly [unanimously] designated as an enemy combatant.

A more egregious record of a detainee twice subjected to Tribunals is that of Detainee #250. The following excerpts present a vivid example of just how little is needed to determine that a detainee is not an enemy combatant. Detainee #250 elected to not appear in person before the Tribunal, but his statement was considered and he was unanimously found *not to have been  properly designated as an enemy combatant.*

---

[35] *Id.*

However, that decision did not long stand. The Government's own Legal Sufficiency Review as written by Commander, United States Navy, James R. Crisfield, Jr. synopsizes the processing of Detainee #250's case.

> A letter from the personal representative initially assigned to represent the detainee at Guantanamo Bay, Cuba, reflects the detainee's elections and is attached to the Tribunal Decision Report as exhibit D-b. The original Tribunal proceedings were held *in absentia* outside Guantanamo Bay with a new personal representative who was familiar with the detainee's file. This personal representative had the same access to information and evidence as the personal representative from Guantanamo Bay. The addendum proceedings were conducted with yet a third personal representative because the second personal representative had been transferred to Guantanamo Bay. This personal representative also had full access to the detainee's file and original personal representative's pass-down information. The detainee's personal representatives were given the opportunity to review the respective records of proceedings and both declined to submit post-Tribunal comments to the Tribunal.

Despite the initial finding that the detainee was not an enemy combatant and the obvious difficulties reflected in this tortured process, Commander Crisfield concluded that "The proceedings and decision of the Tribunal, as reflected in enclosure (3), are legally sufficient and no corrective action is required." He recommended approval of the decision of the subsequent Tribunal finding #250 to be an enemy combatant.

The record of the third decision for yet another detainee, ISN #556, whose proceeding was returned twice, states in the memorandum following his third Tribunal:

> On 15 December 2004, the original Tribunal unanimously determined that the detainee should no longer be designated as an enemy combatant.

Following the initial Tribunal, its membership was changed. The record continues:

> Due to the removal of one of the three members of the original Tribunal panel, the additional evidence, along with the original evidence and original Tribunal Decision Report, was presented to Tribunal panel #30 to reconsider the detainee's status. On 21 January 2005 that Tribunal also unanimously determined that the detainee should no longer be classified as an enemy combatant.

The Tribunal was changed again:

Once again, additional information regarding the detainee was sought, found, and presented to yet a third Tribunal. This additional information became exhibits R-23 through R-30. This time, the three members of the second Tribunal were no longer available, but the one original Tribunal member who was not available for the second Tribunal was now available for the third. That member, along with two new members, comprised Tribunal panel #34 and sat for the detainee's third Tribunal. Following their consideration of the new additional information along with the information considered by the first two Tribunals, this Tribunal determined that the detainee was properly classified as an enemy combatant.

The records of other detainees suggest additional instances of rehearings. In these proceedings, the Tribunal reconvenes and considers an issue about the quality of the evidence, but there is no record of what transpired at the first hearing or why the second hearing occurred or the effect of the issues of concern about the quality of the evidence.

## BOTTOM LINE

"And again, to review, the CSRT is a one-time review to determine if a person, a detainee, is or is not an enemy combatant."[36]

Five hundred fifty-eight detainees went through the process of a Combatant Status Review Tribunal. Thirty-eight detainees, or 7% of the total, were released from Guantánamo as a result of the CSRT process. They were labeled either "non enemy combatants" or "no longer enemy combatants." In contrast to these numbers, no detainee in the sample set was ultimately found to be a non/no longer enemy combatant as a result of the CSRT although some were initially found to be either a "non" or "no longer" enemy combatant by a first (or even a second) Tribunal.

The difference between a "non" enemy combatant and a "no longer" enemy combatant is not clear, but the label "non enemy combatant" implies that the Government was mistaken when it detained the prisoners, while "no longer enemy combatant" implies that, while the prisoner was once an enemy combatant, Guantánamo Bay served as a successful rehabilitation program. Despite these connotations, the Government appears to consider the labels interchangeable.

For example, Secretary of the Navy Gordon England used both terms when he described the CSRT process on March 29, 2005. "The Tribunals also concluded that 38 detainees were found to no longer meet the criteria to be designated as enemy combatants. So 520 enemy combatants, 38 non-enemy- combatants…It should be

---

[36] Gordon England, *Defense Department Special Briefing on Combatant Status Review Tribunals* (Mar. 29, 2005), http://www.defenselink.mil/transcripts/2005/tr20050329-2382.html.

emphasized that a CSRT determination that a detainee no longer meets the criteria for classification as an enemy combatant does not necessarily mean that the prior classification as EC was wrong."[37]

## CONCLUSION

This Report lays out the CSRT Process, both as it exists on paper and as it was implemented in Guantánamo.  The reader may judge whether that process meets the fundamental requirements of due process. Regardless of the answer, at this point in time, more than two years after the Supreme Court's decisions in *Rasul v. Bush*, and *Hamdi v. Rumsfeld* the CSRT is the only hearing that the detainees have received.  The Government is attempting to replace habeas corpus with this no hearing process.

---

[37] *Id.*

Research and Contribution by:
Asim Badaruzzaman, Grace Brown, Jillian Camarote, Edmund Caulfield, Brad Dunn,
Doug Eadie, Paul Elias, Matt Feinstein, Chris Fuller, Brielle Goldfaden, Dan Gottlieb,
Eric Guglielmotti, Jennifer Holt, Colleen Karoll, Molly Moynihan, Mark Muoio, Dave
Pisciotta, Courtney Ray, Heather Siegelheim, Laura Sims, Sarah Wieselgren
Students, Seton Hall University School of Law

# APPENDIX I

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| associated with Total | 58% | -2% | | associated with Total | 60% | -1% | | associated with Total | 59% |
| fighter for Total | 7% | -1% | | fighter for Total | 8% | 3% | | fighter for Total | 11% |
| member Total | 32% | 2% | | member Total | 30% | -1% | | member Total | 29% |
| none alleged Total | 3% | 1% | | none alleged Total | 2% | -1% | | none alleged Total | 1% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| Al Qaeda Total | 31% | -1% | | Al Qaeda Total | 32% | 22% | | Al Qaeda Total | 54% |
| Al Qaeda & Taliban Total | 26% | -2% | | Al Qaeda & Taliban Total | 28% | -4% | | Al Qaeda & Taliban Total | 24% |
| Al Qaeda OR Taliban Total | 6% | -2% | | Al Qaeda OR Taliban Total | 7% | -4% | | Al Qaeda OR Taliban Total | 3% |
| none alleged Total | 3% | 1% | | none alleged Total | 2% | -1% | | none alleged Total | 1% |
| other Total | 1% | 0% | | other Total | 1% | -1% | | other Total | 0% |
| Taliban Total | 23% | 1% | | Taliban Total | 22% | -9% | | Taliban Total | 13% |
| Unidentified Total | 11% | 3% | | Unidentified Total | 8% | -4% | | Unidentified Total | 4% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

| Return & Transcript Sample Set | | % variation | | Original 517 Records | | % variation | | Return Sample Set | |
|---|---|---|---|---|---|---|---|---|---|
| 3-b Present | 44% | -1% | | 3-b Present | 45% | -3% | | 3-b Present | 42% |
| 3-b Not Present | 56% | 1% | | 3-b Not Present | 55% | 3% | | 3-b Not Present | 58% |
| Grand Total | 100% | | | Grand Total | 100% | | | Grand Total | 100% |

# EXHIBIT E

UNCLASSIFIED/FOUO

**Summarized Unsworn Detainee Statement (but see page 2 where the Detainee agrees to take his own oath and makes a sworn statement):**

*The Tribunal President read the hearing instructions to the Detainee. The Detainee confirmed that he understood the process and had no questions.*

*The Recorder presented Exhibits R-1 and R-2 into evidence and gave a brief description of the contents of the Unclassified Summary of Evidence (Exhibit R-1).*

*The Recorder confirmed that he had no further unclassified evidence or witnesses and requested a closed Tribunal session to present classified evidence.*

*The Tribunal President stated that the Detainee wants to participate and has requested two witnesses, one witness from Pakistan and one witness from Yemen. The Tribunal President ruled that these two witnesses are relevant to this tribunal hearing. The witness request was sent to the United States Department of State on 22 November 2004 with a request to contact both governments for assistance. As of this date, 7 December 2004, the Department of State has received an acknowledgment response for the request from both embassies, but they appear not to be supportive of the request. The witnesses have therefore been deemed not reasonably available.*

Tribunal President: Mohammad Ahmad Ali Tahar, you may now present any evidence or information you have to this tribunal, and you have the assistance of your Personal Representative in doing so. Do you still wish to present information to this tribunal?

Detainee: Do I talk now?

Tribunal President: Yes, and would you like to make your statement under oath?

Detainee: Yes. That means do I give an oath? As you see fit; I have no problem with taking that oath.

Tribunal President: We have a Muslim oath prepared if you would like to take the oath.

Detainee: No problem.

Tribunal President: Very well, thank you. Recorder, please administer the Muslim oath to the Detainee.

*At this point, the Recorder begins to administer the oath, but was interrupted by the Detainee.*

Detainee: You are not Muslims. I want to do an oath without him talking. He is not a Muslim.

UNCLASSIFIED/FOUO

Tribunal President: Very well. Would you like to take an oath in your own words? You may do so at this time.

Detainee: I swear to tell the truth. I swear to tell the truth.

Tribunal President: Very well, thank you.

**Summarized Sworn Detainee Statement**

*The Personal Representative read the accusations to the Detainee so that he could respond to the allegations. The Detainee has a question before starting his statements. The allegations appear in italics, below.*

Detainee: Do I have to respond to each point, including the title, saying that the Detainee is associated with the Taliban or al Qaida?

Tribunal President: You can respond to any of the items on the unclassified summary as you choose to.

Personal Representative: (To interpreter) Please relate to him that I recommend that we go one at a time, because that's how we could get his story out about each one of these accusations.

Detainee: That's good.

*3.a. The Detainee is associated with the Taliban and al Qaida.*

*3.a.1. The Detainee traveled to Yemen for (from) Pakistan in September 2001.*

*(The personal representative clarifies that the 3.a.1. should read "from" instead of "for".)*

Detainee: My response, first of all, was that I was captured inside Pakistan. Second of all, I don't belong to nor am I associated with any group. I never had any association with any organization even before. I'm just a student that went there to collect and gather information to help me with my studies. I didn't have any intention; I had only personal intentions of doing the things related to my studies. I didn't have any intentions to help or to do anything with any organization. Or, not even having anything to do with Jama'at al-Tablighi, which is like propaganda, or try to give the Islamic word out there. I didn't even have that intention. I just went for personal reasons to gain knowledge and come back. I never heard of this Taliban or al Qaida before. It's the first time I ever heard of these two names in all of this, is when I got here, to Guantanamo Bay, Cuba. I didn't know what these names were, I didn't hear about them, and I didn't have intel, or anything about them, until I got here, at the Guantanamo camp. Up to now, I really still don't know what these people's goals are. What they are, and what is the definition of these people, and what are they trying to do (referring to al Qaida and Taliban). From

UNCLASSIFIED/FOUO

what I know, all the interrogators, and as I mentioned with my meeting with the P.R., that these people, the Americans, are just trying to tie some people to the incident of 9/11, and to have someone pay for that. They are trying to find the connection and to put me in that connection, the connection to these people. I heard earlier that you really wanted to get to the truth and to be just. I love that and I appreciate that. What you are doing is a good job, very good. But, I only hope that there will be no injustice in this world. Because, you know, that injustice will come back to you anyway. Because I have no means, or no ways of defending myself; I have no lawyer. I don't have any way to get witnesses to prove that I am really innocent of all this. I was hoping that all the time that I have been here, that they would look, look at my file, and search the information for them to prove, and to read and get to a reasonable conclusion to clear me from all this.

This is my entire story about me traveling from Yemen to Pakistan. I traveled by official means. I traveled through a Tabligh organization; I didn't hear or didn't know that this organization favored or was encouraging the Jihad or doing Jihad activities. This organization existed in the United States and even in Tel Aviv. And if I had known that this organization was a terrorist organization, I would never be associated with them. Because I didn't have enough money, I chose Pakistan. That's why I chose to go there and study medicine. I saved up some money and I was told that some organization would help me, and they helped me immediately. They gave me all the information, and they said yes, Pakistan has a good medical program; it's not that hard, it's a good program and it's not that expensive. That's why I went there to find out for myself to see if I would be able to study medicine there or not. So if my plan was successful then, and if I found out that it's really good for me and they can do it, I would stay, and if not then I would go back.

