IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MOHAMMED AHMED TAHER, *et al.*, ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 06-CV-1684 (GK) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| *et al.*, ) | |
| ) | |
| Respondents. ) | |

## RESPONDENTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER, AND IN OPPOSITION TO PETITIONERS' CROSS-MOTION FOR HABEAS HEARING AND RELATED RELIEF

Respondents hereby submit this memorandum in support of respondents' motion to dismiss or transfer (dkt. nos. 4, 5) and in opposition to petitioners' cross-motion for *habeas* hearing and related relief (dkt. no. 8), and state as follows:

Petitioner concedes that the Military Commissions Act of 2006, Pub. L. No. 109-366 ("MCA"), and the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680 (10 U.S.C. § 801 note) ("DTA") clearly apply to this case, withdrawing District Court jurisdiction over petitioner's case.   Petitioner, thus, is left to argue that the MCA violates the Suspension Clause of the Constitution by eliminating district court habeas jurisdiction over his case and by vesting in the Court of Appeals a narrower scope of review.  Further, petitioner argues that the MCA is constitutes a bill of attainder and violates the equal protection component of the Fifth Amendment.  Petitioner's arguments must be rejected.

I.    **Petitioner Has No Constitutional Rights Under the Suspension Clause or Otherwise**.

Respondents' motion to dismiss explained at length that petitioner's argument that aliens

such as petitioner, detained overseas as enemy combatants, have constitutional rights, including a

right to *habeas* protected by the Suspension Clause, was soundly rejected by the Supreme Court

over 50 years ago.  *See* Resps' Mot. to Dismiss at 7-11; *Johnson v. Eisentrager*, 339 U.S. 763

(1950); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 269-78 (1990) (alien seeking

constitutional protections must establish that he has come within the territory over which the

United States has sovereignty and that he had developed substantial voluntary connections with

this country).  Petitioner nevertheless argues that the Supreme Court's decision in *Rasul v. Bush*,

542 U.S. 466 (2004), supports a common law right to habeas relief that falls under the

"protection of the Suspension Clause," Petr's Opp'n at 10, and that *Rasul* somehow limited

*Eisentrager*'s constitutional holding to only those cases having the same fact pattern as in

*Eisentrager*, *id.* at 11-12.   Petitioner's arguments have no merit.

*Rasul* held for the first time that aliens outside of the United States have a right to habeas

relief.  That holding, however, addressed only the reach of the federal habeas *statute*, and did not

address in any way the scope of the Suspension Clause.  *See* 542 U.S. at 476-79; *see also id.* at

475 ("The question now before us is whether the *habeas statute* confers a right to judicial review

of the legality of Executive detention of aliens [at Guantanamo].") (emphasis added).  Indeed,

*Rasul* expressly distinguished between the statutory and constitutional holdings of *Eisentrager*

and limited its analysis to the proper interpretation of § 2241, *see id.* at 476-79, particularly its

distinctive phrase relating to the power of courts to issue writs of habeas corpus "within their

respective jurisdictions."  *Id.* at 471; *see* 28 U.S.C. § 2241(a).  The Court found that the

"statutory predicate" for the Court's holding in *Eisentrager* was overruled by the Court's decision in *Braden v. 30th Judicial Circuit County of Kentucky*, 410 U.S. 484 (1973). *Rasul*, 542 U.S. at 479. Given the additional fact that "the [habeas] *statute* dr[e]w[] no distinction between Americans and aliens held in federal custody," the Court held that "[a]liens held at the base, no less than American citizens, [were] entitled to invoke the federal courts' authority *under § 2241*." *Rasul*, 542 U.S. at 484 (emphasis added). The Court did not, however, cast any doubt on *Eisentrager's* ruling that the *Constitution* does not guarantee aliens held abroad a right to habeas corpus. *See id*. at 478.

To be sure, in interpreting the habeas statute, the Court in *Rasul* also examined "the historical reach of the writ," noting that at common law, courts exercised habeas jurisdiction over the claims of not only "aliens detained within sovereign territory of the realm,"[1] but also "persons detained in the so-called 'exempt jurisdictions,' where ordinary writs did not run, and all other dominions under the sovereign's control." *Id.* at 481-82 & nn. 11-13. This observation, however, does not help petitioner because the "persons" cited by the Court to be in "exempt jurisdictions" or other dominions under the sovereign's control were all citizens (or subjects) of the sovereign that was holding them. *See id.* at 481-82 nn. 12-13. And "[c]itizenship as a head of jurisdiction and a ground of protection was old when Paul invoked it in his appeal to Caesar." *Eisentrager*, 339 U.S. at 770. "Even by the most magnanimous view, our law does not abolish

---

[1] As explained in respondents' motion to dismiss, and as recognized by the Supreme Court in *Rasul,* Guantanamo is outside the sovereign territory of the United States. *See Rasul*, 542 U.S. at 475; Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.–Cuba, art. III, T.S. No. 418 (6 Bevans 1113) (Cuba retains ultimate sovereignty over Guantanamo); *see id*. art. II (prohibiting United States from establishing certain "commercial" or "industrial" enterprises over Guantanamo, a restriction wholly inconsistent with control congruent with sovereignty).

inherent distinctions recognized throughout the civilized world between citizens and aliens," *id.* at 769, not to mention alien enemies. Indeed, even "[a]t common law 'alien enemies have no rights, no privileges, unless by the king's special favour, during the time of war.' (1 Blackstone at 372, 373)." *Id.* at 775 (quoting *Citizens Protective League v. Clark*, 155 F.2d 290, 293 (D.C. Cir. 1946)); *see also Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779) (petitioners, as prisoners of war, were "not entitled to any of the privileges of Englishmen; much less to be set at liberty on habeas corpus"); *Moxon v. The Fanny*, 17 F. Cas. 942 (D. Pa. 1793) (courts "will not even grant a habeas corpus in the case of a prisoner of war, because such a decision on this question is in another place, being part of the rights of sovereignty").

