IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
——————————————————————— x
                                :
MOHAMMED AHMED TAHER,           :
                                :
            Petitioner,         :
                                :
      v.                        :    Civil Action No. 06-CV-1684 (GK)
                                :
GEORGE W. BUSH, et al.,         :
                                :
            Respondents.        :
                                :
——————————————————————— x
```

**PETITIONER'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF HIS CROSS-MOTION FOR HABEAS HEARING AND RELATED RELIEF**

Petitioner Mohammed Ahmed Taher ("Petitioner"), by and through his undersigned counsel, respectfully submits this reply memorandum of law in further support of his cross-motion for a habeas hearing and additional related relief.  Petitioner's cross-motion should be granted for the following reasons.

**Introduction**

On December 11, 2006, Petitioner filed an opposition to Respondents' motion to dismiss or transfer this case for lack of jurisdiction, and a cross-motion for an order scheduling a habeas hearing ("Cross-Motion") (dkt. no. 9).  Petitioner argued that the Court retained jurisdiction to consider the merits of his habeas petition because the purported withdrawal of habeas jurisdiction under the Detainee Treatment Act of 2005 ("DTA") and the Military Commissions Act of 2006 ("MCA") is unconstitutional.  *See* Cross-Motion at 9-37.  He also argued that this case should not be stayed pending resolution of the *Al Odah/Boumediene* appeals because it is distinct from the cases on appeal in two important respects.  First, the cases on

appeal will not necessarily resolve the serious constitutional issues raised here. Second, the Habeas Corpus Act requires a prompt hearing and good cause does not otherwise exist to stay this case. *See id.* at 40-44. In addition, Petitioner sought expedited entry of the protective order, access to his counsel, and production of a factual return to his habeas petition on the ground that such relief was appropriate regardless of whether the Court ultimately retained jurisdiction to consider the merits of his petition. *See id.* at 37-40.

On December 21, 2006, Respondents filed a reply in support of their motion to dismiss and an opposition to Petitioner's cross-motion ("Respondents' Opp'n") (dkt. no. 11). In response to Petitioner's request for a habeas hearing, Respondents once again argued that this Court lacks jurisdiction to proceed under the DTA and MCA. *See* Respondents' Opp'n at 19-20. They also argued that the Court should not consider the merits of the petition at this time because the *Al Odah/Boumediene* appeals will reach issues potentially impacting the jurisdictional and constitutional issues raised in this case. *See id.* at 19-20 & nn.13-14. But Respondents misconstrue Petitioner's common law right to habeas and the protection of that right by the Suspension Clause, which does not confer individual rights but rather acts as a restraint on the power of Congress. They have also failed to show good cause why an indefinite stay is otherwise necessary or appropriate in this case. Indeed, Respondents do not dispute that further delay would cause Petitioner severe prejudice.

Respondents also filed a boilerplate opposition to Petitioner's request for expedited entry of the protective order, access to his counsel, and production of a factual return, advancing the same arguments previously rejected in numerous other detainee cases in this District. *See id.* at 20-25. In the face of these cases – where, as Petitioner noted in his opening brief, courts entered the protective order and ordered the production of information concerning

the basis for detention notwithstanding the jurisdictional provisions of the DTA and MCA – Respondents continue to assert that this Court lacks the power to grant this relief.  The Court should reject Respondents' arguments and order this relief without further delay.

**Argument**

I.     **THE COURT HAS JURISDICTION TO PROCEED WITH A MERITS HEARING AND SHOULD DO SO BECAUSE NO GOOD CAUSE EXISTS FOR FURTHER DELAY**

Respondents argue that this Court cannot proceed with a merits hearing – or grant any relief other than dismissal or transfer of the petition – because the purported withdrawal of habeas jurisdiction under the DTA and MCA does not effect an unconstitutional suspension of the writ.  *See* Respondents' Opp'n at 19.  Respondents' arguments should be rejected for all of the reasons set forth in Petitioner's opposition to the motion to dismiss, which need only be addressed here briefly.  *See* Cross-Motion at 9-29.  Respondents have also failed to show good cause why an indefinite stay is otherwise necessary or appropriate in this case.  The Court should therefore schedule a habeas hearing.

A.     **Respondents' Claim that Petitioner Has No Constitutional Rights Under the Suspension Clause Is Wrong**

Respondents continue to claim that Petitioner has no constitutional rights under the Suspension Clause – relying once again on *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and other cases distinguished by Petitioner in his opening brief (*see* Cross-Motion at 11-12 & n.12) – but that argument misses the point.  Habeas corpus is a common law right that *predates* the Constitution.  It is a writ antecedent not only to the Constitution but "antecedent to statute." *Rasul v. Bush*, 542 U.S. 466, 473 (2004); *see also Ex parte Watkins*, 28 U.S. 193, 202 (1830) ("[H]abeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause.") (Marshall,

C.J.); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 93-94 (1807) ("[F]or the meaning of the term habeas corpus, resort may unquestionably be had to the common law.") (Marshall, C.J.).  As the Supreme Court stated in *Rasul*, "[a]t common law, courts exercised habeas jurisdiction over the claims of aliens detained within . . . all . . . dominions under the sovereign's control . . . even if a territory was 'no part of the realm.'"  542 U.S. at 481-82.  "[T]he reach of the writ depended not on formal notions of territorial sovereignty, but rather on the practical question of 'the exact extent and nature of the jurisdiction or dominion exercised in fact by the Crown.'"  *Id.* at 482.[1]

Respondents also misconstrue the common law cases cited by Petitioner. Although Respondents challenge Petitioner's account of the historical scope of habeas, *see* Respondents' Opp'n at 3-4, 7, they do not dispute the fundamental difference at common law between habeas challenges to detention pursuant to decisions by courts of competent jurisdiction (where limited review was considered adequate), and habeas challenges to executive and other non-judicial detentions (where searching review into the factual and legal bases for detention was required).  *See* Cross-Motion at 18-19, 23-24.

First, Respondents argue that at common law enemy aliens detained as prisoners of war could not challenge their detention through habeas corpus.  They are wrong.  While enemy aliens could be detained as prisoners of war, an individual detained as a prisoner of war had the ability challenge through habeas whether he or she was, in fact, an enemy alien.  In *Rex v. Schiever*, 97 Eng. Rep. 551 (K.B. 1759), and *Case of the Three Spanish Sailors*, 96 Eng. Rep. 775, 776 (C.P. 1779), the courts ultimately concluded on the facts presented that the petitioners

---

[1] Respondents do not dispute that, unlike the Due Process Clause of the Fifth Amendment, the Suspension Clause does not confer individual rights but rather acts as a restraint on the power of Congress.  Nor do they dispute that this Court has the power under Article III of the Constitution to invalidate a statute that exceeds Congress's powers in violation of the Suspension Clause.  *See* Cross-Motion at 10-11.  In any event, Petitioner is plainly entitled to the protections of U.S. law,

in those cases were enemy aliens; but the courts did so *after considering the merits of the petitions*, including evidence presented by the petitioners.[2]  Similarly, in *Lockington's Case*, Bright (N.P.) 269, 298-99 (Pa. 1813), the court concluded that habeas review is foreclosed where a petitioner "admits himself" to be an enemy alien, but noted that the writ would issue if the "applicant can make an affidavit in the first instance that he is not an enemy alien."[3]

Second, Respondents miscite *Goldswain's Case* for the proposition that, at common law, habeas petitioners were not entitled to "controvert the truth of the return."  *See* Respondents' Opp'n at 7.  The case held the opposite.[4]  In the opinion, Judge Gould explained that "[n]either the Court [n]or the party are concluded by the return of a habeas corpus, but may plead to it any special matter necessary to regain his liberty."  96 Eng. Rep. 711, 712 (C.P. 1778).  The full court further stated that it "could not willfully shut [its] eyes against such facts as appeared on the affidavits, but which were not noticed on the return," and ordered Goldswain's release.  *Id.*  Respondents' assertion that this case stands against allowing a

---

including the Due Process Clause, because *Rasul* firmly established that Guantánamo is "within 'the territorial jurisdiction' of the United States."  542 U.S. at 480, 483 n.15.

[2] Respondents' reliance on *Moxon v. The Fanny*, 17 F. Cas. 942 (D. Pa. 1793), for the proposition that courts will not grant habeas corpus in the case of prisoners of war is also misplaced.  *See* Respondents' Opp'n at 4.  That case was a non-habeas case involving a request for restoration of a ship captured in U.S. territory.  The request was denied under admiralty law. The quotation cited by Respondents was also dicta and cannot stand in the face of *Ex parte Quirin*, which held that habeas is available to prisoners of war.  *See* 317 U.S. 1, 25 (1942).

[3] Even in *Eisentrager*, where the petitioners were admitted "enemy aliens," the Supreme Court considered their application for a writ of habeas corpus on the merits but concluded that there was no basis for issuing the writ.  *See* 399 U.S. at 780 ("the doors of our courts have not been summarily closed upon these prisoners"); *see also In re Yamashita*, 327 U.S. 1, 16-17 (1946) (denying application for habeas after ensuring military commission complied with laws of war).

[4] The sentence quoted by Respondents is a subsequent and unrelated comment made by the case reporter; it is not part of the court's decision.  *See* 96 Eng. Rep. 711, 713 note (e) (C.P. 1778).

- 5 -

petitioner to present evidence to controvert the evidence presented by Respondents in its return – which, again, Respondents have refused to provide in this case – is simply incorrect.[5]

Finally, Respondents are incorrect in their assertion that Section 5(a) of the MCA comports with the Suspension Clause because it does not effect a change in law but merely "clarifies settled law that treaties, such as the Geneva Conventions, are presumed not to create individually enforceable rights." Respondents' Opp'n at 8-10. This erroneous characterization of the statute both assumes the conclusion it purports to support and is contradicted by recent Supreme Court precedent. While the Court of Appeals held in *Hamdan* that the Geneva Conventions were not judicially enforceable, the Supreme Court stated that it found that conclusion unpersuasive on the issue. *See Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2793 (2006). In contrast, Supreme Court precedent is clear that it is the duty of the courts, not Congress, to decide whether the Geneva Conventions provide judicially enforceable rights. *See Sanchez-Llamas v. Oregon*, 126 S. Ct. 2669, 2684 (2006).[6]

As explained in Petitioner's opening brief, to the extent that Section 5(a) does effect a change in the law it would raise serious Suspension Clause and Article III problems. *See*

---

[5] As explained in Petitioner's opening brief, *see* Cross-Motion at 19, even if the executive has undertaken some prior process of its own to justify the detention, a habeas court would not be bound by that process or restricted simply to reviewing whether the executive had abided by its own rules in conducting that process. *See, e.g., Bushell's Case*, 124 Eng. Rep. 1006, 1007 (C.P. 1670) ("[O]ur judgment ought to be grounded upon our own inferences and understandings, and not upon [those of an inferior tribunal]."); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 125 (1807) (Supreme Court examined written depositions to determine if there was sufficient evidence of petitioner levying war against United States to justify detention for treason); *see also Moore v. Dempsey*, 261 U.S. 86, 92 (1923) (habeas corpus does not "allow a Judge of the United States to escape the duty of examining the facts for himself").