I wrote many letters to my family, but I didn't get any response or any help from them or the military. I didn't get any letters back. I wanted to ask my family to gather information and to help me prove that I finished high school, and that I was fine, to prove that all this is not funded, not based on any reasonable proof. That's what I was trying to get my family to give me.

I was not even twenty at that time. They (apparently Jama'at al Tablighi) wanted to do something humanitarian and I wanted to go and do my duty, study with civilians and help people. Look, I'm not involved in this big problem and all this mess, and I have nothing to do with them. That is really all my story, really, and I wasn't given the chance to prepare my defense, or help myself, gather witnesses or to see if this is not correct or not true. If you check the Pakistani government and the Yemeni government, they know everything about me. All I wanted was just for you to look deeply into my case and to take into consideration all these things. I would like the Americans not to be unjust or judge me at all, really, because that will reflect badly on the Americans. They preach justice and they don't want to be unjust against anybody or to do wrong to anybody and that's what they swore to do. You and I hope that you will be just.

Tribunal President: I can assure you of that, and you witnessed that we took an oath and we are bound to be fair and offer justice. We are here to determine whether you have

UNCLASSIFIED/FOUO

been properly classified as an enemy combatant. We have come here with an open mind. We have seen nothing about you until today, with these two pieces of paper. We have determined your witness request to be relevant and asked for responses from the two governments that you requested. For whatever reason, those two governments have chosen not to respond. We will not hold that against you. We will still look at all the evidence, all the files, and all the information and with an open mind and with a fair and just purpose make a determination whether you have been properly classified as an enemy combatant.

Detainee: I have reason to tell you why I chose the Yemeni government. When Pakistan captured us, I made a mistake, I did something wrong in Pakistan. I was really surprised to see these allegations from people who are not Pakistani. After that, Pakistani and American Intelligence interrogated me. The Pakistani government put a condition that if there is no proof against me, and I didn't do anything, that they would leave me with the Pakistani government and the Pakistani government will deliver me to my country, Yemen. The interrogation station was in front of me and it was the army translator and the interrogator from the Pakistani intelligence said yes, all of what this man said is correct and all he said about his story in Pakistan is correct and therefore that is why we are going to give him back his passport that we took. I would not stay long in Pakistan; I planned on going back to Yemen. I was really surprised that the American intelligence refused all of those proofs and they said no. We still need him, they said, and then they took me. That's why for these reasons I chose the Pakistani government as a witness because they have all this information and they know everything. I also chose the Yemeni government because I'm sure my government will confirm what the Pakistanis are saying. That's why I am very confident that will be the case. I have great confidence that you will find out too, that what I'm really saying is true and that I really don't have anything to do with all these things that are being said about me. That's why when you make your conclusion, your decision, you'll be confident and you will have no doubt about it, you'll be comfortable with it.

Tribunal President: I'm sure we will have no doubt about it, because we will make sure that there's a preponderance of evidence that will guide us in our decision.

Personal Representative: Now, I need to mention some things that we talked about in the interview. And I'll say that, and he can talk about it.

Detainee: OK, if you want to make comments about each point, that's fine. But, really, I'm not going to respond or say anything, because this is all that I have to say. This is my story. But, you can go ahead and read every point.

Personal Representative: OK. Tell him I will because when we first met I told him that as his P.R., everything that we discuss might be compelled to say at his tribunal. Does he remember me telling him that?

Detainee: Yes.

UNCLASSIFIED/FOUO

Personal Representative: So, I will mention that if he feels compelled to say something he should; if he doesn't want to, then he doesn't have to.

Detainee: Yes, I would like you to read the points, and I will just confirm it or deny it. And we will go from there.

Personal Representative: (Reading from notes taken from previous interview) Good. When we met, we discussed, regarding number one, that yes, what he did was travel from Yemen to Pakistan, he had a passport, a plane ticket, money, all legally traveled. He went to study medicine at the University. However, he did not get a chance, or an opportunity to register to attend the classes when he got there. He was there about three to four months then he was arrested. He got there and met the Jama'at al-Tablighi, and was using them as a way to start to study medicine. They asked him to study the Koran.

Detainee: Yes, that's true.

Personal Representative: That's all the notes I took for number one.

Detainee: Yes.

*3.a.2. The Detainee was sent by the Jama'at al-Tablighi to travel.*

Personal Representative: (Reading from notes taken from previous interview) During our discussion, he said that he paid for himself to get to Afghanistan, and he was accepted from them to travel to Pakistan to attend a school. I'm saying he paid for himself to get there, and that he was accepted to attend the school. It was his intention to go there and study medicine.

*3.a.3. The Detainee obtained his travel visa through Jama'at al-Tablighi.*

Personal Representative: (Reading from notes taken from previous interview) Yes, that's true. Everyone knows they have no relationship with the Taliban or al Qaida, after September 11 the Americans started to say they were associated with the Taliban and the al Qaida.

Detainee: These are my words to you?

Personal Representative: This is from my notes of what you said.

*3.a.4. The Detainee was met by a member of Jama'at al-Tablighi in Pakistan.*

Personal Representative: This is true.

*3.a.5. Jama'at al-Tablighi, a Pakistan based Islamic missionary organization is being used as a cover to mask travel and activities of terrorists including members of al Qaida.*

UNCLASSIFIED/FOUO

Personal Representative: (Reading from notes taken from previous interview) He said that he never had any idea that this was used as a cover. He never knew that it was ever associated with al Qaida.

Detainee: If I've known that they were a terrorist organization I would have never gone to them.

*3.a.6. The Detainee was sent a personal greeting from the Taliban Deputy Minister of Intelligence.*

Personal Representative: (Reading from notes taken from previous interview) Per our conversation, he said that he never received a greeting; he does not know the meaning of the Taliban, he said, I never ever was in Afghanistan.

Detainee: May I talk here?

Personal Representative: Of course.

Detainee: When we talked about this specific point last time, and I said that I did not know the Taliban or have association with them. He said yes but again they are trying to find any connection or any relation between you and Taliban or al Qaida. Somehow they are trying hard to find any connection. I was wondering if the Americans are going to force the issue, force me in connection with these people, even if it wasn't true? And he told me no, no, and so I said, I came to Pakistan; I have no relation with these people. I lived a winter in Pakistan so what's the relation? I don't know, it looks like they want to put these accusations on me, and somehow, they want me to give out a witness (inaudible) This guy, this minister of intelligence, he's a hotshot, a big guy so, I'm just a simple man, what do I have to do with him? I'm sure it was just a mistake that it was somebody else that was mentioned there, and thought that it was me. It could be the name of another person. They know these things and somehow they still have to connect me one way or another. I would like you to read it more, seriously and deeply to this point.

Personal Representative: Also, if I may, I think I told him that later on in a closed session that I may have some information to present to what he may be talking about.

*3.a.7. A senior al Qaida lieutenant recognized the Detainee in a photograph.*

Personal Representative: (Reading from notes taken from previous interview) His response I don't know al Qaida, I don't know the meaning. He doesn't know the meaning of al Qaida.

Detainee: I'm sure that he is mistaken by looking at this picture. I'm sure he's looking at this picture, and looked at that picture. It might be of another man, and he said it's me. Because sometimes when you look at the pictures, you think that you are sure that this is the right person. But you need to see the person physically and you realize that is not.

000309

UNCLASSIFIED/FOUO

That's why I'd like to meet this person and see if he can see, and show him that it's not me. That's all.

*3.a.8. The senior al Qaida lieutenant ran an al Qaida safe house where a number of al Qaida members were captured.*

Personal Representative: (Reading from notes taken from previous interview) His response was that the person who was running the house where he stayed at was a part of the University. The name of the person who that ran it was Issa, a Pakistan who was from the University.

Detainee: That's true.

Personal Representative: (Continues from notes) I never thought or believed in or do not believe that Issa, who ran the house, was al Qaida. He would come and go and run the house.

Detainee: That is correct.

*3.a.9. The Detainee was captured in this safe house.*

Personal Representative: (Reading from notes taken from previous interview) This was the house he was captured in. I had no idea why the Pakistani government raided us. The Pakistani told him that, I think this is what he was alluding to earlier, that this was not a safe house.

Detainee: And also, I wanted to add that for me being with the people that were in that house, me talking to them, and being with them, I never noticed anything that had to do with terrorism or Jihad or anything. I never noticed anything that would indicate that they were in these things. If I have noticed any slightest thing, I would not say anything. I was just staying there, listening to lessons, learning that information, doing our duties, our religious practices, eating and just waiting for the results, or response from the University to see if we were going to be accepted and be able to stay there and study or not. That's all we were doing. I didn't have any information and I didn't have any knowledge or any indication that this house belongs to, or was a safe house or anything. From what I knew, this house belongs to Jama'at al-Tablighi and this has nothing to do with anything else. I used to ask Issa, the guy who was in charge of managing the house when am I going to leave, when am I going to get a response…? He said just wait, just wait, be patient, you'll get a response.

*3.a.10. The Detainee stated that he is a terrorist.*

Personal Representative: (Reading from notes taken from previous interview) His response to me was I must've been misunderstood. Some stuff I did not understand.

000310

UNCLASSIFIED/FOUO

Detainee: I admit that I don't understand everything. And I'm just a simple person and maybe during these interrogations I might have understood in my way but I started saying yes, to how I understood it, but it was the wrong word. That's why I may have said something I didn't understand too. That's all.

Personal Representative: Do you have anything else to add?

Detainee: No, I'm fine. No, I don't have anything else.

Tribunal President: Personal Representative, do you have any questions for the Detainee?

Personal Representative: Thank you, Sir. Yes, I do have a couple. It was about a three or four month timeframe that you were waiting to get into the University; what did you do (during that time)?

Detainee: I was just trying to memorize the Koran.

Personal Representative. Okay, my second question. Did you ever participate in any terrorist activity?

Detainee: I don't know what this is. What is the meaning the meaning of terrorist? I don't even know what that term is.

*The Personal Representative and the Recorder had no further questions.*

<u>Tribunal Members' questions</u>

Q. Good morning. We are pleased that you took the time to explain your situation to us today. As the president mentioned, we haven't seen your file prior to coming to the tribunal. However, there are some things that you said that make us familiar with your story because some of your Yemeni brothers in the house have come before us in the tribunal. When you left Yemen to go to Pakistan, was it your understanding that you had already been accepted at this school for medicine?
A. No, I didn't know. I went there to find out, I just had the information about this University.

Q. But, they have a medical school there?
A. Yes.

Q. You mentioned the Jama Salafia (ph); was this the University that you were trying to attend?
A. No, I didn't have the knowledge. The Pakistani (inaudible) introduced me to this. Before I traveled, and one of the guys who interviewed me told me that there are so many Universities in Pakistan that would interest you in medicine. But on one condition, you have to memorize the Koran; you have to learn the Koran. This happened in Yemen.

UNCLASSIFIED/FOUO

And then I left to go to Pakistan. I found one interviewer, his name was Ismye (ph), who showed me a University that will teach you how to memorize the Koran. I had this information in Yemen. I had to memorize the Koran. I went to this group; at the university and they didn't know if they would accept me. I might just go, to go and memorize the Koran. My decision of choosing this University is just because it was a requirement for me to go to medical school. That's what the education person said, that's why. And according to the information I had in Yemen, that is one of the condition to get accepted to medical school, you have to know the Koran. That's the only thing, that's why it was a condition, I wanted to get that condition out of the way. That was the reason why I traveled to interview.

Q. But, you could've memorized the Koran in Yemen, without having to go all the way to Pakistan. Yet you wanted to go to Pakistan to do that?
A. There is no doubt about that. That is true. Yes, but there will be a big difference in me learning the Koran in Yemen, or me learning it there, following their requirements, their conditions they put for us to get there. And I wanted to make sure myself, does this condition really exist, that you have to memorize the Koran, and I was really in doubt that this condition was really there. You have to memorize the Koran, to get into the medical school. This information was given to me by Jama'at al-Tablighi, so I was really hesitant. I had my doubts, as every medical school that you have to memorize the Koran, to be able to get into that medical school in Pakistan. That's all about that.