Moreover, *Rasul* discussed the common law in the context of interpreting congressional intent under the habeas statute. After concluding that there was "little reason to think that Congress intended the geographical coverage of [§ 2241] to vary depending on the detainee's citizenship," *Rasul,* 542 U.S. at 481, the Court then went on to note that such an interpretation would be consistent with the historical reach of the writ. *Id.* at 481-82. The question before the Court consistently was a statutory one, and so was the Court's holding, which has now been legitimately superceded by the MCA.

Indeed, on December 13, 2006, recognizing that *Eisentrager* provides the controlling precedent on the constitutional question – precedent unaffected by *Rasul* – and rejecting the same arguments raised by petitioner here, Judge Robertson held that an alien detainee held at Guantanamo may not "claim entitlement to a *constitutionally* guaranteed writ [of habeas corpus]" because Guantanamo lies outside "the sovereign realm" and such a detainee lacks any voluntary connection with the United States "that would justify the invocation of a constitutional right to

habeas corpus." *See Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), 2006 WL 3625015 at *7-*9 (D.D.C. Dec. 13, 2006); *see also Khalid v. Bush*, 355 F. Supp. 2d 311, 320-21 (D.D.C. 2005) (Leon, J.) (aliens detained at Guantanamo are not possessed of constitutional rights).

Petitioner, accordingly, lacks cognizable constitutional rights, including under the Suspension Clause, and his claim that the MCA's withdrawal of District Court jurisdiction is unconstitutional, must be rejected.

## II.    The Detainee Treatment Act Provides a Constitutionally Adequate Substitute for *Habeas* That Does Not Offend the Suspension Clause in Any Event.

As explained in respondents' motion to dismiss, even if petitioner could properly invoke the Suspension Clause, the review provided under the DTA in the Court of Appeals of the "enemy combatant" determination, does not effect an unconstitutional suspension of the writ, but rather constitutes an adequate substitute remedy. *See* Resps' Mot. to Dismiss at 11-15; *Swain v. Pressley*, 430 U.S. 372, 381 (1977). Section 1005(e)(2)(C) of the DTA permits the Court of Appeals of the District of Columbia Circuit to review whether the determination of a Combatant Status Review Tribunal ("CSRT") with regard to an alien detainee was consistent with the standards and procedures specified by the Secretary of Defense for CSRTs. The Court of Appeals can also review whether the conclusion of the CSRT is supported by a preponderance of the evidence. DTA § 1105(e)(2)(C). In addition, the Court of Appeals may consider, "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." *Id.* Similarly, final decisions of a military commission are reviewable both as to their consistency with standards and procedures specified for a military commission

and with the Constitution and laws of the United States to the extent they are applicable.  DTA

§ 1005(e)(3)(D).

Thus, while petitioner complains about the nature of the CSRT process, the enemy

combatant definition used by CSRTs, and the types of material submitted to CSRTs, among other

things, all of those issues can be raised before the Court of Appeals in an appropriate DTA

proceeding.  The Court of Appeals can determine the nature of petitioner's rights, if any, under

"laws of the United States" and the U.S. Constitution, and can adjudicate whether the CSRT

process or the military commission decision violated any applicable rights.  *See* DTA

§ 1005(e)(2), (3).   While respondents have argued (and continue to argue) that petitioner has no

constitutional rights in this context, petitioner can plead his arguments to the contrary, where

appropriate, to the Court of Appeals.[2]  In sum, the availability of judicial review under the DTA

and the MCA negates any argument under the Suspension Clause.

---

[2] Petitioner argues that the DTA review is constitutionally deficient also because it does not allow for judicial inquiry for those awaiting their CSRT determination.  Petr's Opp'n at 13.  Petitioner's argument should be rejected out of hand because petitioner has no standing to challenge the MCA on behalf of detainees awaiting an enemy combatant status determination.  Petitioner had his CSRT and was determined to be an enemy combatant, *see* Resps' Mot. to Dismiss at 2; he is not "awaiting determination" of his enemy combatant status.  The Supreme Court has long held that "a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  "A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations."  *County Court of Ulster County v. Allen*, 442 U.S. 140, 154-55 (1979); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (overbreadth challenges to facial validity of a legislative act permitted only "in the limited context of the First Amendment").   Thus, petitioner may not challenge the MCA based on its supposed effects on differently situated detainees.

Furthermore, as explained in respondents' motion to dismiss, the review provided under the DTA and the MCA is consistent, indeed more generous, than traditional *habeas* practice and does not give rise to any Suspension Clause issue. *See* Resps' Mot. to Dismiss at 13-15.[3] The cases cited by petitioner are not to the contrary.

In *Goldswain's Case*, 96 Eng. Rep. 711 (C.P. 1778), the petitioner challenged his eligibility for military impressment where the central questions had never been adjudicated by any body, judicial or otherwise. And even in that case, the court held that, once a return had been made, habeas petitioners were not permitted to "controvert the truth of the return to a habeas corpus, or plead or suggest any matter repugnant to it." 96 Eng. Rep. at 713. In both *R. v. Schiever*, 97 Eng. Rep. 551 (K.B. 1750), and *Case of the Three Spanish Sailors*, 96 Eng. Rep. 775 (C.P. 1779), the alien petitioners were being held as prisoners of war on *sovereign English territory,* and thus, the cases do not speak to the habeas rights of aliens held as enemies outside sovereign territory, which is the relevant class of petitioners.[4]

Similarly inapposite is *Ex Parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), which involved review of the decision of a military tribunal regarding a U.S. citizen being held in sovereign U.S. territory. *Milligan* obviously does not diminish the later controlling holding of *Eisentrager*.