[6] The Geneva Conventions and customary international humanitarian law also plainly create individual rights enforceable in the federal courts. *See Hamdan*, 126 S. Ct. at 2794 ("Whatever else might be said about the *Eisentrager* footnote [that the Court lacked power even to consider the merits of the Geneva Convention argument], it does not control this case."); *id.* nn.57-58; *see also* Brief of *Amicus Curiae* International Human Rights Organizations Center for Constitutional Rights, Human Rights Watch, and International Federation for Human Rights in Support of Petitioner, *Hamdan v. Rumsfeld*, No. 05-184 (Jan. 6, 2006) (attached hereto as Ex. A).

Cross-Motion at 29-35. Respondents do not address these issues, however, and thus waive opposition to them.[7] The MCA can avoid these problems only if construed to permit the assertion of rights protected by other sources of law. *See id.* at 34.[8]

Accordingly, for all of these reasons and for the reasons set forth in Petitioner's opening brief, because the purported withdrawal of habeas jurisdiction under the DTA and MCA is unconstitutional, this Court has jurisdiction to consider the merits of his habeas petition.[9]

**B.    Respondents Have Failed to Show Good Cause for an Indefinite Stay**

Respondents do not dispute that, absent good cause for delay, the Habeas Corpus Act requires a prompt hearing on the merits of a petition. Nor do they dispute that an indefinite stay in this case would cause Petitioner severe prejudice, perhaps including impairment of his

---

[7] Respondents have specifically waived any opposition to Petitioner's argument that Section 5(a) of the MCA (among other provisions of the act) offends the separation of powers principles articulated in *United States v. Klein*, 80 U.S. 128 (1872), by unconstitutionally interfering with the core judicial functions of Article III courts. *See* Cross-Motion at 29-33.

[8] Respondents' reliance on *Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972), is also misplaced. *See* Respondents' Opp'n at 9-10. That case stands only for the proposition that many treaties do not create judicially enforceable individual rights, and that such treaties are enforced through diplomatic and non-judicial processes. It does not support the claim that Congress may constitutionally deny persons the right to invoke otherwise valid treaty-based claims on habeas.

[9] Respondents' suggestion that this case must be dismissed for lack of jurisdiction based on Judge Robertson's recent decision in *Hamdan v. Rumsfeld*, No. 04-CV-1519 (JR) (D.D.C. Dec. 13, 2006) (dkt. no. 86), is also incorrect. *See* Respondents' Opp'n at 4, 7 & n.4. As an initial matter, that decision is not binding on this Court. Judge Robertson's constitutional analysis is also flawed and distinguishable in several respects. First, Judge Robertson improperly dismissed (at pp. 16-18, 21) the Supreme Court's conclusion in *Rasul* that the common law writ of habeas corpus – which the Suspension Clause unquestionably protects – would have been available to detainees. Second, while Judge Robertson suggested (at p. 19) that *Eisentrager* controls habeas cases involving Guantánamo detainees, Petitioner here is a citizen of Yemen who resided in Pakistan (both allies without on-going hostilities against the United States) and has not been charged with or convicted of any war crimes. He is neither an admitted nor convicted "enemy alien," which circumstance the *Rasul* Court recognized in distinguishing *Eisentrager*. *See* 542 U.S. at 476. Third, Judge Robertson concluded (at p.21) that Guantánamo is not subject to the "'implied protection' that accompanies presence on American soil," a view that Justice Kennedy expressly rejected in *Rasul*. *See* 542 U.S. at 487 (concurring in judgment) ("Guantanamo Bay is in every practical respect a United States territory" that is subject to the implied protection of the United States). Finally, unlike petitioner Hamdan, Petitioner here has not been designated for military commission proceedings. Judge Robertson's decision thus should not be followed.

ability ever to proceed with a hearing on the merits of his petition. *See* Cross-Motion at 40-44 & n.30. Accordingly, because Respondents have failed to present any basis for an indefinite stay, Petitioner's request for a hearing should be granted.

Respondents state that "[t]he Court may choose not to proceed even on the jurisdictional issue in this case pending a decision in the pending appeals, which, at a minimum, will significantly impact consideration of the issues in this case." Respondents' Opp'n at 19-20. Respondents specifically argue that "[e]ven if the Court of Appeals did not address the constitutionality of the MCA [in *Al Odah/Boumediene*], in such circumstances it will still reach issues potentially impacting the DTA-related jurisdictional and constitutionality issues, such as whether alien detainees at Guantanamo Bay even may avail themselves of constitutional rights." *Id.* at 20 n.13. Even if Respondents were correct, that would not justify an indefinite stay here. The entry of a lengthy and indefinite stay in a habeas case pending appeal (including possible review by the Supreme Court) in a similar case is unlawful. *See Yong v. INS*, 208 F.3d 1116, 1120-21 (9th Cir. 2000).[10] The need for a stay is particularly great where, as here, a petitioner has been afforded no judicial review. *See Rasul*, 542 U.S. at 473-75; *see also*, *e.g.*, *Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir. 1978) ("The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if the trial courts do not act within a reasonable time.").

---

[10] Respondents' attempt to distinguish *Yong* is unpersuasive. *See* Respondents' Opp'n at 20 n.14. They argue that case is distinguishable because the issues it involved were "not identical" to the issues on appeal. That is equally true here, where Petitioner advances separation of powers claims under *United States v. Klein* and claims under the Equal Protection Clause (among other claims) that are not directly addressed in the *Al Odah/Boumediene* appeals. *See* Cross-Motion at 29-33, 36-37. Respondents also argue that, unlike *Yong*, there are "significant governmental and public interests involving the Executive's detention of enemy combatants during wartime" that merit a stay. But they do not say what those interests are or why they require a stay. Indeed, Respondents overlook the Supreme Court's admonition in *Hamdi v. Rumsfeld* that "a state of war is not a blank check for the President." 542 U.S. 507, 536 (2004).

Respondents have detained Petitioner virtually *incommunicado*, without charge, and without any meaningful opportunity to challenge the legality of his continuing detention for several years. There is simply no basis to continue to stay consideration of his habeas petition until the completion of related appeals, which have resided in the Court of Appeals for more than a year and a half without decision and likely will not proceed to the Supreme Court until next year. The Court should therefore schedule a hearing to consider the merits of the Petition.

## II.    THE COURT SHOULD GRANT PETITIONER'S REQUEST FOR ENTRY OF THE PROTECTIVE ORDER AND PRODUCTION OF A FACTUAL RETURN

As set forth in Petitioner's opening brief, this Court has the power to enter the protective order and order production of a factual return to the Petition regardless of whether it ultimately has jurisdiction under the DTA and MCA to consider the merits of the Petition. *See* Cross-Motion at 37-40. Respondents nonetheless contend that by granting that limited form of relief, the Court would be asserting "jurisdiction and authority in this case inconsistent with [the] DTA's and MCA's clear and unequivocal denial of District Court jurisdiction over this case." Respondents' Opp'n at 21; *id.* at 19. They are wrong.

Respondents ignore the many cases identified by Petitioner where judges in this District (acting *sua sponte* in some instances[11]) have entered the protective order and ordered Respondents to produce factual information notwithstanding the DTA and the MCA. *See* Cross-Motion at 38-39 & Ex. G. Indeed, since Petitioner filed his instant motion, at least one judge in this District has continued to order such relief. *See, e.g., Abdessalam v. Bush*, No. 06-CV-1761 (ESH) (D.D.C. Dec. 22, 2006) (Huvelle, J.) (entering protective order in case filed after

---

[11] *See, e.g., Lal v. Bush*, No. 06-CV-1763 (CKK) (D.D.C. Oct. 29, 2006) (*sua sponte* ordering factual returns post-MCA).

enactment of the DTA and MCA) (attached hereto as Ex. B).  Respondents have also failed to cite a single detainee case where the relief requested by Petitioner's motion has been denied.

Respondents' suggestion that this relief should be denied because Petitioner's requests are "merits-related" and would "infringe" on the jurisdiction of the Court of Appeals under the DTA and MCA should also be rejected.  *See* Respondents' Opp'n at 22 & n.16, 25. Respondents again fail to address the numerous detainee cases in this District where the relief requested here has been granted notwithstanding the DTA and MCA, or related stay orders.  *See*, *e.g.*, Cross-Motion Ex. G (listing cases where protective order entered after enactment of DTA and MCA).  Nor do Respondents explain how they can reasonably contend that Petitioner's motion is "merits-related" when it asks only for counsel access (which Respondents concede they do not intend to "thwart altogether," *see* Respondents' Opp'n at 21) and basic factual information to which Petitioner is entitled by statute even if his petition is ultimately deemed meritless.  *See* 28 U.S.C. § 2243; *see also*, *e.g.*, *Al-Ghizzawi v. Bush*, No. 05-CV-2378 (JDB) (D.D.C. Aug. 9, 2006) (dkt. no. 23, at 3) (finding that petitioner's motion for factual returns "does not approach the merits [of his habeas petition]").  Moreover, regardless of the result in the *Al Odah/Boumediene* appeals, Respondents will have to produce information detailing the basis for the determination that he is an "enemy combatant" who has been properly detained in Guantánamo.  *See Feghoul v. Bush*, No. 06-CV-618 (RWR) (D.D.C. Oct. 31, 2006) (Roberts, J.) ("Despite the lack of finality regarding the issues on appeal . . . it is hardly sensible to withhold or frustrate something that no one doubts is petitioner's right – a meaningful communication with counsel regarding the factual basis of petitioner's detention.") (Cross-Motion Ex. I).[12]

---

[12] Petitioner also seeks production of documents relating to his Administrative Review Board ("ARB") proceedings.  *See* Cross-Motion at 39.  Respondents assert, in characteristic fashion, that the ARB proceedings are "not properly before this Court," without any citation to relevant authority.  *See* Respondents' Opp'n at 24.  Petitioner is entitled to documents from the ARB

As they have tried, unsuccessfully, in numerous other cases, Respondents also seek here to avoid providing counsel with basic information regarding Petitioner's indefinite detention on the ground that "the preparation of returns is not an inconsequential task" and would impose on them "logistical burdens."  Respondents' Opp'n at 23.  This is a frivolous assertion, both because Respondents have been able to promptly assemble the requested information in other habeas cases and FOIA proceedings, *see* Cross-Motion at 24, 39-40, and in light of the extreme prejudice that Petitioner faces as a result of Respondents' intentionally dilatory approach to the Guantánamo detainee litigation.  Equally absurd is Respondents' claim that they need ninety days to produce Petitioner's factual return.  *See* Respondents' Opp'n at 23 n.17.  Judges in this District have repeatedly ordered Respondents to provide returns in a week or less, and Respondents offer no credible reason why a similar result should not obtain here.  *See*, *e.g.*, *Hatim v. Bush*, No. 05-CV-1429 (RMU) (D.D.C. Aug. 22, 2005) (ordering production of returns within seven days); *Errachidi v. Bush,* No. 05-CV-640 (EGS) (D.D.C. Apr. 21, 2005) (five days); *Abdullah v. Bush*, No. 05-CV-23 (RWR) (D.D.C. Apr. 8, 2005) (eight days); *Said v. Bush*, No. 05-CV-2384 (RWR) (D.D.C. May 26, 2006) (ordering submission of four classified returns within one week).