Q. Sounds like more of a school for religious studies than for medical school.
A. Yes, of course, there was no medical school in that University.

Q. So the Tablighi people helped you get to Pakistan and to the house where you stayed and then for three or four months you just studied the Koran the whole time?
A. Yes, this is just from the knowledge, information site, but all the expenses, I paid them. Any financial expenses, I paid them.

Q. Did you have enough money to support yourself or did you have to go out and work to earn money there?
A. I was always working since I was very young. I was going to school and working. I really had enough money to support myself for a long time. To prove that I had money, when I was captured I had some dollars with me. It was over two thousand dollars, and you have it now, with you, its here, with my passport and tickets.

Q. If everything had gone according to your plan, how would it have worked?
A. The purpose was to visit Pakistan and to gather all the information needed and see how things are going to go, and then to go back to Yemen, get all my diplomas, my credits, everything that I would need, and go back and go straight to school. I would bring all the documents necessary from the government and all that, to go to the university, that was the plan.

Q. How long were you initially planning to stay in Pakistan?
A. I really didn't know how long. I was expecting it to be a month or two.

UNCLASSIFIED/FOUO

Q. But it just kept lasting longer and longer?
A. Yes, these people were starting to make problems and they were delaying things. My passport was with them, everything was with them and they just delayed it, and there were lots of delays. I don't know the country. If I had problems I would argue with them, but if I go out, I might get lost. They had all my papers and everything that's why. They kept delaying things.

Q. Why do you think there were so many delays?
A. I asked them many times, they said oh no, wait, just wait, you know how the Pakistanis, how they are. Even their Army wasn't that good, so sometimes I leave, because I can't understand their response, so they said, wait just wait.

Q. It would seem that if they brought you all the way over there, that they would try to help you get what you wanted?
A. That was their intention, yes I had confidence in them but that's how they were behaving to me. And I wasn't comfortable at all. I was not happy with them, because, my passport had expired, my plane ticket I bought, problems with my Visa, the plane ticket, all that, I wasn't happy with it. I was very definite that the Visa was going to expire and the plane ticket also, so I wasn't happy. This is all I paid for it financially.

Q. Could you please explain the circumstances of how you were captured?
A. What conditions? You know everything, so what do you mean?

Q. I assume you were arrested in the house? Or was it from somewhere else?
A. I was in the house, I have all my documents, my passport, my plane ticket, my visa, I was legal, and everything was official. I kept my papers with the manager of that house, Issa, and he used to come on and off. During this waiting period, the Pakistani police came and they invaded the house. When they personally captured me, I didn't have any problems with them, I was calm. I gave them whatever they needed; I didn't cause them any problems. I thought they were just going to get some information from us, from me, which is their right, which was fine. The Pakistanis took me. They took us to the interrogation place, and from there, the sad story and moving started.

Q. How long have you been here at the camp?
A. I don't know the date exactly, but I think it's about two to two and a half years. In Yemen, if you have problems in country, they capture you, they investigate and interrogate you, you go to the court and see the judge, and when its done, its usually within weeks, a month at the most. But, with Americans, look, it has been three years.

Q. The concern, of course, is some of the points on the summary, which you had addressed earlier, particularly the ones concerning the greeting you supposedly received from the Taliban minister and the al Qaida officer recognizing you.
A. He says that also these two points are still a mystery for me. I mean, it doesn't make sense, you can ask a child, if you ask him, please, look into this, this hotshot, this

000313

UNCLASSIFIED/FOUO

minister, who ever said this, or whoever, it doesn't make sense. I hope you would look at it deeply and with a strong mind.

Q. Because, that is the two bases for our concern, you say you didn't know who they were, but for some reason they seem to know who you are.
A. How did this happen? Can you bring them in front of this tribunal? Or in front of this... your law says that you can. You didn't bring them, and I even asked you, but you didn't. We are following the rules and laws. How come these laws do not apply?

Tribunal Member: Certainly if we had the ability to bring the people whom you had requested we would have done so.

Detainee: I heard in the beginning that you couldn't bring these people because of things I did.

Tribunal President: That was previously explained, and also we said, and I will say it again, that we do not hold it against you because the people did not respond to the request.

Detainee: You are referring to the Pakistan and Yemen Government, no, that's not what I was talking about. I'm talking about the videos. I heard in the beginning that you said, you said you could not bring these people, the people that saw me, and the people that saw me and said such things about me.

Tribunal President: Well, naturally, because as was explained also earlier, some of that information has national security implications for the United States and cannot be released.

Detainee: Okay.

Tribunal President: But, in any case, we accept your testimony today, in whatever form you choose to give it.

Detainee: Me, too, I listen to whatever you say, how you present it, and give it its importance to this tribunal.

Tribunal President: Thank you again.

Q. When you left Yemen for Pakistan, did you have a roundtrip ticket?
A. I really don't remember. But I know I have my ticket and it's written there, you will see. I mean, if you look at my ticket, you will see if it was a round trip ticket or not. But, I am sure it was a roundtrip ticket, but of course, it would have to be a round trip ticket.

Q. The papers that you talked about during our questions, you mentioned a passport, tickets, visa, etc., ...have you seen them since you have been here in Cuba?

UNCLASSIFIED/FOUO

A. Yes, they gave them to me one time, in the interrogation. I think they were pictures of the documents, not the original documents. But, they told me that everything is here.

Q. You had mentioned that the Tablighi organization took your passport and tickets for a while, evidently they gave them back to you, but they just took them for a little while?
A. They use to take them, bring them back, take them again, and bring them back. Yes, when they say we are going to transfer you from here to there, we are going to take you from this place to that place, they use to take the papers. I don't know what they did with them.

Q. Were you transferred to many different places?
A. I really didn't go to many, many places but I used to go to the University, then to Jama'at al-Tablighi, to the house and such.

Q. From the University, to Jama'at al- Tablighi to the house, what were you doing when you went to Jama'at al-Tablighi?
A. As I mentioned, I came to them, but, when we used to go, we would go to the mosque.

Q. You said earlier, you're just a simple, common man, but you're going to study medicine. You seem to be very intelligent; did you have any type of medical training before you went to Pakistan?
A. I'm not really that smart, but yes, if I had information, when I was in high school and when I was in Yemen, I would gather information and see how to study medicine, and use to go to the medical school there to see and gather information. Yes, I did have some training.

Q. You mentioned all through school you were working, what kind of jobs did you have? Part time, full time, what were those jobs?
A. I actually use to do only one job. Really, I use to sell grocery products. That's what I used to sell. I used to do that since I was ten or twelve years old, all the time. This is something that is a custom from our tribe that you have to take charge, and take responsibility when you are young.

Q. When you were doing your investigation for medical schools, was it only around Pakistan, that area of the world, or did you look at other areas of the world that may offer medical studies for a reasonable price?
A. Yes, I did look at other countries besides Pakistan. Yes, I would like to study medicine in other countries besides Pakistan. For example, Syria and Jordan. Medical studies are easy there, and it's in Arabic. And even in Syria, the expense is not too high; it's a lot cheaper.

Q. When you were in the house, when you were arrested, how many people were with you that got arrested also?
A. I believe it was like thirteen, fourteen. Anyways, I knew it was more than ten.

UNCLASSIFIED/FOUO

Q. They were the people you were living with?
A. Yes.

Q. Did you know them well enough to know what they were doing, I mean, were they just studying the Koran or did they maybe want to get into a medical school or something else, maybe start a business…what were they doing?
A. I found out these people were just simple and religious people who are into religion and they often didn't wear beards and I was avoiding those guys. I really didn't have any deep personal relations with these people. All that it was, is that I went to lessons, I used to sit and listen to lessons, or classes given, I just didn't go there to be personal and ask, and wonder what you are doing and all that.

Q. Do you consider yourself to be a very religious person or moderately religious?
A. Normal guy, I would say moderate, I'm not extreme. I don't have deep knowledge on the Sharia religion.

Q. To your knowledge, were any of the other people in your house extremely religious or were there because of a fatwa to come and study something more than religion, maybe, some type of military training.
A. I didn't notice anybody. Nobody talks to me about being there for Jihad, or they are going to the Jihad. As I told you before, they were just simple people, I didn't know any of them, and I didn't know what they were doing.

Q. One last question. You have been very cooperative and I appreciate that. I also noticed that you have a certain color of uniform, the orange uniform, and I noticed there are people who have tan, or beige, or white uniforms. Is there any reason that you are still in an orange uniform?
A. I really don't know. I don't like problems. I don't cause problems, but maybe it was a misunderstanding from the interrogators and investigators. They did put me in there, in that area, that gets this color. I really don't know, but I don't cause any problems. I don't try for problems. I believe the interrogators do have a role in causing problems sometimes, and causing the orientation where you are to be put because they try to talk and do things, and then they decide you need to be this way or that way, or in that area. I spent about a year and a half in first class in number one. I was fine. I didn't have any problems, but all of a sudden, after a year and a half, it was a mistake, or a misunderstanding whatever. They talk the wrong stuff about me, wrongly, and then all of a sudden, they move me to this color, and I don't know. I decided after a few months after I got here, I decided to be really cooperative and to help, and to be easily committed because I don't to be causing problems, to make things easier for them, and myself. So, everything we added, was in good terms, the right way.

Q. I understand from the last allegation on the paper, where it's stated that you admitted to being a terrorist and you said that must be some type of misunderstanding. I understand what you are saying. Is there anything you can think of, very shortly we are going to go into a classified session in this tribunal, and it will only be the three of us and we will be reviewing information. Can you think of anything that you might have said

UNCLASSIFIED/FOUO

during past interrogations that you would like to change, or maybe, think, that well, there could be some type of misunderstanding in this type of area, this is an opportunity for you to provide us more information on something you said in the past?

A. Really, I don't have anything specific.  I know that in the beginning, when I got to Cuba, the first interrogations, there was a lot of misunderstanding, a lot of miscommunication between the interrogators and me.  Those interrogators, they caused problems, and there was friction between us and that's why I decided to stop talking.  I didn't want to talk or participate anymore.  Then afterwards, they realized that it was their mistake, and then they brought me decent interrogators, very good interrogators and then I started talking again.   The first interrogators really gave me a very negative impression about Americans.  After that, they brought different interrogators and they were fine.  I got along with them.  But, still until now, it wasn't always what the interrogators said, oh, he's not good, oh he's not right, and that there would be some bad communication, and bad behavior, whatever, until now, it's ongoing.  If the interrogators treat me right, I treat him right and they cooperate with me, the same thing with the guards and soldiers.  Even the people I live with or, whoever I'm with, if they treat me right, I treat them right, that's all.

Q. How's your English?
A. Very weak.  I was even hoping to learn a little bit here.  But the behavior with the guards and stuff, if you talk to them, they don't talk to you back.  Not all of them of course, just some of them.  I found it really hard to learn.

Tribunal Member:  I thank you for the information; I thank you for your cooperation and I have no more questions for you.

Tribunal President's questions.

Q. I'm trying to understand, and I hope you can help me understand something here.  I still don't know why you chose Pakistan over all other countries to go and seek a medical education in?  Was it because of their outstanding medical schools?
A. For me personally, the main reason was the financial reason.  I'll tell you the reason that is important to me.  Because they were the cheapest, that was the main reason, that's important to me.  And the Visa and the plane ticket indicate that, because the Visa to Pakistan is not like a Visa to other countries, it's different.  Even the plane ticket to Pakistan is different.  Also in Pakistan, (there are) no cheats, no robbers, no nothing, so, if you go to other places, you would be scared that your money would be stolen, or you get lost or you get into trouble.

Q. But you indicated in the house you were staying in that you had difficulty communicating with the housekeepers, or your hosts because they spoke a different language.
A. This is not really a problem that would stop me from going to Salafia (ph) it would be just practical, just practical problems.  It's nothing that would scare me personally.

UNCLASSIFIED/FOUO

Q. But the Pakistan people, their language is not Arabic, is that correct?
A. Yes, of course, but the places I traveled to, they have people who speak Arabic.