---

[3] *See also Yamashita v. Styer*, 327 U.S. 1, 8 (1946) ("If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts. Correction of their errors of decision is not for the courts but for the military authorities which are alone authorized to review their decisions"); *id.* at 17 ("We do not here appraise the evidence on which petitioner was convicted" because such a question is "within the peculiar competence of the military officers composing the commission and were for it to decide").

[4] *See also Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR), 2006 WL 3625015 at *7 (D.D.C. Dec. 13, 2006) (distinguishing several cases cited by petitioner here and noting that *Schiever* states, "[petitioner] is the King's prisoner of war, and we have nothing to do in that case, nor can we grant an habeas corpus to remove prisoners of war").

Moreover, even the *Milligan* Court did not "evaluate" exculpatory evidence presented by the petitioner, but relied entirely on facts that were not in dispute, namely, the residency of the petitioner in a state where the Civil War had not been active and where the regular courts were operational. *Id.* at 118, 121. The *Milligan* Court certainly did not engage in or authorize any process approaching the sort of evidentiary hearing envisioned by petitioner here.

Finally, petitioner further argues that the MCA effects a suspension of the writ or is otherwise infirm because it denies a detainee the right to invoke the protection of the Geneva Conventions, when, according to petitioner, review of treaty-based claims is historically part of the habeas inquiry. *See* Petr's Opp'n at 30-35. This argument has no merit.

Section 5(a) of the MCA, which provides that no person may invoke the Geneva Conventions as "a source of rights" in any civil court proceeding to which the United States is a party, clarifies settled law that treaties, such as the Geneva Conventions, are presumed not to create individually enforceable rights. A treaty "is primarily a compact between independent nations," *Head Money Cases*, 112 U.S. 580, 597 (1884), and absent a clear contrary intent, a treaty "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." *Id.*; *see also Whitney v. Robertson*, 124 U.S. 190, 194-195 (1888); *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 937 (D.C. Cir. 1988). If a treaty is violated, this "becomes the subject of international negotiations and reclamation," not the subject of a lawsuit. *Head Money Cases*, 112 U.S. at 597 ("It is obvious that with all this the judicial courts have nothing to do and can give no redress."). The MCA specifically confirms, consistent with the presumption concerning treaty enforcement, that Congress, while taking certain steps through the MCA to implement the United States'

obligations under the Geneva Conventions, does not intend those treaties to be judicially enforced in court by private individuals.[5] *See Holmes v. Laird*, 459 F.2d 1211, 1213, 1222 (D.C. Cir. 1972) (denying U.S. soldiers' claims that because the NATO Status of Forces Agreement granted individual members of the armed forces specific rights, a federal court could adjudicate a claim based upon those treaty rights; holding that "the corrective machinery specified in the treaty itself is nonjudicial"); *see also Eisentrager*, 339 U.S. at 789 (holding that the 1929 Geneva Convention is not judicially enforceable by the captured party).

Nor does the fact that this is a habeas proceeding change the constitutional analysis. The habeas statute is simply a grant of jurisdiction, and does not itself create any substantive rights against detention. Accordingly, every court of appeals to consider the question has determined that treaties that do not themselves create judicially enforceable rights may not be enforced through the habeas statute. As the Sixth Circuit has explained, "the reference to 'treaties of the United States' in § 2241 cannot be construed as an implementation of non-self-executing provisions of treaties so as to render them judicially enforceable." *Bannerman v. Snyder*, 325 F.3d 722, 724 (6th Cir. 2003); *accord Poindexter v. Nash,* 333 F.3d 372 (2d Cir. 2003); *Wesson v. United States Penitentiary Beaumont*, 302 F.3d 343 (5th Cir. 2002); *Hain v. Gibson*, 287 F.3d 1224 (10th Cir. 2002); *United States ex rel. Perez v. Warden*, 286 F.3d 1059 (8th Cir. 2002). In any event, there cannot possibly be any constitutional impediment to Congress limiting

---

[5] In fact, Congress specifically intended to preclude all treaty claims in any challenges to CSRT determinations. Section 1005(e)(2)(C)(ii) of the DTA limits judicial review to the question whether the standards and procedures used by the CSRTs are "consistent with the Constitution and laws of the United States," to the extent the "Constitution and laws of the United States" are applicable. In contrast, the habeas statute permits review of claims that a petitioner is being held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

enforcement of a treaty to diplomatic and non-judicial processes.[6]  That is the norm for treaties.  *See, e.g., Holmes v. Laird*, 459 F.2d 1211, 1220-22 (D.C. Cir. 1972); *cf. Tag v. Rogers*, 267 F.2d 664, 667 (D.C. Cir. 1959) ("it has long been established that treaties and statutes are on the same level and, accordingly, that the latest action expresses the controlling law").  In sum, petitioner never had any judicially enforceable rights under the Geneva Conventions, and there can be no Suspension Clause violation simply because the MCA clarifies that fact.

In sum, the MCA does not offend the Suspension Clause, even if petitioner could properly avail himself of the Constitution.

## III.    The MCA Is Not an Unconstitutional Bill of Attainder.

Petitioner's argument that the MCA is an unconstitutional bill of attainder, *see* Petr's Opp'n at 35-36, also must be rejected. Not only does petitioner lack the ability to avail himself of constitutional rights, but the MCA is not a bill of attainder in any event.

The Constitution provides that "[n]o Bill of Attainder . . . shall be passed."  Art. I, § 9, cl. 3.  A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."  *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841 (1984).  Because the Bill of Attainder Clause acts as "safeguard against legislative exercise of the judicial function or more simply - trial by legislature," *United States v. Brown*, 381 U.S. 437, 442 (1965), it has rarely been

---

[6] For additional reasons similar to those explained *supra* note 2, petitioner's argument that § 5(a) of the MCA adversely impacts detainees that may be prosecuted by a military commission should be rejected.  Petitioner is not currently being prosecuted by a military commission; indeed, final procedures and rules governing military commissions under the MCA have not been promulgated.  Thus, any claim respecting a future military commission is, at this point, premature, and petitioner, accordingly, lacks standing to bring such a claim.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983).