---

proceedings because, as Respondents concede, the ARB proceedings determine whether Respondents will "continue to detain an individual who has already been determined to be an enemy combatant in CSRT proceedings." *Id*.  Moreover, in at least one case an ARB panel has apparently charged a detainee with acts purportedly justifying his detention that were not alleged at his CSRT review.  *See* Motion for Order Requiring Respondents to Provide Counsel for Petitioner with Factual Returns at 2, *Mohammon v. Bush*, No. 05-CV-2386 (RBW) (D.D.C. Nov. 7, 2006) (dkt. no. 204) ("Mr. El Falesteny wrote his counsel a letter in which he indicated that an ARB had been held that had charges with significant differences from those leveled during his CSRT.").  Petitioner thus will not be assured that he has a complete and accurate record of why he is being detained unless Respondents are ordered to produce documents relating to both his CSRT and ARB proceedings.  Nor have Respondents claimed that any prejudice would arise from disclosing these records.  Indeed, Respondents continue to grant members of the press access to such proceedings while denying detainees' lawyers even the most basic information about their clients' detention.  *See, e.g.*, Tim Golden, *For Guantánamo Review Boards, Limits Abound*, N.Y. Times (Dec. 31, 2006), at A1.

Finally, Respondents argue they should not be required to produce a return to counsel because the return may contain classified information. *See* Respondents' Opp'n at 23. Counsel endured a rigorous security clearance process for the very purpose of obtaining the kind of information sought by this motion. *See Al Odah v. United States*, 346 F. Supp. 2d 1, 14 (D.D.C. 2004) (Kollar-Kotelly, J.) ("[T]he Government's decision to grant an individual attorney a security clearance amounts to a determination that the attorney can be trusted with information at that level of clearance."). This is an utterly meritless ground for resistance.

Accordingly, for all of these reasons and for the reasons set forth in Petitioner's opening brief, the Court should enter the protective order and order production of a factual return to the petition within ten days of a ruling granting that request.[13]

<u>**Conclusion**</u>

Petitioner respectfully requests that his cross-motion be granted in its entirety.

Dated:    New York, New York
          January 4, 2007

                              Respectfully submitted,

                              Counsel for Petitioner:

                              /s/ J. Wells Dixon
                              William Goodman (Pursuant to LCvR 83.2(g))
                              Gitanjali S. Gutierrez (Pursuant to LCvR 83.2(g))
                              J. Wells Dixon (Pursuant to LCvR 83.2(g))
                              CENTER FOR CONSTITUTIONAL RIGHTS
                              666 Broadway, 7th Floor
                              New York, New York 10012
                              Tel:  (212) 614-6464
                              Fax:  (212) 614-6499

---

[13] Petitioner also requests that the Court enter the protective order and direct Respondents to produce a factual return promptly so that he may meet with his counsel, who intend to visit him as soon as possible in order to prepare a meaningful ARB submission on his behalf by the deadline of February 23, 2007.

# EXHIBIT A

No. 05-184

In The

# Supreme Court of the United States

SALIM AHMED HAMDAN,

*Petitioner,*

v.

DONALD H. RUMSFELD, SECRETARY OF DEFENSE, ET AL.,

*Respondents.*

On Writ of Certiorari to the United States Court of Appeals
for the District of Columbia Circuit

## BRIEF OF *AMICI CURIAE* INTERNATIONAL HUMAN RIGHTS ORGANIZATIONS CENTER FOR CONSTITUTIONAL RIGHTS, HUMAN RIGHTS WATCH, AND INTERNATIONAL FEDERATION FOR HUMAN RIGHTS IN SUPPORT OF PETITIONER

KATHERINE NEWELL
BIERMAN
HUMAN RIGHTS WATCH
350 Fifth Avenue
New York, NY 10118
(212) 290-4700

BARBARA J. OLSHANSKY
*Counsel of Record*
WILLIAM H. GOODMAN
GITANJALI S. GUTIERREZ
TINA M. FOSTER
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway
New York, NY 10012
(212) 614-6439

January 6, 2006

*Counsel for Amici Curiae*

-i -

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................i

TABLE OF AUTHORITIES.............................................iii

INTEREST OF THE *AMICI CURIAE*...............................1

SUMMARY OF THE ARGUMENT..................................2

ARGUMENT ................................................................3

I.   THE COURT OF APPEALS ERRED IN
     FAILING TO DEMAND THAT THE
     GOVERNMENT COMPLY WITH THE
     REQUIREMENTS OF THE GENEVA
     CONVENTIONS...........................................................3

     A. The Federal Courts Are Obligated to
        Interpret and Apply Treaties.....................................3

     B. The Third and Fourth Geneva
        Conventions Are Enforceable in the
        Federal Courts .........................................................4

        1. *The Geneva Conventions create
           primary individual rights* ..................................4

        2. *The Geneva Conventions' individual
           rights are enforceable under the
           Supremacy Clause and by means of
           the Writ of* Habeas Corpus................................10

     C. All Branches of the United States
        Military Have Consistently Recognized
        the Geneva Conventions as the Supreme
        Law of the Land ....................................................12

II.  CUSTOMARY INTERNATIONAL LAW
     AFFORDS DETAINEES JUDICIALLY
     ENFORCEABLE PROTECTIONS ............................13

-ii -

A. Petitioner's Geneva Convention Claims
   Are Enforceable as Customary
   International Humanitarian Law ............................ 13

B. Petitioner's Customary International
   Law Claims May Be Vindicated by
   Means of the Writ of *Habeas Corpus* ................... 21

CONCLUSION ................................................................. 26

-iii -

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Brown v. Allen*, 344 U.S. 443 (1953) ....................................22

*Burns v. Wilson*, 346 U.S. 137 (1953)..................................23

*Chew Heong v. U.S.*, 112 U.S. 536 (1884)...........................23

*Colepaugh v. Looney*, 235 F.2d 249 (10th Cir.
   1956)................................................................................23

*Delgadillo v. Carmichael*, 332 U.S. 388
   (1947) .............................................................................23

*Diggs v. Richardson*, 555 F.2d 848
   (D.C. Cir. 1976)...............................................................5

*Doe v. Islamic Salvation Front*, 993 F. Supp.
   3 (D.D.C. 1998)..............................................................19

*Edye v. Robertson*, 112 U.S. 580 (1894) ..........................4, 10

*Ex parte Bollman*, 8 U.S. (4 Cranch) 75
   (1807) .............................................................................22

*Ex Parte Lange*, 18 Wall. 163 (1874) ..................................22

*Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866) ....................22

*Ex Parte Quirin*, 317 U.S. 1 (1942) .....................................23

*Gegiow v. Uhl*, 239 U.S. 3 (1915).........................................23

-iv -

*Geofroy v. Riggs*, 133 U.S. 258 (1890) ...................................4

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004)............................21

*In Re Yamashita*, 327 U.S. 1 (1948)......................................23

*INS v. St. Cyr*, 533 U.S. 289 (2001) .....................................22

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
   478 U.S. 221 (1986) ............................................................3

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ......................12

*Jones v. Meehan*, 175 U.S. 1 (1899) .......................................3

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137
   (1803) ...................................................................................3

*Moore v. Dempsey*, 261 U.S. 86 (1923) ................................22

*Owings v. Norwood's Lessee*, 9 U.S. (5
   Cranch) 344 (1809) ..............................................................3

*Parisi v. Davidson*, 405 U.S. 34 (1972) .........................22, 23

*Perkins v. Elg*, 307 U.S. 325 (1939).......................................3

*Rasul v. Bush*, 542 U.S. 466 (2004). ....................................22

*Reid v. Covert*, 354 U.S. 1 (1957) .........................................23

*Sosa v. Alvarez-Machain*, 542 U.S. 692
   (2004) ............................................................................21, 24

*United States v. Jung Ah Lung*, 124 U.S. 621
   (1888) .................................................................................23

-v -

*United States v. Noriega*, 808 F. Supp. 791
(S.D. Fla. 1992) ..................................................................5

*United States v. Paquete Habana*, 175 U.S.
677 (1903) ...........................................................14, 19, 21

*United States v. Rauscher*, 119 U.S. 407
(1886) .............................................................................11

*United States v. Smith*, 18 U.S. (5 Wheat) 153
(1820) .............................................................................19

*Zadvydas v. Davis*, 533 U.S. 678 (2001)...............................22

## CONSTITUTIONS & STATUTES

28 U.S.C. § 2241 .......................................................11, 21, 23

U.S. Const., art. III, §2, cl.1 ......................................................3

## INTERNATIONAL AUTHORITIES

1907 Hague Convention (IV) Respecting the
Laws and Customs of War on Land and its
Annex, Regulation Concerning the Laws
and Customs of War on Land, Pmbl., 36
Stat. 2277, 205 Consol. T.S. 277......................................16

*Continental Shelf* (*Libyan Arab Jamhiriya v.
Malta*), 1985 I.C.J. 13 (June 3) ..................................14, 15

Convention [No. III] for the Adaptation of
Maritime Warfare of the Principles of the
Geneva Convention of 22 August 1864,
July 29, 1899, 32 Stat. 1827, 1 Bevans 263,
*reprinted in* Dietrich Schindler &

-vi -

JiriToman, The Laws of Armed Conflict
385 (1988) ........................................................................16

Convention for the Amelioration of the
Condition of the Wounded in Armies in the
Field, Aug. 22, 1864, 22 Stat. 940,
*reprinted in* Dietrich Schindler & Jiri
Toman, *The Laws of Armed Conflict* 365
(1988) ..............................................................................16

Convention Relative to the Treatment of
Prisoners of War, July 27, 1929, 47 Stat.