Q. But, would the medical school professors speak Arabic? Not likely.
A. Yes, of course, they would be in English. They had to study English there. Yes, of course I had to study English at the same time as my medical studies. That's what I'm told. That's what I think, that's the same thing in Yemen. All medical studies are in English, a very small percentage which was in Arabic, and that's even in Yemen too. You had to study English at the same time as studying other things.

Q. So, no matter what school you attended in what country, all the courses would be in English?
A. Except Syria, I believe that's they only one that had medical studies (not in English).

Q. So, you were going to have to learn English no matter where you went, unless you went to Syria?
A. Yes.

Q. In the time that you were in Pakistan, had you chosen a college that you were going to attend?
A. Of course, I couldn't. I just started by gathering the information and stuff; I couldn't because of the problems. And, I'm sad for that.

Q. Give me a couple of examples of medical schools in Pakistan. What are some of the names you were considering?
A. I don't recall the name exactly, but, when I was in high school, I had some friends that finished high school and they went to Islamabad to study medicine. That was my intention to go to Islamabad. When I was in high school I had friends, and they were talking about studying and practicing medicine. They didn't tell me the name of that college.

Q. Do you have any other information to present to this tribunal today?
A. No I don't.

Tribunal President: Thank you for your testimony today.

*The Tribunal President confirms that the Detainee had no further evidence or witnesses to present to the Tribunal. The Detainee has a comment about the process.*

Detainee: As of today, I have never received any letters, never got any, would it be possible to get help on this?

Tribunal President: The same procedures that you have used in the past will be available to you again, and as long as you are here, you can utilize those procedures to contact your family.

UNCLASSIFIED/FOUO

Detainee:  I couldn't get in touch with them.

Tribunal President:  Unfortunate as it may be from your past experience in trying to get responses from your family, hopefully, if you need to contact them, because of the Administrative Review Board, you'll have better success.

Detainee:  I wish that too.

*The Tribunal President explains the remainder of the Tribunal process to the Detainee and adjourns the Tribunal.*

### *AUTHENTICATION*

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, United States Marine Corps
Tribunal President

000319

# EXHIBIT F

UNCLASSIFIED//F~~OUO~~

## Summary of Administrative Review Board Proceedings for ISN 679

*The Administrative Review Board was called to order.*

*The Designated Military Officer (DMO) was sworn.*

*The Board Reporter was sworn.*

*The Translator was sworn.*

*The Detainee entered the proceedings.*

*The Presiding Officer announced the convening authority and purpose of the Administrative Review Board proceedings.*

*The Administrative Review Board members were sworn.*

*The Assisting Military Officer was sworn.*

*The Presiding Officer read the hearing instructions to the Detainee and confirmed that he understood.*

Detainee: What procedures or proceedings? I just thought you were just going to ask questions. I need some clarification on this process.

Presiding Officer: What would you like to be clarified?

Detainee: Which process are you talking about? What you just said or what is going to follow from this point on?

Presiding Officer: So far, we have discussed conduct during this Administrative Review Board. We have discussed what you may be able to view and the information, which will be discussed.

Detainee: Fine.

Presiding Officer: Very well.

*The Assisting Military Officer presented the Enemy Combatant Notification Form, Exhibit EC-A, to the Administrative Review Board.*

*The Assisting Military Officer presented the Enemy Combatant Election Form, Exhibit EC-B, to the Administrative Review Board.*

UNCLASSIFIED//F~~OUO~~

ISN 679
Enclosure (5)
Page 1 of 12

# UNCLASSIFIED//FOUO

*The Designated Military Officer presented the Unclassified Summary of Evidence, Exhibit DMO-1, and DMO-2 the FBI Redaction Memorandum to the Administrative Review Board.*

*The Designated Military Officer stated that a copy of these exhibits had been previously distributed to the Assisting Military Officer and Detainee.*

*The Designated Military Officer gave a brief description of the contents of the Unclassified Summary of Evidence, Exhibit DMO-1, to the Administrative Review Board.*

*The Designated Military Officer confirmed that he had no further unclassified information and requested a closed session to present classified information relevant to the disposition of the Detainee.*

*The Presiding Officer acknowledged the request.*

*The Presiding Officer opened the Administrative Review Board to the Detainee to present information with the assistance of the Assisting Military Officer.*

*The Assisting Military Officer read his comments to the Administrative Review Board.*

Assisting Military Officer: The Detainee's initial interview occurred on 13 June 2005 and lasted for 90 minutes. After a review of the ARB's purpose and procedures were explained, the Arabic translation of the Unclassified Summary of Evidence was read to the Detainee. The Detainee said he wanted to attend the ARB. The Detainee elected to have the Assisting Military Officer take his comments, and wanted the Assisting Military Officer to read his comments on his behalf regarding the Unclassified Summary of Evidence. A follow up interview was scheduled for 15 June 2005 and lasted for 40 minutes. During the follow up review, the Detainee verified that the response to the Unclassified Summary of Evidence was what he wanted to the Assisting Military Officer to present to the ARB. The Detainee was polite and cooperative throughout both interviews. The Detainee was told that the ARB might ask him questions. He was provided an Arabic translation of the Unclassified Summary of Evidence for additional review.

Detainee: Even though he (*referring to the Assisting Military Officer*) is going to speak on my behalf. I would like to participate, as well.

Presiding Officer: That's fine. Very well.

Detainee: Fine.

Presiding Officer: Continue.

ISN 679
Enclosure (5)
Page 2 of 12

# UNCLASSIFIED//FOUO

UNCLASSIFIED//FOUO

*The Assisting Military Officer read the Detainee's response to the Unclassified Summary of Evidence:*

Assisting Military Officer: In response to the allegation that the Detainee traveled from Yemen to Pakistan in mid-September 2001, the Detainee said is it a crime to travel from Yemen to Pakistan? The Detainee said I do not know what is the month of September. He said what is it in the Hijri calendar. (*Detainee was shown the equivalent time on the Hijri calendar*). In response to the allegation that the Detainee stated he is a terrorist, the Detainee asked when had he stated that? The Detainee said even if I stated that, and knowing what it is, is that considered an allegation? In response to the allegation that the Detainee was sent to Pakistan by a member of the Jama'at al-Tablighi, the Detainee said this is true. In response to the allegation that the Detainee obtained his travel visa through the Jama'at al Tablighi, the Detainee said that is true. The Detainee asked is the Jama'at al Tablighi a terrorist organization? If so, they are the ones who gave him the visa, and he did not know. The Detainee said Jama'at al Tablighi is the terrorist group that committed the crime.

Detainee: I did not know.

Presiding Officer: Very well. I understand.

Detainee: I did not say that the Jama'at al-Tablighi is a terrorist organization or group terrorist.

Presiding Officer: I understand that is consistent with your statement for the record. Your statement questions whether it is or not. I understand what you are saying.

Detainee: I just want to make sure that I did not say.

Presiding Officer: I understand that you did not say that. You asked the question in a rhetorical sense..."Is that in fact a terrorist organization?"

Detainee: I would like the whole statement to be read from the beginning.

Presiding Officer: Very well.

*The Linguist reread the statement from the Assisting Military Officer to the Detainee.*

Detainee: I did not say that.

Presiding Officer: Very well. When you have the opportunity to make a statement you can rephrase that any way you would like at that time. For the record, the fourth item on EC-B, the Detainee says it is not worded as he would like it and he would reword it, during his statement.

ISN 679<br>
Enclosure (5)<br>
Page 3 of 12

UNCLASSIFIED//FOUO 

# UNCLASSIFIED/~~FOUO~~

Assisting Military Officer: In response to the allegation that the Jama'at al-Tablighi, a Pakistani based Islamic missionary organization, is being used as a cover to mask travel and activities of terrorists including members of al Qaida, the Detainee said, he was aware that Jama'at al-Tablighi was all over including the United States, and the United States are aware of it as well. The Detainee said the Yemen Republic knows this also.

Detainee: I want [that] also, Pakistan, as well.

Presiding Officer: Very well. For the record, the Detainee has said in statement 5 of enclosure B *(AMO exhibit EC-B),* he also wants to include, as well as the United States, [and the] Yemen Republic, Pakistan, as well.

Assisting Military Officer: In response to the allegation that a senior al Qaida lieutenant recognized the Detainee in a photograph, the Detainee said if someone saw him in a photo, bring that person so he can meet him. The Detainee said it is possible that the person who saw his photo may have made a mistake. In response to the allegation that the senior al Qaida lieutenant ran an al Qaida safe house where a number of al Qaida members were captured, the Detainee said this has nothing to do with him. He said this has no connection to terrorist, Muslim or other wise. The Detainee said he used the Taliban [al-Tablighi] to accomplish his goals.

Presiding Officer: Excuse me for one second. When you finished reading that [Assisting Military Officer], you said [the Detainee] used the Taliban to accomplish his goals or he used the al-Tablighi to accomplish his goals?

Assisting Military Officer: Al-Tablighi.

Presiding Officer: Okay, you said differently last time. Did you *(referring to the translator)* translate al-Tablighi or translate...

Linguist: I translated Jama'at al-Tablighi

Presiding Officer: Very well. Good. Just want to clarify for the record. Make sure we have the right...(inaudible).

Assisting Military Officer: In response to the allegation that the Detainee was captured in this safehouse, the Detainee said he was not at al Qaida safehouse. He said he was at a house at belongs to the Salafia School. In response to the allegation that the Detainee was sent a personal greeting from the Taliban Deputy Minister of Intelligence, the Detainee laughed and asked, 'where is the letter, and what is the address it was sent [to]?' The Detainee said he has never received the letter. The Detainee said he never knew or heard of the Taliban until the Tribunal. The Detainee said he did not understand and asked during the tribunal, 'what is the Taliban and al-Qaida?' In response to the allegation that the Detainee stated if Muslim scholars said the attacks of September 11, 2001 were the correct actions to take, he would support the scholars, the Detainee said

## UNCLASSIFIED//~~FOUO~~

## UNCLASSIFIED//~~FOUO~~

this is not true. The Detainee said this is not the way he stated this. The Detainee said he does not believe in the Muslim leaders any more, and he would no longer follow them. In response to the allegation that the Detainee stated that if Muslim scholars say that people must die, Muslims must follow their words, the Detainee said this is not true. The Detainee said if Muslim leaders said something that was correct he would follow it, and if it is incorrect he would not. In response to the allegation that the Detainee stated he wants the infidels, non-Muslims, destroyed, the Detainee said this is not true. In response to the allegation that the Detainee said those who do not follow Islam will go to hell or be killed, the Detainee said this not true. The Detainee said he cannot predict the future and does not know who will go to heaven. The Detainee said no reasonable person would accept this allegation. In response to the statement that the Detainee denied having any knowledge of any rumors or plans of future attacks on the U.S. or U.S. interests, the Detainees said this is true.

*The Presiding Officer asked the Detainee if he wishes to make a statement under oath. (Muslim oath offered).*

*The Detainee requested to do the (Muslim) oath on his own.*

Presiding Officer: Very well. Please recite the oath.

Detainee: I swear to tell the truth to you. I will tell you nothing but the truth. And I will give you all the statement. I will answer all the statements. All the statement, I have given you.

*The Detainee made the following statement:*

Detainee: Shall I start?

Presiding Officer: Yes, you may.

Detainee: I appreciate the fact that you are spending some time searching for the truth. That gives him a better picture, as far as the Americans and the American society. I will not forget that. This is what I've seen from them here and I'm sure that they don't want to project a bad picture for the United States. Every individual is searching for the truth and it would (inaudible) to be cruel and unjust to others. I will provide you with all the information and statements, whether this information that were in is true or not. I will explain everything about my life even about the time I spent here in Cuba. I am an ordinary man. Even though, they may have made a mistake, you know, by bringing me over here. All these statements that we have just read, that should give you a clear picture of myself. I never wished any harm for any nation, including that against the United States. I have never been in contact or associated with any organizations. I never had any confrontation with any organization or with any other individual. I would like for you to consider, that I could not give you [I did not give you] enough information is because I did not have any documentation. [Because] they did not allow me to send or

ISN 679
Enclosure (5)
Page 5 of 12

## UNCLASSIFIED//~~FOUO~~


UNCLASSIFIED//~~FOUO~~

receive any letters. Three years I have not been able to contact my family, my attorney or even exercise my rights. And I wish that you consider that in your decision. It's a proven fact, that when they captured me...the Pakistanis...I did not get involved or I did not go into conflict with them or fighting with them.