- 10 -

invoked to condemn legislation.  Indeed, the Supreme Court has struck down statutes on bill of

attainder grounds only five times in the nation's history.  *See BellSouth Corp. v. F.C.C.*, 162 F.3d

678, 683 (D.C. Cir. 1998).  In light of the separation of powers principles underlying the Bill of

Attainder Clause,[7] the Supreme Court has held that only "the clearest proof" suffices "to

establish the unconstitutionality of a statute on such a ground."  *Communist Party of United*

*States v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961).  As explained below, the MCA

does not contain either of the required elements of a bill of attainder:  it neither singles out

petitioner nor does it impose punishment.  *See Foretich v. United States*, 351 F.3d 1198, 1217

(D.C. Cir. 2003) ("Both 'specificity' and 'punishment' must be shown before a law is

condemned as a bill of attainder.").

    As a threshold matter, the MCA does not meet the specificity requirements for a bill of

attainder because it does not apply "either to named individuals or to easily ascertainable

members of a group."  *United States v. Lovett*, 328 U.S. 303, 315-6 (1946).  The group punished

by the MCA, according to petitioner, consists of all non-citizens presently designated or

designated in the future by the government as "enemy combatants."  *See* Petr's Opp'n at 33.

Thus, the MCA does not unlawfully "single out" petitioner alone for punishment – the historical

hallmark of a bill of attainder.  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 471 n.34 (1977);

*Selective Serv. Sys.*, 468 U.S. at 847.  Furthermore, because the constitutional prohibition on bills

_____

    [7] "[T]he Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons."  *United States v. Brown*, 381 U.S. 437, 445 (1965).  Put simply, "[t]he distinguishing feature of a bill of attainder is the substitution of a legislative for a judicial determination of guilt."  *De Veau v. Braisted*, 363 U.S. 144, 160 (1960).

- 11 -

of attainder is directed at the legislative determination and punishment of guilt, it can have no application to the MCA, a jurisdictional statute that applies to an open-ended class of individuals – aliens determined by administrative processes to be enemy combatants or who are being held as enemy combatants while awaiting such determinations. *See Korte v. Office of Personnel Management*, 797 F.2d 967, 972 (Fed. Cir. 1986) (rejecting bill of attainder challenge where alleged finding of "guilt" was not imposed on plaintiff by federal statute, but by agency-level adjudicative body whose decision was subject to judicial review).

Indeed, the broad reading of the Bill of Attainder Clause advanced by petitioner would extend the prohibition far beyond its intended scope. Accepting petitioner's argument would "cripple the very process of legislating" because "every person or group made subject to legislation that he or it finds burdensome" would complain that "he or it is being subjected to punishment." *Nixon*, 433 U.S. at 470. Such reasoning would impermissibly transform any law into a bill of attainder merely because it regulates conduct on the part of designated individuals or classes of individuals. *See Wilson v. Yaklich*, 148 F.3d 596, 605-06 (6th Cir. 1998) (rejecting bill of attainder challenge to provision of Prison Litigation Reform Act that precludes filing of *in forma pauperis* civil actions by a prisoner who has had similar petitions dismissed as frivolous on three or more prior occasions); *Marozsan v. United States*, 90 F.3d 1284,1287 (7th Cir. 1996) (concluding that statute forbidding judicial review of individual veterans' benefits decisions is not bill of attainder); *Nagac v. Derwinski*, 933 F.2d 990, 990-91 (9th Cir. 1991) (holding that provision of the Veterans' Judicial Review Act limiting the jurisdiction of the Court of Veterans Appeals to hear certain claims is not a bill of attainder). For this reason, petitioner notably does

not identify a single case in which a statute regulating the jurisdiction of the federal courts with

respect to certain classes of litigants has been struck down on bill of attainder grounds.

Petitioner's bill of attainder argument is essentially an attempt to recast his equal

protection argument – both arguments essentially contend that the MCA unlawfully discriminates

against non-citizen enemy combatants by limiting the scope of judicial review. The Supreme

Court, however, has held that the Bill of Attainder Clause "surely was not intended to serve as a

variant of the equal protection doctrine, invalidating every Act of Congress or the States that

legislatively burdens some persons or groups but not all other plausible individuals." *Nixon*, 433

U.S. at 470.

Even assuming the specificity element of the Bill of Attainder Clause were deemed

satisfied, petitioner's claim should also be rejected because "the proscription on bills of attainder

reaches only statutes that inflict punishment." *Selective Serv. Sys.*, 468 U.S. at 851. In this case,

section 7 of the MCA is not a bill of attainder because its regulation of the jurisdiction of the

federal courts does not "inflict punishment" on those who come within its purview.

In "determining whether a statute inflicts punishment within the proscription against bills

of attainder," the severity of the sanction imposed "is not determinative of its character as

punishment." *Selective Serv. Sys.*, 468 U.S. at 851. Neither is the fact that the statute "regulates

conduct on the part of designated individuals or classes of individuals," or compels "an

individual or defined group . . . to bear burdens which the individual or group dislikes." *Nixon*,

433 U.S. at 470. Instead, to "decid[e] whether a statute inflicts forbidden punishment," a court

must make "three necessary inquiries: (1) whether the challenged statute falls within the

historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type

- 13 -

and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes;' and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 475-76).  The MCA does not satisfy any of these criteria.