2021, 118 U.N.T.S. 343 ..................................................16

*Darnel's Case*, 3 How. St. Tr. 1-59 (K.B.
1627)................................................................................22

Fourth Geneva Convention Relative to the
Protection of Civilian Persons in Time of
War, Aug. 12, 1949, 6 U.S.T. 3516, 75
U.N.T.S. 287 (entered into force for the
U.S., Feb. 2, 1956) .................................................*passim*

*International Military for the Trial German
Major War Criminals*, 1946, CMD, 6964,
Misc. No. 12 (Nuremberg, 1946) .....................................16

*International Military Tribunal for the Far
East* (*In re Hirota*, 15 Ann. Dig. 356 ...............................17

Jean de Pruex, *International Committee of the
Red Cross: Commentary to the Convention
(III) Relative to the Treatment of Prisoners
of War* (1960) ...............................................................8, 9

-vii -

Jean Pictet, *et al.*, *International Committee of the Red Cross: Commentary to the Convention (I) Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field* (1952) ................................ 9

*LaGrand* (Germany v. United States), 2001 I.C.J. (June 27) *available at* www.icj-cij.org, *opened for signature* Apr. 24, 1961, 21 U.S.T. 77, 596 U.N.T.S. 261 ............................... 4

*Military and Paramilitary Activities in and against Nicaragua* (Nicar. v. United States), Merits, 1986 I.C.J. Rep. 14 (Judgment of June 27) ......................................... 16, 18, 19

Oscar Uhler, *et al.*, *International Committee of the Red Cross: Commentary to the Convention (IV) Relative to the Protections of Civilian Persons in Time of War* (1958) ............. passim

Padilla ex rel. Newman v. Bush, 233 F. Supp. 2d 564, 590 (S.D.N.Y. 2002) .......................................... 11

Protocol [No. I] Additional to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3-434 .............................................. 14, 17, 19, 25

Protocol [No. II] Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609-699 ......................................... 14

-viii -

*Report of the Secretary-General Pursuant to Paragraph 2 of the Security Council Resolution 808, delivered to the Security Council,* U.N. Doc. S/25704 (May 3, 1993) (adopted by the Security Council, S.C. Res. 827 (May 25, 1993))........................................................16

Third Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 76 U.N.T.S. 135 (entered into force for the U.S., Feb. 2, 1956)........................................................................passim

*United States v. von Leeb*, 11 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, (1948) .......................................................16

## OTHER AUTHORITIES

A. Hammarskjold, *Revision of Article 30 of the Geneva Convention, in* International Committee of the Red Cross, *Report on Interpretation, Revision and Extension of the Geneva Convention of July 27, 1929* (1938) ................................................................8

Army Regulation 190-8........................................................12

David Sloss, *Non-Self-Executing Treaties: Exposing a Constitutional Falacy*, 36 U.C. Davis L. Rev. 1 (2002) ....................................................11

Dep't of the Army Field Manual No. 27-10, *The Law of Land Warfare* (1956)..............................12, 17

-ix -

Derek Jinks & David Sloss, *Is the President Bound by the Geneva Conventions?*, 90 Cornell L. Rev. 97 (2004) ...............................................11

*Geneva Conventions for the Protections of War Victims: Report of the Senate Comm. on Foreign Relations*, S. Rep. No. 9, 84th Cong. 1st Sess. (1955)......................................................10

Gerald L. Neuman, *The Habeas Suspension Clause After* INS v. St. Cyr, 33 Colum. Human Rights L. Rev. 555 (2002) ...................................22

Int'l & Operational Law Dep't, U.S. Army Judge Advocate General's Legal Center & School, Dep't of the Army, *53d Judge Advocate Graduate Course Int'l Law Deskbook* I-15 (2004)......................................................19

Int'l & Operational Law Dep't, U.S. Army Judge Advocate General's Legal Center & School, Dep't of the Army, *Law of War Handbook* 144 (2004)......................................................18

International Committee of the Red Cross, *International Humanitarian Law, available at* http://www.icrc.org/Web/Eng/siteeng).nsf/h tml/ihl ...............................................................14

Jean-Marie Henckaerts & Louise Doswald-Beck, *Customary International Humanitarian Law*, 2 vols. (2005) ..............................24, 25

Jean-Marie Henckaerts, *Study on Customary International Humanitarian Law: A*

-x -

*Contribution to the Understanding and
Respect for the Rule of Law in Armed
Conflict,* 87 Int'l Rev. of the Red Cross 1
(2005) .................................................................... 14, 15

Knut Doermann, *The Legal Status of
"Unlawful/Unprivileged Combatants,"* 849
Int'l Rev. of the Red Cross 45 (2003) ............................. 17

Law of War Workshop Deskbook (Brian J.
Bill, ed., June 2000) .......................................... 12

Lt. Col. Paul E. Kantwill and Maj. Sean
Watts, *Hostile Protected Persons or 'Extra-
Conventional Persons:' How Unlawful
Combatants in the War on Terrorism Posed
Extraordinary Challenges for Military
Attorneys and Commanders,* 28 Fordham L.
Rev. 681 (2005)............................................... 18

Michael J. Matheson, *Remarks on The United
States Position on the Relation of
Customary International Law to the 1977
Protocols Additional to the 1949 Geneva
Conventions, The Sixth Annual American
Red-Cross Washington College of Law
Conference on International Humanitarian
Law: A Workshop on Customary
International Law and the 1977 Protocols
Additional to the 1949 Geneva
Conventions,* 2 Am. U.J. Int'l L. & Pol'y.
419 (1987) .................................................... 19

*Restatement (Third) of the Foreign Relations
Law of the United States* (1987)............................ 5, 14, 24

-xi -

Theodor Meron, *The Geneva Conventions as Customary Law*, 81 Am. J. Int'l L. 348 (1987). .............................................................16

## INTEREST OF THE *AMICI CURIAE*

This brief is submitted on behalf of the Center for Constitutional Rights (CCR), a national non-profit legal, educational, and advocacy organization dedicated to advancing and protecting the rights guaranteed by the United States Constitution and international law. Founded in 1966, CCR has a long history of litigating cases on behalf of those with the fewest protections and least access to legal resources. CCR represents numerous individuals affected by the United States' "global war on terror." *See, e.g., Rasul v. Bush*, 542 U.S. 466 (2004); *Doe v. Bush*, No. 05-CV-0313 (CKK); *Turkmen v. Ashcroft*, No. 02-CV-2307 (JG); *Arar v. Ashcroft*, No. 04-CV-0249 (DT); and *Saleh v. Titan*, No. 04-CV-1143 (NLS). CCR has also submitted *amicus* briefs in cases involving suspected "enemy combatants" held in military custody. *See Hamdi v. Rumsfeld*, 542 U.S. 507 (2004); *Rumsfeld v. Padilla*, 542 U.S. 426 (2004) (No. 03-1027).

Human Rights Watch (HRW) is a non-profit organization established in 1978 that investigates and reports on violations of fundamental human rights in over 70 countries worldwide with the goal of securing the respect of these rights for all persons. It is the largest international human rights organization based in the United States. By exposing and calling attention to human rights abuses committed by state and non-state actors, HRW seeks to bring international public opinion to bear upon offending governments and others and thus bring pressure on them to end abusive practices. HRW has filed *amicus* briefs before various bodies, including U.S. courts and international tribunals.

Established in 1922, the International Federation for Human Rights (FIDH) is a federation of 141 non-profit human rights organizations in nearly 100 countries. It coordinates and supports affiliates' activities at the local,

- 2 -

regional and international level. FIDH strives to obtain effective improvements in the prevention of human rights violations, the protection of victims, and the sanction of their perpetrators. With activities ranging from judicial enquiry, trial observation, research, advocacy, and litigation, FIDH seeks to ensure that all international human rights and humanitarian law instruments are respected by State parties and that the enforcement of the protections of the Geneva Conventions is effective. Since 2002, FIDH has initiated and supported key proceedings before domestic courts and regional and international monitoring bodies in cases concerning arbitrary detention, torture, and other abusive practices undertaken under the rubric of the fight against terrorism.[1]

## SUMMARY OF THE ARGUMENT

The detention and military commission systems created by the Executive to hold and try persons seized in the "war on terror" and implemented at the United States Naval Station in Guantánamo Bay, Cuba ("Guantánamo") violate the well-established norms of international humanitarian law embodied in binding treaties and customary international law. The 1949 Geneva Conventions afford persons held in military custody individual primary rights that are enforceable under the Supremacy Clause and by means of a writ of *habeas corpus*. These well-established protections are also independently enforceable in federal court as binding rules of customary international humanitarian law. The United States has misguidedly departed from these fundamental guarantees.

---

[1] In accordance with Supreme Court Rule 37.6, *amici curiae* state that counsel for *amici* authored this brief in its entirety. No person or entity other than *amici curiae* and its counsel made any monetary contribution to the preparation of this brief. Letters of consent to the filing of this brief from the parties have been filed with the Clerk of the Court.

- 3 -

## ARGUMENT

I.    **THE COURT OF APPEALS ERRED IN FAILING TO DEMAND THAT THE GOVERNMENT COMPLY WITH THE REQUIREMENTS OF THE GENEVA CONVENTIONS**

### A.    The Federal Courts Are Obligated to Interpret and Apply Treaties

The principle was established at the beginning of the Republic that it is the responsibility of the judicial branch to interpret and explain the law and determine the rights of individuals under its operation. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). Article III of the Constitution makes clear that it is the duty of the courts to interpret the international laws and treaties to which the United States is a party. U.S. Const., art. III, §2, cl.1 (providing that "the judicial power" extends to "all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."). This Court has consistently affirmed the power of Article III courts to interpret treaties. *See, e.g., Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (stating that "the courts have the authority to construe treaties and executive agreements"); *Perkins v. Elg*, 307 U.S. 325 (1939) (overruling a State Department interpretation of a citizenship treaty); *Jones v. Meehan*, 175 U.S. 1, 3 (1899) (holding that "[t]he construction of treaties is the peculiar province of the judiciary"); *Owings v. Norwood's Lessee*, 9 U.S. (5 Cranch) 344, 348 (1809) (holding that "[t]he reason for inserting that clause [art. VI., cl. 2] in the constitution was, that all persons who have real

- 4 -

claims under a treaty should have their causes decided by the national tribunals").[2]

**B.    The Third and Fourth Geneva Conventions Are Enforceable in the Federal Courts**

**1.    *The Geneva Conventions create primary individual rights***

In *Edye v. Robertson*, 112 U.S. 580, 598 (1894), this Court distinguished between treaty provisions that are "primarily a compact between independent nations" and treaty "provisions which confer certain rights upon the citizens or subjects of one of the nations residing in the territorial limits of the other." In short, the Court properly noted the critical distinction between treaty provisions that create individual rights and those that merely regulate relations between sovereign states. Both the Government and the Court of Appeals below have failed to acknowledge this distinction.