Presiding Officer: You did not resist, if I understand...

Detainee: There was no proof to show that I am an individual that is trying to attack somebody. Even during my stay here in prison, I didn't have any problems even with the soldiers, the other Detainees, or anybody else in camp. Also, some of these points, or statement/allegations, they were not correct. Somehow they said that I have connections to Taliban or al-Qaida. I don't know who they are, what they're doing? Infidel's statement, no reasonable man would accept these statements/allegations. I like to serve my country, my homeland, just as you people are serving your country. I would like to help people as well. I went to Pakistan for the purpose of studying medicine. I used the Jama'at al-Tablighi to achieve my goal, because I did not have the financial means and since I already gone there to study medicine. I found out that I could do something, you know.... I stated that in my previous, to the Tribunal and now.

Presiding Officer: Very well.

Detainee: Even during my stay, in Pakistan, there was nothing I've done over there against the laws and I'm sure they have that information in my file. In fact, there is nothing that was done, you know, against the Pakistani laws or the cities. The reason that I went to Jama'at al-Tablighi is because I know that this is an organization, exist all over the world. And you people know that as well. I admit using Jama'at al-Tablighi for that purpose only and that is only to get my medicine. Also, I would like when and if I'm released. You know once I get out. I would like to go back, so I can help my family and my father. For the past three years, the time I spent here in prison, I was prevented from doing what I was supposed to be doing. I hope that the United States, you know, made a mistake in capturing me or bringing me over here. And maybe they meant to capture somebody else, but they captured me instead. I hope that they don't make a mistake. I hope that I will not have an ugly picture toward the United States. United States says that they don't like to be cruel and they like to be just. I will see, how they will evaluate my situation. I would like you to consider all the things that I have told you. If you need any further explanation, please ask.

Presiding Officer: We will? Does this conclude your statement? We will ask questions.

Detainee: I would like, when and if I'm released, to go back to my country and would like to get married and settled down within a family and support, you know. I would like to have family life, a very stable one. I would not repeat the mistake of going to Pakistan again.

Presiding Officer: Does this conclude your statement [so we] can get to questions?

# UNCLASSIFIED//~~FOUO~~

Detainee: I would like you to consider all the facts that were given to you and I believe that this is an informal type of thing and that we are just going to the tribunal and the ARBs, and nothing is going to come out. And when you find out that all this information, I'm clear of all the wrong doing, I'd like you to release me to my home country.

Presiding Officer: We will consider all information, including your statement.

*The Assisting Military Officer had no further questions for the Detainee.*

*The Designated Military Officer had the following question:*

Designated Military Officer: The Detainee stated that he does not believe in the Muslim leaders anymore, but in the very next statement, it said if a Muslim leader said something that was correct he would follow it. So, I guess I'm unclear, about his regard for the Islamic leaders.

Detainee: I did not follow the Muslim leader to begin with. I was doing my work without having to go back to the Muslim leader. I have no connections with these Muslim leaders. I pray. I do my daily work and I (inaudible).

Presiding Officer: Okay. Do any of the Administrative Review Member's have any questions for the Detainee?

*Administrative Review Board Member's questions:*

Board Member: Yes, sir, I have a question. Mr. Tahar do you believe the events of September 11, 2001 was a terrorist attack?

Detainee: Are you talking about what happened here in the States?

Presiding Officer: What happened on New York City, September 11, 2001?

Detainee: I don't know whether it is or it's not but I'm against it regardless. Anybody who attacks somebody else...that is a wrongdoing and he should be punished or penalized. Any reasonable man would see that.

Board Member: Does it matter whether the people that are attacked are infidels or not?

Detainee: I don't know as I told you anything about that. My level of intelligence is so that I can't make that prediction. I'm not at that high level that you should ask me this question.

Board Member: Do you know any members of al-Qaida?

ISN 679
Enclosure (5)
Page 7 of 12



UNCLASSIFIED//F~~OUO~~

# UNCLASSIFIED//~~FOUO~~

Detainee: No, I don't know. I told you in my statements here that I did not even know [anything] about al-Qaida or the Taliban. Even when I went to my Tribunal I had to ask there. I heard of it, but I didn't know the meaning of these [this] deviate al-Qaida and Taliban until, you know, put these allegations against me.

Presiding Officer: When you were studying in Pakistan, you did not hear of the Taliban in the neighboring country of Afghanistan?

Detainee: No, I did not.

Board Member: Were you ever contacted by a member of al-Qaida?

Detainee: No, I was not.

Board Member: Ever contacted by someone that was a member of the Taliban?

Detainee: No. Do you mean that he sent the letter to me while I'm here at Cuba?

Presiding Officer: No. [The Unclassified Summary of Evidence reads] 'The Detainee was sent a personal greeting from the Taliban Deputy Minister of Intelligence, prior to arrival in Cuba.'

Detainee: Did you find this letter?

Presiding Officer: We can discuss that in the closed session.

Detainee: I said that I didn't have any connection to nobody.

Presiding Officer: We understand your response.

Detainee: No reasonable man would understand. I did not get in touch with any one of these people. How is it that they're accusing me of being al-Qaida or Taliban? During the Tribunal, the [personal representative] told me that they did not find any allegation against me. I requested him to declare that to the Tribunal members. You can look in the file; you should find that there. They indicated they could not find any proof, that I am a member or I belong to either the Taliban or al-Qaida but he said 'we are looking for something, regardless what it is to connect me to them.' I told them, is this what you consider justice? The guy said "no."

Presiding Officer: We are looking for the truth.

Board Member: Where is your home country?

Detainee: [With] all this going on and you don't know where my country is?

Presiding Officer: We are confirming.

# UNCLASSIFIED//~~FOUO~~

Detainee: Yemen. I should tell you to go back to my file, but I want to save you some time. I am Yemeni.

Board Member: Thank you. We've been talking about the letter you got from...someone said you got a letter from the chief of intelligence or this is the chief of intelligence of Taliban.

Detainee: Whoever told you this; ask him to give you the letter.

Board Member: Who would say such a thing about you?

Detainee: I don't know who would say something like that. This question should not be directed to me. You should look for that yourself. That is what I'm trying to find out. Where's the source of this lie?

Board Member: Yes, it's my job to find out too. So that's why I asked.

Detainee: This allegation is to me.

Board Member: Yes, I know. If someone is not telling the truth about you, we need to know.

Detainee: I told you this is not true.

Board Member: I know, but someone is giving this information.

Presiding Officer: He (referring to the Board Member) is asking [if] you know who would have told us that information?

Detainee: I was not doing that interrogation. So, I cannot tell you, who would say something like that about me.

Board Member: Okay. You have no idea.

Detainee: I told you the whole thing does not make any sense. Your telling me you don't have any idea.

Board Member: No. No, we have to find out who did that. Who said that?

Detainee: I don't know.

Board Member: Did any of the other Detainees tell you what the board was like...what this hearing was like? Did any of the other Detainees out at camp tell you what the hearing was like?

# UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED//~~FOUO~~

Detainee: Yes. They told me about it. They say this is nothing more than a theatrical thing. It's formality. They're just going through this thing and everybody is laughing at the whole process. But I made up my mind that I wanted to attend the ARB despite what they said. That's why I attended the Tribunal and I'm here now. If I wanted to follow what they're saying inside the camp, I wouldn't be here now. I am sure that the majority of the people that were here…they refuse to come to the ARB.

Board Member: Do the people at the camp know that these boards can keep them here and recommend that they be tried later on?

Detainee: Everybody is saying that these ARBs are nothing but a formality. These are not interrogators and even you don't know that this is just formality. They, the soldiers and interrogators, said it was a matter of paperwork and paper pushers and the American politics is just playing its role and that's true. You can check with your countrymen, you'll find out that's true. A lot of people, they end up leaving the camp here without having to attend the ARB or the Tribunal. They were accused of larger crimes than myself. You people know that as well.

Board Member: Thank you. Last question, if you return home would you study medicine again?

Detainee: Yes, I will.

Board Member: Okay, thank you.

Presiding Officer: I have several questions. When you were studying in Pakistan…the house that you were staying in…how many residents lived there with you?

Detainee: I don't know.

Presiding Officer: Were the others who lived there students?

Detainee: I don't know.

Presiding Officer: Are you the only student?

Detainee: I can only tell you about myself. I was a student there. If there were other people there, [I don't know] whether they're students or not. As you will know that these are personal things other people don't like to discuss.

Presiding Officer: The owner of the house. Did you know him?

Detainee: What do you mean by that?

Presiding Officer: It said you stayed in a house that was where a number of al-Qaida were captured. Did you know the owner of the house?

# UNCLASSIFIED//F~~OUO~~

UNCLASSIFIED//FOUO

Detainee: I used to know a guy...his name is Issa Pakistani.

Presiding Officer: Very well. I want to clarify [that] until your Tribunal you had never heard the term Taliban or al-Qaida.

Detainee: That's correct.

Presiding Officer: Very well. Does anyone have any further questions?

Board Member: I have one more. The house you were staying in in Pakistan, did you ever see any weapons inside that house?

Detainee: I did not see anything.

Presiding Officer: Thank you, Mr. Tahar, for your patience and forthrightness with your answers today.

Detainee: I have some comments to make about four points.

Presiding Officer: OK. On [Exhibit] EC-B there are four items that you do not agree with the statements that were written. You can restate them.

*The linguist read the statements to the Detainee in Arabic and the Detainee gave the following answers.*

Detainee: Number One, this is not correct [about] the Islamic leaders [saying] that this something is correct [and that because of that] I will follow it. Anything that's said, even though it's correct, it doesn't mean that I'm going to follow it. I do what my conscience tells me...what my God tells me to do. Their statements or words or decisions might be incorrect or inaccurate. Number two, all this is not true and the Islamic leader never said to kill other people. Even if they did I would not follow it because I do not hold a grudge against anybody.

Presiding Officer: We understand.

Detainee: Number three, this is not true. No reasonable man would make such an allegation or statement. Again, I would not hold any grudge against [anyone]. Number four, and finally, again this is not true. Restating I will not predict the future and whoever does not predict the future cannot determine whose going to hell and who is going to heaven. I can only talk about myself. That is all I have to say.

Presiding Officer: Thank you.

*The Presiding Officer read the post-Administrative Review Board instructions to the Detainee and adjourned the open session of the Administrative Review Board.*

ISN 679
Enclosure (5)
Page 11 of 12

UNCLASSIFIED//FOUO

# UNCLASSIFIED//FOUO

*The Presiding Officer opened the classified portion of the session.*

*The Presiding Officer adjourned the classified portion of the session and the Administrative Review Board was closed for deliberation and voting.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Captain, USN
Presiding Officer