According to petitioner, the "punishment" imposed by the MCA is the deprivation of habeas review to which petitioner believes he would otherwise be entitled.[8]  *See* Petr's Opp'n at 35-36.  But the list of punishments covered by the Bill of Attainder Clause has been limited to death, imprisonment, banishment, the punitive confiscation of property, and  legislative bars to participation by individuals or groups in specific employments or professions.  *Selective Serv. Sys.*, 468 U.S. at 852; *Nixon*, 433 U.S. at 474.  By contrast, the MCA simply specifies the forum in which permissible claims by enemy combatants must be brought and clarifies the scope of that review.  Accordingly, the MCA does not involve any of the several punishments the Supreme Court has noted as being historically associated with bills of attainder.[9]

Additionally, the MCA plainly "can be said to further nonpunitive legislative purposes." *Selective Serv. Sys.*, 468 U.S. at 852.  The purpose of the MCA is not to punish petitioner but to

---

[8]  As explained *supra*, petitioner's insistence that enemies captured during armed conflict, and detained by the military as enemy combatants have a right to *de novo* review of the ruling of the governing military tribunal is wholly unfounded and inconsistent with Supreme Court precedent.  Consequently, the MCA does not impose "punishment" because petitioner is not entitled to such sweeping judicial review.  In any event, the MCA does not fall within the historical meaning of legislative punishment.

[9]  Petitioner's reliance on *Pierce v. Carskadon*, 83 U.S. (16 Wall.) 234 (1872), is inapposite.  *Pierce* arose in the unique context of the Reconstruction period following the Civil War and involved a statute that deprived non-residents of all access to West Virginia state courts to protect property rights, unless they provided a loyalty oath that they had not supported the Confederacy. Conversely, the MCA involves no similar circumstance and, in fact, expressly *creates* procedures for judicial review of permissible enemy combatant claims.

clarify the scope of the habeas statute by creating a jurisdictional scheme establishing a single judicial forum in which claims by enemy combatants must be brought. Through the MCA, Congress was acting to clarify the meaning of the DTA, after *Hamdan*, to state expressly that the elimination of jurisdiction over habeas claims applies to all pending cases. The statutory response by Congress to the *Hamdan* decision can hardly be deemed punishment. *See, e.g.*, 152 Cong. Rec. S10367 (Sen. Graham) ("The only reason we are here is because of the *Hamdan* decision. The *Hamdan* decision did not apply to the [DTA] retroactively, so we have about 200 and some habeas cases left unattended and we are going to attend to them now.").

Moreover, there can be no serious question that the MCA is a rational means of furthering nonpunitive purposes. *See Foretich*, 351 F.3d at 1221. The outgrowth of the Supreme Court's decision in *Rasul*, which for the first time read the habeas statute to provide jurisdiction over the claims of alien enemy combatants held outside the United States, was a flood of habeas corpus petitions filed in district court raising a wide variety of claims, including challenges to nearly every aspect of detention, transfer, and treatment of alien enemy combatants. In response to this unprecedented litigation, Congress enacted both the DTA and MCA – comprehensive legislation establishing procedures for military commissions and a uniform system of judicial review of enemy combatants in single forum. *See* 152 Cong. Rec. H7938 (Rep. Hunter) (daily ed. Sept. 29, 2006) ("The practical effect of this amendment will be to eliminate the hundreds of detainee lawsuits that are pending in courts throughout the country and to consolidate all detainee treatment cases in the D.C. Circuit"). Congress, therefore, sought to bring relief and clarity to the federal courts, which in its view, had been burdened with claims that were not appropriate for judicial review. *See* 152 Cong. Rec. S10403 (Sen. Cornyn) ("Weighing of the evidence is a

function for the military when the question is whether someone is an enemy combatant. Courts simply lack the competence -- the knowledge of the battlefield and the nature of our foreign enemies -- to judge whether particular facts show that someone is an enemy combatant"). Thus, far from punishing petitioner, Congress exercised its legitimate constitutional authority to provide a comprehensive legislative solution to the unique situation presented by the litigation resulting from the detention of enemy combatants during wartime. For these reasons, the legislative record does not support the conclusion that Congress was motivated by a desire to punish petitioner.[10]

In sum, the MCA is not a bill of attainder.

**IV.    Petitioner's Equal Protection Challenge to the MCA Is Meritless.**

Petitioner also alleges that the MCA's restriction on court jurisdiction violates the equal protection component of the Fifth Amendment because it applies to non-citizens only. *See* Petr's Opp'n at 36. As explained below, petitioner's argument lacks merit and should be rejected.

As an initial matter, petitioner's argument should be rejected because, as respondents have argued *supra*, as a non-resident alien with no voluntary contacts with the United States, petitioner cannot invoke the Constitution of the United States. In fact, the Supreme Court has already expressly rejected the claim that the equal protection component of the Fifth Amendment applies to non-resident aliens lacking appropriate voluntary contacts with the Nation. *See Verdugo-Urquidez*, 494 U.S. at 269-74 (citing *Eisentrager*, 339 U.S. at 782-85).

---

[10] *See Navegar, Inc. v. United States*, 192 F.3d 1050, 1067 (D.C. Cir. 1999) ("unmistakable evidence of punitive intent" required); *see also BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 67 (D.C. Cir. 1998) (requiring " 'smoking gun' evidence of congressional vindictiveness" to justify finding punitive intent).