The question of whether a treaty creates primary rights for individuals is a question of treaty interpretation, a matter which first entails recourse to the plain meaning of the text. *See Geofroy v. Riggs*, 133 U.S. 258, 271 (1890) (when interpreting treaties, "words are to be taken in their ordinary meaning, as understood in the public law of nations, and not in any artificial or special sense impressed upon them by local law").[3] Only where the treaty language is uncertain may

---

[2] *See* Amicus Brief on behalf of Law Professors in Support of Petitioner Hamdan submitted by Professors David Sloss and Carlos Vazquez.

[3] *See also LaGrand* (Germany v. United States), 2001 I.C.J. (June 27) ¶¶ 75-77, *available at* www.icj-cij.org (rejecting U.S. government's argument that the Vienna Convention on Consular Relations, *opened for signature* Apr. 24, 1961, 21 U.S.T. 77, 596 U.N.T.S. 261 (VCCR), does not create individual rights, and relying on plain meaning of the treaty

- 5 -

the courts resort to other indicators of the drafters' intent. *See Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976) (a court looks to "the intent of the signatory parties as manifested by the language of the instrument, and, if the language is uncertain, it must then look to the circumstances surrounding its execution").

The Court of Appeals erred in concluding that "nothing in the [revised 1949 Geneva Conventions] altered the method by which a nation would enforce compliance" with the Geneva Conventions and that the 1949 treaty did not provide for judicial enforcement. On the contrary, the text and drafting history of the 1949 Geneva Conventions show that the Geneva Conventions were drafted specifically to afford judicially enforceable individual rights to detainees in military custody. The 1949 drafters included these rights to remedy the egregious failure of diplomatic mechanisms to impose compliance with the protections of the 1929 Geneva Conventions during World War II.

The language histories of the Third and Fourth Geneva Conventions[4] establishes that they were intended to codify and delineate numerous primary individual rights, and that it would be "inconsistent with both the language and the spirit of the treaty and with our professed support of its purpose to find that the rights established therein cannot be enforced by the individual POW in a court of law." *United States v. Noriega*, 808 F. Supp. 791, 799 (S.D. Fla. 1992); *Restatement (Third) of the Foreign Relations Law of the United States*, § 111, Rpt.'s Note 5 (1987). This conclusion is

---

text to support holding that Article 36(1) of VCCR creates primary rights for individuals).

[4] Third Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 76 U.N.T.S. 135 (entered into force for the U.S., Feb. 2, 1956) ("Third Geneva Convention"); Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (entered into force for the U.S., Feb. 2, 1956) ("Fourth Geneva Convention").

- 6 -

unequivocally supported by evidence of the intent of the drafters, the intent of the Senate in ratifying the Conventions, and the purposes and objectives of the Conventions.

Both the Third and the Fourth Geneva Conventions contain numerous provisions that create individual rights. Under Third Geneva Convention, members of the armed forces of a State party to an international armed conflict and members of affiliated militias are entitled to prisoner of war (POW) status upon capture. One of the central protections provided by the Third Geneva Convention is a detainee's right to be treated as a POW unless and until his status or innocence can be determined by a "competent tribunal." *See* Third Geneva Convention, art. 5. The Third Geneva Convention also guarantees other basic individual rights, including the right to humane treatment, the right to protection from violence, intimidation, insults, public curiosity, and coercive interrogation tactics, *id.*, arts. 13, 17, 18, 19, due process rights if the detainee is subject to disciplinary or punitive sanctions, *id.*, arts. 99 – 108, the right to proper medical attention, *id.*, art. 15; the right not to be interned in unhealthy areas, *id.*, arts. 21 – 22, and the right to practice one's religion, *id.*, art. 34.

In addition, the Third Geneva Convention expressly guarantees prisoners of war who are charged with crimes specific fair trial rights, *id.*, arts. 84, 99, 103-07, 129, as well as the comprehensive right to be tried by the same courts, under the same procedures as those provided for military personnel of the detaining power, *id.*, art. 102, and the right of appeal. *Id.*, art. 106. Articles 84, 99, and 103 through 107, guarantee the right to an impartial tribunal, the right to be free from retroactive punishments, protection against coerced interrogation and the use of coerced confessions, the right to a speedy trial, the right to present an adequate defense, and the right of appeal in the same manner as for members of the armed forces of the detaining power. These fair trial guarantees are considered so essential that "willfully

- 7 -

depriving a prisoner of war of the rights of a fair and regular trial prescribed in th[e] [Third] Convention" is deemed a "grave breach" of the Convention, which makes the person responsible subject to criminal punishment.[5] Moreover, under Article 5, Hamdan must be treated as a POW until a competent tribunal determines otherwise.

Similarly, the Fourth Geneva Convention affords all "protected persons," including civilians subject to military detention—because they are suspected of criminal activity or of constituting a security threat—the rights to a "fair and regular trial," "the right to present evidence," "the right to be assisted by a qualified advocate or counsel of their own choice," and "the right of appeal." *See* Fourth Geneva Convention, arts. 5, 72-73, 78, 147. The category of "protected persons" under the Fourth Geneva Convention include all those "in the hands of a Party to the conflict" who are not prisoners of war or wounded or sick.[6] This includes not only civilian bystanders to the conflict, but even those individuals who may be "definitely suspected of or engaged in activities hostile to the security of the State."[7]

Finally, Common Article 3 of the Geneva Conventions delineates fundamental humanitarian protections applicable to all persons subject to the authority of a party to the conflict.[8] The Geneva Conventions explicitly refer to these protections afforded as "rights" and state that "[p]rotected persons may in no circumstances renounce in part or in entirety *the rights secured to them by the Present Convention*." Fourth Geneva Convention, art. 8 (emphasis added); *see also* Third Geneva Convention, art. 7 (stating the same with respect to prisoners of war). Article 7 of the Fourth Geneva Convention further states that nations cannot

---

[5] Third Geneva Convention, art. 130.

[6] Fourth Geneva Convention, art. 4.

[7] Fourth Geneva Convention, art. 5.

[8] *See* Brief for Amicus Curiae Association of the Bar of the City of New York in Support of Petitioner Hamdan.

- 8 -

"restrict the rights which [the Conventions] confer upon" protected persons. *See also* Third Geneva Convention, art. 6. It is evident from the plain meaning of these provisions that the Geneva Conventions were intended to give rise to individual rights and not merely to regulate relations between States.

Moreover, the official commentary on the Geneva Conventions written by the International Committee of the Red Cross ("ICRC") makes clear that the 1949 Geneva Conventions were written "first and foremost to protect individuals, and not to serve State interests."[9] The Government's reliance on the 1929 Conventions to prove that the current Conventions are not judicially enforceable is therefore entirely misplaced.

The drafters of the Geneva Conventions were well aware that diplomatic measures contained in the 1929 Conventions had failed badly during wartime. *See, e.g.*, Jean de Pruex, *International Committee of the Red Cross: Commentary to the Convention (III) Relative to the Treatment of Prisoners of War* 631-32 (1960) ["*ICRC Commentary III*"] (analyzing the ineffectiveness of the diplomatic "enquiry" procedure set forth in Article 30 of the 1929 Third Geneva Convention for remedying "any alleged violation of the Convention").[10] The failure of these measures highlighted the need for rules directly enforceable by individuals.

It was in this context that the drafters adopted the unanimous recommendations of the Red Cross Societies "to

---

[9] Oscar Uhler, *et al.*, *International Committee of the Red Cross: Commentary to the Convention (IV) Relative to the Protections of Civilian Persons in Time of War* 21 (1958) ("*ICRC Commentary IV*") (referring to the provisions of all four Conventions).

[10] A. Hammarskjold, *Revision of Article 30 of the Geneva Convention*, *in* International Committee of the Red Cross, *Report on Interpretation, Revision and Extension of the Geneva Convention of July 27, 1929* at 83, 91 (1938).

- 9 -

confer upon the rights recognized by the Conventions a personal and intangible character allowing the beneficiaries to claim them irrespective of the attitude adopted by their home country."[11] Thus, under the 1949 Geneva Conventions protected persons "may even, either personally or through their prisoners' representative . . . put their claim directly to the detaining authorities" because "[t]his is the practical application of the concept of rights which the individual may invoke, independently of the State."[12] The provisions allow protected persons to "claim the protection of the Convention, not as a favour, but as a right, and in case of violation, it enables them to employ any procedure available, however, rudimentary, to demand respect for the Convention's terms."[13] The drafters recognized that "[f]rom the practical standpoint . . . to assert that a person has a right is to say that he possesses ways and means of having that right respected."[14]

As a result, the 1949 Geneva Conventions sought to ensure that protected persons could use whatever means available, including domestic judicial remedies, to protect their rights. The drafters explicitly contemplated proceedings in domestic courts: "It should be possible in States which are parties to the Convention . . . for the rules of the Convention . . . to be evoked before an appropriate national court by the protected person who has suffered the violation." *ICRC Commentary I*, at 84; *see ICRC Commentary III*, at 92 (protected persons may bring legal actions "in those countries at least in which individual rights may be maintained before the courts"); *see also ICRC Commentary IV*, at 79 (same).

---

[11] *ICRC Commentary III*, at 91; *ICRC Commentary IV*, at 77-78.

[12] Jean Pictet, *et al.*, *International Committee of the Red Cross: Commentary to the Convention (I) Relative to the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field* 84 (1952) (*ICRC Commentary I*); *see also ICRC Commentary III*, at 91-92; *ICRC Commentary IV*, at 78-79.

[13] *ICRC Commentary I*, at 84; *see also ICRC Commentary IV*, at 79.

[14] *ICRC Commentary IV*, at 78; *see also ICRC Commentary III*, at 91-92.

- 10 -

In light of the failures of the 1929 Geneva Conventions, the drafters of the 1949 Conventions deliberately crafted key provisions to confirm the existence of individual rights.[15] Accordingly, persons detained by enemy forces during an armed conflict have individual rights and protections under the Geneva Conventions which they may seek to vindicate by means of judicial enforcement.[16]

> **2.** **_The Geneva Conventions' individual rights are enforceable under the Supremacy Clause and by means of the Writ of Habeas Corpus_**

Under the Supremacy Clause, "all Treaties made . . . under the Authority of the United States" share with the Constitution and federal statutes the status of "supreme Law of the Land." U.S. Const., art. VI, cl. 2; _see Edye v. Robertson_, 112 U.S. 580, 598-99 (1884) ("A treaty . . . is a law of the land as an act of congress is."); _see also El Al Israel Airlines, Ltd. v. Tseng_, 525 U.S. 155, 167 (1999); _Zicherman v. Korean Airlines_, 516 U.S. 217, 226 (1996). Given that the Geneva Conventions have the status of supreme federal law, and they create individual rights under international law, it necessarily follows that the Geneva Conventions create individual rights under domestic law. _See United States v. Schooner Peggy_, 5 U.S. 103, 110 (1801) ("[W]here a treaty is the law of the land, and as such affects the rights of the parties litigating in court, that treaty as much

---

[15] _ICRC Commentary III_, at 91; _ICRC Commentary IV_, at 77.