# UNCLASSIFIED//FOUO

# EXHIBIT G

## Guantánamo Habeas Protective Orders Entered Post-DTA

1. Al-Sopai v. Bush, 05-cv-1667 (D.D.C., Jan. 4, 2006) (Walton)
2. Khiali-Gul v. Bush, 05-cv-877 (D.D.C., Jan. 6, 2006) (Robertson)
3. Bostan v. Bush, 05-cv-883 (D.D.C., Jan. 9, 2006) (Walton)
4. Mohammad v. Bush, 05-cv-879 (D.D.C., Jan. 9, 2006) (Walton)
5. Wahab v. Bush, 05-cv-886 (D.D.C., Jan. 10. 2006) (Sullivan)
6. Labed Ahmed v. Bush, 05-cv-1234 (D.D.C., Mar. 2, 2006) (Sullivan)
7. Almerfedi v. Bush, 05-cv-1645 (D.D.C., Mar. 6, 2006) (Friedman)
8. Razakah v. Bush, 05-cv-2370 (D.D.C., Mar. 17, 2006) (Sullivan)
9. Thabid v. Bush, 05-cv-2398 (D.D.C., Mar. 21, 2006) (Huvelle)
10. Ahmed v. Bush, 05cv1234 (D.D.C., Mar. 21, 2006) (Sullivan)
11. Awad v. Bush, 05-cv-2379, (D.D.C. Apr. 11, 2006) (Robertson)
12. Al Shareef v. Bush, 05-cv-2458 (D.D.C., Apr. 12, 2006) (Roberts)
13. Alsaaei v. Bush, 05-cv-2369 (D.D.C., Apr. 12, 2006) (Roberts)
14. Said v. Bush, 05-cv-2384 (D.D.C., Apr. 12, 2006) (Roberts)
15. Zadran v. Bush, 05-cv-2367 (D.D.C., Apr. 12, 2006) (Roberts)
16. Al Salami v. Bush, 05-cv-2452 (D.D.C. Apr. 14, 2006) (Friedman)
17. Faizullah v. Bush, 05-cv-01489 (D.D.C. April 21, 2006) (Urbina)
18. Sohail v. Bush, 05-cv-00993 (D.D.C. April 21, 2006) (Urbina)
19. Al-Ghizzawi v. Bush, 05-cv-02378 (D.D.C., June 2, 2006) (Bates)
20. Amon v. Bush, 05-cv-1493 (D.D.C., June 6, 2006) (Walton)
21. Nasrullah v. Bush, 05-cv-00891 (D.D.C., June 12, 2006) (Walton)
22. Al-Khalaqi v. Bush, 05-cv-999 (D.D.C., June 15, 2006) (Walton)
23. Mohammon v. Bush, 05-cv-2386 (D.D.C., June 27, 2006) (Walton)
24. Haleem v. Bush, 05-cv-2376 (D.D.C., June 30, 2006) (Walton)
25. Al Darby v. Bush, 05-cv-2371 (D.D.C., July 3, 2006) (Lamberth)
26. Al Harbi v. Bush, 05-cv-2479 (D.D.C., July 5, 2006) (Kennedy)
27. Qasim v. Bush, 05-cv-1779 (D.D.C., July 20, 2006) (Bates)
28. Muhibullah v. Bush, 05-cv-884 (D.D.C., Aug. 1, 2006) (Collyer)
29. Nabil v. Bush, 05-cv-1504 (D.D.C., Aug. 1, 2006) (Collyer)
30. Aboassy et al v. Bush, 05-cv-0748 (.D.D.C., Aug. 1, 2006) (Collyer)
31. Bacha v. Bush, 05-cv-2349 (D.D.C., Aug. 4, 2006) (Collyer)
32. Amin v. Bush, 05-cv-2336 (D.D.C., Sept. 18, 2006) (Friedman)
33. Razak v. Bush, 05-cv-1601 (D.D.C., Sept. 25, 2006) (Kessler)
34. Al Subaie v. Bush, 05-cv-2216 (D.D.C., Sept. 28, 2006) (Lamberth)
35. Al Wirghi v. Bush, 05-cv-1497 (D.D.C., Sept. 28, 2006) (Lamberth)
36. Al-Baidany v. Bush, 05-cv-2380 (D.D.C., Oct. 4, 2006) (Kollar-Kotelly)
37. Moosa v. Bush, 06-cv-1686 (D.D.C., Oct. 4, 2006) (Kollar-Kotelly)
38. Al-Nakheelan v. Bush, 06-cv-02201 (D.D.C., Oct. 6, 2006) (Huvelle)
39. Kabir v. Bush, 05-cv-1704 (D.D.C., Oct. 7, 2006) (Robertson)
40. Lal v. Bush, 06-cv-1763 (D.D.C., Oct. 29, 2006) (Kollar-Kotelly)
41. Feghoul v. Bush, 06-cv-00618 (D.D.C., Oct. 31, 2006) (Roberts)
42. Saleh v. Bush, 06-cv-1765 (D.D.C., Nov. 17, 2006) (Kennedy)
43. Hentif v. Bush, 06-cv-1766 (D.D.C., Nov. 21, 2006) (Kennedy)
44. Al-Zarnouqi v. Bush, 06-cv-1767 (D.D.C., Dec. 4, 2006) (Urbina)

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MOHAMED AL-ZARNOUQI *et al.*, | : | |
| | : | |
| Petitioners/ | : | |
| Plaintiffs, | : | Civil Action No.:    06-1767 |
| | : | |
| v. | : | Document No.:    6 |
| | : | |
| GEORGE W. BUSH *et al.*, | : | |
| | : | |
| Respondents/ | : | |
| Defendants. | : | |

### <u>MEMORANDUM ORDER</u>

### Granting the Petitioners' Motion for Entry of a Protective Order; Staying the Case; and Ordering 30 Days' Notice of Any Intent to Move the Petitioners

This matter comes before the court on the petitioners' motion for entry of a protective order establishing procedures for access to counsel by detainees in Guantanamo Bay, Cuba ("GTMO"). The petitioners are Yemenese citizens classified as enemy combatants and detained at GTMO. Pet. for Writ of Habeas Corpus at 2. The respondents oppose the motion, arguing that this court does not have jurisdiction to consider habeas petitions filed after December 30, 2005. Specifically, the respondents argue that the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680, ("DTA") and the Military Commissions Act of 2006, Pub. L. No. 109 --- ("MCA"), when read together with the Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. --- (2006), divest this court of jurisdiction over habeas petitions filed after the enactment of the DTA. Resps.' Opp'n at 2-4. For the reasons that follow, the court grants the petitioners' motion for entry of the protective order, stays the case, and orders 30 days' notice of any intent to move the petitioners.

The DTA amended the federal habeas statute, 28 U.S.C. § 2241, by adding language

giving the D.C. Circuit Court of Appeals "exclusive jurisdiction to determine the validity of any

final decision of a Combatant Status Review Tribunal that an alien is properly detained as an

enemy combatant." DTA § 1005(e). In other words, the DTA purports to eliminate this court's

jurisdiction over the habeas petitions filed by or on behalf of detainees in GTMO. The MCA

further amends the habeas statute (and the DTA) and provides that "no court, justice, or judge

shall have jurisdiction" to consider habeas petitions filed by or on behalf of detainees whom the

United States has "properly" determined are enemy combatants or who are awaiting such

determination. MCA § 7(a).

The D.C. Circuit, however, has not yet decided the scope of the DTA and MCA

provisions stripping this court of jurisdiction over the habeas petitions filed by GTMO detainees.

*Hicks v. Bush*, --- F. Supp. 2d ----, 2006 WL 2699305, at * 4 (D.D.C. Sept. 21, 2006) and Order,

Case No. 05-5062 (D.C. Cir. Oct. 18, 2006). Stated differently, the state of the law in this circuit

concerning the habeas rights of GTMO detainees is unclear. "Despite the lack of finality

regarding the issues on appeal, however, it is hardly sensible to withhold or frustrate something

that no one doubts is petitioner's right – a meaningful communication with counsel regarding the

factual basis of petitioner's detention. Allowing petitioners to meet with their lawyers is not the

type of interim relief that even remotely risks infringing on the Court of Appeals' possible

jurisdiction." *Feghoul v. Bush*, 2006 WL 3096856, at *1 (D.D.C. Oct. 31, 2006) (internal

quotations and punctuation omitted) (quoting *Said v. Bush*, Civil Action No. 05-2384, slip. op. at

10 (D.D.C. May 23, 2006)). That said, precisely because the current jurisdictional waters are

murky, the court also stays the proceedings in this case. *Id.*, at * 1-2 (citing *Wash. Metro. Transit*

*Comm'n v. Holiday Tours*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

Lastly, the court is aware of the petitioners' concern that the government may remove the petitioners from GTMO in the near future, Pet. for Writ of Habeas Corpus at 16, thereby divesting the court of jurisdiction (*de facto,* rather than through operation of the law). Such an outcome would abuse the processes now put in place for the purpose of adjudicating matters on their merits. *See Rasul v. Bush*, 542 U.S. 466 (2004). The court cannot allow such a scenario to unfold and will "guard against depriving the processes of justice of their suppleness of adaptation to varying conditions." *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936). Coextensive with the district court's inherent power to stay proceedings is the court's power to craft a stay that balances the hardships to the parties. *Id.* at 255 (noting concerns regarding the stay causing "even a fair possibility . . . [of] damage to some one else"); *see also Clinton v. Jones*, 520 U.S. 681, 707 (1997) (noting that "burdens [to the parties] are appropriate matters for the District Court to evaluate in its management of the case").

Accordingly, it is this 4th day of December, 2006,

**ORDERED** that the petitioners' motion for entry of a protective order is **GRANTED**, and it is

**FURTHER ORDERED** that the case is stayed pending resolution of the appeals pending before the D.C. Circuit Court of Appeals in *In re Guantanamo Detainee Cases* and *Boumediene v. Bush et al.*, and it is

**ORDERED** that the court **ENTERS** by way of reference the protective orders previously entered in the other Guantanamo detainee cases. *E.g.*, Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, *In*

*re Guantanamo Detainee Cases*, No. 02-0299 (D.D.C. Oct. 8, 2004); and it is

 **FURTHER ORDERED** that the respondents, their agents, servants, employees,

confederates, and any persons acting in concert or participation with them, or having actual or

implicit knowledge of this Order by personal service or otherwise, may not remove the

petitioners from GTMO unless this court and counsel for petitioners receive thirty days' advance

notice of such removal.