Even assuming petitioner could raise a claim under the Fifth Amendment's equal protection component, however, that claim fails. Petitioner bases his equal protection argument upon a claim that the MCA deprives persons such as himself of a fundamental right, *i.e.*, in petitioner's view, to seek habeas corpus relief, and thus is subject to heightened scrutiny. As explained *supra*, however, the MCA does not transgress any constitutional right related to habeas corpus, even if petitioner were in a position to be able to assert a constitutional claim, but rather provides adequate and appropriate substitute relief through the judicial review and court access mechanism established in the Court of Appeals under the DTA. *See Ludecke v. Watkins*, 335 U.S. 160, 163, 170-73 (1948) (no constitutional issue existed with respect to the severe restriction of judicial access and review provided a person determined to be an enemy alien with respect to the summary seizure and removal of the alien under the Alien Enemy Act of 1798 (50 U.S.C. § 21)).[11]

Petitioner also asserts that aliens are a suspect class, citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971). That case, dealing only with lawful, resident aliens, is inapposite, however. *See id.* at 371 (the "statutes in question [in *Graham*] create two classes of needy persons, indistinguishable except with respect to whether they are or are not citizens of this country"); *see also In re Griffiths*, 413 U.S. 717, 722 (1973) (according protection to resident aliens on the premise that "like citizens, [they] pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society"); *Verdugo-Urquidez*, 494 U.S. at 273 (rejecting nonresident alien's reliance on *Graham*).

---

[11] None of the cases cited by petitioner regarding restrictions on access to courts involved policies related to the access of aliens held as enemy combatants or rationales that would legitimately apply to issues of such access.

Section 7 of the MCA limits district court habeas jurisdiction with respect to certain "alien[s]," to be sure, and so applies to lawful, resident aliens as well. As a nonresident alien, however, petitioner has no standing to allege an equal protection violation on behalf of that distinct group. *See Kowalski,* 543 U.S. at 129; *County Court of Ulster County*, 154 U.S. at 55; *see also Salerno*, 481 U.S. at 745. As a representative of the broader, unprotected class of aliens, petitioner's challenge would be subject to rational basis review. *See, e.g., Dandridge v. Williams*, 397 U.S. 471, 485 (1970); *United States v. Carolene Products*, 304 U.S. 144, 152 (1938). Under that lenient standard, the MCA § 7 restrictions must be upheld as long as a court can identify any rational basis for them. *Carolene Products*, 304 U.S. at 152. Here, it cannot be seriously argued that no rational basis exists supporting section 7 of the MCA, in which Congress has acted to regulate the jurisdiction of the federal courts as it pertains to actions by aliens held as enemy combatants during wartime.[12]

Further, the Supreme Court has made it clear that federal policies regarding aliens are entitled to a high degree of deference, in any event. *See, e.g., Graham*, 413 U.S. at 379-80. As the Supreme Court has repeatedly observed,

> [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Matthews v. Diaz*, 426 U.S. 67, 81 n.17 (1976) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952)); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *Shaughnessy v. United*

---

[12] Indeed, while the MCA jurisdictional provisions need only have a rational basis, as they undoubtedly do, they would survive exacting scrutiny as well.

- 18 -

*States ex rel. Mezei*, 345 U.S. 206, 210 (1953).   The concerns motivating the Court's deference –

that regulation of aliens is committed to the political branches – is magnified in this case, which

involves the regulation of aliens held as enemy combatants, thus implicating grave war powers,

national security, and foreign policy concerns.

For these reasons, petitioner's equal protection challenge to the MCA should be rejected.

## V.    Petitioner's Requests for a Habeas Hearing and Related Relief Should Be Denied.

Despite the explicit withdrawal of this Court's jurisdiction by the DTA and the MCA,

petitioner's counsel nonetheless asks the Court to forge ahead in this case with merits

proceedings, including ordering respondents to provide a factual return, as well as entry of a

protective order developed in cases filed at a time when the Court had jurisdiction.   Petitioner's

requests should be denied.

Where, as here, a court lacks jurisdiction, it "cannot proceed."   *Steel Co. v. Citizens for a

Better Env't*, 523 U.S. 83, 94 (1998); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869)

("Jurisdiction is power to declare the law, and when it ceases to exist, the only function

remaining to the court is that of announcing the fact and dismissing the cause.").   Forging ahead

with petitioner's requested relief would be an assertion of jurisdiction and authority in this case

inconsistent with the statutory withdrawal of the Court's jurisdiction.   Respondents have noted

that the Court of Appeals is currently considering the effect and constitutionality of the MCA in

the pending appeals of other Guantanamo Bay detainees' habeas cases, *Boumediene v. Bush*, No.

05-5062 (D.C. Cir.), and *Al Odah v. United States*, No. 05-5064 (D.C. Cir.).   Briefing on that

issue was completed on November 20, 2006.   The Court may choose not to proceed even on the

jurisdictional issue in this case pending a decision in the pending appeals, which, at a minimum

will significantly impact consideration of the issue in this case.[13]  In the meantime, petitioner's

requests for relief should not be granted.[14]

      Accordingly, the Court should not proceed to exercise jurisdiction and enter the

protective order regime requested by petitioner's counsel, which imposes multiple requirements

---

[13] Petitioner wrongly argues that the pending appeals are of no moment because petitioner's case was filed after enactment of the DTA, whereas the cases on appeal were filed before enactment of the DTA.  *See* Petr's Opp'n at 40-41.  Although petitioner's case was filed after the enactment of the DTA, the petition, like those in *Boumediene* and *Al Odah*, was pending at the time of the MCA's enactment.  And, the MCA, in amending the DTA, explicitly provides that the jurisdiction-limiting provisions shall apply to "*to all cases, without exception, pending on or after the date of the enactment of this Act* which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001."  MCA § 7(b) (emphasis added).  Thus, the Court of Appeals' decision on the effect and constitutionality of those provisions, including whether the MCA applies to pending cases, would apply with equal force here.  Further, the remote possibility that the Court of Appeals might find the MCA inapplicable to pending cases, leaving petitioner here potentially challenge the constitutionality of the provisions of the DTA withdrawing *habeas* jurisdiction, does not justify ignoring the pendency of the issues before the Court of Appeals.  Even if the Court of Appeals did not address the constitutionality of the MCA, in such circumstances it will still reach issues potentially impacting the DTA-related jurisdictional and constitutionality issues, such as whether alien detainees at Guantanamo Bay even may avail themselves of constitutional rights.  That issue was part of the pending appeals even before enactment of DTA and MCA.  *See In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 461-64 (D.D.C. 2005) (Green, S.J.) (Guantanamo detainees have Fifth Amendment due process rights), *appeal pending*; *Khalid v. Bush*, 355 F. Supp. 2d 311, 320-21 (D.D.C. 2005) (Leon, J.) (Guantanamo detainees are not possessed of constitutional rights), *appeal pending.*