[16] _Amici_ note that implementing legislation is unnecessary for the 1949 Geneva Conventions to create judicially enforceable individual rights. The Senate Foreign Relations Committee concluded, and the Executive branch concurred, that implementing legislation was not required for the Geneva Convention provisions at issue here to be enforceable in domestic courts. _See Geneva Conventions for the Protections of War Victims: Report of the Senate Comm. on Foreign Relations_, S. Rep. No. 9, 84th Cong. 1st Sess.. 30-31 (1955).

- 11 -

binds those rights and is as much to be regarded by the courts as an act of congress."). Indeed, the core meaning of the Supremacy Clause, as applied to treaties, is that it converts primary international rights and duties into primary domestic rights and duties, without the need for implementing legislation.[17] Under these principles, there can be no doubt that the primary individual rights delineated in the Third and Fourth Geneva Conventions are enforceable in the federal courts under the Supremacy Clause. *See, e.g., Padilla ex rel. Newman v. Bush*, 233 F. Supp. 2d 564, 590 (S.D.N.Y. 2002) (declaring that the Third Geneva Convention "under the Supremacy Clause has the force of domestic law").

In addition, the *habeas* statute, 28 U.S.C. § 2241, which is relied upon by Petitioner Hamdan and embodies the constitutional, statutory, and common law writs, also provides a vehicle for Petitioner's effort to enforce the rights granted him by the Geneva Conventions. The writ of *habeas corpus* provides the cause of action for Petitioner's claim and the international humanitarian law norms codified in the Geneva Conventions provide the rule of decision for the adjudication of a specific claim. *See United States v. Rauscher*, 119 U.S. 407, 431 (1886) ("This remedy is by a writ of error" and "the just effect and operation of the treaty upon the rights asserted by the prisoner would be there decided" or "a writ of habeas corpus from one of the federal judges or federal courts, issued on the ground that he is restrained of his liberty in violation of the constitution or a law or a treaty of the United States, will bring him before a federal tribunal, where the truth of that allegation can be inquired into."); *Schooner Peggy*, 5 U.S. (1 Cranch) at 110.

---

[17] *See* Derek Jinks & David Sloss, *Is the President Bound by the Geneva Conventions?*, 90 Cornell L. Rev. 97, 123-24 (2004); David Sloss, *Non-Self-Executing Treaties: Exposing a Constitutional Falacy*, 36 U.C. Davis L. Rev. 1, 46-48 (2002).

- 12 -

## C.    All Branches of the United States Military Have Consistently Recognized the Geneva Conventions as the Supreme Law of the Land

The Court of Appeals below ignored the long-standing and consistent recognition by the United States military that that the Geneva Conventions constitute binding United States law and that they are judicially enforceable by prisoners in United States military custody.[18] *See, e.g.*, Law of War Workshop Deskbook 85 (Brian J. Bill, ed., June 2000) (acknowledging that prisoners of war "have standing . . . to seek enforcement of their GPW rights"). The regulations promulgated by every branch of the armed forces treat the Geneva Conventions as binding law. *See, e.g.*, Army Regulation 190-8, § 1-1(b) (stating, in military regulations applicable to the Army, Navy, Air Force, Marines, and their Reserve components, that this regulation implements the Geneva Conventions, and that "[i]n the event of conflicts or discrepancies between this regulation and the Geneva Conventions, the provisions of the Geneva Conventions take precedence"); Dep't of the Army Field Manual No. 27-10, *The Law of Land Warfare*, ch. 3, §1 ¶71(d) (1956) (stating that "[p]ersons who have been determined by a competent tribunal not to be entitled to prisoner-of-war status may not be executed, imprisoned, or otherwise penalized without

---

[18] The Court of Appeals' reliance on *Johnson v. Eisentrager*, 339 U.S. 763 (1950), to support its conclusion that the drafters of the 1949 Conventions intended to bar domestic judicial remedies for treaty violations is misguided for two reasons. First, *Eisentrager* considered the 1929 Conventions, not the current treaty, and therefore did not speak to the intentions of the drafters of the 1949 Geneva Conventions. Second, even assuming that the 1929 Conventions did not create judicially enforceable rights—a point this brief does not address—it is clear that the relevant provisions of the 1949 Geneva Conventions do, in fact, create individually enforceable rights.

- 13 -

further judicial proceedings [in compliance with the Fourth Geneva Convention] to determine what acts they have committed and what penalty should be imposed therefore"). Thus, the various branches of the U.S. military have regarded the Geneva Conventions as directly binding on all military forces as a matter of domestic law.

Accordingly, the Geneva Conventions afford persons in the custody of enemy armed forces specific individual rights that are enforceable in U.S. court as supreme federal law.

## II.    CUSTOMARY INTERNATIONAL LAW AFFORDS DETAINEES JUDICIALLY ENFORCEABLE PROTECTIONS

### A.    Petitioner's Geneva Convention Claims Are Enforceable as Customary International Humanitarian Law

Both the detention and military commission systems established by the Executive to indefinitely imprison certain individuals and to try others being held as enemy combatants at Guantánamo violate the protections afforded military detainees by customary international humanitarian law, independent of protections under humanitarian law treaties.

International humanitarian law is comprised of the obligations of governments to individuals subject to their jurisdiction during wartime, and is intended to protect people who have not participated in the military hostilities and those who are no longer participating in them because of incapacitation or capture. These rules are intended to be observed not only by governments and their armed forces, but also by armed opposition groups and other parties

- 14 -

participating in the conflict.[19] International humanitarian law has been codified in a number of international treaties, with the four Geneva Conventions on the Protection of War Victims[20] and the two Additional Protocols[21] as the principal instruments. It can also be found, however, in the universally acknowledged body of customary international law—the norms reflecting the actual practices of nations, developed over time, and accepted by them as binding legal rules.[22] *See United States v. Paquete Habana*, 175 U.S. 677, 711 (1903).

It is widely accepted that the existence of a rule of customary international law requires the presence of two elements: State practice (*usus*), and the belief that such practice is required or prohibited as a matter of law depending on the nature of the rule (*opinio juris sive necessitates*).[23] Both the physical acts of States—such as battlefield behavior, use of certain weapon, and the treatment of different categories of persons—and their verbal acts—

---

[19] *See* International Committee of the Red Cross, *International Humanitarian Law, available at* http://www.icrc.org/Web/Eng/siteeng) .nsf/html/ihl (defining international humanitarian law).

[20] Each of the four Conventions prescribes rules defining the proper treatment of one category of "protected persons" – the sick and wounded on land; the sick, wounded, and shipwrecked at sea; prisoners of war; and civilians. The central idea of the Conventions is to ensure compliance with a minimum standard for the treatment of persons subject to the authority of the enemy.

[21] Protocol [No. I] Additional to the Geneva Conventions of 12 August 1949 relating to the Protection of Victims of International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 3-434 (Protocol I); Protocol [No. II] Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609-699 (Protocol II).

[22] Restatement (Third) Foreign Relations Law § 102 (2) (1987).

[23] *See Continental Shelf* (*Libyan Arab Jamhiriya v. Malta*), 1985 I.C.J. 13, 29-30 (June 3); *see also* Jean-Marie Henckaerts, *Study on Customary International Humanitarian Law: A Contribution to the Understanding and Respect for the Rule of Law in Armed Conflict,* 87 Int'l Rev. of the Red Cross 1, 4 (2005) (hereinafter "*Study on Customary International Humanitarian Law*").

- 15 -

such as military manuals, instructions to armed forces, national legislation and case law, diplomatic protests, pleadings and statements before international fora, and government positions on resolutions adopted by international organizations—constitute practice that contributes to the creation of customary international law.[24]  The requirement of *opinio juris* in establishing the existence of a rule of customary international law "refers to the legal conviction that a particular practice is carried out 'as of right.'"[25]

In addition, while treaties may codify pre-existing customary international law, they may also lay the foundation for the development of new customs based on the norms contained in those treaties.  The International Court of Justice (ICJ) recognized that the drafting of treaty norms focuses world legal opinion and has an undeniable influence on the subsequent behavior of States in the *Continental Shelf* case, noting that "multilateral conventions may have an important role to play in recording and defining rules derived from custom, or indeed in developing them."  *Continental Shelf*), 1985 I.C.J. at 29-30.  In fact, the ICJ has made clear that widespread ratification of a treaty and the consistent practice of States affected by it can provide sufficient evidence that treaty norms have become part of customary international law.  *See North Sea Continental Shelf*, 1969 I.C.J. 13, 42 ("[I]t might be that . . . a very widespread and representative participation in [a] convention might suffice of itself, provided it included that of States whose interests were specially affected.").

The laws of war, codified in the Geneva Conventions and their two Protocols, are among the norms of customary international law most well-established through State practice and most widely recognized as binding on all nations whether or not they are party to a specific international

---

[24] *See Study on Customary International Humanitarian Law*, *supra*, at 87.
[25] *Id.* at 7.

- 16 -

agreement.[26] The nature of the 1949 Geneva Conventions as the embodiment of customary international law, the worldwide ratification of the Conventions, and the consistent State practice acknowledging and following the Conventions, establish that the rules codified in them are properly deemed customary international law norms.

The 1949 Geneva Conventions were constructed from the protections adopted in previous conventions,[27] operating as refinements of those protections, and thus were based upon many years of State practice.[28]

---

[26] *See, e.g., Report of the Secretary-General Pursuant to Paragraph 2 of the Security Council Resolution 808,* ¶35, *delivered to the Security Council,* U.N. Doc. S/25704 (May 3, 1993) (adopted by the Security Council, S.C. Res. 827 (May 25, 1993)) (stating that the basic international agreements detailing the laws of war have "beyond a doubt become part of customary international law"); Theodor Meron, *The Geneva Conventions as Customary Law,* 81 Am. J. Int'l L. 348 (1987).