 **SO ORDERED**.


       RICARDO M. URBINA
      United States District Judge

4

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____     )
                                        )
ABDULLI FEGHOUL,                        )
                                        )
            Petitioner,                 )
                                        )
      v.                                )    Civil Action No. 06-618 (RWR)
                                        )
GEORGE W. BUSH et al.,                  )
                                        )
            Respondents.                )
_____     )
```

### MEMORANDUM ORDER

Petitioner Feghoul is a detainee in United States custody at
Guantanamo Bay Naval Base who filed *pro se* a petition for habeas
corpus relief by depositing the *pro se* petition with his captors
for filing in mid-November 2005. Now represented by a federal
public defender, Feghoul has filed an amended petition, which
seeks, among other things, an order restraining respondents from
delivering, returning, or rendering him to a country where there
is a foreseeable and imminent risk that he would be subjected to
torture. In addition, Feghoul has filed motions seeking the
entry of a protective order and an order compelling respondents
to submit a factual return. Respondents oppose the relief
requested, arguing lack of jurisdiction. They have also moved to
dismiss or transfer this case for want of jurisdiction. In the
alternative, respondents seek a stay of all proceedings pending
resolution of the appeals in Khalid v. Bush et al., 355
F. Supp. 2d 311 (D.D.C. 2005), appeals docketed sub nom.

-2-

Boumediene v. Bush et al., Nos. 05-5062, 05-5063 (D.C. Cir.
March 3, 2005) and In re Guantanamo Detainee Cases, 355 F.
Supp. 2d 443 (D.D.C. 2005), appeals docketed, Nos. 05-5064 et al.
(D.C. Cir. March 7, 2005).[1]

Feghoul's motions for a protective order and an order
directing respondents to file a factual return will be granted.
Respondents do not dispute petitioner's right to notice of the
factual basis for his detention or to be represented by counsel
to challenge the legality of his detention.  Rather, respondents
dispute this court's jurisdiction to entertain this petitioner's
habeas corpus petition.  Whether this court or another has
jurisdiction to determine the legality of petitioner's detention,
and what the exact nature and scope of the proceedings before the
court with jurisdiction should be, are legal questions that have
not yet been resolved by the D.C. Circuit and will not be
resolved here.  Despite the lack of finality regarding the issues
on appeal, however, it is hardly sensible to withhold or
frustrate something that no one doubts is petitioner's right -- a

---

[1] Disputed matters on appeal before the District of
Columbia Circuit include the effect on district court
jurisdiction over cases such as this one filed before
December 30, 2005 of the Detainee Treatment Act ("DTA") enacted
on December 30, 2005 (which purported to strip district courts of
jurisdiction over Guantanamo detainee cases); the decision in
Hamdan v. Rumsfeld, 126 S. Ct. 2749 (2006) (holding in part that
the DTA did not govern cases filed before its enactment); and the
Military Commission Act of 2006 (which purported to strip
district courts of jurisdiction over all Guantanamo detainee
cases).

-3-

meaningful communication with counsel regarding the factual basis of petitioner's detention. "Allowing petitioners to meet with their lawyers . . . is not the type of interim relief that even remotely risks infringing on the Court of Appeals' possible jurisdiction." Said v. Bush, Civil Action No. 05-2384 (RWR) (AK), slip. op. at 10 (D.D.C. May 23, 2006)(Kay, M.J.).

Feghoul's request for an order enjoining respondents from rendering him to another country will be denied. However, in light of respondents' reasonable request for a stay, an order staying proceedings but requiring respondents to provide thirty days' advance notice of any planned transfer of Feghoul to another location will be entered. A primary purpose of a stay pending resolution of issues on appeal is to preserve the status quo among the parties. Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (a stay pending appeal is preventative or protective, and seeks to maintain the status quo pending a final determination of issues on appeal); see Warm Springs Dam Task Force v. Gribble, 417 U.S. 1301, 1310 (1974) (granting stay pending appeal to maintain the status quo between the parties). A court may, in appropriate situations, specify protective conditions in balancing the hardship necessarily imposed on the party whose suit or execution of judgment has been stayed pending appeal. Cooks v. Fowler, 459 F.2d 1269, 1272-73 & n.27 (D.C. Cir. 1971) (affirming condition

-4-

of stay requiring tenant appealing judgment to deposit funds in court registry pending appeal); see also City of Portland, Or. v. Federal Maritime Comm'n, 433 F.2d 502, 504 (D.C. Cir. 1970) (directing the proponent of a stay in a case challenging shippers' exclusion of one city's port from service to "be prepared to state reasons why this court should not impose a conditional stay requiring the rotation of service among the ports involved pending final review and determination"); Scott v. Scott, 382 F.2d 461, 462 (D.C. Cir. 1967) (discussing a stay of execution of judgment conditioned upon support payments); Center for Int'l Environmental Law v. Office of the U.S. Trade Rep., 240 F. Supp. 2d 21, 23 (D.D.C. 2003) (conditioning stay pending appeal on party seeking an expedited appeal). Where, as here, the conditions imposed on the proponent of the stay are "neither heavy nor unexpected," imposing a protective condition is well within a court's discretion. Cooks v. Fowler, 459 F.2d at 249 (quoting Bell v. Tsintolas Realty Co., 430 F.2d at 482 (D.C. Cir. 1970) (stating "[w]e have little doubt that . . . [a court] may fashion an equitable remedy to avoid placing one party at a severe disadvantage during the period of litigation")).

Therefore, here

the court will "guard against depriving the processes of justice of their suppleness of adaptation to varying conditions." Landis v. North American Co., 299 U.S. 248, 256 (1936). Coextensive with a district court's inherent power to stay proceedings is the power to craft a stay that balances the hardships to the

-5-

parties.  Id. at 255 (noting concern regarding a stay
causing "even a fair possibility . . . [of] damage to
some one else."); see also Clinton v. Jones, 520 U.S.
681, 707 (1997) (noting that "burdens [to the parties]
are appropriate matters for the District Court to
evaluate in its management of the case.").

Al-Oshan v. Bush, Civil Action No. 05-520 (RMU), slip op. at 2

(D.D.C. Mar. 31, 2005) (Urbina, J.).

### CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

ORDERED that Feghoul's motions for orders entering a

protective order and directing respondents to file a factual

return [#14, 23] be, and hereby are, GRANTED.  A protective order

will be entered by separate order.  Respondents are directed to

file and make available to counsel a factual return relating to

Feghoul by close of business November 20, 2006.  It is further

ORDERED that respondents' request [#9] to stay proceedings

be and hereby is, GRANTED in part and DENIED in part.  Other than

what is ordered in the previous paragraph, the proceedings in

this case are STAYED pending resolution of the appeals pending

before the United States Court of Appeals for the District of

Columbia Circuit in In re Guantanamo Detainee Cases and

Boumediene v. Bush et al., except that Feghoul may seek emergency

relief from this court in appropriate circumstances, such as when

he has reason to believe that he is facing the possibility of

continued detention at the request of the United States in a

-6-

location that does not provide access to this court.  It is
further

ORDERED that Feghoul's request for an order restraining
respondents from transferring him to a country where there is a
foreseeable and imminent risk that he will be tortured be, and
hereby is, DENIED.  It is further

ORDERED that respondents, their agents, servants, employees,
confederates, and any persons acting in concert or participation
with them, or having actual or implicit knowledge of this Order
by personal service or otherwise, shall provide this court and
Feghoul's counsel with thirty days' advance written notice of any
transfer or removal of Feghoul from United States custody at
Guantanamo Bay.

SIGNED this 31st day of October, 2006.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

# EXHIBIT J

Cleared Public Version - AMZ

FILED WITH
COURT SECURITY OFFICER
[signature]
DATE 9.5.06

[ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 11, 2006]

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| JAMAL KIYEMBA, as Next Friend of ABDUSABUR DOE, *et al.*, | Appeal Nos. 05-5487 and 05-5488 |
| *Appellees/Cross-Appellants*, | (Consolidated with Appeal Nos. 05-5489, 05-5490, 05-5491, 05-5492 and 06-5042) |
| v. | |
| GEORGE W. BUSH, *et al.*, | **EMERGENCY MOTION TO SUPPLEMENT RECORD ON APPEAL** |
| *Appellants/Cross-Appellees*. | |

Pursuant to Fed. R. App. P. 27 and Circuit Rule 27(f), Appellees/Cross-Appellants hereby move for leave to supplement the record on appeal with the September 1, 2006 Declaration of Sabin Willett ("Willett Decl.").

As grounds for this motion, Appellees/Cross-Appellants state:

1.    These consolidated appeals are fully briefed and oral argument is scheduled for September 11, 2006.

2.    Petitioners' counsel has just learned of facts that bear directly on the propriety of the stays that are the subject of the cross appeal. As set forth below, petitioners' counsel has diligently sought to unearth these facts earlier but has been prevented from doing so by the Government.

3.    The *Kiyemba* habeas petition was filed in approximately August, 2005.  In September, 2005, District Judge Urbina entered the standard form of protective order.  Among other things, it obligated the Government to provide reasonable counsel access to Petitioners.  However, the Government unilaterally refused requests for counsel visits to those Petitioners because, it contended, the "next-friend" authorization was improper.  This contention had not been sustained by any Court, and the protective order had not been modified, but the Government nevertheless blocked our access to any detainee who had not spontaneously written an "authorization" in a form acceptable to the Government.  In late 2005/early 2006, when three such letters arrived, the Government objected to two of them on the ground that they were in English.  Petitioners' counsel promptly sought a negotiated solution through Magistrate Judge Kay.  A cumbersome compromise was reached as to the two, but as to five *Kiyemba* petitioners who had not written to us, the Government made no concession.  Magistrate Kay (who had already decided the same issue in another case) was obliged to decide it again.  The Government then appealed to Judge Urbina, who affirmed in August.  The Government procured further delay by initially denying access to counsel's interpreter, Ms. Rushan Abbas, on the grounds that she lacked adequate security clearance, despite the fact that Ms. Abbas formerly served as an interpreter for Department of Defense interrogators interrogating these very detainees at Guantanamo Bay.

4.    The result of this byplay was that counsel was blocked from meeting five of the petitioners, petitioners Abdusabur Doe, Abdunasir Doe, Khalid Doe, Hammad Doe, and Jalaal Doe, prior to August 29-31, 2006[1].

---

[1] The visit was originally schedule to begin on August 28, 2006, and delayed by one day by Hurricane Ernesto.  As a result of the hurricane, counsel was unable to meet Petitioner Khalid Doe.

5.    As is set forth in greater detail in the Willett Declaration, information learned from, and conduct of three of the foregoing petitioners, together with information learned from petitioners Abdusamad Doe and Hudaifa Doe (whom counsel had met previously), is highly relevant to three serious issues presented by the Appeal.

6.    *First*.  The first issue is the degree to which the indefinite delay caused by the stay has compromised – and perhaps fatally injured – the Petitioners' ability *ever* to proceed with a hearing on the merits of their petition.  The declaration contains evidence that the delays in this case have brought the Petitioners – who were raised under a Chinese legal system in which there is no independent judiciary -- to the conclusion that there simply is no legal process in America, and that the persons visiting them and claiming to be attorneys are likely imposters.  It now appears that certain of the petitioners may never place in American counsel the trust necessary to permit counsel to advance their case.  As the declaration shows, petitioners' conclusion in this regard, although incorrect, is not irrational.  Their access to information is controlled utterly by the Department of Defense, and they have no way to verify that their counsel are who they say they are.  Several Petitioners were advised by the Defense Department more than three years ago that they were "innocent," and would soon be released; all learned, more than two years ago, that the Supreme Court, in *Rasul*, had decided that cases might be heard in the courts; all learned, more than one year ago, that a habeas petition had been filed in their case.  The fact that nothing has happened was cited by all of them as evidence that the legal process either does not exist at all, or is a sham.  In short, the stay in this case is not simply delaying the hearing, it is fundamentally destroying the petitioners' ability ever to trust or participate in it.  The facts supporting this conclusion were not known until three days ago.

7.    *Second*.  The second point, which is related to and contributes to the first, is that the petitioners' living conditions have worsened dramatically during the pendency of the stays, and in particular since May.  The stay is causing them a deep and profound hardship.  As is shown in the declaration, one of the petitioners articulated in measured and thoughtful tones the view that while the American courts are meaningless, the pendency of the litigation may be antagonizing the military, thus may be rendering his living condition harsher, *and thus should be abandoned*.

8.    *Third*.  The visit uncovered new evidence of Government admissions of innocence of certain of the petitioners, not previously disclosed by the Government, which has never made a return in the *Kiyemba* cases.  This evidence points up the urgent need for a hearing.[2]

9.    Petitioners concede that this motion is highly unusual, and a matter for the exercise of the Court's discretion.  Petitioners believe the motion should be allowed because (i) the record supplementation sought bears directly on the balancing test advanced by the Government, *see Landis v. North Am. Co.*, 299 U.S. 248, 254-55 (1936)[3], (ii) the information contained in the declaration was not obtained before only because of the Government's manifold attempts to prevent Counsel from learning of it, (iii) Petitioners' counsel learned of and advanced the information as diligently as possible, and (iv) in the unique circumstances of this

---

[2]  Petitioners do not propose that "innocence," (in its broad sense of the status of being inappropriate for detention) which may or may not be contested by the Government, would be resolved by this Court or on this record.  Such questions are for the trial court.  However, the new evidence of Government admissions, like the other evidence to which the briefs advert, points up the urgent need for that resolution to take place.

[3]As the briefing reflects, Petitioners contend that the stays are absolutely impermissible in light of the mandate of *Rasul v. Bush*, 542 U.S. 466 (2004).  The declaration shows, however, that the balancing test necessary to determine "immoderate" stays in ordinary civil litigation, *see* 299 U.S. at 256, even if applicable in these habeas cases, is unmet by the Government.

case, where the Government controls all access to information, the relief sought is equitable and will assist the Court in making an informed decision.

10. Counsel returned from Guantanamo Bay on September 1, 2006, and prepared and submitted this motion and the attached declaration in the Secure Facility on the evening of September 1, 2006.

11. In light of the time ordinarily allowed for response and disposition of the motion, it could not be resolved prior to the scheduled September 11, 2006, oral argument. Accordingly, the motion has been styled as an Emergency Motion and the Appellees/Cross-Appellants request expedited action on the motion.

WHEREFORE, Appellees/Cross-Appellants requests that the Court allow this motion and grant leave to supplement the record on appeal with the Willett Declaration.

Dated: September 1, 2006

COUNSEL FOR
APPELLEES/CROSS-APPELLANTS:

Of Counsel:

Barbara Olshansky
Deputy Director
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Telephone: (212) 614-6439

Sabin Willett (Bar No. 50134)
Neil McGaraghan (Bar No. 50530)
Jason S. Pinney (Bar No. 50534)
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110-1726
Telephone: (617) 951-8000
Facsimile: (617) 951-8736

Susan Baker Manning (Bar No. 50125)
BINGHAM McCUTCHEN LLP
1120 20th Street NW, Suite 800
Washington, DC 20036-3406
Telephone: (202) 778-6150

Facsimile:  (202) 778-6155

## CERTIFICATE OF SERVICE

I certify that on September 1, 2006, I prepared the foregoing Emergency Motion to Supplement Record on Appeal at the secure facility in Arlington, Virginia, provided a copy of the same to the Court Security Office agent stationed there, and requested that the same be forwarded to Court Security Officers Jennifer Campbell and Christine Gunning for filing in the Court of Appeals and service on the Appellants/Cross-Appellees.

Sabin Willett

FILED WITH
COURT SECURITY OFFICER
~~~~~~~
DATE 9.5.06

[ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 11, 2006]

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

|  |  |
|---|---|
| JAMAL KIYEMBA, as Next Friend of ABDUSABUR DOE, *et al.*, | Appeal Nos. 05-5487 and 05-5488 |
| Appellees/Cross-Appellants, |  |
| v. | (Consolidated with Appeal Nos. 05-5489, 05-5490, 05-5491, 05-5492 and 06-5042) |
| GEORGE W. BUSH, *et al.*, | **SEPTEMBER 1, 2006 DECLARATION OF SABIN WILLETT** |
| Appellants/Cross-Appellees. |  |

Pursuant to 28 U.S.C. section 1746, I declare under the penalties of perjury that the following is true:

1.       My name is Sabin Willett. I am a partner of Bingham McCutchen, LLP, counsel to the *Kiyemba* and *Mamet* petitioners in Appeal Numbers 05-5487 and 05-5488. I have practiced law continuously since 1983.