[14] The *Yong v. INS*, 208 F.3d 1116 (9th Cir. 2000), case cited by petitioner does warrant a different result here; *Yong* is readily distinguishable.  The Ninth Circuit held in that case that the district court's stay of a habeas petition pending resolution of all appeals in a related case, including potential review by the Supreme Court and any subsequent remand, was an abuse of discretion only after balancing the justifications for the stay, *i.e.*, conservation of the INS's resources and intra-district uniformity (which the court found would not be furthered by the stay, *id.* at 1121), against the duration of the stay.  *See id.* at 1119-21.  In addition, the issues involved in the case on appeal were not identical, so that judicial economy did not weigh heavily in favor of a stay.  *Id.*  Here, in contrast, the Court of Appeals' resolution of *Boumediene* and *Al Odah* would be controlling in this case, both as to this Court's jurisdiction and other issues.  In addition to judicial economy, there are in these cases also significant governmental and public interests involving the Executive's detention of enemy combatants during wartime, which support awaiting the Court of Appeals' decision and were not involved in *Yong*.

- 20 -

upon respondents respecting counsel access to detainees at Guantanamo Bay.[15]  Such relief

would require an assertion of jurisdiction and authority in this case inconsistent with DTA's and

MCA's clear and unequivocal denial of District Court jurisdiction over this case.

Respondents' opposition to petitioners' motion for entry of a protective order regime is

not intended to thwart altogether counsel access to petitioners.  However, a regime for counsel

access should be developed or ordered by a forum court that, consistent with MCA and DTA, has

jurisdiction with respect to claims brought on behalf of petitioners.  That forum is the Court of

Appeals.  As explained in respondents' motion, the only review mechanism available to

petitioner is the exclusive review provided in the Court of Appeals of a final CSRT decision

determining the detainee to be an enemy combatant.  There is no obstacle to petitioner filing a

petition for review in the Court of Appeals pursuant to the DTA and seeking entry of an

appropriate protective order governing counsel access and handling of classified and sensitive

information.  Several Guantanamo detainees have already filed such petitions in the Court of

Appeals and briefing concerning a protective order governing counsel access in those

proceedings is currently pending.  *See*, *e.g.*, *Bismullah v. Rumsfeld*, Case No. 06-1197 (D.C.

Cir.).  Accordingly, entry of the protective orders in this case, and the concomitant assertion of

---

[15] The protective order establishes a regime, *inter alia*, governing the handling of classified information in the litigation, requiring the government to seek Court permission to have certain information maintained under seal, and controlling issues related to counsel access to represented detainees.  The counsel access procedures appended as Exhibit A to the protective order also, *inter alia*, contemplate that the government permit qualifying counsel privileged face-to-face access to represented detainees, require the government to establish and operate a system of privileged "legal mail" between qualified counsel and represented detainees, command a government team to conduct classification review of certain materials on certain schedules, impose on the government a presumption that counsel may share classified information across cases in certain circumstances, and otherwise limit in significant ways the discretion the military would normally exercise with respect to mail and in-person access to wartime detainees.

jurisdiction by this Court, would be improper because such relief would infringe upon the jurisdictional scheme intended and provided by the amended habeas statute.[16]  *See Telecomm. Research and Action Ctr. v. FCC*, 750 F.2d 70, 75, 78-79 (D.C. Cir. 1984) (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals); *cf. id.* at 77 ("By lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power.").  Petitioner is not entitled to ignore the governing statutes and obtain relief, *i.e.*, entry of a protective order regime by the Court, as if the DTA and MCA do not exist.  Whatever arguments may be marshaled in favor of the existence of some form of jurisdiction ancillary to that in the Court of Appeals provided by the DTA and MCA, it is clear that such jurisdiction would not reside in the District Court, as opposed to some other court.  *See Telecomm. Research and Action Ctr*, 750 F.2d at 75, 78-79; *see also Kokkonen v. Guardian Life Ins. Co of America*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.").

For the same reasons, the Court should deny petitioner's request that the Court order respondents to produce and file a factual return in this Court.  Furthermore, the Court

---

[16] In the same vein, any protective order and counsel access regime should be properly tailored for purposes of the type of review proceeding provided for pursuant to statute; wholesale importation of a regime developed for *habeas* proceedings at a time when the District Court legitimately exercised *habeas* jurisdiction unconstrained by limits now set by statute, would not be appropriate. *Cf. Telecommunications Research and Action Center*, 750 F.2d at  at 75, 77, 78-79.  As mentioned above, litigation in the Court of Appeals concerning the scope of such a protective order is currently pending; thus, entry of the District Court protective orders in a case such as this one, which clearly belongs in the Court of Appeals, would infringe upon the Court of Appeals' exclusive jurisdiction.