[27] *See* Convention for the Amelioration of the Condition of the Wounded in Armies in the Field, Aug. 22, 1864, 22 Stat. 940, *reprinted in* Dietrich Schindler & Jiri Toman, *The Laws of Armed Conflict* 365 (1988); Convention [No. III] for the Adaptation of Maritime Warfare of the Principles of the Geneva Convention of 22 August 1864, July 29, 1899, 32 Stat. 1827, 1 Bevans 263, *reprinted in* Schindler & Toman, *supra,* at 385; Convention Relative to the Treatment of Prisoners of War, July 27, 1929, 47 Stat. 2021, 118 U.N.T.S. 343; 1907 Hague Convention (IV) Respecting the Laws and Customs of War on Land and its Annex, Regulation Concerning the Laws and Customs of War on Land, Pmbl., 36 Stat. 2277, 205 Consol. T.S. 277, arts. 25-26.

[28] *See, e.g., International Military for the Trial German Major War Criminals,* 1946, CMD, 6964, Misc. No. 12, at 65 (Nuremberg, 1946) (*IMT*) (holding that the Hague Regulations of 1907 had, by 1939, been "recognized by all civilized nations, and were regarded as being declaratory of the laws and customs of war"); *United States v. von Leeb,* 11 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 462 (1948) (endorsing the principle of *IMT* with respect to the 1929 Geneva Conventions and holding that the Conventions bound Nazi Germany with regard to its invasion of the Soviet Union even though the Soviet Union was not a party to them and the Conventions had been adopted only twelve years prior); *Military and Paramilitary Activities in and against Nicaragua*

- 17 -

Under the Geneva Conventions, every person seized in the zone of military hostilities "must have some status under international law: he is either a prisoner of war and, as such, covered by the Third Convention, [or] a civilian covered by the Fourth Convention . . . . *There is no intermediate status; nobody in enemy hands can be outside the law.*"[29]  Every individual captured amidst the conflict between the United States and Afghanistan is therefore entitled to the protections of the Geneva Conventions and thus also the customary international humanitarian law principles they reflect.[30]

The Third Geneva Convention confers upon soldiers substantive and procedural protections designed to curb a detaining power's basest impulses.  Under the Third Geneva Convention, members of the armed forces of a state party to an international armed conflict or members of affiliated militias are entitled to POW status upon capture.  While one of the central protections provided under this Convention is a detainee's right to be treated as a POW unless and until his status or innocence can be determined by a "competent tribunal,"[31] as noted above, the Third Geneva Convention also guarantees other basic dignities and fundamental

---

(Nicar. v. United States), Merits, 1986 I.C.J. Rep. 14 (Judgment of June 27) (endorsing the *IMT* principle with regard to the 1949 Conventions); *see also International Military Tribunal for the Far East* (*In re Hirota*, 15 Ann. Dig. 356, 366) (viewing Hague Conventions No. IV "as good evidence of the customary law of nations, to be considered by the Tribunal along with all other available evidence in determining the customary law" and holding that "acts of inhumanity to prisoners which are forbidden by the customary international law of nations as well as by conventions are to be prevented by the Governments having responsibility for the prisoners")).

[29] *ICRC Commentary IV* at 51 (emphasis added); Fourth Geneva Convention, arts. 4(1), 4(3); Additional Protocol I, art. 50; *see also Law of Land Warfare* ¶ 73.

[30] Knut Doermann, *The Legal Status of "Unlawful/Unprivileged Combatants,"* 849 Int'l Rev. of the Red Cross 45 (2003).

[31] *See* Third Geneva Convention, art. 5.

- 18 -

procedural rights. Of particular import to this case, the Third Geneva Convention expressly guarantees all persons caught amidst an international armed conflict the right to humane treatment including protection from torture and coercive interrogation tactics[32] and due process rights if the person may be subject to disciplinary or punitive sanctions,[33] and provides POWs charged with crimes extensive fair trial rights.[34] The Fourth Geneva Convention provides similar protective guarantees, as well as similar fair trial protections, to all "protected persons," who may be sentenced only by "competent courts" after a "regular trial."[35]

Common Article 3 of the Geneva Conventions further delineates the humanitarian law protections applicable to all persons subject to the authority of a party to the conflict,[36] and is widely regarded as establishing the most fundamental guarantees of humane treatment for all persons in all conflicts.[37] Common Article 3 prohibits murder, summary

[32] *Id.*, arts. 13, 17, 18, & 19.

[33] *Id.*, arts. 99-108.

[34] Third Geneva Convention, arts. 99, 103-107.

[35] Fourth Geneva Convention, arts. 4, 71-76, 126. *See also* Point I. B, *supra.*

[36] *See* First Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3(1) (First Geneva Convention); Second Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, art. 3(1) (Second Geneva Convention); Third Geneva Convention, art. 3(1); Fourth Geneva Convention, art. 3(1).

[37] *See, e.g., ICRC Commentary IV,* at 36 (stating that Common Article 3 should be applied "as widely as possible"); Lt. Col. Paul E. Kantwill and Maj. Sean Watts, *Hostile Protected Persons or 'Extra-Conventional Persons:' How Unlawful Combatants in the War on Terrorism Posed Extraordinary Challenges for Military Attorneys and Commanders,* 28 Fordham L. Rev. 681 (2005) (hereinafter "*Hostile Protected Persons*"); Int'l & Operational Law Dep't, U.S. Army Judge Advocate General's Legal Center & School, Dep't of the Army, *Law of War Handbook* 144 (2004) (observing that Common Article 3 "serves as a 'minimum yardstick of protection in all conflicts, not just internal armed conflicts" and quoting *Nicaragua v. U.S.,* 1986 I.C.J. Rep. 14, ¶ 218, 25 I.L.M.

- 19 -

execution, torture, and "humiliating and degrading treatment," and provides that individuals detained by enemy forces may only be sentenced pursuant to court proceedings which "afford[] all the judicial guarantees which are recognized as indispensable by civilized peoples."[38] Finally, Article 75 of Protocol I provides more detailed fair trial protections, and is accepted by the United States as customary international humanitarian law.[39]

Moreover, the binding nature of these norms has been established by the writings of international humanitarian law scholars as well as judicial decisions recognizing and enforcing these norms.[40] In the *Nicaragua* case, *Nicaragua v. United States*), Merits, 1986 I.C.J. Rep. 14 (June 27), for

___

1023); Int'l & Operational Law Dep't, U.S. Army Judge Advocate General's Legal Center & School, Dep't of the Army, *53d Judge Advocate Graduate Course Int'l Law Deskbook* I-15 (2004) (citing *Prosecutor v. Dusko Tadic*, Case No. IT-94-1-AR72, 1995 Int'l Crim. Trib. for Former Yugoslavia, reprinted in 35 I.L.M. 32). The International Court of Justice has stated that "[t]here is no doubt that, in the event of international armed conflicts . . . [the rules articulated in Common Article 3] . . . constitute a minimum yardstick, in addition to the more elaborate rules which are also to apply to international conflicts; and they are rules which, in the Court's opinion, reflect what the Court in 1949 called 'elementary considerations of humanity.'" *Nicaragua v. United States*, 1986 I.C.J. Rep. 14, 113-14 (citation omitted).

[38] First Geneva Convention, art. 3(1); Second Geneva Convention, art. 3(1); Third Geneva Convention, art. 3(1); Fourth Geneva Convention, art. 3(1).

[39] *See* Michael J. Matheson, *Remarks on The United States Position on the Relation of Customary International Law to the 1977 Protocols Additional to the 1949 Geneva Conventions, The Sixth Annual American Red-Cross Washington College of Law Conference on International Humanitarian Law: A Workshop on Customary International Law and the 1977 Protocols Additional to the 1949 Geneva Conventions*, 2 Am. U.J. Int'l L. & Pol'y. 419 , 427-428 (1987).

[40] The law of nations may be ascertained by consulting the works of jurists with expertise in international law and judicial decisions. *See United States v. Smith*, 18 U.S. (5 Wheat) 153, 160-61 (1820); *see also The Paquete Habana*, 175 U.S. at 700; *Doe v. Islamic Salvation Front*, 993 F. Supp. 3, 7 (D.D.C. 1998).

- 20 -

example, the ICJ expressly found that the conduct of the United States could be judged according to fundamental principles of customary international humanitarian law and that the Geneva Conventions represent "in some respects a development, and in other respects no more than the expression," of these fundamental principles. 1986 I.C.J. Rep. at 113, ¶ 218. In support of its binding holding that certain provisions of the Geneva Conventions are declaratory of customary international law, the ICJ referred to the denunciation provisions of the Geneva Conventions,[41] which emphasize that, by denouncing the Conventions, no state can derogate from its obligations under international humanitarian law.

According to the ICRC *Commentary*, a State that denounces one of the Geneva Conventions "would still be morally bound by the principles of that Convention, which are today the expression of valid international law in the sphere."[42]     Because the Geneva Conventions are, in substance, an expression of international humanitarian law as accepted by the nations of the world, the norms they articulate are binding on all States despite any denunciation by a particular State.

In sum, the protections and rights claimed by Petitioner Hamdan and codified in the Geneva Conventions are independently enforceable as customary international humanitarian law rules in the courts. These rules of international humanitarian law provide a binding and comprehensive framework for the treatment of individuals caught up in an international armed conflict.

---

[41] *See, e.g.*, Third Geneva Convention, art. 142.
[42] *ICRC Commentary III*, at 647.

- 21 -

**B.    Petitioner's Customary International Law Claims May Be Vindicated by Means of the Writ of *Habeas Corpus***

Customary international law claims, including those seeking to remedy violations of international humanitarian law, may be vindicated by way of *habeas corpus* because customary international law forms part of the "laws . . . of the United States" within the meaning of 28 U.S.C. §2241(c)(3). For more than a century, this Court has upheld the principle that our Nation's courts have the power to ascertain and enforce individual rights arising under customary international law. As the Court opined first in *The Paquete Habana*: "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. at 700. And just this past Term, the Court reaffirmed this principle in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732-39 (2004) (reviewing numerous sources to determine whether the detention at issue violated customary law before concluding that it did not), and *Hamdi v. Rumsfeld*, 542 U.S. 507, 520-21 (2004) (looking to customary international law and to Article 118 of the Third Geneva Convention to determine whether Hamdi's detention could continue past the cessation of hostilities). In fact, *Sosa* expressly addresses the issue of whether the Alien Tort Statute constitutes a grant of jurisdiction to the courts to interpret customary law: "The First Congress, which reflected the understanding of the framing generation and included some of the Framers, assumed that federal courts could properly identify some international norms as enforceable in the exercise of § 1350 jurisdiction." 542 U.S. at 730.