2.       I visited the Guantánamo Bay Naval Station and met with certain of the Petitioners on August 29-31, 2006. Pursuant to the base regulations, all of our team's interview notes were delivered to our Guantanamo escort for delivery by military pouch to the Secure Facility, and I was not permitted to keep copies.

3.     On September 1, 2006, I traveled from Guantanamo Bay to Washington, D.C., where I prepared this declaration without the benefit of my files in these cases, or of my interview notes from August 29-31. I make this declaration on the basis of my best memory.

4.     The *Kiyemba* habeas petition was filed in approximately August, 2005.  In September, 2005, District Judge Urbina entered the standard form of protective order.  Among other things, that order obligated the Government to provide reasonable counsel access to Petitioners.  However, the Government unilaterally refused our requests for counsel visits to those Petitioners because, as Government attorneys advised me, the "next-friend" authorization was improper. This contention had not been sustained by any Court, and the protective order had not been modified, but the Government nevertheless blocked base access to any detainee who had not spontaneously written an "authorization" in a form acceptable to the Government.  In (approximately) late 2005 or early 2006, letters arrived from three of the petitioners.  The Government objected to two of them on the ground that they were in English.  I was able to meet one of the petitioners, Saabir Doe, and I sought a negotiated solution through Magistrate Judge Kay as to the other two, Hudaifa Doe and Abdusamad Doe.  A cumbersome compromise was reached as to the latter two, but as to five of the *Kiyemba* petitioners who had not written, the Government made no concession.  Magistrate Kay (who had already decided the access issue in another case) was obliged to decide it again.  In May or June, 2006, he ordered that the Government provide us with access to our clients. The Government then appealed to Judge Urbina, who affirmed.

5.     Throughout this case we have had enormous difficulty securing secret-cleared Uighur speakers to serve as interpreters.  In 2006, we located Ms. Rushan Abbas, an American citizen and Uighur speaker.  The Government initially

denied access to Ms. Abbas, on the grounds that she lacked adequate security clearance.

6.    On information and belief, Ms. Abbas formerly served as an interpreter for Department of Defense interrogators interrogating these very detainees at Guantanamo Bay.  Nevertheless, the Government insisted that Ms. Abbas be "re-cleared." This led to further delay of our visit.

7.    The result of this byplay was that our firm was blocked from meeting five of the petitioners, petitioners Abdusabur Doe, Abdunasir Doe, Khalid Doe, Hammad Doe, and Jalaal Doe, prior to August 29-31, 2006[1].

8.    My colleague Jason Pinney, Ms. Abbas, and I met for the first time with Petitioner Hammad Doe on the morning of August 29, 2006.

9.    We met for the first time with Petitioner Jalaal Doe on the afternoon of August 29, 2006.

10.    We met for the first time with Petitioner Abdunasir Doe on the morning of August 30, 2006.

11.    We met Petitioner Abdusamad Doe on the afternoon of August 30, 2006.  This was our firm's second meeting with Abdusamad, whom previously I met in April, 2006.

12.    We were scheduled to meet Petitioner Abdusabur Doe for the first time on August 31, 2006.  When we arrived on the Windward side of the base that morning, our escort advised that Abdusabur had refused to meet us.  Our translator translated into Uighur a letter to Abdusabur, urging him to meet with us.  Later that day, we were advised by an officer from the Staff Judge Advocate General's department that the letter was taken in to Abdusabur and that he refused to read it.

---

[1] The Government gave us leave to commence our visit on August 28, 2006, but the visit was delayed by a day by Hurricane Ernesto.  As a result of the hurricane, counsel was unable to meet Petitioner Khalid Doe.

13.    We met during the late morning and early afternoon of August 31,
2006 with Petitioner Hudaifa Doe, whom previously I had met in April, 2006.

14.    What follows is my memory of certain statements and observations
from these meetings.

15.    *Hammad.*    Petitioner Hammad Doe expressed anger and mistrust of
us. We had brought food and tea to the meeting, which he declined to accept. He
explained that he could not be sure we were interrogators, and that he believed
interrogators had drugged detainees before. He advised that initially he had been
an admirer of America. He said that he had been patient for two years thereafter,
until, in April, 2003, an interrogator had said, "Congratulations, your interrogation
is over. You are innocent. You will be leaving here soon." He said he had then
been sent to Camp IV, where living conditions were substantially better than the
other camps. Later, he became aware that our habeas petition had been filed on his
behalf. He said that because he had not been released in the more than three years
that have elapsed since he was advised by an interrogator that he was "innocent,"
since no court hearing had taken place, and since his living conditions had
dramatically worsened in 2006, he had reached the conclusion that the American
justice system was a sham, and that persons claiming to be American lawyers
likely were interrogators who could not be trusted.

16.    Hammad advised that conditions in the camp had deteriorated
markedly in the last six months. At some point in 2005, the men had been moved
out of Camp IV into various other, harsher camps. By mid-2006, most of them had
[Classified] been moved to ███████ in Camp III. Each man was housed in a separate
wire-mesh cage, about six feet by seven feet in area. Hammad said that tensions
had increased, and random searches, beatings by teams of helmeted guards, and
punishments (typically being sent to solitary confinement for a period of days)
have become much more frequent in the summer of 2006. Each of the other four

men with whom we spoke confirmed that the Uighurs were now living in Camp III and that conditions there had deteriorated markedly during the summer of 2006.

17.    *Jalaal.*  Petitioner Jalaal Doe expressed profound mistrust of us. He would not shake our hands, look directly at us, or accept food or tea. He said that in his view our meeting must be an interrogators' trick, since lawyers had been telling the prisoners for more than two years that the American courts had said there cases could be heard, and yet no cases had been heard.

18.    *Abdulnasir.*  Petitioner Abdulnasir's demeanor was quite different from that of Petitioners Hammad and Jalaal. He was gentle, soft-spoken, and thoughtful in affect. He shook the men's hands warmly, engaged with us pleasantly, smiled and occasionally chuckled. He asked intelligent and probing questions regarding the status of this petition, the *Al Odah* matter, and the American legal process. I asked him whether he trusted us. He then apologized, and asked us not to take us personally, but admitted that he no longer felt he could trust any American. I asked why. He said that he too had been advised by an American interpreter that his "case was closed," and that he was "innocent," that there would be no more interrogations, that he would soon be leaving the camp. (He said he believed this had occurred in the spring of 2003.) He expressed surprise at the "CSRT" proceeding that took place more than a year later, after he had been told of his innocence. He then said the men were surprised by the result, because while eighteen Uighurs had been together in Afghanistan and Pakistan, five had been determined by the military to be non-combatants (he used the word, "innocent"), w̶h̶i̶l̶e̶ ̶t̶h̶e̶ ̶o̶t̶h̶e̶r̶s̶ (including him) were deemed "enemy combatants" for reasons that the Americans never explained. He advised that even after the CSRTs, many of the Uighurs had received assurances from military personnel that they would soon be released, and that these representations had always been false.

19. Abdulnasir asked measured and patient questions about what we thought the benefits of litigation could be given that no court had heard his case for so long. He then asked about what the "downside" of litigation might be. This question puzzled us, but as the discussion progressed his further questions expressed his view that while the court system appeared to be an irrelevancy, the litigation might well be antagonizing the military and contributing to the worsening of his living conditions.

20. At the very end of the meeting, Abdulnasir courteously thanked us for our efforts, and then instructed us to cease pressing litigation on his behalf, as it appeared to be counterproductive to his living conditions. There was no time to discuss this surprising statement, which was made literally as the MPs arrived and ordered us to terminate our meeting and leave, and had to be hastily transcribed in the escort's van outside the camp.

21. As a practicing attorney for more than twenty years, it is my opinion that Abdulnasir's view, expressed under duress and after four and one-half years of imprisonment, and after his first meeting with counsel (which was less than two hours in duration), was not well-informed. Nevertheless, it illustrates profoundly that the delay brought upon by the stay has injured, perhaps irrevocably, his trust in the legal system and in American attorneys, and thus that the stay has profoundly injured his ability to present his habeas case.

22. *Abdusamad*. We had previously met Petitioner Abdusamad in April, 2006. In our first meeting he was extremely warm and genial in affect. On August 30, 2006, his affect had changed. He was courteous but guarded. He advised that his trust had been worn thin by the delay and by the worsening camp conditions.

23. Abdusamad advised that at approximately the time that the five Uighur men were sent to Albania (*i.e.* May, 2006), he was called into an interrogation room by military officers. One of the officers said that he had good

news. Abdusamad was "innocent," and his "file" indicated that he was to be "released and granted asylum by a foreign country." Abdusamad told us that he then asked, "In that case, why did you say I was an enemy combatant two years ago?" He said the interrogator appeared surprised by this question, and after paging through a file, shrugged his shoulders and said, "Oops." (We asked the interpreter to review this conversation with him twice to assure that we had understood it correctly).

24. We met Hudaifa on August 31. Previously we had met him in April, 2006. In this second meeting, he was courteous but candidly expressed that he had serious misgivings about American attorneys. Several times he asked if he could speak "just to the terjiman (interpreter)." I asked him whether he trusted us. He said, "We used to trust you. Maybe, God willing, we could trust you again, but nothing has happened, and so we have lost our trust."

25. We said to each of our clients that the five Uighurs now in Albania had been released literally on the eve of an important hearing. Each of the men advised that the military had told them that was just a coincidence. Hudaifa advised that, in light of the delay since May, he thought the military's explanation was probably correct.

26. I can draw no firm conclusion about petitioner Abdusabur, since I did not meet him, but his reported refusal to meet us or to read our letter suggests a deep injury to the attorney-client relationship, and thus to his practical ability to proceed.

27. On information and belief, all of the Petitioners were born and raised in Communist China. The notion of an independent judiciary is utterly foreign to them. They speak no English, and have limited educations. Their understanding of the American justice system derives largely from rumors they have heard in the camp, and to a limited extent from our brief meetings and correspondence.

28.    Our observations from August 29-31 demonstrate that the delay brought on by the stay in the *Kiyemba* case, in combination with the deterioration of the conditions of their confinement, has created in our clients a deep mistrust for all American lawyers and the American judicial system. I believe that our clients' mistrust, while misplaced (and perhaps difficult to comprehend if one has not been to Guantanamo Bay), nevertheless is rationally based upon the limited evidence available to them, including the facts of long delay and inaction.

29.    As a practicing attorney for more than twenty-two years, I believe that the ability to proceed successfully in any case, no matter how strong the merits, depends on a relationship of trust between attorney and client. I believe this is profoundly true where barriers of language, heritage, culture and education render the legal system unfamiliar to the client. Because delay has caused the petitioners to doubt all American attorneys and to mistrust the process, I believe that delay has profoundly injured their practical ability to present their case should the stay ever be lifted. Based on my observations of the clients, I believe that further delay is highly likely to render that injury irreparable to at least some of the petitioners.

I declare under penalty of perjury that the foregoing is true.

September 1, 2006.

_____
Sabin Willett

## CERTIFICATE OF SERVICE

I certify that on September 1, 2006, I prepared the foregoing September 1, 2006 Declaration of Sabin Willett at the secure facility in Arlington, Virginia, provided a copy of the same to the Court Security Office agent stationed there, and requested that the same be forwarded to Court Security Officers Jennifer Campbell and Christine Gunning for filing in the Court of Appeals and service on the Appellants/Cross-Appellees.

_____
Sabin Willett