additionally should not require the production and submission of a factual return in this case because such action involves the disclosure to counsel of classified information and the preparation of a return is not an inconsequential task. As to the first point, requiring respondents to provide to counsel factual returns containing classified information, even where counsel receive such disclosures subject to certain handling restrictions, is not without prejudice to respondents where the issue of whether the Court has any authority to require such disclosure is in question. And as to the logistical burdens involved in producing factual returns, each factual return must be obtained from the Department of Defense ("DoD"), and then reviewed by agencies who provided source information to DoD to ensure that information disclosed to counsel in the returns is in accordance with all applicable statutes, regulations, and Executive Orders. Respondents must then prepare both public and classified versions of the factual returns for submission to the Court and counsel. Because each return can range from dozens to hundreds of pages, depending upon the circumstances, this review and redaction process is a significant and time-consuming undertaking. For these reasons, as well as the outstanding jurisdictional issues, petitioner's request for an order requiring production of a factual return should be denied.[17]

---

[17] Although respondents maintain that factual returns should not be required at all, if the Court decides to assert jurisdiction notwithstanding the DTA and MCA and order the production of a factual return in this case, respondents request that in light of the logistical burdens involved, they be given at least 90 days to submit the factual return. The review of information in the return described above, that is, to ensure that any information disclosed to counsel is in accordance with all applicable statutes, regulations, and Executive Orders, must be conducted. Furthermore, significant numbers of counsel in other pending Guantanamo cases have moved or are moving for orders requiring the submission of factual returns by respondents. In light of such factors, if the Court determines to require the submission of a factual return in this case, the Court should grant respondents at least 90 days to produce the factual return.

Furthermore, to the extent petitioner asks the Court to require production of information related to petitioner's Administrative Review Board ("ARB") proceedings, the request should also be denied because such proceedings are not properly before this Court, nor are they a proper subject for this litigation.  ARB proceedings are separate and distinct from proceedings before the CSRTs that determine whether detainees are properly classified as enemy combatants.  ARB proceedings serve purposes unrelated to the issues raised by the habeas petitions before the Court.  The habeas petition, and thus any factual return that would be filed in connection with the petition, concerns whether a petitioner is properly subject to detention by the United States, that is, whether a detainee has been legitimately determined to be an enemy combatant and may therefore be detained for the duration of hostilities, if necessary.  By contrast, ARB proceedings are designed to provide annual assessments not of whether a detainee is properly detained as an enemy combatant, but of whether it is in the interests of the United States to transfer or continue to detain an individual who has already been determined to be an enemy combatant in CSRT proceedings.  A decision in an ARB proceeding is based on a weighing and balancing of factors such as the threat a detainee is believed to pose to the United States or its allies in the ongoing armed conflicts against al Qaeda and its supporters and the detainee's continuing intelligence value.  See Revised Implementation of Administrative Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba (July 14, 2006) (available at <<http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf>>).  As a result, the ARB issues and the habeas issues are not the same; indeed, the ARB determination involves a complex weighing of factors and exercise of discretion by the Military that is not

justiciable.[18]  *See, e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Mar. Admin.*, 215 F.3d 37, 42 (D.C. Cir. 2000) (finding that the Executive's "judgments on questions of foreign policy and national interest . . . are not subjects fit for judicial involvement").

For all of these reasons, petitioner's requests for merits-related proceedings and other relief should be denied.

## CONCLUSION

For these reasons, as well as those stated in respondents' motion to dismiss, the Court should dismiss the above-captioned petition for lack of subject-matter jurisdiction.  In the alternative, the Court should transfer the petition to the United States Court of Appeals for the District of Columbia Circuit for review of the validity of the petitioner's detention at Guantanamo Bay as provided by the Detainee Treatment Act of 2005, as amended.

Dated: December 21, 2006                    Respectfully submitted,

                                            PETER D. KEISLER
                                            Assistant Attorney General

                                            DOUGLAS N. LETTER
                                            Terrorism Litigation Counsel

---

[18]Accordingly, petitioner's request for information related to ARB proceedings is, in essence, an improper request for discovery.  "A habeas petitioner, [however,] unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Harris v. Nelson*, 394 U.S. 286, 297 (1969) (discovery in habeas proceedings is not automatic and cannot be "activated on [the petitioner's] own initiative."); *cf.* Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts (codifying *Harris v. Nelson* by allowing discovery only "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise" and requiring submission of the proposed discovery to the court for approval); *id.* Rule 1(b) (application of § 2254 Rules in non-§ 2254 cases is within court's discretion).  In any event, for the reasons discussed in the text, any such discovery would be inappropriate.

_/s/ Terry M. Henry_

JOSEPH H. HUNT (D.C. Bar No. 431134)
VINCENT M. GARVEY (D.C. Bar No. 127191)
TERRY M. HENRY
JAMES J. SCHWARTZ
ROBERT J. KATERBERG
NICHOLAS J. PATTERSON
ANDREW I. WARDEN
EDWARD H. WHITE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-4107

Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
————————————————————————————  )
MOHAMMED AHMED TAHER, et al.,   )
                                )
              Petitioners,      )
                                )
      v.                        )          Civil Action No. 06-CV-1684 (GK)
                                )
GEORGE W. BUSH,                 )
      President of the United States, )
      et al.,                   )
                                )
              Respondents.      )
————————————————————————————  )
```

**O R D E R**

Before the Court is Respondents' Motion to Dismiss or, in the Alternative, to Transfer

(dkt. nos. 4, 5) and Petitioners' Cross-Motion for *Habeas* Hearing and Related Relief (dkt. no. 8).

Upon consideration of the motions, the oppositions filed thereto, and any reply, as well as the

entire record in this case, it is hereby

ORDERED that respondents' motion to dismiss or transfer is GRANTED.  It is further

ORDERED that petitioners' cross-motion for *habeas* hearing and related relief is

DENIED.  It is further

ORDERED that the above-captioned case be DISMISSED [*or* TRANSFERRED to the

United States Court of Appeals for the District of Columbia Circuit pursuant to 28 U.S.C.

§ 1631].

IT IS SO ORDERED.


Dated: _____, 200__          _____
                                        UNITED STATES DISTRICT JUDGE