That the rules of customary international humanitarian law are enforceable specifically by means of the Great Writ is beyond question. For more than 150 years,

- 22 -

this Court has resolutely refused to limit the availability of the writ of *habeas corpus* as the vehicle by which executive detention may be challenged. From its historical underpinnings in English common law to this Court's most recent jurisprudence, the fundamental and incontrovertible understanding of the writ of *habeas corpus* is its purpose of protecting personal liberty by subjecting executive restraints on liberty to judicial scrutiny.[43] The Court has never wavered from this initial understanding of the writ's core purpose as empowering the judiciary to test the legality of executive detention. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807) (reading the Suspension Clause as requiring Congress to vest federal *habeas* jurisdiction in the courts, and concluding that Congress had supplied such jurisdiction in the First Judiciary Act of 1789 giving federal courts the power to grant writs on behalf of federal prisoners "for the purpose of an inquiry into the cause of commitment"); *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).[44]

From the outset, this Court recognized that the framers intended the writ to ensure that the safeguards against executive tyranny established in England were preserved here. *See INS v. St. Cyr*, 533 U.S. 289, 301-304 (2001).[45] Thus, from its earliest application in this country to the present day, the Great Writ has been the cardinal means by which persons have obtained swift judicial review of executive restraints on liberty. In every conceivable context, the courts have considered the legality of executive detention on *habeas* review, including: (i) challenges by non-citizens

---

[43] *E.g., Darnel's Case*, 3 How. St. Tr. 1-59 (K.B. 1627); *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *Parisi v. Davidson*, 405 U.S. 34 (1972); *Rasul v. Bush*, 542 U.S. 466 (2004).

[44] *See also Ex Parte Lange*, 18 Wall. 163 (1874); *Moore v. Dempsey*, 261 U.S. 86 (1923); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Brown v. Allen*, 344 U.S. 443 (1953).

[45] *See* Gerald L. Neuman, *The Habeas Suspension Clause After* INS v. St. Cyr, 33 Colum. Human Rights L. Rev. 555, 564 (2002).

- 23 -

in the immigration context, *see, e.g., Chew Heong v. U.S.*, 112 U.S. 536 (1884) (*habeas* challenge to exclusion order); *United States v. Jung Ah Lung*, 124 U.S. 621 (1888) (same); *Gegiow v. Uhl*, 239 U.S. 3 (1915) (same); *Delgadillo v. Carmichael*, 332 U.S. 388 (1947) (challenge to deportation order); (ii) challenges to induction into the military, *see, e.g., Parisi v. Davidson*, 405 U.S. 34 (1972); (iii) challenges by citizens to military detention domestically, *see Colepaugh v. Looney*, 235 F.2d 249 (10th Cir. 1956); and overseas, *see, e.g., Reid v. Covert*, 354 U.S. 1 (1957); *Burns v. Wilson*, 346 U.S. 137 (1953); and (iv) challenges to detention by enemy aliens, whether they were detained in the United States, *Ex Parte Quirin*, 317 U.S. 1 (1942), or in United States territories overseas, *In Re Yamashita*, 327 U.S. 1 (1948).

The cardinal humanitarian protections against torture and coercive interrogation tactics and the fair trial rights afforded military detainees by the Geneva Conventions—and invoked by Petitioner Hamdan in this case—represent the codification of customary international law principles extant at the time of the drafting of the 1949 Conventions. For these reasons, the rights and protections invoked by Petitioner Hamdan are enforceable as customary international humanitarian law through a writ of *habeas corpus*.

Specifically, the relevant substantive protections for individuals in military custody afforded by the Geneva Conventions embody customary international humanitarian law rules judicially enforceable by Petitioner Hamdan through a petition for writ of *habeas corpus* under 28 U.S.C. § 2241(c)(3) because they constitute "laws . . . of the United States," and enforceable under 28 U.S.C. § 2241(c) (1) because they provide cognizable grounds to challenge the legality of his detention under the common law writ.

Thus, with regard to the conditions of Petitioner Hamdan's internment at Guantánamo, there can be no doubt that Petitioner may seek to remedy the Government's

- 24 -

violation of the clear customary international law prohibition
against prolonged arbitrary detention, which is set forth in §
702 of the Restatement (Third) Foreign Relations Law[46] and
which this Court implicitly recognized last Term in *Sosa,* 542
U.S. at 737,[47] Nor can the Government contest Hamdan's
effort to compel its compliance with the customary
international law prohibition against torture.[48] *See, e.g.,
Sosa,* 542 U.S. at 732 (quoting *Filartiga v. Irala-Pena,* 630
F.2d 876, 890 (2d Cir. 1979) ("for purposes of civil liability,
the torturer has become – like the pirate and slave trader
before him – *hostis humani generis,* an enemy of all
mankind.")).

Finally, the Government cannot dispute that
customary international law has long recognized the
fundamental right to a fair trial.[49] *See, e.g.,* Precautionary
Measures, 12 Mar. 2002, Inter-Amer. Comm. on Human
Rights (stating that "[a]ccording to international norms
applicable in peacetime and wartime, such as those reflected
in Article 5 of the Third Geneva Convention and Article
XVIII of the American Declaration of the Rights and Duties
of Man, a competent court or tribunal, as opposed to a
political authority, must be charged with ensuring respect for

---

[46] *See* Restatement (Third) Foreign Relations Law, § 702 (declaring that a
State violates customary international law if "as a matter of state policy, it
practices . . . (e) arbitrary detention").
[47] *See* Rule 99, Jean-Marie Henckaerts & Louise Doswald-Beck,
*Customary International Humanitarian Law,* 2 vols. (2005) [hereinafter
*Customary International Humanitarian Law*] (stating that "[a]rbitrary
deprivation of liberty is prohibited"). This exhaustive ten-year study of
universally-accepted international humanitarian law principles and
prohibitions by the International Committee of the Red Cross, catalogued
and codified customary international humanitarian law norms.
[48] *See* Rule 90, *Customary International Humanitarian Law, supra,*
(stating that "[t]orture, cruel or inhuman treatment and outrages on
personal dignity . . . are prohibited.").
[49] *See* Rule 100, *Customary International Humanitarian Law, supra*
(stating that "[n]o one may be convicted or sentenced, except pursuant to
a fair trial affording all essential judicial guarantees").

- 25 -

the legal status and rights of persons falling under the authority and control of a state). Nor can it contend that the use of coerced confessions would not violate that right and other norms of customary international law.[50] *See* Third Geneva Convention, art. 99 (stating that "[n]o moral or physical coercion may be exerted on a prisoner of war in order to induce him to admit himself guilty of the act of which he is accused."); Protocol I, art. 75 (forbidding "torture of all kinds, whether physical or mental."); Rule 100, *Customary International Humanitarian Law*, (identifying that coerced confessions violate international customary international law).

Accordingly, the rights and protections codified in the Geneva Conventions delineate important humanitarian guarantees, including the right to humane treatment and a fair trial, which govern the treatment of all detainees in military custody, and which are judicially enforceable under the *habeas* statute as customary international law.

---

[50] *See, e.g.,* Rule 144, *Customary International Humanitarian Law*, *supra.*

- 26 -

## CONCLUSION

The Court should reverse the judgment below and remand to the Court of Appeals for further proceedings.

Respectfully submitted,

KATHERINE NEWELL
   BIERMAN
HUMAN RIGHTS WATCH
350 Fifth Avenue
New York, NY 10118
(212) 290-4700

BARBARA J. OLSHANSKY
   *Counsel of Record*
WILLIAM H. GOODMAN
GITANJALI S. GUTIERREZ
TINA M. FOSTER
CENTER FOR CONSTITUTIONAL
   RIGHTS
666 Broadway
New York, NY  10012
(212) 614-6439

January 6, 2006

*Counsel for Amici Curiae*

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ACHRAF SALIM ABDESSALAM, | ) |
| Petitioner, | ) |
| v. | ) Civil Action No. 06-1761 (ESH) |
| GEORGE W. BUSH, *et al.*, | ) |
| Respondents. | ) |

## ORDER

Petitioner Achraf Salim Abdessalam is a Libyan citizen classified as an enemy combatant and detained by the United States in Guantanamo Bay, Cuba. (Pet. at 2). Petitioner filed a petition for writ of *habeas corpus* on October 16, 2006. Before the Court is petitioner's motion for entry of the Amended Protective Order and Procedures for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, Cuba, issued by Judge Joyce Hens Green in *In re Guantanamo Detainee Cases*, No. 02-cv-0299, *et al.* Because entry of the relevant orders is essential to petitioners' representation, *cf. Aminullah v. Bush*, No. 05-cv-1237 (D.D.C. Aug. 10, 2006) (post-DTA order requiring the production of a factual return as essential to petitioner's "effective representation" in pending proceedings), the Court has uniformly entered the orders in these cases, *see*, *e.g.*, *Kurnaz v. Bush*, No. 04-cv-1135 (D.D.C. Apr. 12, 2005).

Respondents oppose petitioner's motion, asserting that the Detainee Treatment Act of 2005, Pub. L. No. 109-148, tit. X, 119 Stat. 2680, ("DTA") and the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA") divest this Court of jurisdiction over *habeas* petitions filed after the enactment of the DTA on December 30, 2005. In two pending cases, *Boumediene v. Bush* and *In re Guantanamo Detainee Cases*, the D.C. Circuit will address

the effect of the MCA and DTA on district court jurisdiction over cases such as this one.

Briefing was complete in these cases on November 20, 2006, but the D.C. Circuit has not yet

issued an opinion. The law in this circuit regarding the effect of the jurisdiction-stripping

provisions of the MCA and DTA therefore remains unclear. "Despite the lack of finality

regarding the issues on appeal, however, it is hardly sensible to withhold or frustrate something

that no one doubts is petitioner's right – a meaningful communication with counsel regarding the

factual basis of petitioner's detention. Allowing petitioners to meet with their lawyers is not the

type of interim relief that even remotely risks infringing on the Court of Appeals' possible

jurisdiction." *Feghoul v. Bush*, 2006 WL 3096856, at *1 (D.D.C. Oct. 31, 2006) (internal

quotations and punctuation omitted) (quoting *Said v. Bush*, Civil Action No. 05-2384, slip. op. at

10 (D.D.C. May 23, 2006)).

Accordingly, it is hereby

**ORDERED** that petitioner's motion for entry of a protective order [#5] is **GRANTED**;

and it is

**FURTHER ORDERED** that the Court **ENTERS** by way of reference the November 8,

2004 Amended Protective Order and Procedures for Counsel Access to Detainees at the United

States Naval Base in Guantanamo Bay, Cuba; the November 10, 2004 Order Addressing

Designation Procedures for "Protected Information;" and the December 13, 2004 Order

Supplementing and Amending Filing Procedures Contained in November 8, 2004 Amended

Protective Order, each issued by Judge Joyce Hens Green in *In re Guantanamo Bay Detainee*

-2-

*Cases*, No. 02-cv-0299, *et al.*

   **SO ORDERED**.

                                        _____/s/_____
                                        ELLEN SEGAL HUVELLE
                                        United States District Judge

Date:   December 22, 2006